IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COMISIÓN EJECUTIVA HIDROELÉCTRICA DEL RÍO LEMPA,<br><br>Plaintiff,<br><br>v.<br><br>NEJAPA POWER COMPANY, L.L.C.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)     Misc. Action No. _____<br>)<br>)<br>)<br>)<br>) |

**APPLICATION FOR AN ORDER
GRANTING DISCOVERY FOR USE IN A
FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

I.     INTRODUCTION

La Comisión Ejecutiva Hidroeléctrica del Río Lempa ("CEL") respectfully moves for an expedited order pursuant to 28 U.S.C. § 1782 authorizing CEL to issue subpoenas pursuant to Fed. R. Civ. P. 45 directing Nejapa Power Company, L.L.C., also known as Nejapa Power Co., Nejapa Co., and NPC ("NPC"), to produce documents for use in a pending foreign arbitration and to produce an employee for deposition. The arbitration was filed by NPC against CEL, and is pending in Geneva, Switzerland ("Pending Arbitration").

The Pending Arbitration is governed by the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL Rules"). Salvadorian substantive law will apply to the dispute and procedural issues not specifically addressed by the UNCITRAL Rules will be governed by Swiss law.

II.     RELEVANT BACKGROUND OF PROCEEDINGS

The dispute in the Pending Arbitration arises out of two previous arbitrations between CEL and NPC. The first arbitration ("1999 Arbitration"), initiated by CEL on May 13,

1999, sought to terminate a Purchase Power Agreement ("PPA") between the parties. The Tribunal in the 1999 Arbitration confirmed in its award a settlement by the parties through which CEL had the right to terminate the PPA subject to certain conditions, including the payment to NPC of a $90 million cash award and and the execution of a Transmission Costs Agreement ("TCA") between CEL and NPC, pursuant to which CEL agreed to reimburse certain electricity transmission costs to NPC during the 5-year life of the TCA. The second arbitration ("2003 Arbitration"), filed by NPC on September 5, 2003, focused on the nature and scope of certain of CEL's reimbursement obligations to NPC under the TCA. The Tribunal in the 2003 Arbitration interpreted a provision of the TCA regarding CEL's obligation to reimburse NPC for a certain type of transmission costs.

On July 5, 2007, NPC notified CEL that it was filing a third arbitration -- the Pending Arbitration. As framed by NPC, the Pending Arbitration relates to certain of CEL's reimbursement obligations under the TCA and the need to maintain a Standby Letter of Credit. Thus, at issue in the Pending Arbitration is the meaning and scope of certain reimbursement obligations under the TCA and CEL's obligation to maintain a Standby Letter of Credit. Pursuant to Article 1431 of the Salvadorian Civil Code, the intent of the parties is paramount in interpreting the meaning and scope of TCA provisions at issue in the Pending Arbitration.[1]

---

[1] "If the intention of the contracting parties is clearly known, such intention shall take precedence over the literal meaning of the words." (English translation from the Spanish original) "Conocida claramente la intención de los contratantes, debe estarse a ella más que a lo literal de las palabras." El Salvador Civil Code, Article 1431.

III.    NPC IS LIKELY IN POSSESSION OF INFORMATION THAT
        IS RELEVANT TO THE PENDING ARBITRATION

NPC is believed to be in possession of evidence relevant to the Pending Arbitration. In the Pending Arbitration, NPC asks the Tribunal to construe and interpret CEL's reimbursement obligations pursuant to the TCA. *See* NPC's Notice of Arbitration, July 5, 2007 ("NPC further seeks a declaratory judgment regarding the meaning and effect of the Final Award and the TCA in respect of CEL's ongoing and future obligations to reimburse NPC for NPC's payment of all Taxes…as set out in the Final Award and the TCA…), attached as Exhibit 1. Here, discovery is sought from NPC which was involved in the negotiation of the very documents at issue in the Pending Arbitration.

NPC is a Delaware Limited Liability Corporation registered to do business in El Salvador. *See* Nejapa Power Company L.L.C.'s Statement of Defense (1999 Arbitration), October 11, 1999, at 6, attached as Exhibit 2. NPC is the owner of the Nejapa Power Plant and was the successor-in-interest to the PPA. *Id.* at 1. NPC constructed the Nejapa Power Plant and supplied energy to CEL under the PPA. *Id.* After the 1999 Arbitration, NPC executed the TCA and has now brought two arbitrations to enforce the TCA. *See* NPC's Notice of Arbitration, September 5, 2003, attached as Exhibit 3; NPC's Notice of Arbitration, July 5, 2007, attached as Exhibit 1.

Until 2007, NPC was an indirect subsidiary of El Paso Technology Company ("El Paso"), which was the manager of NPC and was the administrator and operator of the Nejapa Power Plant. *See* Second Declaration of Stephen M. Sutton (2003 Arbitration), December 17, 2004 at ¶¶ 2, 3, attached as Exhibit 4. Stephen Sutton, a long time El Paso employee, testified in the 2003 Arbitration that he executed the TCA on the behalf of NPC. *Id.* at ¶ 2.

3

NPC likely possesses documents that are relevant to the negotiation and signing of the TCA and the settlement of the 1999 Arbitration. Stephen Sutton testified in the 2003 Arbitration that NPC had been in frequent contact with El Paso regarding the negotiation and signing of the TCA.[2]   Contemporaneous documents from the same time frame confirm that

Q.    Did you have to communicate this information to El Paso?

A.    Yes.

Q.    Was this communication to be made in writing or orally?

A.    I really do not recall, but basically at the time we were just looking at a continuation of the provision of the change in law provision of the PPA. It is just the way it was so stated there.

Q.    Usually, before signing a contract, are you required, when you have to communicate your decision of stipulating a particular contract, and you are required to transmit this information to El Paso, how do you transmit the information? By writing or orally?

A.    Both.

Q.    Both. So you have a written document that indicates what were your expectations under the TCA, which was communicated to El Paso?

MR. BAKER: Objection: mischaracterises the answer.

A.    I cannot answer one way or the other. I do not know or recall the document in question that you are searching for. I know I had a lot of communications with Houston, obviously.

Q.    These communications were in writing sometimes?

A.    Sometimes, I am sure they were, sure.

Q.    Did you prepare any internal memoranda on the basis of --

A.    I do not believe so. I am not sure. To be quite honest, I do not really recall any specific approval for this particular TCA. One of the reasons was it was part of an arbitration and there was another group deeply involved, based in Houston.

4

(Continued . . .)

multiple El Paso employees were intensely involved with NPC in the negotiation of the TCA.[3]
In addition to Stephen Sutton, these employees include, without limitation, Nadeem Babar, Mark
Croak, and Basil Nichols, all of whom are believed to have participated in the settlement of the
1999 Arbitration that led to the negotiation and execution of the TCA. These employees appear
to have provided insight into NPC's economic estimates for the TCA, as well as their intentions
for signing the agreement. As the testimony and evidence in the 2003 Arbitration suggest,
representatives of NPC were heavily involved in the negotiation, approval, and execution of the
TCA; the intent and fulfillment of which is at the heart of the Pending Arbitration.

As noted above, under the applicable Salvadorian law, the intent of the parties at
the time of signing a contract -- here the TCA -- is critical to its interpretation. The discovery
sought relates to the parties' intent when negotiating and ultimately signing the TCA and its
amendment. Given the relevance of this information to the present dispute, an order requiring its
production is vital. Without the assistance of this Court, this important evidence may never be

A.    Yes.

Q.    Okay. But you recall having written communications on this subject with El Paso
to decide whether or not to -- you said yes?

( . . . continued)

2003 Arbitration, Hearing Testimony of Stephen M. Sutton, p. 137, l. 13 - p. 138, l. 21,
March 14, 2005, attached as Exhibit 5.

---

[3]    *See*, Summary of CEL-NPC Negotiations, Miami November 8-9, 2001, (confirming that
Nadeem Babar, Senior Managing Director, Structured Markets, El Paso; Mark Croak,
Managing Director, Structured Markets, El Paso; Steve Sutton, Manager, NPC and Basil
Nichols, in-house counsel, El Paso were present and active in the settlement negotiations
of the 1999 Arbitration), attached as Exhibit 6.

produced. *In re Application of Roz Trading Ltd.*, 469 F. Supp. 2d 1221, 1230 (N.D. Georgia 2006) (explaining that "discovery is particularly appropriate where…the practical availability of documents requested through other means of discovery is uncertain.").

IV. SECTION 1782 AUTHORIZES THE DISCOVERY SOUGHT BY CEL AND THE *INTEL* DISCRETIONARY FACTORS WEIGH IN FAVOR OF GRANTING THE DISCOVERY REQUESTED

28 U.S.C. § 1782, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals," provides for discovery of companies headquartered or doing business in the United States when that discovery may be used in a foreign or international proceeding.

The statute provides in relevant part:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal …

*See* 28 U.S.C. § 1782(a). The request must be made by an "interested person," as defined in the statute:

The order may be made … upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.

*Id.*

A. The Three Threshold Requirements of § 1782(a) Have Been Met

An applicant under § 1782(a) must establish that the target of the discovery request resides in the jurisdiction of the federal district court to whom the request is being made;

that the documents being requested are intended for use in a foreign proceeding; and, that the party making the request is an "interested person" as defined in the statute. *Essex v. Hanania*, 101 F3d 873 (2d Cir. 1996). CEL's request satisfies the three requirements under § 1782. Specifically, (i) NPC is incorporated and resides in Delaware; (ii) the documents and deposition requested from NPC are intended for use in a foreign proceeding; and (iii) CEL, the respondent in the Pending Arbitration, is an "interested person," as required by the statute. *See* 28 U.S.C. § 1782, *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (explaining that "No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782....").

> B. The Discretionary Factors to be Considered by the Court Weigh in Favor of Granting CEL's Application

In *Intel Corp. v. Advanced Micro Devices, Inc.*, the Supreme Court set forth four factors a court may consider in ruling on a § 1782(a) application (the "*Intel* Factors"). These factors are as follows: (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding," (ii) "the nature of the foreign tribunal," (iii) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits;" and (iv) whether the request is "unduly intrusive or burdensome." 542 U.S. at 264-5. The majority of the *Intel* Factors bear favorably on CEL's request.

> 1. The fact that NPC is a party to the foreign proceedings does not bar a court from granting discovery pursuant to 28 U.S.C. § 1782

Generally speaking, the first *Intel* factor favors discovery that is sought from parties who are not part of the foreign proceeding. That being said, post-*Intel* cases demonstrate that courts can and have granted § 1782 discovery when the party from whom discovery is

sought is also a party to the pending foreign proceeding. *See In re Application of Proctor & Gamble Co.*, 334 F. Supp. 2d 1112 (E.D. Wis. 2004) (granting an application for discovery pursuant to § 1782 when the party from whom discovery was sought was a participant in the foreign proceeding); *see also Infineon Techs. AG v. Green Power Techs. LTD.*, 247 F.R.D. 1, (D.D.C. 2005) (explaining that "the weight of the [*Intel*] factors [is] in favor of granting the discovery" and that despite the fact that the first *Intel* Factor did not favor the party seeking discovery, "the final three factors of the Intel test all counsel in favor of the discovery").

Here, NPC is a party to the Pending Arbitration. This does not, however, mean that NPC's Application should be denied. Rather, as the following sections demonstrate, because the remaining three *Intel* factors favor CEL's discovery requests, this Court should grant CEL's Application consistent with the Court's holdings in *In re Application of Proctor & Gamble Co.* and *Infineon Techs. AG.*

2. The nature of the foreign tribunal, the character of the foreign proceedings, and the Tribunal's receptivity to assistance favor granting CEL's application

Here, there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL. In fact, the evidence sought by CEL through its § 1782 petition would assist the Tribunal in its analysis of the case, and the Tribunal will retain the choice whether or not to accept the evidence and, if accepted, what weight it is to be given. Moreover, the UNCITRAL Arbitration Rules do not prohibit admission of discovery obtained pursuant to § 1782.

It is therefore likely that the Tribunal in the Pending Arbitration would accept and consider such discovery, and that the second *Intel* factor also weighs in favor of granting CEL's § 1782 application.

3.     CEL is not attempting to circumvent the laws and
rules that govern the Pending Arbitration

CEL seeks discovery to assist and supplement, not to circumvent, the proof-gathering rules for the Pending Arbitration. There is no applicable law or rule that CEL would circumvent through its use of the procedures outlined in § 1782. Moreover, courts have observed that "[g]ranting discovery under § 1782(a) would not undermine the policies of foreign governments in favor of low discovery costs because as a general rule it imposes no costs on such governments or their inhabitants [but] applies only to … litigants normally subject to American discovery procedures." *Proctor & Gamble*, 334 F. Supp. 2d at 1115-6 (granting discovery in aid of proceedings pending in various jurisdictions), *see also Intel*, 542 U.S. at 261-2 (noting that the drafters of § 1782 "were quite aware of the circumstance that civil law systems generally do not have American type pretrial discovery," but nonetheless holding that § 1782 contains no foreign discoverability requirement) (internal citation omitted).

As noted above, the UNCITRAL Arbitration Rules do not preclude the discovery being sought.  Because CEL is not seeking to circumvent the laws and rules that govern the Pending Arbitration, this *Intel* factor also weighs in favor of granting CEL's Application.

4.     The discovery requested is not unduly intrusive or
burdensome

The discovery requested is not unduly intrusive or burdensome.  The discovery requested is specific and narrow, as delineated in the "Document Requests" section of Appendix B and the deposition subpoena listed in Appendix C.  CEL seeks only documents and testimony from the relevant time frames and limited to a narrow set of issues.  To the extent possible, CEL has endeavored to provide the names of the relevant parties and their association with the requests so as to narrow and target the information it is seeking.  These requests are not overly

broad, nor do they compromise any of the discovery protections NPC has pursuant to the Federal Rules of Civil Procedure. Moreover, NPC will not be prejudiced by an order allowing CEL to issue subpoenas for production of documents and testimony, as they will be afforded all of the rights and protections of the Federal Rules of Civil Procedure in responding to the subpoenas. Accordingly, the final *Intel* factor weighs in favor of granting CEL's application.

V.    CONCLUSION

CEL requires the assistance of this Court to obtain relevant evidence from NPC, a limited liability corporation that resides in this jurisdiction. CEL is not asking this Court to determine the merits of the issues that will be addressed in the Pending Arbitration. CEL's application meets the statutory prerequisites for such assistance as set forth in 28 U.S.C. § 1782(a). Furthermore, the majority of the discretionary *Intel* Factors weigh in favor of granting CEL's application. For all of these reasons, CEL respectfully requests that this Court grant its § 1782 Application.

WHEREFORE, in order to obtain evidence that is relevant and pivotal to the transactions at issue in the Pending Arbitration, and where such evidence may not be otherwise available to the parties, CEL hereby seeks this Court's assistance pursuant to § 1782 in obtaining discovery from NPC and respectfully requests that the Court enter an order:

A.    granting CEL's application for discovery from NPC pursuant to 28 U.S.C. § 1782(a);

B.    authorizing CEL to issue the following to NPC pursuant to Fed. R. Civ. P. 45:

10

(1)    subpoenas for the production of documents compelling NPC to produce documents within 30 days following the service of each subpoena;

(2)    subpoenas for the depositions of NPC personnel listed in Appendix C; and

(3)    subpoenas for the production of additional documents and the taking of additional depositions as CEL may reasonably deem appropriate based upon review of documents produced and depositions given by NPC.

C.    authorizing the undersigned counsel to issue, sign, and serve such subpoenas upon NPC pursuant to Fed. R. Civ. P. 45.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Donald E. Reid (#1058)
Jeremy D. Eicher (#5093)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
dreid@mnat.com
*Attorneys for Plaintiff*

OF COUNSEL:

David M. Orta
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5667
David.Orta@aporter.com

11

July 3, 2008

2395671

12

# EXHIBIT 1

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 McKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

DIRECT DIAL:          (713) 651-7708
TELEPHONE:          (713) 651-5151
FACSIMILE:          (713) 651-5246

C. MARK BAKER
PARTNER
MBAKER@FULBRIGHT.COM

July 5, 2007

**BY HAND DELIVERY AND**
**BY FEDERAL EXPRESS INTERNATIONAL**

Comisión Ejecutiva Hidroeléctrica del Río Lempa
Seccion de Correspondencia
9a Calle Poniente No. 950, Centro de Gobierno
San Salvador, El Salvador
Atención: Dirección Ejecutiva and Centro de Operaciones del Sistema

Re:    Final Award dated March 21, 2002, and the Transmission Costs Agreement dated
       March 21, 2002, as amended by Amendment Number 1 dated July 1, 2002,
       between Nejapa Power Company, L.L.C. and Comisión Ejecutiva Hidroeléctrica
       del Río Lempa
       **Notice of Arbitration**

Dear Sirs:

       Nejapa Power Company, L.L.C. ("NPC") and Comisión Ejecutiva Hidroeléctrica del Río
Lempa ("CEL") are the parties to the above-referenced Transmission Costs Agreement ("TCA").
This letter is to advise CEL that a Dispute as defined in Section 7 of the TCA exists between the
parties. Therefore, pursuant to Section 7 of the TCA and Article 3 of the UNCITRAL
Arbitration Rules, NPC hereby demands arbitration of such Dispute.

       The parties to the arbitration shall be:

       Claimant:

              Nejapa Power Company, L.L.C.
              Stephen M. Sutton, President
              Cenergica, S.A. de C.V.
              Edificio FUSADES, Blvd. Santa Elena
              Antiguo Cuscatlan, La Libertad
              El Salvador, C.A.

HOUSTON • NEW YORK • WASHINGTON DC • AUSTIN • DALLAS • LOS ANGELES • MINNEAPOLIS • SAN ANTONIO • HONG KONG • LONDON • MUNICH

Comision Ejecutiva Hidroelectrica del Río Lempa
July 5, 2007
Page 2

Respondent:

Comisión Ejecutiva Hidroeléctrica del Río Lempa
Sección de Correspondencia
9a Calle Poniente No. 950, Centro de Gobierno
San Salvador, El Salvador
Atención: Dirección Ejecutiva and Centro de Operaciones del Sistema

Section 7 of the TCA sets out the parties' agreement to resolve all Disputes between them arising out of or relating to the TCA by arbitration in accordance with the current UNCITRAL Arbitration Rules. A copy of the text of the referenced sections of the Final Award and arbitration agreement is attached hereto as an appendix for your convenience.

The existing dispute concerns the existence of and performance by CEL of its obligation to reimburse to NPC all Taxes (as defined in the TCA, other than value added taxes) paid by NPC that are associated with the commitment to transmit or actual transmission in El Salvador of up to 127 MW of declared capacity, plus all electricity derived therefrom generated by the Nejapa Plant, up to a maximum of 1,112, 520 MWh in any year, annually for the five (5) year period defined in the Agreement. In particular, the dispute concerns CEL's obligations and performance with respect to reimbursement of all Taxes imposed upon and paid by NPC, as ordered in the arbitral Final Award between the parties dated March 21, 2002, in paragraphs 10 - 13 and under Section 3 of the TCA as amended by that Amendment Number 1 dated July 1, 2002 (the "TCA") and CEL's ongoing obligation to maintain a Standby Letter of Credit under Section 4 of the TCA.

NPC seeks monetary reimbursement in an amount equal to the tax liability imposed upon NPC over the life of the TCA and not otherwise recovered through execution of the Standby Letter of Credit. NPC further seeks a declaratory judgment regarding the meaning and effect of the Final Award and the TCA in respect of CEL's ongoing and future obligations to reimburse NPC for NPC's payment of all Taxes (other than value added taxes), as set out in the Final Award and the TCA, and in respect of CEL's ongoing obligations to maintain the Standby Letter of Credit as set out in the TCA. NPC also seeks an award of its costs.

The amount in controversy greatly exceeds US $1,000,000, exclusive of interest and attorneys' fees. Accordingly, the Dispute shall be heard and determined by a panel of three arbitrators, each of whom shall be independent and impartial. The seat of the arbitration shall be Geneva, Switzerland, and the arbitration shall be conducted in the English language.

Pursuant to Article 7 of the UNCITRAL Rules, NPC will advise CEL of the identity of the arbitrator to be appointed by NPC within 30 days after delivery of this demand and notice to CEL.

31351794-2

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 3

Very truly yours,

*C. Mark Baker*

C. Mark Baker

cc:     Nejapa Power Company, L.L.C.
        c/o El Paso Corporation
        1001 Louisiana Street
        Houston, Texas 77002
        Attention: Office of the Corporate Secretary

3135179-4.2

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 4

# TEXT OF ARBITRATION AGREEMENT
## TRANSMISSION COSTS AGREEMENT, SECTION 7

*Section 7. Dispute Resolution.*

(a) Any dispute, claim, or controversy arising out of or relating to this Agreement, or the performance, breach, validity, interpretation, application, or termination thereof ("Dispute") shall be finally resolved by arbitration in accordance with the then current United Nations Commission on International Trade Law Arbitration Rules ("UNCITRAL Rules"), and judgment on the award may be entered in any court having jurisdiction thereof.

(b) The seat of the arbitration shall be Geneva, Switzerland, and the language of the arbitration shall be English. The arbitrator(s) shall determine the matters at issue in the Dispute in accordance with the substantive law of the Republic of El Salvador.

(c) In the event that any party's claim or counterclaim equals or exceeds US $1,000,000 (one million US dollars), exclusive of interest or attorneys' fees, the Dispute shall be heard and determined by three arbitrators, each of whom shall be independent and impartial; otherwise, the Dispute shall be heard and determined by one arbitrator.

(d) The American Arbitration Association ("AAA") shall be the Appointing Authority, as defined in the UNCITRAL Rules, for purposes of this agreement.

(e) In the event that one arbitrator shall hear the Dispute, the parties shall attempt to agree upon a qualified individual to serve as arbitrator. If the parties are unable to so agree within thirty (30) days of the response to the notice of arbitration, then the arbitrator shall be selected and appointed in accordance with the UNCITRAL Rules.

(f) In the event that three arbitrators shall hear the Dispute, each party shall, within thirty (30) days after commencement of the arbitration, select one person to act as arbitrator. The two arbitrators so selected shall, within thirty (30) days of their appointment, select a third arbitrator who shall serve as the chairperson of the Arbitral Tribunal. The arbitrators selected shall be qualified by education, training, and experience to hear and determine the matters in the nature of the Dispute.

(g) If a party fails to appoint an arbitrator as provided herein, or if the arbitrators selected by the parties are unable or fail to agree upon a third arbitrator within thirty (30) days of their appointment, then that arbitrator shall be selected and appointed in accordance with the UNCITRAL Rules.

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 5

(h)  Should an arbitrator die, resign, refuse to act, or become incapable of performing his or her functions as an arbitrator, the Appointing Authority may declare a vacancy on the panel. The vacancy shall be filled by the method by which that arbitrator was originally appointed.

(i)  The arbitrator(s) shall act strictly as arbitrators-at-law and not as amiable compositeurs.

(j)  The arbitrator(s) shall be bound by and shall follow the then current International Bar Association standards of Ethics for International Arbitrators or such other-recognized code of ethics for arbitrators in international commercial disputes as may then be in effect and the parties agree should apply.

3135179̲4.2

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 6

## TEXT OF FINAL AWARD
### REIMBURSEMENT OF TAX PAYMENTS, SECTIONS 10-13

10. The Tribunal further awards and orders that the Awarded Consideration due hereunder shall be rendered without setoff, counterclaim, or other defense. All amounts awarded herein and to be paid by CEL shall be paid in United States Dollars and free and clear of and without withholding for or on account of any present or future Salvadoran Taxes, duties, assessments, or governmental charges of whatever nature (other than value added taxes), unless the withholding or deduction is then required by law. If any withholding or deduction for or on account of any present or future Taxes of the Republic of El Salvador or any political subdivision or taxing authority thereof shall be required in respect of any amounts to be paid by CEL pursuant to this Award, then CEL shall pay such Additional Amounts as may be necessary so that the net amount received by NPC (including Additional Amounts) after such withholding or deduction will not be less than the amount that NPC would have received if such Salvadoran Taxes had not been withheld or deducted. (The grossed up amount may be calculated by applying the formula 1/(1 – the applicable maximum tax rate, currently 25%).

11. The Arbitral Tribunal recognizes the possibility exists that the Government of El Salvador, the Legislative Assembly, or some other person or entity of or on behalf of the Republic of El Salvador may fail to recognize or take actions inconsistent with the terms of this Award. The Tribunal therefore awards and orders that, to the extent that, for whatever reason, the Government of El Salvador, the Legislative Assembly, or some other person or entity of or on behalf of the Republic of El Salvador imposes, now or in the future, any Taxes (other than value added taxes), levies, duties, fines, charges, fees, deductions, or withholding in any form whatsoever with respect to the Cash Award, the existence or performance of the Transmission Costs Agreement, the value of the services received under the Transmission Costs Agreement, or any other portion of the Awarded Consideration, then CEL shall reimburse NPC for all such amounts paid by NPC.

12. CEL shall indemnify and hold harmless NPC for the amount of any Salvadoran Taxes (other than value added taxes) levied or imposed upon and paid by NPC as mentioned in paragraph 11 above. If NPC is called upon to pay any such Taxes (other than value added taxes) to any Salvadoran governmental authority, NPC shall inform CEL of such imposition within ten (10) working days thereof, and CEL shall determine and advise NPC whether to contest the imposition of such Taxes. CEL

3135179.4.2

shall make such determination and advise NPC of its election in that regard as soon as reasonably possible and in no event later than ten (10) working days prior to the date upon which payment of such Tax amounts would otherwise be due. If CEL fails to timely advise NPC regarding whether to contest the imposition of such Taxes, CEL will be deemed to have elected that the imposition of such Taxes shall be contested. If CEL elects that such Taxes should be paid without contest, and NPC pays such Taxes, then CEL shall reimburse NPC for all such amounts as provided herein. If CEL elects that the imposition of such Taxes should be contested, then CEL and NPC shall cooperate in good faith to jointly determine in what manner and to what extent to conduct such Tax contest. If NPC is required by Salvadoran law to pay such Taxes despite the existence of a Tax contest, then NPC shall pay such Taxes and CEL shall reimburse NPC for all such amounts paid. If the Tax contest is successful and any such pre-paid Taxes are refunded to NPC, NPC shall pay such refunded amounts to CEL, up to the amount previously reimbursed by CEL to NPC. CEL shall indemnify and reimburse NPC for the amount of all costs and expenses, including attorneys' fees, expert witness fees, and costs of court, incurred by NPC in connection with any such Tax contest and any appeals therefrom. If, after such contest, NPC shall be deemed to owe such Salvadoran Taxes, NPC shall pay and CEL shall timely reimburse to NPC all such Taxes, and any fees, penalties, and interest thereon upon submission to CEL by NPC of proof of payment of same.

13. CEL shall reimburse NPC as required by paragraphs 11 and 12 above for all such amounts paid. If CEL fails to reimburse NPC any such amounts within the period of thirty (30) days from CEL's receipt of NPC's invoice of request for payment, then CEL shall incur and be required to pay interest at the then-current Citibank, New York prime rate on all such sums due and unpaid until such sums are paid.

J13517P4.2

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 8

## TEXT OF TAXES AGREEMENT
## TRANSMISSION COSTS AGREEMENT, SECTION 3

*Section 3. Taxes*

CEL shall be responsible for reimbursing NPC for all Taxes (other than value added taxes) paid by NPC that are incurred by NPC in connection with the commitment to transmit or actual transmission in El Salvador of up to 127 MW of declared capacity, plus all electricity derived therefrom generated by the Nejapa Plant, up to a maximum of 1,112,520 MWh in any year, annually for the five (5) year period defined in Section 5 ("Term") below or the value thereof. NPC shall be responsible for payment of the value added taxes, and NPC shall pay those taxes directly to the appropriate taxing authority. If NPC is called upon to pay any such taxes (other that [sic] value added taxes) to any Salvadoran governmental authority, NPC shall inform CEL of such imposition, within ten (10) working days. Notwithstanding what is stated in paragraph 12 of the Final Award CEL hereby irrevocably elects not to challenge any Tax imposition and will reimburse NPC the tax claimed or ultimately assessed by the relevant Salvadoran government authority (except value added taxes) within the period and under the conditions set forth in Section 4(d)(ii) below.

# SECTION 4. STANDBY LETTER OF CREDIT

(a)     CEL shall post an irrevocable Standby Letter of Credit in the favor of NPC in the amount of FIFTEEN MILLION FIVE HUNDRED THOUSAND AND ZERO 100's UNITED STATES DOLLARS (US$ 15,500,000.00) (as amended, the "Standby Letter of Credit") in part to guarantee CEL's performance under this Agreement and in part to indemnify NPC for the risk of the imposition of Tax liability by a Salvadoran government authority with respect to the Awarded Consideration. The Standby Letter of Credit shall be issued by a bank satisfactory to NPC and in form attached as Exhibit A hereto. CEL shall issue the Standby Letter of Credit prior to any termination of the Nejapa PPA, and shall maintain the Standby Letter of Credit, as it may be amended from time to time as set forth below, until the later to occur of (i) the expiration of this Agreement, (ii) the applicable statute of limitation on the imposition by any Salvadoran authority of Tax liability on the Cash Award has expired (three (3) years from the date NPC presents its income declaration for the fiscal year when it received payment of the Cash Award or such other limitation period as may be provided by Salvadoran law), and (iii) no claim for Taxes with respect to the Cash Award asserted by a Salvadoran government authority has been made within the term of this agreement or CEL has reimbursed NPC any outstanding taxes plus penalties, interest, attorney's fees and other costs imposed on the Cash Award (the date of satisfaction of clause (ii) being the "Cash Award Taxes Disposition Date"). The final date upon which CEL must continue to maintain the Standby Letter of Credit is referred to herein as the "Standby Letter of Credit Expiration Date."

(b)     From and after the Cash Award Taxes Disposition Date, and provided that CEL has reimbursed NPC any outstanding taxes plus penalties, interest, attorney's fees and other costs imposed on the Cash Award, the Standby Letter of Credit will be amended to reduce the amount thereof to SIX MILLION AND ZERO 100'S UNITED STATES DOLLARS (US$ 6,000,000.00).

(c)     The Standby Letter of Credit shall be continuously renewed until the Standby Letter of Credit Expiration Date, and may be drawn upon if replacement acceptable to NPC is not delivered to NPC at least fifteen (15) days prior the scheduled expiration of the Standby Letter of Credit then in effect. If NPC draws upon the Standby Letter of Credit, then CEL shall within a period of thirty (30) days (the "Restoration Deadline") restore the amount and duration of the Standby Letter of Credit required by this Agreement.     If NPC makes a draw due to failure of CEL to post a replacement Standby Letter of Credit (per Section 4 (d) (iii) below), or due to

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 10

failure to restore the amount and/or duration of the Standby Letter of Credit prior to the Restoration Deadline (per Section 4 (d) (iv) below), then NPC shall deposit the amount drawn in a bank account. NPC shall maintain the full amount so drawn in such bank account until the Standby Letter of Credit Expiration Date, except that NPC shall have the right to make withdrawals from such bank account in the amounts and at the times that NPC would have been authorized to draw under Sections 4(d)(i) and (ii) below, if the Standby Letter of Credit had remained properly in place. After the Standby Letter of Credit Expiration Date, NPC shall return to CEL the amount then remaining in the bank account. If, before the Standby Letter of Credit Expiration Date, CEL delivers a renewal Standby Letter of Credit satisfactory to NPC, or restores de amount of the Standby Letter of Credit (as relevant) after NPC has drawn under the Standby Letter of Credit, then NPC shall immediately return to CEL the amount drawn, less any amounts properly withdrawn in accordance with Section 4(d)(i) or (ii).

(d)    Upon the occurrence of any one or more of the following events (each, "Draw Event"), NPC shall have the right to draw under the Standby Letter of Credit:

(i)    In full accordance with requirements of Sections 2(a), 2(b) and 2(c) of this Transmission Cost Agreement, NPC has presented an invoice for Costs to CEL together with proof of payment by NPC, forty (40) days have expired since CEL's receipt of such invoice, and CEL has failed to pay the amount set forth in such invoice, plus interest owed on late payment in accordance with the terms of this Transmission Cost Agreement; or,

(ii)    NPC has presented an invoice together with a proof of payment to CEL for Taxes paid by NPC in connection with the Cash Award or this Transmission Costs Agreement, after forty (40) days have expired since CEL's receipt of such invoice, and CEL has failed to pay the amount set forth in such invoice, plus interest owed on late payment, in accordance with the terms of the Final Award; or

(iii)    CEL has failed to provide NPC with a replacement Standby Letter of Credit acceptable to NPC in the amount and under the conditions set forth in Section 4(a),(b) and (c) of this Transmission Cost Agreement not less than fifteen (15) days prior to scheduled expiration of the Standby Letter of Credit then in effect.

(iv)    During the period that CEL is required to restore the amount and/or duration of the Standby Letter of Credit pursuant to paragraph 4(c) of this Transmission Costs Agreement, CEL has,

Comision Ejecutiva Hidroelectrica del Rio Lempa
July 5, 2007
Page 11

prior to the Restoration Deadline, failed to restore the full amount and/or duration of the Standby Letter of Credit then in place to the amount and/or duration then required by this Transmission Costs Agreement.

(e)  Upon occurrence of any Draw Event set forth in paragraphs 4(d) (I or ii) above, NPC shall have the right of make a partial draw under the Standby Letter of Credit, in the amount of any unpaid invoices plus interest owed thereon. Upon occurrence of any Draw Event set forth in Section 4(f) (iii) and (iv) above, NPC shall have right to draw the full amount of the Standby Letter of Credit.

31351794.2

# EXHIBIT 2

**ARBITRATION**

Under the Rules of

**THE UNITED NATIONS COMMISSION
ON INTERNATIONAL TRADE LAW**

In The Matter Of

**COMISIÓN EJECUTIVA HIDROELÉCTRICA DEL RIO LEMPA**

Claimant

v.

**NEJAPA POWER COMPANY LLC**

Respondent

**NEJAPA POWER COMPANY LLC'S
STATEMENT OF DEFENSE, INCLUDING JURISDICTIONAL OBJECTION,
AND RESPONSE TO CLAIMANT'S STATEMENT OF CLAIM**

October 11, 1999

53:82449

# TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY ................................................. 1

II.  THE PARTIES ................................................................ 5
     A.   Nejapa Power Company LLC ............................................ 5
     B.   Comisión Ejecutiva Hidroeléctrica del Río Lempa .................... 6

III. FACTUAL BACKGROUND ........................................................ 7
     A.   The Genesis and Development of the Nejapa Project and the PPA ....... 7
          1.   The Need for the Nejapa Power Plant Project ................... 7
          2.   The Bidding and Negotiation Process .......................... 7
     B.   The Terms of the PPA ............................................... 8
          1.   The Pricing Structure ........................................ 8
          2.   Contract Termination Provisions .............................. 12
          3.   Change of Law Provision ...................................... 14
          4.   Government Approvals and Obligations ......................... 15
     C.   NPC's Involvement with the PPA ..................................... 17
          1.   NPC's Acquisition of the PPA Rights and Obligations .......... 18
     D.   Renegotiation, Expansion, and Operations ........................... 18
          1.   CEL Has Previously Asked for Changes in the Pricing Formula and
               for a Plant Expansion, and NPC Agreed ........................ 21
          2.   The Amended Pricing Structure ................................ 21
          3.   Additional Contract Modifications and Amendments ............. 21
          4.   NPC's Investment and Risks in the Project and the PPA ........ 24
          5.   The Negotiations CEL Now Calls a "Dispute" ................... 25
     E.   CEL's Role as an Entity of the Government of El Salvador ............ 26
          1.   CEL is Part and Parcel of the Government of El Salvador ....... 28
          2.   The Agreement Between CEL and NPC ............................ 28
     F.   CEL Shaped Privatization Policy and Process ........................ 31
     G.   CEL's Privatization Asset Sales and its Engineering of Its Financial
          Situation ......................................................... 32

IV.  JURISDICTION: NO DISPUTE SUBJECT TO ARBITRATION EXISTS ................... 37
     A.   The Arbitrators Can and Should Decide Jurisdiction as a Threshold Matter .. 38
     B.   The Arbitration Clause is Remarkably Narrow in Scope ............... 38
          1.   The Standard Broad Form Arbitration Clause ................... 39
          2.   The Arbitration Clause in the PPA is Deliberately Very Narrow . 39
     C.   No Dispute Exists .................................................. 42
     D.   The Alleged "Dispute" is Not Within the Scope of the Arbitration Agreement .. 43
     E.   The Arbitrators Do Not Have the Power to Grant the Relief Requested ..... 44
          ................................................................... 45

ii

V.   ARGUMENT: ARTICLE 994 DOES NOT AND CANNOT APPLY IN THIS
     CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
     A.   The Basic Principles of Commercial Contract Law in El Salvador: *Pacta Sunt
          Servanda* – Contracts Must Be Honored . . . . . . . . . . . . . . . . . . . . . . . . . . 48
     B.   The Exceptional Nature and Essential Elements of Article 994 . . . . . . . . . . . 48
     C.   The Express Terms of the PPA Confirm Article 994 Cannot Apply . . . . . . . 50
          1.   The Lack of a Renegotiation Clause . . . . . . . . . . . . . . . . . . . . . . . . . . 50
          2.   The Entireties Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
     D.   CEL Entirely Fails to Satisfy the Essential Elements of Article 994 . . . . . . . 51
          1.   Privatization Was Not a Supervening Event Beyond CEL's Control . . . 52
          2.   The Events Were Neither Unforeseeable Nor Extraordinary . . . . . . . . 52
               a.   Foreseeability and Diligence in the Marketplace . . . . . . . . . . . . 54
               b.   The Effects of the 1996 Electricity Law Were Neither
                    Unusual Nor Unforeseeable . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
          3.   The Other Events Upon Which CEL Relies Were Neither
               Unforeseeable Nor Extraordinary . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          4.   CEL's Performance of the PPA Does Not Impose an Excessive
               Hardship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
     E.   The Limited Application of Article 994 in El Salvador . . . . . . . . . . . . . . . . 59
     F.   Other Statutes Similar to Article 994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
     G.   Common Law Commercial Impracticability Is Equally Inapplicable . . . . . . . 63
          1.   Commercial Impracticality is Very Rarely Applied . . . . . . . . . . . . . . 66
          2.   CEL Misrepresents the Theory and Results of Prior Litigation . . . . . . 66

VI.  IN THE ALTERNATIVE, AN EQUITABLE MODIFICATION . . . . . . . . . . . . . . 69

VII. CONCLUSION: NO BASIS EXISTS TO ALLOW CEL TO TERMINATE
     THE CONTRACT WITHOUT COMPENSATION TO NPC . . . . . . . . . . . . . . . . . 72

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

ATTACHMENT 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

ATTACHMENT 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

5518244.9

iii

NEJAPA POWER COMPANY LLC'S
STATEMENT OF DEFENSE, INCLUDING JURISDICTIONAL OBJECTION,
AND RESPONSE TO CLAIMANT'S STATEMENT OF CLAIM

Nejapa Power Company LLC, respondent herein, files this Statement of Defense, including a Jurisdictional Objection, and Response to the Statement of Claim filed by claimant Comisión Ejecutiva Hidroeléctrica del Río Lempa. This Statement also responds to the Tribunal's Provisional Order No. 1.

I.    INTRODUCTION AND SUMMARY

Nejapa Power Company LLC ("NPC") is the successor-in-interest to the original signatory to a Power Purchase Agreement dated May 18, 1994 (the "PPA"). The other party to that contract, Comisión Ejecutiva Hidroeléctrica del Río Lempa ("CEL"), is an entity owned and operated by the government of El Salvador. The parties' agreement provides for the Contractor, now NPC, to construct a power plant near CEL's Nejapa substation in El Salvador and supply electricity to CEL for redistribution to its end users. NPC constructed the Nejapa plant at a price in excess of US $150 million and has supplied power to CEL, as provided by the PPA and the amendments thereto. CEL, however, has become dissatisfied with the terms of its carefully negotiated contract and seeks to have the Arbitral Tribunal terminate the PPA without compensation to NPC.

CEL's Statement of Claim is remarkable more for those issues it avoids than for those it addresses. Chief among these unaddressed but clearly existing issues is that of whether or not any dispute exists between the parties within the meaning of the parties' arbitration agreement and subject to determination by the Tribunal. Also missing from the Statement of Claim is any mention of the equally important issue of the express limitation on the scope of the Arbitral Tribunal's authority to revise, amend, or otherwise modify the parties' contract. Although the parties and the

1

5318244.9

Tribunal discussed these threshold arbitrability issues at a pre-hearing conference in August 1999, one would be hard pressed to discern these issues' existence, much less their vital importance, from CEL's Statement of Claim.

The fact is, no dispute exists between the parties for the arbitrators to resolve. The scope of the parties' arbitration agreement is even narrower than a typical "narrow" arbitration clause. It provides for arbitration of only those "disputes or discrepancies that arise from the interpretation or performance of this Agreement and that cannot be resolved favorably between the Parties with a period of fifty (50) days from their arising." PPA § 20.1(b).

Neither of the parties have failed to perform their contract obligations, and CEL makes no allegation that they have. The parties have not disagreed regarding the interpretation of the PPA, and CEL makes no allegation that they have. And, even if the Arbitral Tribunal were to find a "dispute" arising from the "interpretation or performance" of the PPA, the parties expressly agreed that the Tribunal would have no power to grant the relief CEL seeks – termination without compensation. PPA § 20.7 ("Limited Authority. Nothing herein contained shall be deemed to give the arbitrators any authority, power or right to alter, change, amend, modify, add to or subtract from any of the provisions of this Agreement.")

NPC believes that no amount of rhetoric can obscure these fundamental jurisdictional facts, and, consequently, the Tribunal should conclude without consideration of the other issues raised by CEL, that it has no jurisdiction. NPC, however, in accordance with Provisional Order No. 1, will respond here to CEL's allegations and demonstrate that CEL's demand that it be authorized to terminate the contract without compensation lacks any basis in fact or law.

2

531824-9

In that regard, it must be noted at the outset that CEL's Statement of Claim contains remarkably blatant factual distortions and misrepresentations. Perhaps most disingenuous is CEL's assertion that the PPA was drafted by Trigen "and not by CEL." In fact, the PPA evolved from a detailed draft prepared by CEL and contained in the bid documents issued by CEL in 1993 – documents specifying the detailed price formula CEL now incorrectly implies Trigen created.

CEL's argument that Article 994 of the Commercial Code of El Salvador[1] operates to permit termination without compensation of the PPA rests entirely upon such factual distortions. However, Article 994 does not apply to the PPA and CEL's argument fails as both a matter of fact and law.

Article 994 is an attempt to provide a remedy in cases of catastrophic economic events, such as hyperinflation or currency devaluation occurring in the aftermath of extraordinary and unforeseeable events that radically destroy the foundations of contracts, such as wars and revolutions. This is certainly not the situation in this case.

Article 994 and other formulations of its ilk is an exception to the basic rule of contract law that freely negotiated contracts must be honored. It must be, and is, narrowly applied, with the claimant bearing the burden of proving all of its requirements. CEL cannot meet the heavy burden of proof that might in some cases justify application of Article 994.

The parties, and particularly CEL, could and did anticipate the events it now complains were extraordinary and unforeseeable. CEL knew fully the nature and effect of the privatization. CEL was, in fact, a driving force behind both privatization and the form that privatization took in the El Salvadoran electricity sector.

[1] Código De Comercio [Com. C], art. 994 (El Salvador) ("Article 994")

53:8244.9

3

In accordance with its statutory authority and legislative direction, CEL has drafted electrical sector policies for the government since at least 1988. It promulgated and submitted an integral Plan of Privatization to the President of El Salvador in 1995. CEL was the principal author of the 1996 Electricity Law[2] and not only knew, but crafted, the form and effect of that Law. Its active role in the privatization process was expressly recognized by CEL's president. The liberalization of the market was always under CEL's control.

Even if CEL had played no role in such a process, the effects of the 1996 Electricity Law were predictable. The economic and practical results of the deregulation and privatization process have been well established, both in economic theory and in practice in the many countries in which it has occurred. Any process of privatization means the loss of the ability to set prices that are out of line with the market.

CEL does not identify the supposed changes in the financial markets it asserts were so extraordinary and unforeseeable that should excuse it from its contractual obligations. However, fluctuations in international financial markets are elemental, and even extreme market changes are neither extraordinary or unforeseeable. Parties of even moderate sophistication recognize and provide for such fluctuations in their contracts. That was undeniably the case here.

Contrary to its current assertions, CEL structured the basic pricing mechanism of the PPA, including that basic formula in its original request for bids for the PPA. That mechanism provided for an indexed pricing formula to account for market and other economic fluctuations. When CEL

_____

[2] General Electricity Act, Decree No. 843, published in Diario Oficial, No. 25 [333], [Official Gazette] (October 1996).

4

55182449

disliked the effect of its chosen indexed pricing factors, the parties, at CEL's requests, amended the PPA to change two of these indexed factors.

Moreover, CEL's ability to set resale prices was never a fundamental assumption of the PPA. Any loss of profits resulting from the liberalization of the electricity market was contractually allocated to CEL, and CEL's financial situation does not result from performance of the Nejapa contract but from CEL's own decisions during the privatization process.

CEL also fails to meet the requirement that its continued performance of the contract must impose an excessive hardship on it. Simply losing money on a contract does not meet the threshold of imposing a hardship so excessive that one could even consider justifying destruction of a negotiated commercial contract. CEL is fully capable of performing the PPA.

CEL has generated, to date, approximately US$ 711 million in revenues from the sale of its assets and is going to generate even more cash flow from the planned sale of additional assets – answering in large part its plea for an explanation of why it would orchestrate a plan of privatization that would result in its own eventual break-up. Privatization offered not only support for the democratic and economic progress of El Salvador, but also the prospect of huge cash infusions into the Salvadoran government coffers. Privatization was thus extremely attractive to CEL and the rest of the Salvadoran government. CEL consciously chose to sell its profitable assets while retaining the PPA it now characterizes as "intenable." CEL's projected inability to honor the contract is thus not the result of supervening, extraordinary, unforeseeable, or uncontrollable developments.

II.   THE PARTIES

Both the current parties to the PPA, CEL and NPC as Contractor, are sophisticated commercial entities with substantial assets and extensive experience in the area of power generation

53152449

and distribution. The same is true of Trigen Energy Corporation ("Trigen Energy"), the original Contractor who negotiated the PPA with CEL.

A.    Nejapa Power Company LLC

Nejapa Power Company LLC is a Delaware corporation registered to do business in El Salvador. The commercial risks and financing requirements of the Nejapa power project dictated a complex ownership structure for the company. Coastal Salvadoran Power, Ltd., a wholly-owned subsidiary of The Coastal Corporation, owns ¾ of 1% of Nejapa Power Company LLC, while another ¼ of 1% is owned by Coastal Nejapa, Ltd., a Cayman Islands company which is itself owned by Coastal Salvadoran Power, Ltd. and Crystal Power Company, Ltd., a Bahamian subsidiary of Salvadorian company, La Casa Castro. The remaining 99% of Nejapa Power Company LLC is owned by a special purpose trust created under a Declaration of Trust as part of the financing requirements of the project. Coastal Nejapa currently leases this 99% ownership interest pursuant to the trust agreement.

NPC did not negotiate the PPA with CEL. Instead, Trigen Energy negotiated that contract with CEL and entered into it as Contractor effective May 18, 1994. Deciding the risks of investment in El Salvador were too great, Trigen, with CEL's permission, thereafter assigned its interest to Tenneco Gas International, and, again with CEL's consent, Tenneco subsequently assigned that interest to Coastal Aruba Holding Company, N.V. ("Coastal Aruba"), effective July 30, 1994. Coastal Aruba assigned the contract to NPC effective December 14, 1994. CEL's approvals are recorded in the amendments to the PPA. NPC thus came to the PPA as a stranger and took the contract as it stood on the terms negotiated by the original parties.

53182464.9

6

B.    Comisión Ejecutiva Hidroeléctrica del Río Lempa

CEL is El Salvador's state-owned and operated electric utility company. In 1995, CEL celebrated its 50th anniversary in the energy business. *See* CEL, Memoria Anual de Labores [CEL Annual Report] (1995) ("CEL Annual Report"). CEL was originally formed because of the private sector's inability to develop major, long-term electric projects with a low rate of return. *See* CEL, Desarrollo del Sistema Eléctrico [Report for the Development of the Electric System] (1994), p. 2. And ever since, CEL, on behalf of the government, has proposed new legislation for the electric sector; decided on the industry projects necessary to satisfy the electric demand in the country; and contracted, either through a competitive bidding process or its own directives, the legal instruments to carry out such projects. In other words, CEL has been and continues to be a highly sophisticated and expert agent in the Salvadoran energy market.

While it conveniently serves CEL's purposes now to claim it is an entity completely independent and autonomous from the El Salvador government, CEL really has been and remains an entity belonging to and inextricable from the country's government. And, as discussed below, CEL was also unquestionably the chief architect of the privatization of the electric power industry in El Salvador that it now asserts was unforeseeable.

III.    FACTUAL BACKGROUND

A.    The Genesis and Development of the Nejapa Project and the PPA

1.    The Need for the Nejapa Power Plant Project

In 1993, El Salvador, and CEL as El Salvador's state electric utility, faced numerous problems in developing the electrical sector and satisfying the electric power needs of the country. As CEL described them, the problems included a 13.5% increase in demand, damaged transmission

lines, generation units that were in bad condition and virtually obsolete, failures in three thermal units, administrative chaos, a weak financial situation, and a general lack of credibility. *See* CEL Conference, The Electrical Sector in El Salvador, Reforms and Opportunities (May 17, 1999), (hereinafter, "Reforms and Opportunities"), *see also* Statement of G. Sol Bang, NotiCEL, May/June 1995, p. 4.

Based on the studies it conducted, CEL determined that to satisfy the increase in the national demand for electricity, the Salvadoran electricity system required a new plant capable of generating at least an additional 80 megawatts ("MW") of electricity by 1995. CEL also concluded that the proposed plant would "provide the necessary reserve to the system to cover the deficit in capacity that the planned rehabilitations of the thermal units will produce." *See* Bid Documents No. CEL-1304 at TR-1 (Oct. 25, 1993) ("Bid Documents"). To help address this power deficiency and the other problems it and the country faced, in the fall of 1993 CEL solicited international bids for the construction of a minimum 80 MW power plant to be built by a private company, with CEL to purchase all of the electrical energy generated by the plant.

    2.    <u>The Bidding and Negotiation Process</u>

CEL developed and distributed bid documents seeking a qualified contractor to construct and operate the new power plant and provide the additional electrical capacity El Salvador needed for its future development. A primary goal of the bidding process was to insure that CEL had bidders who were willing and able, technically and financially, to comply fully with the terms of the contract and reliably accomplish its goals.

To that end, CEL required potential bidders to submit a great deal of technical and financial information to even qualify to submit a bid. One of CEL's qualification inquiries asked the potential

8

531824-4.9

bidder to state each instance where the bidder had not complied with any contract, and further reserved CEL's right not to qualify an entity that had not fulfilled obligations under any contract with CEL. *See* Bid Documents at II-2. In addition, each bid had to be accompanied by a US $2 million bid bond. *See* Bid Documents at II-8.

The bid documents expressly required that each bidder fully acquaint itself with all of the market conditions that could affect the contract, so that the bidder "could not claim lack of knowledge of specific conditions" as an excuse for non-performance or demand contract changes. *See* Bid Documents at II-4.

The CEL bid documents also set out in detail the provisions that were ultimately to be included in the PPA, including, among others, general contract conditions, payment conditions, termination events, arbitration, indemnifications, and force majeure events. *See* Bid Documents at CG-1-CG-10; CE-1-CE-3. Additional contract details were to be negotiated by the bidder and CEL. *See* Bid Documents at II-10.

Most notably, the CEL bid documents set out the complex pricing structure for the purchase of power by CEL to be included in the PPA, the same pricing structure that eventually was included in the PPA. CEL specifically mandated that "Factor A" of the pricing formula correspond to the recovery of investment and be escalated in accordance with the LIBOR Rate; "Factor B" corresponded to operating and maintenance costs and be based on the GDP Implicit Price Deflator; and "Factor C" corresponded to the costs of fuel escalation according to <u>Platt's Oilgram Price Report</u>. *See* Bid Documents at CG-5-CG-6.[9]

_____

[9]The price formula included in the PPA and its subsequent modifications is discussed in greater detail in the Factual Background section hereof and in Appendix A hereto.

9

531824.9

CEL specifically reserved the right to reject any and all proposals if CEL concluded that the price was not adequate or that the competition among bidders was lacking. *See Bid Documents at II-8-II-9.* The Bid Documents also made clear that before any offer could be accepted, the Ministry of Economy had to approve the price. *See Bid Documents at II-2.*

Eventually five companies qualified to participate in the bidding process, and three of these qualified companies submitted bids. CEL examined each bid, including detailed price analyses and 20-year forecasts. Following this analysis, CEL awarded the bid to the consortium of Independent Energy Corporation ("IEC") and United Thermal Corporation ("UTC"). With CEL's approval, IEC/UTC assigned its right as successful bidder to Trigen Energy Corporation ("Trigen").

In the three-and-a-half months after CEL's bid decision, Trigen and CEL conducted lengthy and "arduous" negotiations to finalize the details of the PPA.[4] Although CEL had set out the core of the PPA's contract provisions in the bid documents,[5] finalizing the PPA required at least 30 negotiating sessions, at least 30 drafts of the Agreement, and the participation of numerous representatives of CEL, including CEL's lawyers, accountants, engineers, and occasionally its president, Guillermo A. Sol Bang.

Although the basic pricing formula remained the same, over 50% of the negotiations involved pricing and other economic provisions of the contract. The course of these negotiations included comprehensive price forecasting by both parties. CEL and Trigen obviously paid extremely close attention to pricing issues throughout the bidding and contracting process. During this same

---

[4] Statement of CEL President G. A. Sol Bang, 4, NotiCEL, May/June 1995.

[5] In fact, during the PPA negotiations CEL took the position that, if there was any substantial deviation from CEL's Bid Documents, the project would have to be re-bid.

53:8244.9

10

period, the government of El Salvador, including CEL, was actively planning the privatization of El Salvador's electric power industry.

Nowhere in the bid documents or in the PPA itself did CEL indicate that its ability to set the retail prices at which it would resell the power it purchased under the contract was the "foundation of the PPA," nor did it indicate this price-setting power was a condition upon which the continuation of the PPA would be based. Further, nowhere in the bid documents or the PPA did CEL indicate any necessity to retain the right and ability to adjust the contract price should the conditions under which it resold the power change. Given this intense focus on pricing issues and the fact that CEL was already planning privatization, it is not only inconceivable but plainly untrue that CEL did not consider the possible effects of privatization on pricing and power resale issues.

Another issue important to the parties was the contractor's need to account for and reduce the significant risks inherent in embarking upon such a significant project given the political, economic, and social conditions in El Salvador. Only a short time had passed since the El Salvadoran Civil War ended. These risks were magnified exponentially by the presence of CEL, a government entity, as the opposite party to the contract. The terms of the PPA reflect these concerns, not only in the pricing and risk allocation provisions but in the Change of Law, dispute resolution, and termination provisions.

Finally, on May 18, 1994, CEL and Trigen executed the PPA. On May 24th, Luis Enrique Cordova, Minister of Economy for the Republic of El Salvador, sent a letter of assurance to Trigen, stating that the government of El Salvador agreed to take all actions necessary to cause CEL to perform its obligations under the PPA.

11

**B.    The Terms of the PPA**

Obviously, no analysis of whether the events of which CEL complains were supervening, unforeseeable, extraordinary, and uncontrollable can be conducted without examining the PPA. As with most contracts, it is the final written expression of the parties' agreements, and the clearest expression of their intent.

    1.    The Pricing Structure

Central to CEL's desire to avoid its agreement is the pricing formula that determines the price at which NPC shall sell and CEL shall buy the power generated by the Nejapa plant. The original pricing structure was a deliberate creation of CEL. The agreed formula included in Article 5 of the PPA was the price indexed formula CEL required any bidder for the contract to accept. *See* Bid Documents at TR-1–TR-2. The basic sales price was based on investment and plant capacity (Factor A), operation and maintenance costs (Factor B), and fuel costs (Factor C).

The general conditions for bids, *see* Bid Documents at CG-5, provided for an adjustment formula, the "escalation of prices," indexing the price to the LIBOR rate[6]/, the GDP Implicit Price Deflator[2]/ as published in the "Survey of Current Business" edited by the Department of Commerce of the United States, and the price per barrel, as reported in *Platt's Oligram Price Report*. The PPA adopted the price structure CEL set out in the bid documents.

[6]/ "LIBOR" means the London Interbank Offered Rate as published daily in the *Wall Street Journal* or an equivalent publication. The LIBOR uses as a basis the average interbank offered rate for dollar deposits in the London Market based on quotations from major banks. *See* PPA Art. 1 (definitions).

[2]/ "GDP Implicit Price Deflator" means the ratio of the current dollar gross domestic product (GDP) to a constant-dollar GDP. Changes in the implicit price deflator reflect the changes in prices of all goods and services that make up the GDP and changes in the composite of GDP. *See* BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS 233 (5th ed. 1998)

Essentially, the original pricing formula gave the seller: (i) a monthly payment for each unit of capacity (or kw) that the plant demonstrates as available at a given rate (A); (ii) a variable payment intended to compensate the seller for the variable Operations and Maintenance and Fuel costs incurred in the generation of each unit of energy (or kwh), with CEL being obligated to take a certain amount of Fixed Base Energy and the remaining being "programmable" or "callable" by CEL and charged at the same variable (only) rate as all other units of energy delivered.

Under the contractual formula, these pricing components were adjusted every month. Factor "A," or the capacity rate, was to be adjusted once a month, for the corresponding invoicing month. Essentially, the formula provided (within certain ceilings and floors protecting both the buyer and seller) for adjustments to the Capacity Rate (Factor A) as a result of changes in the average 6-month LIBOR as compared to the 6-month LIBOR that was set for bidding purposes (3.5%).

"Factor B," or the variable Operations and Maintenance payment, was adjusted once a quarter according to an express formula. In essence, that formula originally intended to adjust the variable Operations and Maintenance payment for changes in the US GDP Implicit Price Deflator (published quarterly), which is a measure of inflation.

"Factor C," or the variable fuels payment, was also adjusted according to a specified formula. In essence, it intends to provide for a mechanism for adjustments in the variable fuel payment that result from variations in the commodity price (cost of fuel) as compared to the initial bid assumptions, a type of indexation mechanism very common in the industry.

Like any other indexed formula, the price could go up or down. Fluctuations in the market might benefit either the seller or the buyer, and the party enjoying the benefit could change with the

13

531&244-9

movement of the index. Thus, had the LIBOR decreased below 3.5%, CEL would have enjoyed the benefit of the fluctuation, just as it would have done if fuel costs had decreased.[8]

2.    Contract Termination Provisions

CEL imposed the basic provisions for contract termination in its bid documents, setting out that the agreement might be terminated by mutual consent, in case of force majeure, or for non-performance by either party. *See* Bid Documents at CG-4.

Starting from CEL's terms for bidding, the original parties to the PPA negotiated and agreed upon exact terms for contract termination, including the basis on which termination would or could occur, and a basis for establishing the value of the project in the event of termination. CEL's power as a government entity made the risk of expropriation or other uncompensated contract termination a significant risk for the Contractor. The parties dealt with this risk in the PPA's termination provisions.

Article 10 of the PPA is entitled "Termination" and provides for contract termination and valuation. It allows termination (a) by mutual agreement of the parties, (b) upon request and acceptance in the event of force majeure, (c) at CEL's request under certain circumstances in the event of non-performance by the Contractor, and (d) at the Contractor's request if CEL fails to fulfill its obligations. PPA § 10.1.

The termination provisions define what shall occur in the event of termination due to the default of the Contractor or of CEL. In the event of termination due to CEL's default:

If any termination event referred to in clause (d) above or a Force Majeure caused by the events referred to in Section 5.4(b) hereof or the termination event referred to in

_____

[8] Again, *see* Appendix A for a more detailed discussion of the changes CEL requested from NPC.

14

53\83244.9

Section 6.1 hereof shall have occurred and Contractor shall have exercised its right to terminate this Agreement, CEL shall purchase the Plant from Contractor for a price equal to the Termination Value.

PPA § 10.2(b). The final section of Article 10 provides:

Notwithstanding any provision in this Agreement to the contrary, after an event of default by CEL and if CEL does not purchase the Plant, CEL shall: (i) upon Contractor's request, use its good faith efforts to cause or enable Contractor to receive the necessary governmental approvals to generate, transmit and sell the electrical capacity and energy produced by the Plant, and (ii) upon Contractor's request, negotiate and agree upon wheeling arrangements for the transmission of electrical energy from the Plant upon terms mutually satisfactory to the parties [sic] hereto.

PPA § 10.3. The parties expressly defined "Termination Value" in Article 2 of the PPA:

"Termination Value", on any Day, as determined in accordance with the dispute resolution procedure set forth in Section 20.1(a) hereof, the replacement cost of the Plant on such Day, assuming the Plant to be a going concern without giving effect to the event causing termination of the Agreement.

PPA art. 2

The ultimate goal of the termination provision was to protect the Contractor's investment from a misuse of the power possessed by CEL and the Salvadoran government. While CEL agreed to that protection in the PPA, it now attempts to avoid its agreement and achieve the same goal of termination without compensation through its specious invocation of Article 99A.

3.   Change of Law Provision

The "Change of Law" provision in the PPA confirms the Contractor who negotiated the PPA with CEL was concerned with CEL's status as an entity and integral part of the government of El Salvador. Its status as a part of the government gave CEL immense power. CEL's governmental power threatened the Contractor's investment on several levels, making the risk of such a capital investment unacceptably high unless the Contractor was protected in the PPA itself.

15

53:8244.9

The parties addressed the potential inequities of CEL's governmental power through the Change of Law provisions of the PPA. They defined a Change in Law as:

"Change in Law": any law, statute, regulation, rule, legal interpretation or agreement having the effect thereof enacted or taking effect after the date hereof, and any modification to the foregoing.

PPA Art. 2 (definitions). Section 5.4 provides for "Adjustments for Changes in Law," providing for price adjustments if their effect on pricing assumptions was greater than a set amount. However, that adjustment served to correct pricing effects on the Contractor, not changes in CEL's resale pricing.

PPA § 5.4(a).[2/]

The PPA expressly addresses the consequences of, and remedy for, a change in law that "impedes the performance of this Agreement, including without limitation, causing in whole or in part, an inability of CEL to purchase power hereunder or a suspension of this Agreement or any other event which prevents CEL from performing its obligations hereunder." PPA § 5.4(b). The remedy in such an event – which is exactly what CEL is complaining has or will result from

---

[2/] "(a) The price for Base Energy shall be adjusted by mutual agreement not later than 30 Days after one of the Parties has communicated to the other that a Change in Law has occurred provided that the effect of such Change in Law would result in an adjustment of more than 0.3% in the sale price of the Base Energy per Kilowatt-hour. Such adjustment shall fully counteract the effect of such Change in Law on such price." In fact, CEL invoked § 5.4(a) on February 12, 1999.

"(b) If any Change in Law or the failure to obtain necessary authorizations from any government agency or authority in El Salvador impedes the performance of this Agreement, including without limitation, causing in whole or in part, an inability of CEL to purchase power hereunder or a suspension of this Agreement or any other event which prevents CEL from performing its obligations hereunder, CEL shall within 30 Days following such Change in Law or failure to obtain such necessary authorizations pay for the charge of capacity ("Factor A") for the Committed Capacity for the affected period but in no event a period in excess of six (6) months and, at Contractor's election, thereafter, Contractor may terminate this Agreement with the results set forth in Section 10.2(b)."

16

531824-9

privatization and the 1996 Electricity Law – is that, "at Contractor's election, thereafter, Contractor may terminate this Agreement with the results set forth in Section 10.2(b)." PPA § 5.4.

The Change of Law provision clearly protects the Contractor from changes in law, but offers no reciprocal protection for CEL. The lack of such reciprocity is natural, given that CEL – as part and parcel of the government of El Salvador – did not need protection from changes in law. The parties recognized that by its nature CEL largely controlled any changes in law, and that such changes were unlikely to be detrimental to CEL. Thus, by this provision, CEL clearly assumed the risks of changes in the law of El Salvador, including the one about which it now "complains."

In any event, the Change in Law provision proves the lie to CEL's claim that the parties could not and did not anticipate the occurrence and effects of changes in the law of El Salvador. They not only anticipated such possible changes in law, they expressly set out the remedy for such potential changes. PPA § 5.4.

4.    <u>Government Approvals and Obligations</u>

The parties' concerns with protecting the Contractor given CEL's role in the government, and concerns with the known possibility of privatization, appear quite clearly in the "Government Approvals and Obligations" provisions of Article 6 of the PPA. Section 6.1 first addresses the role of CEL and the Ministry of Economy, noting that the Ministry of Economy must approve the agreement, including pricing.[19]

[19] "In accordance with El Salvador's laws, the activities of electric generating plants are permitted only after the approval and authorization of the Ministry of Economy. The Ministry of Economy, at the moment of approving this Agreement, approves the sale price of the energy sold and bought in accordance with this Agreement and assures that it will execute all the necessary actions to cause CEL to be able to perform its obligations under this Agreement. CEL shall, at its sole expense, obtain said approvals. CEL shall collaborate with Contractor to acquire and maintain in effect all

17

53:183:44.9

Section 6.1 then continues, addressing the possibility of some "institutional transformation" that would require CEL to transfer its contract rights and obligations to a third party or result in a change in ownership of CEL. In such an event, the PPA "shall continue with full force and strength. If such institutional transformation results in a change of ownership and the new owner is not acceptable to Contractor, the Contractor may terminate this Agreement by applying the provisions of Section 5.4(b) [regarding changes in law]." PPA § 6.1.[17]

This provision not only clearly contemplates the possibility of privatization, it also expressly provides for the protection of the Contractor in that event, allowing the Contractor to terminate the contract and receive the Termination Value. CEL is now trying to avoid this express recognition that privatization might affect the roles of the parties to the contract and the explicit agreement that the Contractor should be protected in that event.

C.   **NPC's Involvement with the PPA and the Nejapa Project**

    1.   NPC's Acquisition of the PPA Rights and Obligations

    Although Trigen had made a substantial investment of time and resources in the project, as these detailed contract negotiations progressed, its management decided that the risks inherent in the permits and approvals that will be necessary for the construction, operation and maintenance of the Plant but it will be at the expense and obligation of CEL to obtain the Ministry of Economy approval of this Agreement, including the tariffs and prices that arise from it, and all amendments thereto." PPA § 6.1.

[17] "If by reason of any institutional transformation, CEL would have to grant to a third party the rights and obligations that it assumes in this Agreement none of the provisions of same shall be affected by such grant, and the present document shall continue with full force and strength. If such institutional transformation results in a change of ownership and the new owner is not acceptable to Contractor, the Contractor may terminate this Agreement by applying the provisions of Section 5.4(b)." PPA § 6.1.

531:8244.9

project were too great for Trigen to bear. Trigen determined not to proceed with the project and located a substitute, Tenneco Gas International Inc. ("Tenneco"). Trigen's assignment of the contract to Tenneco was expressly contemplated in the PPA. With the approval of CEL, Trigen assigned the PPA to Tenneco shortly after execution.

On May 23, 1994, all of the provisions of the PPA, with Tenneco as the Contractor, were approved by the Executive Section of the Economics Branch of the El Salvador government. *See* May 27, 1994, letter from CEL to Tenneco. Two weeks later, Tenneco executed a turn-key contract with Wartsila Diesel for construction of the plant. However, less than a week after that, Tenneco's management, like Trigen's, decided that going forward with the construction and operation of the plant under the terms of the PPA was too risky an investment for Tenneco. Tenneco determined to withdraw from the project, as had Trigen.

Soon after it decided to withdraw from the Nejapa Project, Tenneco contacted representatives of Coastal Power Company ("Coastal Power"), a subsidiary of The Coastal Corporation, about whether Coastal Power might have an interest in acquiring the rights to and pursuing the Nejapa Project. Understandably, Coastal Power also had great concerns about the political, economic, and social conditions in El Salvador. Of further concern was that there was little foreign investment in El Salvador at the time, and Coastal Power, too, was concerned with the extreme power CEL possessed as a government entity. These concerns were only heightened by the fact that other competent and substantial companies had backed away from the project. Further, as a latecomer to the project, Coastal Power was in the position of essentially having to take or leave the deal as it stood. The PPA was already negotiated and signed, and any assignee would be firmly bound by its terms.

19

53\8244.9

CEL assured Coastal Power of CEL's commitment to the Nejapa Project and to the PPA, having negotiated the contract with great care.[19] Coastal Power also relied upon assurances by other elements of the government of El Salvador that CEL would fulfill its obligations. Relying on the representations by CEL and the El Salvadoran government, Coastal Power agreed to go forward with the project in joint ownership with a reputable local partner, La Casa Castro.

CEL gave its approval of the assignment of the PPA first to Coastal Power and eventually to the newly formed entity, Nejapa Power Company, in accordance with the PPA. As a condition of approval, however, CEL required that The Coastal Corporation provide a performance guarantee. The Coastal Corporation agreed and provided the guarantee. *See* PPA Amendment No. 2 at 2.

Following Coastal's and La Casa Castro's decision to go forward with the Nejapa Project, CEL repeatedly lauded the formalization of the agreement between NPC and CEL. CEL particularly stressed the facts that the agreement guaranteed electrical energy for 20 years and that the energy would be generated by the plant at a cost cheaper than CEL's current cost of generation. *See* "Energía Privada en Julio" [Private Energy in July] La Prensa Gráfica (Jan. 19, 1995), p. 16A. CEL also boasted that the contract contributed to both the technological development of El Salvador and to the confidence of foreign investors. *See* Statement of G. Sol Bang, NotiCEL (May/June 1995), p. 6.

_____

[19] Coastal's willingness to take on these risks was in large part because of the long-time friendship between Coastal's then Chairman, Oscar Wyatt, Jr., and CEL's President, Guillermo Sol Bang. Mr. Sol Bang assured Mr. Wyatt that CEL would honor its contract.

20

53182449

**D.    Renegotiation, Expansion, and Operations**

1.    "    CEL Has Previously Asked for Changes in the Pricing Formula and for a
Plant Expansion, and NPC Agreed

In February 1995, before the construction of the Nejapa power plant was completed, CEL
communicated to NPC that CEL wanted to amend the PPA to change the pricing formula. In CEL's
view, the LIBOR rate originally included at CEL's request as a variable in the calculation of Factor
A (the capacity payment) of the price formula, had become too high and its use in the pricing
formula led to price volatility. CEL therefore requested that "if possible" Factor A be revised. See
Feb. 2, 1995, letter from Sr. Casaniquela (CEL) to Coastal. CEL later asked that Factor C of the
pricing formula (the fuel component) also be revised. CEL also discussed the potential expansion
of the facility to increase capacity by 50 MW.

It soon became apparent that CEL simply wanted a lower purchase price and viewed Factors
A and C as "good candidates" to help achieve this result. NPC was under no obligation to revise the
contract to suit CEL's changed perceptions, but it valued its relationship with CEL and wanted the
project to succeed to the satisfaction of both parties. NPC therefore entered into good faith
negotiations with CEL to restructure the PPA in a manner acceptable to both parties to alleviate
CEL's pricing and capacity concerns. After several days of long negotiating sessions, many of
which lasted until the early morning hours, CEL and NPC agreed to both a revision of the price
formula and a 50 MW expansion of the plant.

2.    The Amended Pricing Structure

As discussed above, early on CEL became dissatisfied with the agreed pricing formula and
asked NPC to renegotiate pricing. In the first quarter of 1995, CEL became concerned due to the

21

53:82449

effect of movements in the relevant indices on prices, particularly the effect on the capacity payment (Factor A) and the variable fuel price (Factor C). The two indices affecting these factors had changed significantly, causing an increase in the factors and thus the power price.

With respect to Factor A, when the bid was awarded, the cent per kilowatt hour equivalent of the capacity payment (using the volumes of energy that CEL is required to purchase per the PPA, which yield approximately 80% of the committed capacity) was approximately $.026. The 3.5% LIBOR was below historical norms, and during the first quarter of 1995, LIBOR returned to more normal levels. As a result, the Capacity Rate went from $15.20 to approximately $25.37 (using a LIBOR of 6.43% for 1995 as compared to 3.5%).

CEL's primary concern regarding Factor C was related to how the opening of the fuels market, previously monopolized by a few players (the "majors") had caused a decrease in the delivered cost of fuel in El Salvador. Initially, CEL did not request a change in the indexation parameters of Factor C; it simply wanted a lower power price and it was evident that both Factor A and Factor C would be "good candidates" for that reduction. Notably, the entry of Coastal affiliates into El Salvador, and with them competition, brought fuel prices down significantly. Prior to Coastal's entry into the market, fuel prices per barrel in El Salvador ranged at around US$ 40.

At the same time, the parties began discussions about a potential expansion of the facility by approximately 50 MW. CEL welcomed the opportunity to add capacity to the system. Shortly thereafter, long negotiations began and continued through several days and nights.

Fundamentally, CEL and NPC agreed to (1) two pricing changes and (2) the 50 MW expansion. First, as CEL had asked, they agreed to eliminate the LIBOR index from the Factor A capacity payment calculation. This provided a reduction (vis-a-vis what the capacity payment had

22

53.2244.9

grown to, given LIBOR at the time) and eliminated the price volatility that came along with the continuing indexation to this interest rate. As a result of this change, the capacity payment went from approximately $25 per kw per month to $20 per kw per month, escalating in a pre-determined fashion until 2001, remaining flat from 2001 levels until 2004, and then being reduced all the way down to $19.20 during the last four contract years. Note that given the change in LIBOR since the bid and through to the date of negotiations, the initial capacity payment level ($15.20) was never restored.

Second, CEL and NPC agreed to a change in the way in which Factor C, the variable fuel factor, was adjusted. After several rounds of negotiations, CEL and NPC agreed not to change the initial variable Fuel payment of $.0251, but instead to break it down in two components: (i) commodity; and (ii) non-commodity. They further agreed to apply indices that closely track each of the cost components. Platt's continued to be used for the commodity piece. To adjust the ongoing non-commodity charge, the parties agreed to select: (i) US GDP Implicit Price Deflator which tracks US inflation; (ii) the World Scale Rate, which tracks ocean freight costs; and (iii) the Salvadoran CPI, which tracks local inflation. The parties also agreed to establish "base" values for each of the indices.

Essentially, this amended formula splits up the initial Factor C into two sub-factors: C1 and C2, again representing the commodity and non-commodity prices respectively. Further, the formula establishes that C1, or the commodity piece, will be 100% indexed to Platt's. The non-commodity piece, on the other hand, was to be indexed: 50% by the World Scale Rate, reflecting the portion of the cost assumed to be associated with ocean freight; 25% by the US GDP Implicit Price Deflator, reflecting the portion of cost assumed to be associated with elements affected by U.S. inflation; and

23

531:8244.9

25% by the Salvadoran CPI, reflecting the portion of cost assumed to be associated with elements affected by local inflation.

In effect, CEL had the contractual opportunity to correct any deficiencies in its original pricing formula. At CEL's request, the parties entirely renegotiated the contract price formula, and CEL asked for and obtained a fixed capacity price and fuel cost indices that could fluctuate to its advantage or disadvantage. CEL would benefit if the commodity price or the ocean freight costs decreased, and the effects of inflation would be neutralized. Despite having obtained these modifications, it was not long before CEL became dissatisfied with its contract and began concocting a way to avoid its obligations entirely.

    3.    <u>Additional Contract Modifications and Amendments</u>

Indisputably, CEL negotiated long and hard to achieve the concessions that it wanted in early 1995. In fact, a final agreement between the parties was not reached until NPC conceded the following additional modifications to the PPA: (1) a $2.00 kw/month reduction in the capacity payment for the last six years of the PPA; (2) no floor on the World Scale Rate index to be used in determining Factor C; and, (3) higher penalties for any delay in completing the plant expansion. CEL also required that NPC agree to construct the expansion, and fulfill all of its obligations under the PPA as modified, even if NPC's lenders did not approve the modification. Amendment No. 4 of the PPA reflects these revisions to the price formula and the expansion, was approved by CEL on May 29, 1995, and executed on June 19, 1995.

The effect of these negotiations and amendments on the price formula was that both Factors A and C that CEL wanted changed were changed. To eliminate the price volatility CEL found undesirable, the parties replaced the LIBOR element in Factor A with a schedule of capacity

24

S:\15344:9

payments. The parties also adjusted Factor C, the fuel factor, to incorporate indices related to fuel transportation and thereby provide a more accurate measure of fuel costs.

4.    NPC's Investment and Risks in the Project and the PPA

On September 1, 1995, commercial operations began on Phase I, the 91 MW Nejapa Power Plant. On May 9, 1996, the expansion providing an additional 53 MW of generating capacity came on line. The total cost for the construction of the plant was US$ 155 million. NPC employs roughly 153 people at the plant, all but one of whom are citizens of El Salvador. Various accounting, administrative, legal, engineering, and environmental services are provided in Houston, Texas and other sites outside of El Salvador.

The Nejapa Project involved both commercial and political risks mainly resulting from the developing nature of the country, its emerging but uncertain economy, its social and political instability, the size of the investment, and the governmental character of CEL. A summary listing of NPC's risks also included the risks of construction, completion, technology, operational, financial, commodities' prices, payment, currency, environmental, political and expropriation risks. *See* IEC/UTC, Confidential Memorandum: First IPP El Salvador (Jan. 1, 1994), pp. 9-12 (memorandum seeking investors in competitive Bid CEL No. 1304) ("First IPP"). *See also* Tenneco, Information Memorandum: El Salvador Independent Power Project: Nejapa, El Salvador § 2 (June 1994) (Tenneco information book seeking investors to the PPA).

Construction and completion risks were high due to the size of the investment and the short period of time allowed (only 335 days). Delay penalties were severe. Interest rate and permanent financing risks also loomed. Both were managed by originally indexing capacity payments to LIBOR and requesting participation of international financial institutions. The project's economics

53182544.9

were exposed to LIBOR rates below the existing rate and above the floor of 3.5%. Indexation to Platt's Oilgram commodity prices also created risks if the commodity price increased at a rate lower than transportation costs. A long-term fuel supply agreement mitigated such a risk. The risk of market price fluctuations in commodities was assumed by CEL. Currency risks might also arise because of the developing and uncertain economy of El Salvador. In addition, CEL's governmental nature created the need for governmental approval so the Ministry of Economy might prioritize CEL's obligations. It was the same guarantee as is usually required by multilateral lending agencies. Currency risks might also arise because of the developing and uncertain economy of El Salvador.

In sum, the Nejapa Project was not an easy-profit project but a risky investment requiring a careful risk management program. After hedging all risks, the project might be considered a "conservative, sound and well crafted investment with solid returns." *See* First IPP at 12.

5.    The Negotiations CEL Now Calls a "Dispute"

In 1997 CEL again expressed interest in renegotiating the price terms of the PPA. NPC agreed to negotiate and those negotiations resulted in a "bonus" program – the PPA price terms were not changed but a plan was agreed to under which higher levels of dispatch would result in bonuses, thus reducing the average price paid by CEL.

CEL, however, was still not content and, in April 1998, its president, Mr. Sol Bang, again badgered Coastal to renegotiate the PPA. Shortly thereafter CEL asked Coastal to consider a total "buy-out" of the PPA. CEL's concept of a "buy-out" was that CEL would make a substantial payment to NPC after which there would be no more contractual obligations between the parties, and NPC's power plant would become a merchant plant competing in the market and exposed to dispatch risk.

53182449

NPC evaluated the buy-out concept during the summer of 1998 and concluded that computing a buy-out value for the PPA required complex estimates of both the long-term market price of electricity and the tax implications of the transaction, but that such a buy-out value would clearly exceed US$ 100 million. On August 25, 1998, NPC representatives met in El Salvador with senior CEL representatives to discuss these and other aspects of the buy-out concept.

At that August 25 meeting, CEL was adamant that it wanted to pursue the buy-out concept. CEL's representatives said CEL had retained the Coudert Brothers law firm to advise them on the computation of buy-out amounts and regarding issues of structure involved in implementing such an arrangement. In particular, CEL's representatives said they fully understood the order of magnitude of the sums that would be necessary to accomplish such a buy-out. They insisted that NPC prepare and submit a buy-out proposal in writing to CEL.

NPC's response to CEL's request for a buy-out proposal was set out in an October 5, 1998, letter from Robert Hart, President of Coastal Power, to CEL's President. Because of its importance in understanding the trumped-up nature of CEL's claim of a "dispute," a true and correct copy of that October 5, 1998 letter is attached hereto as Attachment 1. The letter estimated the buy-out value of the PPA to be approximately US$ 135.5 million based upon what were clearly stated to be "preliminary estimates" of long-term market prices and a "preliminary analysis" of the tax implications of such a transaction. The Hart letter explicitly stated that (1) the US$ 135.5 million preliminary estimate would be significantly impacted, either up or down, by the results of a market study then being conducted by CEL, (2) NPC and Coastal were committed to identify a solution that would "optimize CEL's long-term financial position", and, (3) each of the parties should appoint a

531:8244-9

27

negotiating committee to develop a specific plan for management review and approval. See Oct. 5, 1998, letter from R. Hart to G. Sol Bang.

CEL had repeatedly demanded such a buy-out proposal from NPC and Coastal, knew the order of magnitude of the consideration that would be involved in such a proposal, and understood the estimate was only preliminary and subject to negotiation. CEL, however, did not negotiate. Instead, on February 17, 1999, president Sol Bang wrote to Mr. Hart saying only that CEL did not agree with the US$ 135.5 million estimate and, consequently, was notifying NPC that a "dispute" existed under Article 20.1(g) of the PPA. A true and correct copy of president G. Sol Bang's February 17, 1999, letter is attached hereto as Attachment 2.

President Sol Bang did not explain then – nor does CEL even attempt to explain now – how a disagreement over a preliminary estimate of the buy-out value of the PPA – an estimate provided at CEL's request – relates in any way to the "interpretation" or "performance" of the PPA.

E.    CEL's Role as an Entity of the Government of El Salvador

1.    CEL is Part and Parcel of the Government of El Salvador

CEL was the state-owned agency that monopolized the electricity market in El Salvador from 1948. See Legislative Decree No. 137, Diario Oficial [Official Gazette] No. 210, [145] (Sept. 27, 1948). Legally, it is defined as an "autonomous entity of public service for non-profit." See CEL Act art. 1. Its purported autonomy and private nature, however, are belied by the law and by CEL's own statements.

A summary review of the law shows the interdependent and seamless relationship between CEL and the government of El Salvador. According to its statutory regulation, CEL is a sort of

53.18244.9

hybrid legal being.[12] It behaves like a private entity in the market but works like a governmental agency as far as its purposes, powers, budget, management, and political decisions. Not surprisingly, CEL is deemed to be a "corporation of the State." *See* CEL Act art. 31.

In contrast to CEL, no private entity in El Salvador is required to obtain loans, issue bonds, or acquire new obligations with the approval of the Ministry of Economy. *See* CEL Act art. 5. No private entity's capital is mainly composed by governmental investments, subsidies, and state assignations. *See* CEL Act arts. 30(a), (f), (g). No private entity is to submit its budget to the Ministry of Economy for approval by Congress. *See* CEL Act art 19.6. No private entity must report the execution of its budget to the Ministry of Economy, *see* CEL Act art. 19.9, or request its approval to transfer credits, *see* CEL Act art. 19.11.

Moreover, no private entity in El Salvador is subject to an audit by the Republic Court of *Cuentas* or required to submit a detailed financial status report to the Congress through the Ministry of Economy. *See* CEL Act art. 25. No private entity requires the prior approval of the Ministry of Economy to build any plant at a cost in excess of 250,000 colones. *See* CEL Act art. 22. And last, but not least, no private entity's board of directors is composed of representatives of the Ministries of Interior, Economy, Agriculture, Public Constructions, Planning and Development, and Finances. *See* CEL Act art. 3; *see also* CEL Annual Reports (listing Board of Directors). Furthermore, no private entity has its president appointed by the Ministry of the Interior.

---

[12] Act to Constitute the Comisión Ejecutiva Hidroeléctrica del Río Lempa, Legislative Decree No. 137, published in Federal Register No. 210, Volume 145 (Sept. 27, 1948), as amended as of April 1981 (the "CEL Act").

5318244.9

CEL's nature as a government entity goes well beyond these organizational aspects. CEL plays an active role in the design and execution of governmental policies in the electricity market: it advises the government on all aspects of the electricity industry and it has been responsible for drafting electrical sector policies for the government since at least 1988. *See* CEL, "Informe Reunión Presidente de la República, Comite Economico y Junta Directiva De CEL" [Report of the Meeting with the President of the Republic, Economic Committee and CEL Board of Directors] (hereinafter, "Report of the Meeting with the President"), at Table No. 1-A, "Matriz Actual de Relaciones Interinstitucionales del Sector Energetico" [Current Table of Inter-Institutional Relations of the Energy Sector] (Dec. 10, 1990). The Act creating and governing CEL sets out CEL's role in this regard, establishing that among CEL's powers and purposes are to draft and propose bills for new legislation or amending the legislation currently in effect with respect to its activities. *See* CEL Act art. 5. CEL is also authorized to expropriate private property through the Ministry of Economy. *See* CEL Act art 5.1. Consistent with its public nature, no obstacle may impair CEL's development of its projects. Moreover,

The Commission shall propose to the Executive Power, in the Branch of Economy, or to the Legislative Assembly through the former, all measures it deems necessary to be adopted in case of adverse or emergency situations that seriously affect the supply of electric energy, and shall give all type of explanations about their effects, consequences and justification of such measures.

Reglamento para la Aplicación de la Ley de la Comisión Ejecutiva Hidroeléctrica del Rio Lempa [Regulation for the Application of the CEL Act], Diario Oficial 24 [246] (Feb. 5, 1975). A state agency that conceives and implements the policies of the government in the electricity market cannot be considered independent and autonomous.

SJ1824v.9

30

A further manifestation of the integral relationship between CEL and the Salvadoran government is apparent in the government's assumption of all of CEL's foreign debt (approximately 209.5 million Colones). *See* CEL Annual Report (1992) at 17.

2.    The Agreement Between CEL and NPC

Finally, the PPA is further evidence of CEL's inextricable ties to the Salvadoran government. In that contract, CEL waived any foreign sovereign immunity defense, PPA § 20.5, assumed all risks deriving from changes in law, PPA § 5.4, and committed to obtaining every governmental permit or authorization, PPA § 6.1.

CEL drafted the General Conditions of the PPA, but no contract could be executed without the approval of the Ministry of Economy, and approval from the Ministry was a condition of the price of the energy sold under the PPA. *See* Bid Documents at II.-1. Any modification of the PPA required previous notification to the Salvadoran government. *See* July 30, 1994, letter from CEL to Coastal Aruba.

CEL planned, and the Salvadoran government always backed, the Nejapa Project – the same government that approved the sale price of energy in 1994 and assured the Contractor that it would do everything necessary to cause CEL to be able to perform its obligations under the PPA. *See* May 24, 1994, letter from the Minister of Economy for the Republic of El Salvador to Trigen.

The close relationship between CEL and the Salvadoran government is also apparent in the performance of the PPA. For example, in May 1996, NPC submitted an invoice to CEL that CEL did not pay. At a June 25, 1996, meeting attended by representatives of CEL and NPC, CEL directed NPC to submit the invoice to the Ministry of the Treasury for payment.

5318244.9

F.    CEL Shaped Privatization Policy and Process

The privatization of the electricity sector in El Salvador occurred and continues not merely with CEL's knowledge, but under CEL's direction and guidance. CEL has been responsible for drafting electrical sector policies for the government of El Salvador since at least 1988.

In 1988, FUSADES, the El Salvador Foundation for Social and Economic Development, announced a program of stabilization and structural adjustment for the country. Deregulation and privatization were among the main aspects of the program. FUSADES declared that "[a]bove all, it shall be eliminated any governmental interference that increases production and intermediation costs and distorts an optimal assignation of resources. As regards this issue, the regulatory and intermediary role of institutions such as the IRA, the General Direction of Transportation, CEL as a distributor company ... shall be reviewed." See FUSADES, Bases para un programa de estabilización y ajuste estructural [Basis for a program of stabilization and structural adjustment] (July 14, 1988).

Privatization of the Salvadoran electricity sector and other industries in El Salvador was proposed in 1989 by El Salvador's then-President Cristiani. In December 1990, to deal with the financial status of CEL, Salvadoran government representatives met with the CEL's Executive Commission. The report on this meeting first set out the institutional structure of the electricity sector and stated "the Ministry of Economy, the Central Bank of Reserve, and the Ministries of Finance and Planning play an important role in this sector." See Report of the Meeting with the President at 1 and Annex 1. Then, the report suggested the transformation of CEL's electricity business into a private company subject to the same rules as private businesses. To achieve this

5318244.9

goal, the report recommended that "all franchisees and exceptions that this entity currently enjoys be suppressed." *See id.* at 6.

In May 1991, the National Congress of El Salvador enacted Decree No. 768, which created the National Commission for Privatization.[14] According to a report prepared by the World Bank and CEL, in September 1991 the government of El Salvador "adopted an energy sector policy more consistent with the market-based economy being developed in El Salvador." The World Bank Staff Appraisal Report, "El Salvador Energy Sector Modernization Project" (May 26, 1995), p. 2 (jointly prepared by the World Bank, the Government of El Salvador, and CEL). Among the government's objectives were to "adopt pricing policies and procedures based upon economic costs and market forces" and "increase private sector participation in the energy sector." *Id.*

In 1992, CEL signed a contract with a consulting company to study the privatization of the electrical sector in El Salvador, and in 1993 CEL created a separate division to work on privatization and prepare its own study of privatization issues. *See Reforms and Opportunities* at 9.

In April 1994, CEL formulated the legislation necessary to remove two obstacles to privatization, the 50-year maximum for concessions on public works projects, and the free reversion to the state at the expiration of such a concession. This legislation, Article 120, was ratified in October of the same year. *See* Amendment to Article 120 of the Constitution, Legislative Decree No. 166, Diario Oficial 196 [325] (Oct. 24, 1994).

---

14 Act to create the National Privatization Commission, Legislative Decree No. 768, published in Diario Oficial No. 82 [311] (May 7, 1991) (the "National Commission Act").

Also in April 1994, Sr. Armando Calderón Sol of the ARENA political party was elected president of El Salvador.[17] The ARENA party had promised a program of privatizing state services as part of El Salvador's economic progress. Consistent with that promise, in June 1994, President Calderón Sol announced an ordered and gradual privatization of CEL. In October 1994, El Salvador enacted Legislative Decree 142, ordering CEL to submit to the President a step-by-step plan for the privatization of electrical energy distribution in El Salvador.[18] Decree No. 142 stated specifically that this plan was to include "[p]roposals for the legal framework to regulate the establishment of rates of the service of electric energy." See Legislative Decree No. 142 art. 3(g). And, according to the American Embassy in El Salvador, that plan was to include the establishment of a commission to oversee the rates for electricity distribution. See Report of the American Embassy-- San Salvador (Feb. 25, 1995). In fact, according to a May 1994 report by the firm of SEFISTA, an earlier study performed for CEL by the consulting firm Synex had proposed the creation of a separate commission, the duties of which would include the administration of the electricity sector prices and rates. See Electrical Sector Efficiency and Proposals to Modernize and Privatize Companies Doble G SEFISTA (May 1994).

On April 4, 1995, CEL submitted its self-formulated privatization plan, describing the division of distribution activities among four private investors, and specifically submitting the draft law that would become the 1996 General Law of Electricity. As had been anticipated as early as

[17] President Armando Calderón Sol is the nephew of CEL's President, Guillermo Sol Bang.

[18] Temporary Act for the Rendering of the Public Service of Distribution of Electric Energy, Legislative Decree No. 142, Diario Oficial 183 [325], Oct. 4, 1994 (hereinafter, "Legislative Decree No. 142")

5318244.9

1991, the April 1995 CEL draft provided that electricity sector prices, both wholesale and retail, would be linked to the market. The draft law provided that the power to set wholesale prices would be taken from CEL and vested in a newly created entity called the Energy and Hydrocarbons Regulatory Commission ("EHRC"). Article 72 of the draft law provided that the price of electricity from generators to distributors would not be regulated except that "the block sales price of electricity from generators to electric distribution service concessionaires shall be regulated by the EHRC" until the EHRC determined that "competitive conditions [were] sufficient to allow the deregulation of prices for these services." During the period of EHRC price regulation, EHRC was to determine the price:

> based on marginal generating costs, the average cost of transmission for a system that is economically appropriate and the value added by the distribution, in accordance with the provisions of this Law an the Regulations hereunder.
>
> The prices shall be structured so as to promote the economic efficiency of the sector.
>
> In no case may costs attributable to the service provided to one category of customers be recovered by rates charged to other customers or to other categories of customers.

Draft Electricity Law art. 73. The draft law proposed by CEL went on to provide:

> Prices regulated by EHRC pursuant to the provisions of this Law shall be established by adjustment formulas that shall express them as a function of indices, prices and/or factors representative of the costs of the service in question.

Draft Electricity Law art. 73.

On February 22, 1996, President Calderon Sol approved CEL's plan, and through Executive Decree No. 283 ordered the CEL Board of Directors to start the restructuring of electrical energy distribution. *See Reforms and Opportunities* at 9-11.

Most notably, in October 1996, El Salvador passed the General Law of Electricity, the lynchpin of CEL's privatization efforts. The stated purpose of this law was to provide for free competition in the generation, transmission, and distribution of electric energy consistent with the 1995 CEL draft and government policy going back to at least 1991. Among the key aspects of the 1996 Electricity Law is that electricity prices at the wholesale level would not be determined by CEL, but rather would be determined by the market.

Contrary to CEL's present assertions that the enactment, content, and effect of the 1996 General Law of Electricity took CEL by surprise and could not have been anticipated, CEL had for years been acutely aware of this pending legislation and of its scope and potential effect. In preparation for this change in status, CEL had its employees visit numerous countries, including Chile, Argentina, England, and others, to analyze privatization and the effects of a free market in electricity. *See* CEL Annual Report (1995), p. 7; *see also* NotiCEL, Sept./Oct. 1996, p. 4.

Further, since enactment of the 1996 Electricity Law, CEL has trumpeted the fact that it was responsible for proposing that law to both the executive and legislative branches of El Salvador's government. This law, CEL boasted, "sets a new example for the electrical industry, based on efficiency through competition in all its activities of generating, distribution, and sales to end users." *See* Reforms and Opportunities at 11, 20, 23, 38; Dr. Ana Maria Majano, General Coordinator of the Restructuring Process of the Electrical Sector, Competence and Efficiency for Better Service; El Diario de Hoy (June 10, 1998). In addition, in CEL's 1997 Annual Report, CEL's president explicitly states:

CEL had an active role in the shaping of the Law of the Creation of SIGET and especially in the creation of the General Law of Electricity.

36

531824.9

*See* Statement of G. Sol Bang, CEL Annual Report (1997).

CEL's participation in passing the 1996 General Law of Electricity was publicly recognized by El Salvador's president, Armando Calderón Sol, both before and after its adoption. In his inaugural address in 1995, Calderón Sol lauded CEL's participation in shaping privatization:

> The Government takes this opportunity to recognize the important participation of the Executive Hydroelectric Commission of the Lempa River (CEL) in the privatizing process which is carried out under its leadership to improve the electrical service in our country.

*See* "Inaugural Message of President Armando Calderón Sol," El Diario de Hoy (July 8, 1995). In 1998, Calderón Sol reiterated the government's pride in CEL's pursuit of the goal of privatization:

> If the Government of the Republic and my administration has anything to be proud of, it is the work that CEL has carried out in these past five years, the transformation of the electrical system, having introduced a competitive market, private generation, the opening of doors to the electrical system in our country, and having promoted foreign investment.

*See* June 6, 1998 "Speech of President Armando Calderón Sol," El Diario de Hoy (June 10, 1998).

**G.    CEL's Privatization Asset Sales and Its Engineering of Its Financial Situation**

In its Statement of Claim, CEL repeatedly contends that its continued performance of the PPA in its present form "will drive CEL to bankruptcy or at a minimum, cripple CEL financially." *See* Statement of Claim at 2. Contrary to CEL's claims, however, these financial pressures were not due to unforeseeable changes brought about by deregulation and privatization altering the economic circumstances within which CEL operates. Instead, they are the direct result of CEL's own decisions and actions during the privatization process and the attendant contracting process.

37

53182266.9

In April 1997, El Salvador's Congress passed Legislative Decree 1004,[17] authorizing the sale of CEL's distribution assets. In January 1998, these distribution assets were privatized, with CEL selling its interest in four distribution companies to three foreign bidders for a total of US$ 568 million. In August of 1999, CEL sold three geothermal plants to Duke Energy for a price of US$ 125 million. In effect, NPC was prohibited from bidding on these assets by legislation, urged by CEL and directed at NPC, prohibiting companies who were parties to PPAs in El Salvador (NPC) from participating in the bidding process.

The privatization CEL engineered had involved the sequential sale of its assets to private investors. First, in 1998, CEL sold most of its shares in its distribution companies. Subsequently, in the summer of 1999, CEL sold its shares in its three thermal plants. Now CEL is considering looking for a strategic partner for its geothermal plants, and transferring the operation of its hydroelectric plants to a third party (whether under management contract or outright sale is not presently clear). CEL's original assets were extremely valuable, and CEL has realized considerable sums from the sale of those assets.

IV.   JURISDICTION: NO DISPUTE SUBJECT TO ARBITRATION EXISTS

A.   The Arbitrators Can and Should Decide Jurisdiction as a Threshold Matter

The arbitration agreement provides that the arbitrators shall decide the arbitrable issues before them as "arbitrators at law" in accordance with the laws of El Salvador. The procedural rules governing the proceedings are those Rules of Arbitration of the United Nations Commission on

[17] Act for the Sale of Shares of Distributors of Energy Corporations, Decree No. 1004, published in Diario Oficial No. 76 [335] (April 29, 1997).

38

5318244.9

International Trade Law (the "UNCITRAL Rules"), and any arbitration is to take place in Geneva, Switzerland. PPA § 20.4, § 20.3.

The UNCITRAL Rules adopt the doctrine of "competence de la competence," explicitly giving the arbitrators the authority to determine their own jurisdiction. Article 21 of the UNCITRAL Rules specifies that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." UNCITRAL Rules art. 21(1).

While the arbitrators do have the authority to continue with the arbitration and decide jurisdiction in the award, the UNCITRAL Rules set out an express preference for arbitrators to make such jurisdictional determinations early in the proceedings. UNCITRAL Rules art. 21(4). If the arbitrators were to carry the jurisdictional question forward and then determine no dispute exists within the scope of the parties' arbitration agreement, the entire proceedings will have been a waste of time, effort, and money. Certainly, as a matter of efficiency, and consistent with the goals of the arbitral process, the arbitrators should determine the jurisdictional issues before them as a threshold matter.

**B.    The Arbitration Clause is Remarkably Narrow in Scope**

**1.    The Standard Broad Form Arbitration Clause**

Prerequisite to continuing this arbitration is the existence of a "dispute" over interpretation or performance of the PPA. Section 20.1 of the PPA sets out the scope of the arbitration agreement:

**Dispute Resolution.** (a) In the case of disputes over technical matters that cannot be resolved between the Parties within 15 days, the services of an independent expert will be contracted and approved by both Parties, who will issue a decision within 30 Days of his appointment, which resolution will be accepted by both Parties. The costs of such expert will be covered by both Parties in equal amounts.

39

531 8244.9

(b)  In the case of disputes that are not over technical matters, each Party shall respond in writing to the petitions of the other Party over divergences in application and/or interpretation of this Agreement, within a term of thirty (30) Days after such petition is presented to such Party in writing.  All disputes or discrepancies that arise from the interpretation or performance of this Agreement and that cannot be resolved favorably between the Parties within a period of fifty (50) Days from their arising, with the exception of technical matters, shall be submitted to arbitration in accordance with the following sections.

PPA § 20.1.

Article 1 of the UNCITRAL Rules sets out the scope of the Rules' application.  So long as the parties have agreed in writing that disputes relating to the contract shall be referred to arbitration under the UNCITRAL Rules, then "such disputes shall be settled in accordance with these Rules subject to such modification as the parties may agree in writing."  UNCITRAL Rules art. 1(1).  The UNCITRAL Rules thus require that the disputes presented be within the scope of the parties' arbitration agreement.

The arbitration agreement in the PPA is remarkably narrow in scope.  Arbitration clauses are generally considered either "broad form" or "narrow," and the language the parties chose to use in setting their agreement is key to the scope of what is subject to arbitration.  A typical broad form arbitration clause contains language such as that recommended by various international arbitral bodies.  The UNCITRAL Rules offer the following model clause:

Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL arbitration Rules as at present in force.

UNCITRAL Model Arbitration Clause, UNCITRAL Rules art. 1.  The International Chamber of Commerce suggests this broad-form language:

531:8744.9

All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.

Standard ICC Arbitration Clause, Rules of Arbitration and Conciliation of the International Chamber of Commerce (1998).

The American Arbitration Association recommends the following suggested language in its International Arbitration Rules:

> Any controversy or claim arising out of or relating to this contract shall be determined by arbitration in accordance with the International Arbitration Rules of the American Arbitration Association.

Standard Arbitration Clause, AAA International Arbitration Rules. The London Court of International Arbitration suggests:

> Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the LCIA, which Rules are deemed to be incorporated by reference into this clause.

LCIA Recommended Arbitration Clause for Arbitration Under LCIA Rules.

The key phrase in a broad form arbitration clause is "arising out of or relating to" or very similar language. Courts have held these phrases to require arbitration not only of disputes arising out of the underlying contract, but of disputes outside of, but related to, the agreement. *See, e.g.*, *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 5, 103 S. Ct. 927, 931, 74 L. Ed. 2d 765 (1983); *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995); *Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd*, 139 F.3d 1061, 1067 (5th Cir. 1998).

Using the phrase "arising out of" is not sufficient to give an arbitration agreement broad scope. It must be followed by the phrase "or relating to" or a similar expansive phrase to maximize

531 82 4 4 9

41

the scope of the arbitration agreement. Just the phrase "arising out of" has been viewed by courts to cover only those disputes "relating to interpretation and performance of the contract itself." *See Mediterranean Enter. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983); *In re Kinoshita & Co.*, 287 F.2d 951, 953 (2d Cir. 1961); *S.A. Mineraca O Dea Trinidade-Samitri v. Utah International, Inc.*, 745 F.2d 190, 1994 (2d Cir. 1984).

2.    The Arbitration Clause in the PPA is Deliberately Very Narrow

The "magic language" of a broad form arbitration clause has become axiomatic. Thus, any departure from a standard broad form clause may be construed narrowly. In his role as commentator, counsel for CEL recognizes this premise, stating "it is dangerous to invent elaborate formulations, which in fact may be interpreted as reflecting a desire to limit the scope of arbitration." W. Laurence Craig, William W. Park, Jan Paulsson, International Chamber of Commerce Arbitration, part II § 6.03 at 111 (1990).

For example, courts hold the omission of the "or relating to" language to be significant. *See Tracer Research Corp. v. Nat'l Environmental Serv. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994). "The parties' failure to use phrases or terms ordinarily included in an arbitration clause is evidence that they did not agree to arbitrate all the issues arising out of their business relationship." *Beckham v. William Bayley Co.*, 655 F. Supp. 288, 291 (N.D. Tex. 1987).

In this case, the parties not only substantially departed from the standard language of a broad form arbitration clause, they were clearly aware of that standard language in making that deliberate departure. The parties specified arbitration pursuant to the UNCITRAL Rules, but distinctly deviated from the language expressly set forth in those Rules. Rather than using the suggested language of "[a]ny dispute, controversy or claim arising out of or relating to this contract, or the

5318244.9

breach, termination or invalidity thereof...," the parties chose to use the much more restrictive language of "[a]ll disputes or discrepancies that arise from the interpretation or performance of this Agreement...." PPA § 20.1.

The parties' choice of language, and the clear deviation from the standard, is plainly an intentional limitation of the scope of the matters arbitrable under the PPA. Not only did the parties omit the "in relation to" language, but they expressly limited the matters arbitrable under the agreement to (1) disputes or discrepancies (2) that arise from (3) the interpretation of the PPA or the performance of the PPA. PPA § 20.1. CEL does not present any such dispute or discrepancy arising from the interpretation or performance of the PPA in its Notice of Arbitration or in its Statement of Claim, and does not present any arbitrable issue to the Arbitral Tribunal.

C.    No Dispute Exists

In retrospect it seems clear that CEL has deliberately tried, but failed, to manufacture an arbitrable dispute. CEL's repeated requests in 1998 for NPC to present a buy-out proposal now appears to be nothing other than an utterly cynical and bad faith effort to create a "dispute." CEL relies almost entirely upon the October 5, 1998, letter from NPC as evidence of both the existence of a "dispute" and NPC's alleged "bad faith." However, CEL fails to disclose that the October 5, 1998, letter was generated at CEL's request, or that CEL originated the concept of a buy-out, or that CEL knew full well at the time that US$ 135.5 million for the buy-out of the contract was in no way, as it now asserts, "outlandish."

CEL's accusations that NPC refused to negotiate in good faith have no basis in fact – CEL did not give NPC the chance to negotiate. CEL characterizes NPC's October 5, 1998, proposal as "outlandish," trying to excuse its own failure to respond in good faith to that initial offer. The

53183449

43

parties' history of negotiations and amendments establishes the lack of a genuine dispute. CEL has come to NPC seeking changes in the PPA several times, and the parties negotiated and agreed to several amendments. The parties always managed a process of productive negotiation. In this instance, however, CEL did not want productive negotiation. Instead, it wanted to set up the appearance of a dispute triggering arbitration and camouflage its desire to avoid its contractual obligations without paying any compensation for that privilege.

D.    The Alleged "Dispute" is Not Within the Scope of the Arbitration Agreement

As discussed above, the parties' arbitration agreement is exceptionally narrow in scope and only allows arbitration of disputes or discrepancies arising from the interpretation or performance of the PPA. Nowhere in CEL's recitation of the asserted "dispute" over the buy-out of the PPA does CEL even attempt to explain how such a "dispute," even if it existed, can be characterized as arising out of the interpretation or performance of the PPA.

No dispute exists over the performance of the PPA.[18] Neither of the parties have failed or refused to perform, and CEL does not allege any such failure. Neither of the parties breached the contract, and CEL does not allege any such breach.

No dispute exists over interpretation of the PPA.[19] The parties have not disagreed over the meaning or effect of the contract's substantive terms, and CEL does not allege any disagreement.

---

18/ "Performance" means: "The fulfillment or accomplishment of a promise, contract, or other obligation according to its terms, relieving such person of all further obligation or liability thereunder." BLACK'S LAW DICTIONARY at 593 (1983).

19/ "Interpretation" means: "The art or process of discovering and ascertaining the meaning of a statute, will, contract, or other written document. The discovery and representation of the true meaning of any signs used to convey ideas. BLACK'S LAW DICTIONARY at 420 (1983).

5318244.9

CEL does not identify any disputed contract provision. What CEL sets out is its unhappiness with the terms of the contract to which it agreed, and its dissatisfaction with the opening offer NPC made in response to CEL's request for such an offer. CEL simply wants the Arbitral Tribunal to bless CEL's desire to avoid the agreement it negotiated and made.

E.    **The Arbitrators Do Not Have the Power to Grant the Relief Requested**

In their arbitration agreement, the parties expressly defined and limited the arbitrators' roles and authority in crafting a resolution to any arbitrable dispute. Section 20.4 of the PPA sets out the parties' choice of applicable law and procedure and the manner in which the arbitrators are to decide the issues presented to them, as follows:

**Rules and Choice of Law.** The arbitrators shall decide the issues submitted to them **as "arbitrators at law"** in accordance with the laws of El Salvador. The arbitration shall be conducted in accordance with the UNCITRAL arbitration rules.

PPA § 20.4. The direction that the arbitrators are to act as "arbitrators at law" cannot be disregarded. In so providing, the parties direct that the arbitrators **must** apply the parties' contract as written and base their decision on that agreement, and **shall not** modify, amend, or renegotiate the parties' contract for them.

A recent commentary explains the practice of authorizing arbitrators to craft solutions based on "equity," *ex aequo et bono*, or as "amiable compositeur":

On occasion, parties decide to authorize arbitrators to renegotiate or, in effect, to negotiate supplementary agreements, which reflect what the arbitrators deem appropriate rather than an interpretation of existing contractual language or the application of governing law to the original agreements. This function is generally referred to as "equity," a term which is quite misleading in that it implies decisions made according to law or the contract are necessarily or have somehow become inequitable. It is also referred to as decision *ex aequo et bono* or amiable composition.

W. Michael Reisman, W. Laurence Craig, William Park, Jan Paulsson, International Commercial Arbitration 259 (Foundation Press 1997). The UNCITRAL Rules allow arbitrators to engage in such "equity" only if the parties agree to it and if in accordance with applicable law. UNCITRAL Rules art. 33(2). In this instance, the parties have denied the arbitrators any such authority.[20]

In section 20.7 of the PPA, the parties further explicitly limited the arbitrators' authority, denying the arbitrators any power to derogate from the express provisions of the PPA:

Limited Authority. Nothing herein contained shall be deemed to give the arbitrators any authority, power or right to alter, change, amend, modify, add to or subtract from any of the provisions of this Agreement.

PPA § 20.7.

The motivations of the parties in setting down these limitations are likely similar to those described in the following commentary:

Parties to a modern contract usually view the contractual rights that they have secured from the other party as entitling them to full and strict performance. While many disputes about such contracts are frequently described by one or both parties as disagreements about the meaning of the terms of the agreement, an observer will often see them as a conflict in which one party seeks strict performance while the other, invoking some principle or rule of the governing law, seeks to justify non-performance and/or a change in its obligations. In short, one party seeks implementation of the contract and the other seeks relief from it. When the governing law does not permit such relief, the party seeking it is, in effect, requesting an equitable solution. Equity, in this contractual context, means a renegotiation of the benefits and burdens in ways that are different from those originally expressed in the agreement.

In the absence of a direct contractual authorization or an authorization in the governing law, arbitrators are expected to provide a legal application of the

[20] At the preliminary hearing, CEL's counsel asked the Tribunal to consider acting as amiable compositeur. Counsel for NPC objected and the Tribunal correctly and quickly confirmed that it had no such authority in the absence of an express agreement between the parties. Here, there is not only no such agreement between the parties, but a clear contractual prohibition.

46

531824-9

contract and not to renegotiate it on behalf of the parties. When arbitrators are authorized to make a decision which departs from the terms of the contract and/or the governing law, they are usually described as deciding *ex aequo et bono*, or according to equity. These are terms of art which are misleading in their ordinary connotation. For historic reasons, common law lawyers contrapose "law" and "equity," a distinction which implies that law is not equitable. That is quite misleading. Agreements which are freely reached between parties in positions of power parity are not necessarily inequitable. Indeed, it would appear to be inequitable not to give effect to them. A decision *ex aequo et bono* does not import an absolute conception of equity but simply an instruction to arbitrators to ignore the existing terms of a contract and/or those parts of the governing law which are dispositive and to refashion the contract in ways that appear to them to be appropriate.

Reisman, Craig, Park, Paulsson, International Commercial Arbitration at 195-96 (emphasis added).

CEL's counsel, when not acting as an advocate, has thus ably described CEL's desperate effort to manufacture this arbitral "dispute."

The parties' intent to restrict the scope of the matters arbitrable under the PPA and the scope of the arbitrators' powers in resolving those matters could not be more clearly stated. CEL would like the Arbitral Tribunal to disregard these limitations, thus asking not only that the arbitrators ignore the parties' express contractual agreements on contract price and termination, but also ignore and modify the parties' express contractual agreement that the arbitrators have no such authority.

V.    ARGUMENT: ARTICLE 994 DOES NOT AND CANNOT APPLY IN THIS CASE

CEL relies entirely upon the supposed application of Article 994 of the Commercial Code of El Salvador to support its bid to avoid complying with its contract and allow it to destroy the contract with no compensation to the other party. Article 994, however, is very clearly an extraordinary remedy, rarely justified, and applicable only in narrow and egregious circumstances. Those circumstances clearly do not exist in this case.

53182449

47

## A. The Basic Principles of Commercial Contract Law in El Salvador: *Pacta Sunt Servanda* – Contracts Must Be Honored

The most basic principle of the law of contracts in El Salvador, as in virtually all other countries, is that contracts must be honored (*pacta sunt servanda*). This principle is set out in the Civil Code of El Salvador. Article 1416 of the Civil Code provides: "A contract validly entered into is binding upon the parties and its effects between them only cease by their mutual agreement or for legal causes." *See* Civ. C. art. 1416. Thus, in El Salvador, contracts are law between the parties and are binding. *Id.; see also* UNIDROIT Principles arts. 1-3.

The principle of party autonomy is the backbone of *pacta sunt servanda*. It derives from the French Napoleonic Code and emphasizes the sovereign power of individuals to create binding obligations.[2/] *See* Civ. C. art. 1308. According to this principle, parties can regulate their relations at will. As a result, few mandatory rules override contractual clauses. In El Salvador, as in the rest of the international marketplace, the contract is essentially dispositive. *See, e.g.,* Civ. C. art. 1418.

## B. The Exceptional Nature and Essential Elements of Article 994

Contrary to the implications in CEL's Statement of Claim, Article 994 is not a central precept of Salvadoran contract law with which every potentially contracting party must necessarily be concerned. It is instead a very narrow, and very rarely applied, exception to the essential principles of contracting and the overriding rule of the sanctity of negotiated commercial contracts discussed above.

---

[2/] Art 1134, French Civil Code provides: "Conventions legally entered into have the force of law between those who entered into it." "Party autonomy" has been defined as "the legislative delegation to individuals of the power to regulate social relations through contracts." *See* Barbosa Verano, Jeanet, La teoría de la imprevisión en el Derecho Privado Colombiano (1991), p. 101 (hereinafter, "Barbosa").

48

5318244.9

Article 994 provides:

When, with respect to an act of continuous performance, with periodical or deferred consideration, the burden of such consideration on one of the parties becomes excessively onerous because of the occurrence of extraordinary and unforeseeable events in the marketplace, the party owing such consideration shall be entitled to termination (resolución) of its duty of continuing performance; but the other party shall also be entitled to oppose such termination (resolución) by proposing an equitable and proportional amendment.

In case of disagreement of the parties, the Court shall submit the issue to the opinion of an expert.

Article 994.[22]

As in the other codes from which it derives, Article 994 is an attempt to provide a remedy in cases of catastrophic economic events, such as hyperinflation or currency devaluation, occurring in the aftermath of extraordinary and unforeseeable events that radically destroy the foundations of contracts, such as wars and revolutions. This is certainly not the situation in this case.

The excessive hardship doctrine is an extraordinary remedy and rarely applied. Because it is a limitation to the principle that the parties' contracts must be honored, and because of the potential harm to basic principles of economic certainty, Article 994 must be narrowly applied and the claimant shall bear the burden of proving all of its requirements. See, e.g., Cap CC. Santa Fe, [1978-N] L.L., XL, 486 (Argentina); Capp. Rosario, [1979-M] L.L., XL 480 (Argentina); Cass, 28 Nov. 1958, n. 1373 Giust. Civ., 1973 (Italy); STS, Oct. 27, 1989 (Spain).

---

[22] The current Commercial Code of El Salvador was adopted by Legislative Decree No. 671 (May 8, 1970), Diario Oficial No. 140, Vol. 228 (July 31, 1970), and became effective April 1, 1971. Legislative Decree No. 149 (December 18, 1970), Diario Oficial No. 235, Vol. 229 (Dec. 23, 1970). It replaced the former Commercial Code of 1904.

53182449

The essential elements of Article 994, as with the foreign statutes from which it derives, are set out in the statute itself. Article 994 requires:

(1)  the parties must have a contract requiring continuous periodic/deferred consideration;

(2)  payment of the consideration imposes an excessive hardship on one of the parties;

(3)  the excessive hardship is due to events that are supervening, extraordinary, **and** unforeseeable in the marketplace; and,

(4)  the events were beyond the claimant's control.

Article 994.[27] CEL not only fails to meet **all** of these essential elements, but, with the exception of having a contract involving continuous performance, it fails to meet **any** of them.

C.  **The Express Terms of the PPA Confirm Article 994 Cannot Apply**

The terms of the PPA confirm that, as is expected of sophisticated entities operating in international commerce, the parties allocated the risks and benefits of their contract between them and appropriately addressed the issues significant to a long-term commercial endeavor such as the Nejapa Project and the PPA. The detailed provisions for pricing, termination, changes of law, and government approvals and obligations all confirm the parties anticipated and addressed the matters CEL now wrongly insists were entirely unforeseeable and extraordinary.

1.  **The Lack of a Renegotiation Clause**

CEL contends that the lack of a "standard" renegotiation clause in the PPA is some sort of proof that the parties were aware of and relying upon the existence of Article 994 as a substitute for such a clause. Accepting that argument requires accepting that, in crafting an intensely negotiated

---

[27] See also Civ. C (Argentina), art. 1198; C. c. (Italy), art. 1467; H. Masnata, La excesiva onerosidad sobreviniente y el contrato (1968), p. 47; Ival Rocca, La imprevisión contractual y las revisiones del contrato (1989), pp. 23-29; Barbosa at 151.

53182444.9

and detailed commercial contract involving a project worth hundreds of millions of dollars and upon which the future development of a nation's electric power infrastructure rested, the parties decided they would rely on an obscure, entirely untested, and disfavored provision of law to protect their rights rather than including what CEL itself calls a "common" contract provision.

Article 994 is not mentioned anywhere in the PPA. Its existence is not even hinted at. There is no evidence that the parties considered Article 994 a substitute for a "common" renegotiation clause. And, in fact, the provisions expressly prohibiting the arbitrators' authority to engage in the kind of "equity" represented by Article 994 is strong evidence of a desire to derogate from any potential effects of that law. What is clear is that the parties wanted the PPA to be the universe of their relationship so only they could modify or terminate it.

2.    The Entireties Clause

The purpose of the PPA is to provide for the terms and conditions that will regulate the construction, operation, and maintenance of the power plant, as well as the sale and purchase of energy, throughout the 20-year term of the contract. A review of the PPA leaves no doubt that the parties intended to allocate all risks resulting from the project and to regulate all events, foreseeable or not, that might impair its entire performance. Article 19 of the PPA states:

This Agreement is intended by the Parties as the final expression of their agreement and is intended also as a complete and exclusive statement of the terms of their agreement with respect to the energy sold and purchased hereunder.

PPA art. 19.

The parties clearly intended to regulate the terms and conditions to govern their rights and duties throughout the life of the contract. They exercised their freedom to contract in negotiating and entering into the PPA, and agreed that it would be enforced as written and according to its terms.

51

52:8244.9

Under El Salvador law, the principle of party autonomy is far stronger than that of the rare exception of Article 994.

D.    CEL Entirely Fails to Satisfy the Essential Elements of Article 994

1.    Privatization Was Not a Supervening Event Beyond CEL's Control

Privatization was not a supervening event. The privatization of the electricity sector in El Salvador was well under way as of May 18, 1994, when CEL and Trigen entered into the PPA. Furthermore, privatization occurred not merely with CEL's knowledge, but under CEL's direction and guidance.

CEL has been responsible for drafting electricity sector policies for the government of El Salvador since at least 1988. See Report of the Meeting with the President at Annex 1. Electricity privatization was proposed as early as 1989 by then President Cristiani. In addition, independent reports in the electricity market financial press already supported the feasibility of the proposal, seeing "El Salvador in the process of returning six distribution companies to the private sector." See "El Salvador Seeks Private Power," Independent Power Report 10 (March 1, 1991).

In May 1991, the National Congress advanced the privatization process. Confirming the government privatization initiative, it passed Legislative Decree No. 768 creating the National Commission for Privatization. From that moment on, no market force could deny the immediate liberalization of the electricity sector in El Salvador. CEL was officially notified and commanded to adopt an active role consistent with the National Commission of Privatization. Article 8 of the National Commission Act provided:

The Official Autonomous Institutions including therein the Comisión Ejecutiva Hidroeléctrica del Río Lempa (the National Executive Hydroelectric Commission of the Lempa River), the Administración Nacional de Acueductos y Alcantarillados

53182449

52

(National Administration of Water Lines and Sewage), and the Instituto Salvadoreño del Seguro Social (Salvadorian Institute of Social Security), because of their own laws, shall abide by the provisions and procedures of the Commission with respect to the privatization of the goods and services they own or administer.

Recognizing its active role, the state-owned monopoly signed a contract with a consulting company in 1992 further mapping the contours of the privatization process. It was considered "the start of the privatization process." *See Reforms and Opportunities* at 6.

In 1993, CEL created a separate division to work on privatization and prepare its own study on privatization, and retained Union Fenosa, a Spanish utility, as a consultant for the privatization of the distribution companies. *See id.* at 9.

In October 1994, the National Constitution, *see* former art. 120, was amended to facilitate the privatization process and promote foreign investment. *See Reforms and Opportunities* at 6. CEL was appointed "official architect" of the market liberalization on October 4, 1994, when Legislative Decree No. 142 ordered CEL to submit to the President a step-by-step plan for the privatization of electrical energy distribution in El Salvador.

On April 4, 1995, CEL submitted its integral plan to the President of El Salvador, proposing the methods and manner of the privatization of the distribution companies. The plan included the formation of the regulating body for the Energy Act and the formation of the Transactions Unit, the company that operates the electricity system and the electricity power spot market. At the time it proposed this plan, CEL certainly knew it would no longer control prices or receive public subsidies. It clearly stated that the result of its plan would be to lower prices in the Salvadorian spot market.

On February 22, 1996, the President of El Salvador approved CEL's plan, and through Executive Decree No. 283 ordered the CEL Board of Directors to start the restructuring of electricity

energy distribution. *See Reforms and Opportunities* at 9-11. CEL was thereby empowered to create, merge, transform, liquidate, or sell stock of its own distribution companies as well as to propose a legal framework for continuing privatization.

2. The Events Were Neither Unforeseeable Nor Extraordinary

CEL has only vaguely referenced the events which it now claims were extraordinary and unforeseeable. In its Statement of Claim, it advances only that "the precise shape and tone of the Electricity Law of 1996 as enacted was not foreseeable to CEL at any time." *See* Statement of Claim at 24. Additionally, CEL refers to changes in elected officials and supposedly extraordinary and unforeseeable, but unspecified, changes in unidentified financial markets. Even given this lack of detail, it is apparent that by their very nature, none of the events upon which CEL relies were unforeseeable and extraordinary, or even particularly unusual.

a. Foreseeability and Diligence in the Marketplace

In El Salvador, as elsewhere, objective foreseeability is governed by the commercial standards of the marketplace. Article 994 sets forth the requirements that the events must be extraordinary and unforeseeable "in the market." Commercial Code Article 947 establishes that "mercantile obligations shall be performed with the diligence of a good merchant in its own business." And, Civil Code Article 1418 provides that parties are free to determine whether foreseeable or unforeseeable events should be governed by the contract (*e.g.*, through force majeure clauses).

The marketplace in which the PPA was negotiated and exists is that of sophisticated, international electricity generation and distribution. It consists of the status of the general industry at a certain date – indices, prices, interest rates, public information, history and predictions,

governmental policies, and any of the other risk factors that any participant in the electricity market would take into account before making an investment decision. *See* Civ. C. art. 1417; UNIDROIT Principles art. 6.2.2.[24]

Salvadoran law imposes an obligation of diligence upon the parties to a contract. For the layman, diligence means effort, care, or effectiveness in performing any activity. *See* Diez Picazo, Fundamentos de Derecho Civil Patrimonial, TII (1998), p. 95. A higher standard of diligence applies to the businessman than for the lay person. *See* Com. C. art. 947.

Parties must act diligently in their own business, and are expected to anticipate foreseeable events and address them in their contracts. *See* Civ. C. art. 1417; Civ. C. art. 1198 (Argentina); Civ. c. art. 1467 (Italy). In international commercial contracts, it is common that sophisticated parties carefully provide for fluctuations in prices, inflation, currency depreciation, changes in law, force majeure events, and other such commercial risks. As is apparent on the face of the PPA, CEL, and the Contractor carried out a detailed projection and allocation of such risks in their contract.

Of course, the standard of diligence is even higher when considering the duties of an expert like CEL that also shapes the future of the marketplace. *See* Badosa, La diligencia y la culpa del deudor en la obligacion civil (1987). Thus, under Commercial Code Article 947, a state-owned monopoly cannot not behave as a small enterprise. CEL was required to use all available resources to foresee the consequences of privatization and market liberalization. In this case, CEL was not simply in the role of sophisticated prognosticator. The privatization, and specifically CEL's

---

[24] *See also* A. Pino, La eccessiva onerosita della prestazione (1952), p. 66 (hereinafter, "Pino"), Lily R. Flah, Miriam Smayevski, Teoria la imprevisión Aplicacion y alcances. Doctrina y jurisprudencia (1989), p. 27 (hereinafter, "Flah").

5318244.9

forfeiture of its monopoly over wholesale electricity prices, had been considered for years and described clearly in the draft of the 1996 Electricity Law CEL submitted to the President of the Republic in early 1995. Under these circumstances, foreseeability is not even a question.

    b.    The Effects of the 1996 Electricity Law Were Neither Unusual Nor Unforeseeable

CEL admits that privatization was foreseeable at the time of contracting. As a sophisticated entity, CEL had seen the privatization process and its effects many other times in many other places. Competition is indisputably incompatible with price control and yet, CEL pretends that the loss of its ability to set retail prices is an extraordinary and unforeseeable consequence of the privatization. CEL surely could foresee the potential natural effects of such privatization and market liberalization, including the loss of CEL's ability to set wholesale sale prices.

Even if the active role played by CEL in the privatization process is ignored, it remains that the consequences of the liberalization process were neither extraordinary nor unusual. Privatization brings about decreases in prices because of the natural play of supply and demand, the entry of new economic agents, and eventually, elimination of the state participation. None of those effects are unexpected after the liberalization of any market.

No doubt exists that in 1993 CEL was aware of the inevitable privatization of the electricity sector. By May 18, 1994, the date on which the PPA was signed, the privatization process was well underway in El Salvador and CEL was its main architect. CEL further had ample opportunities to revise the PPA to adjust it for the change in CEL's status during the various renegotiations of the PPA's price terms. It certainly knew of the existence and direction of privatization on July 30, 1994, when the PPA was assigned to Coastal Aruba (Amendment 2), on December 14, 1994, when the

5318244.9

PPA was assigned to NPC (Amendment 3) on June 19, 1995, when the parties agreed to both a plant expansion and a change in the pricing formula (Amendment 4); and on September 17, 1997, when the parties again agreed to modify the pricing indices (Amendment 5). Indeed, during the negotiation of the amendments, CEL reexamined the validity of its initial contract assumptions, adjusting them to address existing circumstances.

Of course, prices are lower in the Salvadoran spot market after the liberalization. Lower prices are a natural consequence of competition and higher efficiency. When CEL requested a capacity increase and change in pricing formula in June 1995, it already knew the consequences of the liberalization because it had studied and proposed it in its own plan. CEL cannot reasonably argue that either the privatization or its effects were unforeseeable.

3. The Other Events Upon Which CEL Relies Were Neither Unforeseeable Nor
   Extraordinary

CEL alleges that unforeseeable "events in the international financial markets" contributed to the hardship of which it complains. As in its Notice of Arbitration, CEL fails to state which of the events in question are market fluctuations (i.e., LIBOR rate variations, fuel cost indices fluctuations) or similar processes of liberalization in neighboring markets (e.g., Guatemala, Honduras). In any event, their occurrence is predictable as an essential element of market existence, and their potential directions are foreseeable from a long history of privatization efforts. Given the essential nature of financial markets and CEL's lack of specificity, no credence can be given to this claim.

International contracts entered into by sophisticated parties can and do introduce provisions dealing with market fluctuations (e.g., prices, interest rates, fuel costs) because they constitute normal risks in the market and they are objectively foreseeable. The PPA is not an exception. CEL

drafted a price formula in 1994, requested its amendment in 1995 and finally, obtained another revision in 1997. ----.

Article 5 of the PPA set forth a complete price index formula designed to change with the markets. However, the capacity rate (Factor A), which originally was 80% adjusted to the LIBOR rate, was amended in June 1995 at CEL's requests. The LIBOR rate was then replaced for a fixed capacity price while CEL requested a capacity expansion. The Fuel Cost Payment was also entirely renegotiated introducing new indexes able to track non-commodity fluctuations. And finally, the O&M payment (Factor B) was also amended in 1997 regarding the GDP, Implied Price Deflator, neutralizing inflation effects. Therefore, the price formula in the contract, which CEL agreed to as recently as 1997, is no longer susceptible to the kind of financial market changes of which CEL complains.

As for the other events of which CEL complains, it seems CEL regrets that the same ruling party during the Peace Accords in 1992 won the Presidential Election in 1994 and 1999 but lost its majority in the legislative assembly in 1996. It asserts that this political situation has "affected the process of privatization and deregulation of the energy sector." *See* Statement of Claim at 24.

Again, however, CEL makes only a bare allegation of how this normal aspect of democracy allegedly resulted in the unforeseeable and unpredictable situation CEL suggests.

It is the most basic and ancient rule of democracy that sovereignty resides in the population and, as a result, changes in governments will occur. While one may not be able to predict who will be elected, elections will occur, and those elections may result in new official being elected and old officials being ousted. Governmental policies, such as privatization, may or may not be altered according to changes in government dictated by the popular will, but that possibility exists as a

531824.9

fundamental tenet of democracy. In this case, it is difficult to detect to what changes in the privatization policy or plan CEL is referring. The fact is, the privatization and deregulation process of the electricity sector in El Salvador has suffered no significant obstacle or impasse since 1994.

One cannot divorce CEL's admitted knowledge that privatization of the electricity market was firmly planned from the reasonable anticipation that such a drive toward a free market might possibly affect CEL's ability to set prices. CEL cannot, as it attempts to do, reasonably argue that it knew privatization and market liberalization were going to occur, but deny that it could anticipate this possible consequence of that privatization.

An event is unforeseeable only if parties could not reasonably have predicted it acting with due care and diligence. CEL's skewed interpretation of this standard requires us to accept that the parties could have ignored that the liberalization of the electricity market, no matter the manner or path it takes, might result in the loss of CEL's ability to set prices above market rates. How on earth could sophisticated parties have ignored that liberalization and privatization means free market prices? Yet, CEL asks the Arbitral Tribunal to go a step further, and believe that CEL could not reasonably foresee the deregulation of electricity sector prices, even though such deregulation was under consideration for years and was set forth in detail in the draft law CEL submitted to the President of El Salvador. It is, on its face and in a word, ridiculous.

4.    CEL's Performance of the PPA Does Not Impose an Excessive Hardship

Even if Article 994 could apply, which it cannot, CEL's continued performance of the PPA does not impose an excessive hardship upon CEL. CEL asserts it faces impending financial devastation flowing from its inability to set retail prices in a competitive market, a power which,

531824.9

according to CEL, was a fundamental assumption of the PPA. None of these allegations are supported by the facts.

Excessive hardship in this context means a flagrant injustice supervening to the contract and contrary to the principle of good faith. *See* [1978-A] L.L., 945; E.D. (Aug. 24, 1989). Article 994 demands a comparative exercise of the burdens anticipated and allocated by the parties in their contract and the burdens it has incurred resulting from the supervening, unforeseeable, and extraordinary events. Before Article 994 may apply, an essential or fundamental alteration in such burdens as allocated by the parties must exist. To qualify as a fundamental basis of the contract, the matter in issue must be one that the parties should have considered so essential that they would not have entered into the contract had they known they were uncertain. *See Karl Larenz, Las bases del negocio jurídico y cumplimiento de las obligaciones* (1, 956). If the contract allocates the risks of extraordinary and unforeseeable events, Article 994 cannot apply. *See Civ. c. art. 1467 (Italy);* Cass n. 2518 (July 9, 1969); Pino at 23, 66.

It is true that, at the time of execution of the PPA, CEL enjoyed a monopoly in the sale of electricity in El Salvador. However, not only was the loss of that monopoly an anticipated and foreseeable event, none of the elements of the price formula depended upon the existence of that monopoly, and nothing in the PPA suggests that CEL's ability to perform was dependent upon its ability to control retail prices. The parties did not mention, much less agree upon or specifically provide for, any particular conditions under which CEL was to resell the power it purchased under the PPA.

CEL pretends that the ability to fix prices was a condition of the contract so that it may now terminate the PPA after the liberalization of the market. In other words, CEL contends that NPC

60

agreed the contract would exist only so long as CEL maintained its monopoly, a monopoly the destruction of which was already being planned at the time of contracting. The reality is just the opposite. NPC agreed to assume the obligations of the PPA because the PPA guaranteed that the foreseeable liberalization, or any other risk in the market, would not frustrate the purposes of the contract for a 20-year period. It was clear to NPC that CEL, as part of the government, was involved in a process of privatization, and the contract allocated those risks of changes in the law to CEL. CEL was the master of its destiny. If CEL's continued ability to resell at a higher price had been a basis of the PPA, NPC would never have assumed the obligations under the contract.

Furthermore, no evidence exists that CEL will suffer severe economic consequences if it is made to live up to its promises and continue to perform under the PPA. CEL repeatedly asserts that should it have to honor its obligations, it "will drive CEL to bankruptcy or at a minimum, cripple CEL financially." *See* Statement of Claim at 2. Giving this assertion a charitable characterization, it is at least inconsistent with the known facts.

CEL suffered losses for more than a decade prior to entering into the PPA. CEL, however, has posted a profit every year since the PPA became effective. Whereas CEL's losses in 1993 were US$ 1,348,571, CEL's profits rose to US$ 15,714,286 in 1994, reaching a peak in 1996 with US$ 46,114,286 profits. *See* CEL Annual Reports (1989-1997). NPC attracted foreign investment and the PPA triggered a profitable generation of energy in El Salvador which allowed CEL to overcome a weak financial situation. Moreover, CEL and the government have earned over US$ 711 million thanks to the sale of CEL's assets, and they anticipate additional asset sales that will generate even greater revenues. What it chooses to do with that massive influx of capital is its decision, but these facts show CEL's economic status to be sounder than ever. If it is not, that condition is not the result

of unforeseeable and extraordinary events in the marketplace, but is instead is the result of CEL's own decisions and actions.

E.    **The Limited Application of Article 994 in El Salvador**

As evidence of its exceptional nature, Article 994 has only been applied once by a lower court in El Salvador. And, regardless of its interpretation, that single case has no precedential value.

Like any other civil law country, case law (jurisprudence) has no precedential value in El Salvador. Courts must interpret statutory or contractual regulation on a case-by-case basis, following the rules freely agreed to by the parties or set forth in the Codes. For case law to be a source of law in El Salvador, there must be at least three equal Supreme Court judgments on the same issue. *See* Ley de Casación [Law of Cassation] art. 3.1, Legislative Decree No. 1135, Diario Oficial 161 [160], (Sept. 4, 1953), amended by Legislative Decree No. 339, Diario Oficial 185 [305] (Oct. 6, 1989) ("Law of Cassation")

Therefore, in El Salvador, the only binding jurisprudence is that from the courts of last resort and only provided that the number of decisions required by the law exists. Under El Salvador law, the only case on Article 994, *Cooperativa Algodonera Salvadoreña Limitada v. Nichimen, Ltd.*, (March 18, 1974) ("the Cotton Case"), is not binding precedent. No Salvadoran Court, not even the court that decided the Cotton Case, would be obliged to follow either its holding or reasoning. Even if the facts were the same, which they clearly are not, a court or the arbitrators in this or any other case is free to arrive at an entirely different result. *See* Law of Cassation art. 3.1. The Cotton Case has no more value than any other non-binding interpretation of the law. In any event, neither its holding nor its reasoning apply to the facts in this case. *See id.*

53:8244.9

### F.    Other Statutes Similar to Article 994

Article 994 is derived from the laws of various civil law countries, which are themselves derived from the French Napoleonic Code.[27] It is, in particular, taken from provisions of the Italian Civil Code and the Civil Code of Argentina, while the civil or commercial codes of Honduras, Colombia, Peru, Bolivia, and Paraguay also contain almost identical provisions. Each of these other countries recognize the same extremely limited application of this doctrine and the significant dangers of its misapplication in circumstances not explicitly within its parameters.

The countries providing for this exception start with the essential rule that a contract must be honored, and it is only in very specific and unusual circumstances that the excessive hardship exception may apply to intervene in any contract.[28] The courts in these countries consider it a truly extraordinary remedy whose application is rarely found justified. See, for example, in Italy, Cass n. 1373 (Nov. 28, 1958), Giust. Civ., 1973; in Argentina, C. Ap. C.C. Santa Fe, [1978-N] L.L., XL, 486 (Nov. 29, 1978); C. App. Rosario [1979-M] L.L., XL 480; C.N. Especial Civ. y Com. (Dec. 12, 1979); in Spain, STS (Aug. 11, 1983); in Mexico, Judgment 1947/80 (Oct. 25, 1980).

Argentinian courts, for example, have said of the doctrine they call "imprevisión" that it "is not a legal device that allows somebody to undo bad business but a heroic remedy that prevents a rude violation of justice." See [1980-B] L.L. 420, 148. Its aim is to "avoid a flagrant injustice when ...

---

[27] In January 30, 1959, recitals to the preliminary draft of the current El Salvador Commercial Code, the Review Committee stated that among the sources used in preparing the draft code were the 1950 Commercial Code of the Republic of Honduras, the Mexican Commercial Code, the Argentine Code, the Spanish Code, and contemporary Italian commercial law.

[28] The relevant statutes are: Civil Code of Italy Ch. XIV, § 3, art. 1467; Civil Code of Argentina art. 1198. In Spain, it is a creature primarily of case law.

53182449

63

an inevitable event, strange to the debtor or the common ability of foreseeing, makes the consideration an excessive hardship." *See* [XL] L.L. 479, Sum 92, 170.

The unforeseeable excessive hardship or imprevision doctrine must not be interpreted or applied in any way that would encourage parties to enter into contracts with the idea they may terminate them should the contract become bad business at any time. *See* [1977-D] L.L. 323 (Argentina). Thus, before the exception may apply, not only must the party suffer an excessive hardship through no fault of its own, and the allocation of risk of which is not addressed in the parties' contract, but the event causing the excessive hardship must be **both** extraordinary and unpredictable, as well as beyond the parties' control. *See* [1978-A] L.L. 54.

For example, Spanish courts require "an exorbitant disproportion, out of any calculation, between the parties' considerations to the extent that the new circumstances truly overturn the contract for annihilation of its equilibrium." *See* STS (June 27, 1984). The Supreme Court of Spain is extremely conservative in applying the *clause rebus sic stantibus* because of its negative impact on the sanctity of contract and legal certainty. *See id.* As that court has stated, "[I]t is a **dangerous clause.**" *See* STS (Oct. 27, 1989).

By far the most frequent circumstance in which the unforseen excessive hardship doctrine is applied, although even then rarely, is in the event of extreme hardship caused by unexpected and extreme devaluation and inflation. *See* Flah at 79-103. For example, in the mid-1970's, Argentina experienced an inflationary and currency crisis. In June 1975, a governmental decision ("El Rodrigazo") triggered 257% inflation. That unexpected hyperinflation supported the exceptional application of the imprevision theory. *See* [1979-B] L.L. 586. However, the same economic effects

after June 1975 were considered predicable, and imprevision did not apply. *See* [XL] L.L., 483 SUM 134.  ....

Similarly, a drastic and unexpected change in the Argentine government's currency policy caused a devaluation of 126.7% during February 1981. As a result, contracts entered into between 1978 and February 1981 were individually reviewed for application of the imprevision doctrine. *See* [129] L.L., 127. But, contracts entered into after February 1981 were not subject to imprevision. In effect, the government had lost its credibility by its actions in early 1981 and its actions could not be considered a legal surprise. *See* [1986-III] J.A., 216.

To apply Article 1198, the Argentine courts required that inflationary processes undergo "a radical alteration," "'an unpredictable and sharp curb,'" "a super-inflation," or "suddenly rare levels." *See* [XL] L.L., 482, SUM 122. Thus, the courts held that monthly inflation rates of 59%, 55%, and 27% were not unforeseeable or extraordinary because (1) a higher level of foresight and knowledge is required of businessmen, and (2) inflationary predictions already warned of the possibility of such geometric increases. *See* Flah at 86.

Finally, and importantly, even if an event might be considered unforeseeable, these countries recognize that parties may still freely and validly allocate risks in case of unforeseeable and extraordinary events in their contracts. Consequently, the party that assumed those risks cannot allege excessive hardship even if the nature of the contract provided for a different allocation. *See* Pino at 66-67 (Italy). The terms for comparing the parties' performances should be found in the contract, which is the parties' expression of the desired balance of performances and distribution of risks. *See* [S.P.] L.L., 9809-306 (Argentina). The contract should be interpreted to avoid adversely

53182449

impacting commercial certainty. In case of doubt, the judge must decide in favor of preserving the parties' contract. *See* [1978-A] L.L., 54 (Argentina).

G.  Common Law Commercial Impracticability Is Equally Inapplicable

1.  Commercial Impracticability is Very Rarely Applied

Article 994 and statutes of its ilk in other countries are related to the common law doctrine of commercial impracticability as a defense to contract enforcement. As with the statutory versions of this doctrine, common law commercial impracticability is rarely applied and even more rarely succeeds.

The reasons for the extreme reluctance to apply such provisions are apparent. They promote economic uncertainty and thus discourage economic development. They are extremely unpopular with legal scholars in all countries in which they exist, and such provisions have only been applied in extremely narrow and egregious circumstances.

The common law principles of commercial impracticability apply only when, in the light of exceptional circumstances, justice requires a departure from the general rule that a promisor bears the risk of increased difficulty of performance. Almost unanimously, this exception to the rule of contractual certainty and party autonomy is rejected.[27]

[27] *See, e.g., Am. Trading & Prod. Co. v. Shell Int'l Marine, Ltd.*, 453 F.2d 939 (2d Cir. 1972) (contract of voyage charter via Suez Canal. Canal closed in June, 1967 due to a state of war which had developed in the Middle East, and ship had to proceed via Cape of Good Hope. Ship argued that "transit of the Suez Canal was the agreed specific means of performance of the voyage charter and that the supervening destruction of this means rendered the contract legally impossible to perform and therefore discharged the owner's unperformed obligation." The court rejected the impracticability argument, finding no extreme or unreasonable difficulty. Mere increase in cost alone is not a sufficient excuse for nonperformance; it must be an "extreme and unreasonable" expense. The court did cite with approval the two leading English cases, *Ocean Tramp Tankers Corp. v. V/O Sovfracht (The Eugenia)*, [1964] 2 Q.B. 226, 233 (C.A. 1963), and *Tsakiroglou & Co.*

5318244.9

The party which claims that a supervening event of "contingency" prevented his performance must meet four requirements: (1) the event must have made performance as agreed impracticable; (2) the nonoccurrence of the event must have been a basic assumption on which the contract was made; (3) the impracticability must have resulted without the fault of the party seeking to be excused; and (4) that party must not have assumed a greater obligation than the law imposes. *See* Restatement (Second) of Contracts ch. 11, Introductory Note.

If an event is foreseeable, a party who makes an unqualified promise necessarily assumes an obligation to perform, even if the occurrence of the event makes performance impracticable. In such cases, the "contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as art of the dickered terms." *See* U.C.C. § 2.615, com. 8. For example, if governmental approval is required for a party's performance, the party assumes the risk that approval will be denied if he fails to include a provision excusing him in that event.[19]

Courts have consistently ruled that new regulations of utilities and the energy industry do not excuse performance of commercial contracts. These courts hold that a government order regulating utilities or the energy industry does not render performance of a sales contract commercially impracticable, citing the foreseeability of such regulations or the fact that long-term fixed-price contracts by their nature assign the risk of cost fluctuations to one of the parties.

---

[19] *Li. v. Noblee Thorl GmbH,* [1960] 2 Q.B. 318, 348, *aff'd,* [1962] A.C. 93 (1961).

[20] *See* Restatement (Second) of Contracts ch. 11, Introductory Note; Smit, Frustration of Contract: A Comparative Attempt at Consolidation, 58 Colum. L. Rev. 287, 314 (1958).

53182445

The courts expressly or implicitly recognize that a change in market price of the subject goods from the price that existed at the time the parties entered into their sales contracts does not generally, of itself, render performance impracticable.[29]

For example, in *Iowa Elec. Light & Power Co. v. Atlas Corp*, 467 F.Supp. 129 (N.D. Iowa 1978), *rev'd on other grounds*, 603 F.2d 1301 (8th Cir. 1979), *cert. denied* 445 U.S. 911 (1979), the performance of a uranium-concentrate seller was not rendered impracticable by increased production costs allegedly caused by several contingencies including increased market prices and general inflation. In *Missouri Pub. Serv. Co. v. Peabody Coal Co.*, 583 S.W.2d 721 (Mo. App. 1979), *cert. denied*, 444 U.S. 865 (1979), the court held that a coal seller was not excused from performance where the market prices for coal had substantially increased. And, in *No. Indiana Pub. Serv. Co. v. Carbon County Coal Co.* 799 F.2d 265 (7th Cir. 1986), the court held that a utility could not be excused from performance of a long-term, fixed-price contract to purchase coal on the grounds of impracticability due to changes in governmental regulations and increased prices.

The take-or-pay crises of the natural gas industry in the mid-1980's amply illustrates the extreme reluctance to interfere with the commercial agreements of sophisticated parties, regardless of extreme changes in circumstances. In *Day v. Tenneco, Inc.* 696 F.Supp. 233 (S. D. Miss. 1988), the court rejected a buyer's claim that UCC 2-615 excused it from performing its obligations under a take-or-pay natural gas purchase contract on the grounds that the market for natural gas had collapsed and that government deregulation of that market had contributed to the collapse. And, in

---

[29] *See e.g., Resources Inv. Corp. v. Enron Corp.*, 669 F. Supp. 1038 (D. Colo. 1987); *No. Illinois Gas Co. v. Energy Co-op., Inc.*, 461 N.E.2d 1049, 122 Ill. App. 3d 940 (Ill. App. 1984); *Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F. Supp. 53 (W.D. Pa. 1980); *Missouri Pub. Serv. Co. v. Peabody Coal Co.*, 583 S.W.2d 721 (Mo. App. 1979), *cert. denied*, 444 U.S. 865 (1979)

531824.9

*Sabine Corp. v. ONG Western, Inc.*, 725 F. Supp. 1157 (W. D. Okla. 1989), the buyer under a take-or-pay contract failed in its claim that government regulation and deregulation of the natural gas industry rendered performance impracticable by creating a large differential between the price called for by the contract and the actual market price. In fact, a search of the case law reveals no take-or-pay case in which the commercial impracticality defense succeeded.

    2.    <u>CEL Misrepresents the Theory and Results of Prior Litigation</u>

        Contrary to CEL's arguments, neither The Coastal Corporation nor any of its affiliates have ever been granted relief from contract obligations under any law such as Article 994 or under any theory of commercial impracticability.

        CEL wrongly relies on natural gas purchase contract "take-or-pay" cases involving Coastal's subsidiary, ANR Pipeline Company. In none of those cases did ANR seek to avoid the terms of its contract. Instead, it fought to enforce its contracts as written and it succeeded in those cases on that basis. *See Atlantic Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777 (Tex. App. – Houston [14th Dist.] 1989, no writ); *Dyco Petroleum Corp. v. ANR Pipeline Co.*, 1988 U.S. Dist. LEXIS 18317 (N.D. Okla. 1988). *See also ANR Pipeline Co. v. Devon Energy Corp.*, 1989 U.S. Dist. LEXIS 17684 (W.D. Mich. 1989) (interpreting the same contract language).

        When the mass of litigation over natural gas purchase take-or-pay contracts arose in the mid-1980's, virtually every gas pipeline, including affiliates of The Coastal Corporation, initially raised commercial impracticability as a defense to enforcement of take-or-pay obligations. The pipelines suffered severe and unanticipated financial hardships under their take-or-pay contracts directly attributable to the effects of the federal government's restructuring of the natural gas industry. What CEL fails to note is that the commercial impracticability defenses did not succeed in those cases.

69

55182449

Those courts that considered the issue rejected commercial impracticability as an excuse for failure to perform existing obligations in take-or-pay contracts.

CEL also fails to recognize that the basis for the holdings in the *ANR* cases was not commercial impracticability, but was instead strict enforcement and application of the parties' contracts according to their plain meaning. The contracts at issue in the *ARCO v. ANR*, *Dyco v. ANR*, and the *ANR v. Devon* cases, contained virtually identical language concerning the definition and effect of an event of force majeure. The courts focused strongly on that language, enforcing the contracts' terms to which those parties had agreed.

The ANR contracts expressly reduced ANR's obligations to take, or pay for if not taken, gas on any day in which an event of force majeure existed. *See ARCO v. ANR*, 768 S.W.2d at 781; *Dyco v. ANR*, 1988 U.S. Dist. LEXIS 18317 at *8-11; *ANR v. Devon*, 1989 U.S. Dist. LEXIS 17684 at *7-8. The contracts' definition of force majeure included "any act or omission (including failure to take gas) of a purchaser of gas from Buyer which is excused by ... any laws, orders, rules, regulations, acts or restraints of any of any governmental body or authority, civil or military." *See id.*

The customer to whom ANR resold the gas bought under the take-or-pay contracts was relieved from its contractual obligation to purchase gas from ANR through a series of government orders. The courts concurred with ANR's contention that the plain language of the force majeure provisions, in conjunction with the other terms in the contracts, applied to excuse ANR's obligation to take or pay for the sellers' gas. As the *ANR v. Devon* court explained, "a plain language reading of the contractual language confirms that the force majeure provision was designed to include the exact fact scenario involved in this case.... Accordingly, I determine as a matter of law that no ambiguity exists as to the definition of force majeure in the contract and that the failures of ANR's

5318244-9

customers to take gas from ANR fall under the contracts' force majeure definition." *ANR v. Devon*, 1989 U.S. Dist. LEXIS 17684 at *7-8. *See also ARCO v. ANR*, 768 S.W.2d at 781; *Dyco v. ANR*, 1988 U.S. Dist. LEXIS 18317 at *8-11.

As the Texas Court of Appeals observed, "the parties were at liberty to define force majeure in whatever manner they desired," and the courts enforced the parties' contracts as written. *ARCO v. ANR*, 768 S.W.2d at 781. The parties to those contracts agreed that the parties would be relieved of their obligations upon the occurrence of events within the agreed definition of force majeure—just as could have been done in the PPA had the parties agreed to such a provision, and just as could have been included in a renegotiation clause, had the parties agreed to such a provision.

The effect of the *ANR* cases is the exact opposite of that CEL suggests. Instead, those cases prove the importance of contract enforcement, and show that the destruction of contracts based upon such theories as commercial impracticability or the statutory "excessive hardship" of Article 994, almost never succeeds. And, rightfully so.

CEL is asking the Arbitral Tribunal to terminate a valid and freely agreed-upon contract and to use an extreme, extraordinary, and rarely justified remedy to do so. The doctrine set forth in Article 994 is not a convenient legal device to cure bad business decisions through the judicial termination of contracts. Article 994 is not a reward for less-than-diligent parties who want to undo valid contracts. It is instead a "heroic remedy that prevents a rude violation of justice." *See* [1980-B] I.L., 148. Article 994 and the other laws from which it derives are an exception to the most basic and universally accepted principles of contract law, namely, that contracts must be honored and performed in good faith. The exception cannot swallow the rule. Thus, its application is limited to only those rare circumstances clearly within its parameters.

71

53182542.9

## VI.   IN THE ALTERNATIVE, AN EQUITABLE MODIFICATION

Assuming the arbitrators were to find jurisdiction exists, and assuming they were to find Article 994 applicable, then NPC would be entitled to the opportunity to make an equitable modification. Under Article 994 "the other party shall also be entitled to oppose such termination (resolution) by proposing an equitable and proportional amendment." Clearly, Article 994 does not necessarily provide for termination without compensation. Rather, parties should be allowed to decide how to terminate or modify their contract provided the solution is equitable and proportional. When the contract contains an express provision for value at termination, as does the PPA, it should be respected. In this case, the only equitable solution is that to which the parties agreed in Article 10 of the PPA, the payment of an appropriate "Termination Value."

## VII.   CONCLUSION: NO BASIS EXISTS TO ALLOW CEL TO TERMINATE THE CONTRACT WITHOUT COMPENSATION TO NPC

CEL is attempting to use the arbitral process to accomplish a trick that is unacceptable in international commercial relations. It seeks to avoid the obligations imposed by the plain language of a contract that was negotiated between highly sophisticated parties and thereby destroy an established, long-term commercial relationship. And, CEL hopes to be allowed to do this without paying any compensation at all to the other party to the contract, a party who has consistently and fully performed the contract in good faith.

The means CEL uses to try to accomplish this goal, Article 994, is antithetical to modern commercial relations, and is therefore very rarely applied and only in precise and extreme circumstances, none of which are present in this case. By its express terms, Article 994 may only apply when the event resulting in a party's extreme hardship in contract performance was objectively

72

5318244.9

and subjectively unforeseeable and was extraordinary. Not only was privatization and its effects clearly known to aid foreseeable, both objectively and subjectively, by the parties at the time of contracting, but CEL was largely responsible for designing that program of privatization of the electricity sector and strongly influenced its scope and effect. Furthermore, those effects were consistent with the known effects of similar privatization plans throughout the world. There is nothing extraordinary in privatization resulting in open market competition.

CEL and NPC are the extremely sophisticated parties to a complete and clear contract that addresses their relationship in great detail, assigns contractual risk between them, and defines the scope of matters subject to arbitration between them and the powers of the arbitrators in resolving such disputes. No one suggests that any dispute exists over the interpretation or the performance of that contract. Therefore, under the clear terms of the contract, the Arbitral Tribunal has no jurisdiction to decide the issues put before them by CEL and no power to grant the uncompensated contract destruction CEL seeks. Even if the arbitrators did have such jurisdiction and power, no basis exists under the law or the facts for negating this valid commercial contract.

Therefore, the Arbitral Tribunal should decide the jurisdictional issues as a threshold matter and reject jurisdiction of the "non-dispute" before them. If the arbitrators should determine for some reason that jurisdiction exists, or decide to carry the jurisdiction issue with the case, NPC requests that the arbitrators issue their award rejecting CEL's claims and denying the extraordinary "remedy" it seeks.

73

ATTORNEYS FOR NEJAPA POWER COMPANY, LLC

FULBRIGHT & JAWORSKI L.L.P.

By: _____

C. Mark Baker
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
USA
Tel: (713) 651-7708
Fax: (713) 651-5246

OF COUNSEL:
Carl Corrallo
Michael S. Yauch
Basil Nichols
The Coastal Corp.
Nine Greenway Plaza
Houston, Texas 77046
USA
Tel: (713) 877-6859
Fax: (713) 877-6109

53182449

74

## CERTIFICATE OF SERVICE

Served by facsimile and international air service on October 11, 1999 on:

Mr. Doak Bishop
Baker & McKenzie
4500 Trammel Crow Center
2001 Ross Avenue
Dallas, TX 75201

Prof. Dr. Stefan N. Frommel
Flat 19, 169 Queen's Gate
London SW7 5HE

Mr. Wm. Laurence Craig
Coudert Brothers
52, Avenue des Champs Elysees
BP 639 - 75367 Paris CEDEX 08

Mr. Robert F. Pietrowski, Jr.
Coudert Brothers
1627 I Street, NW
Washington, DC 20006

C. Mark Baker

75

53182449

# EXHIBIT 3

# FULBRIGHT & JAWORSKI L.L.P.

A Registered Limited Liability Partnership
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
WWW.FULRIGHT.COM

DIRECT DIAL: (713) 651-7708
TELEPHONE: (713) 651-5151
FACSIMILE: (713) 651-5246

C. MARK BAKER
PARTNER
MBAKER@FULRIGHT.COM

September 5, 2003

**BY HAND DELIVERY AND**
**BY REGISTERED MAIL, RETURN RECEIPT REQUESTED #RB 069 023 US**

Comisión Ejecutiva Hidroeléctrica del Río Lempa
Sección de Correspondencia
9a Calle Poniente No. 950, Centro de Gobierno
San Salvador, El Salvador
Atención: Dirección Ejecutiva and Centro de Operaciones del Sistema

Re:  Transmission Costs Agreement dated March 21, 2002 between Nejapa Power
Company, L.L.C. and Comisión Ejecutiva Hidroeléctrica del Río Lempa
**Notice of Arbitration**

Dear Sirs:

Nejapa Power Company, L.L.C. ("NPC") and Comisión Ejecutiva Hidroeléctrica del Río
Lempa ("CEL") are the parties to the above-referenced Transmission Costs Agreement ("TCA").
This letter is to advise CEL that a Dispute as defined in Section 7 of the TCA exists between the
parties. Therefore, pursuant to Section 7 of the TCA and Article 3 of the UNCITRAL
Arbitration Rules, NPC hereby demands arbitration of such Dispute.

The parties to the arbitration shall be:

Claimant:

Nejapa Power Company, L.L.C.
c/o El Paso Corporation
1001 Louisiana Street
Houston, Texas 77002
Attention: Office of the Corporate Secretary

Respondent:

Comisión Ejecutiva Hidroeléctrica del Río Lempa
Sección de Correspondencia
9a Calle Poniente No. 950, Centro de Gobierno

**EXHIBIT**
C-44

Houston • New York • Washington DC • Austin • Dallas • Los Angeles • Minneapolis • San Antonio • Hong Kong • London • Munich

30545221.1

Comision Ejecutiva Hidroelectrica del Rio Lempa
September 5, 2003
Page 2

San Salvador, El Salvador
Atencion: Direccion Ejecutiva and Centro de Operaciones del Sistema

Section 7 of the TCA sets out the parties' agreement to resolve all Disputes between them arising out of or relating to the TCA by arbitration in accordance with the current UNCITRAL Arbitration Rules. A copy of the text of the arbitration agreement is attached hereto as an appendix for your convenience.

The existing dispute concerns the existence of and performance by CEL of its obligation to reimburse to NPC all Costs (as defined in the TCA) incurred by NPC that are associated with the commitment to transmit or actual transmission in El Salvador of up to 127 MW of declared capacity, plus all electrically derived therefrom generated by the Nejapa Plant, up to a maximum of 1,112, 520 MWh in any year, annually for the five (5) year period defined in the Agreement. In particular, the dispute concerns CEL's obligations and performance with respect to payment of all TU Costs (as defined in the TCA) and CEL's allegations of manipulations with respect to the Deviations component of the TU Costs.

NPC seeks a declaratory judgment regarding the meaning and effect of the TCA in respect of CEL's obligations to reimburse NPC for all Costs as set out in the TCA. NPC seeks monetary damages in an amount exceeding $60 million USD. NPC also seeks an award of its costs.

Accordingly, the Dispute shall be heard and determined by a panel of three arbitrators, each of whom shall be independent and impartial.

Pursuant to Article 7 of the UNCITRAL Rules, NPC will advise CEL of the identity of the arbitrator to be appointed by NPC within 30 days after delivery of this demand and notice to CEL.

Very truly yours,

C. Mark Baker

cc:    Nejapa Power Company, L.L.C.
       c/o El Paso Corporation
       1001 Louisiana Street
       Houston, Texas 77002
       Attention: Office of the Corporate Secretary

30545721.1

30545221.1

# TEXT OR ARBITRATION AGREEMENT
# TRANSMISSION COSTS AGREEMENT, SECTION 7

*Section 7. Dispute Resolution.*

(a)  Any dispute, claim, or controversy arising out of or relating to this Agreement, or the performance, breach, validity, interpretation, application, or termination thereof ("Dispute") shall be finally resolved by arbitration in accordance with the then current United Nations Commission on International Trade Law Arbitration Rules ("UNCITRAL Rules"), and judgment on the award may be entered in any court having jurisdiction thereof.

(b)  The seat of the arbitration shall be Geneva, Switzerland, and the language of the arbitration shall be English. The arbitrator(s) shall determine the matters at issue in the Dispute in accordance with the substantive law of the Republic of El Salvador.

(c)  In the event that any party's claim or counterclaim equals or exceeds US $1,000,000 (one million US dollars), exclusive of interest or attorneys' fees, the Dispute shall be heard and determined by three arbitrators, each of whom shall be independent and impartial; otherwise, the Dispute shall be heard and determined by one arbitrator.

(d)  The American Arbitration Association ("AAA") shall be the Appointing Authority, as defined in the UNCITRAL Rules, for purposes of this agreement.

(e)  In the event that one arbitrator shall hear the Dispute, the parties shall attempt to agree upon a qualified individual to serve as arbitrator. If the parties are unable to so agree within thirty (30) days of the response to the notice of arbitration, then the arbitrator shall be selected and appointed in accordance with the UNCITRAL Rules.

(f)  In the event that three arbitrators shall hear the Dispute, each party shall, within thirty (30) days after commencement of the arbitration, select one person to act as arbitrator. The two arbitrators so selected shall, within thirty (30) days of their appointment, select a third arbitrator who shall serve as the chairperson of the Arbitral Tribunal. The arbitrators selected shall be qualified by education, training, and experience to hear and determine matters in the nature of the Dispute.

(g)  If a party fails to appoint an arbitrator as provided herein, or if the arbitrators selected by the parties are unable or fail to agree upon a third arbitrator within thirty (30) days of their appointment, then that arbitrator shall be selected and appointed in accordance with the UNCITRAL Rules.

Comision Ejecutiva Hidroelectrica del Rio Lempa
September 5, 2003
Page 4

(h) Should an arbitrator die, resign, refuse to act, or become incapable of performing his or her functions as an arbitrator, the Appointing Authority may declare a vacancy on the panel. The vacancy shall be filled by the method by which that arbitrator was originally appointed.

(i) The arbitrator(s) shall act strictly as arbitrators-at-law and not as amiable compositeurs.

(j) The arbitrator(s) shall be bound by and shall follow the then current International Bar Association standards of Ethics for International Arbitrators or such other-recognized code of ethics for arbitrators in international commercial disputes as may then be in effect and the parties agree should apply.

30545Z21.1

# EXHIBIT 4

30435689-3

ARBITRATION
UNDER THE RULES OF
THE UNITED NATIONS COMMISSION
ON INTERNATIONAL TRADE LAW

IN THE MATTER OF

NEJAPA POWER COMPANY LLC

CLAIMANT

V.

COMISIÓN EJECUTIVA HIDROELÉCTRICA
DEL RIO LEMPA

RESPONDENT

SECOND DECLARATION OF STEPHEN M. SUTTON

REPUBLIC OF EL SALVADOR    §§
                           §§
CITY OF SAN SALVADOR       §

1. My name is Stephen M. Sutton. I am over the age of eighteen and competent in all respects to make this declaration. The facts contained in this declaration are based upon my personal knowledge and are true and correct.

2. I have previously filed a declaration in this arbitration. This statement is a supplement to my prior declaration and responds to certain claims and statements made by respondent Comisión Ejecutiva Hidroeléctrica del Río Lempa ("CEL"). As stated in my

previous declaration, I am employed as President and General Manager of El Paso Technology El Salvador, S.A. de C.V. ("EPT"), the manager of Nejapa Power Company LLC ("NPC") and the administrator and operator of the Nejapa Power Plant. In that capacity, I negotiated the settlement of the prior dispute in arbitration between CEL and NPC, and I executed the Transmission Costs Agreement ("TCA") behalf of NPC through EPT as its manager.

3. My general reaction to CEL's Statement of Defence and Counterclaims dated October 15, 2004 as a whole is that, as CEL did in the course of the prior arbitration between the parties ("the PPA Dispute"), CEL seeks to invoke the unjustified sympathy of the Arbitral Tribunal by creating misperceptions of the facts. Among the misperceptions CEL attempts to foster is that CEL, although it is an instrumentality of the Government of El Salvador (the "GOES"), is at the mercy of NPC in the parties' business relationship due to NPC's status as the indirect subsidiary of El Paso Corporation, a large, international energy and power company. In fact, the reverse is true, and it is NPC which is subject to the use and misuse of governmental power by CEL and the GOES.

4. As detailed in my prior declaration, I have extensive experience in operating as a power generator in El Salvador, including substantial familiarity with the regulatory structure and commercial norms of those activities. I am also very familiar and experienced with CEL and its actions and influence with respect to the Salvadoran power markets. As set out in my prior declaration, I have had responsibility on behalf of NPC for dealing with CEL under the Power Purchase Agreement ("PPA") between them, negotiating the settlement of the dispute over that contract in the PPA Arbitration, administering the Transmission Costs Agreement ("TCA") entered into as part of the compensation due to NPC under that settlement, and in operating as



competitors in the Salvadoran power markets after NPC assumed its status as a merchant plant upon the termination of the PPA pursuant to the agreed settlement.

5.    During the negotiations for the settlement of the PPA Dispute, the cash amount CEL offered as compensation for the early termination of the Nejapa PPA was substantially less than that necessary for NPC to be able to agree to forego its rights and benefits under that long-term, fixed price, take-or-pay contract. CEL indicated it did not have additional funds available but was willing to provide additional consideration on a deferred basis. NPC was willing to accept deferred consideration, but as any prudent lender would require in a similar "loan" arrangement, the deferred consideration agreement included protective mechanisms.    Additionally, NPC sought protection from the additional risks posed to NPC as a new participant in the electricity market dominated by CEL and subject to abuse of governmental power by CEL and the GOES.

6.    The parties devised the TCA as a method of providing both deferred compensation, through which CEL could afford to compensate NPC at a level sufficient to justify NPC's agreement to the early termination of its existing long-term, fixed-price take-or-pay contract, and some protection from the potential abuse of power by CEL and the GOES. While the parties agreed on a cash consideration of US $90 million, they left the amount of the additional consideration represented by the TCA undefined. Neither the Final Award nor the TCA sets a limit on the amount of compensation to be paid by CEL to NPC and the parties did not agree on any such limit or maximum amount.

7.    As discussed in my first declaration, CEL acts to support the political goals of the GOES, dominates the market with the majority of generation and all of the transmission (through its substantial majority interest in the transmission company, ETESAL), sets noncommercial

3

309436893



pricing that impacts other participants in the market negatively, and is protected from sanctions by the regulator.

8. CEL is owned and controlled by the GOES. In my experience, CEL carries out the desires of the GOES with support from the power sector regulator, the Superintendencia General de Electricidad y Telecomunicaciones ("SIGET"), whether or not those desires and actions follow accepted commercial principals. The attached organizational chart (Ex. C-52) shows the direct link between CEL and SIGET with their direct reporting lines to the Ministry of Economy of the GOES.

9. The direct link between CEL, SIGET, and the GOES has a substantial impact on the Salvadoran electricity markets. Among other things, the GOES depends upon CEL for the control and manipulation of electricity tariffs to garner public support and to achieve political goals. The GOES implements these controls and manipulations in large part through its instrumentality, CEL, using CEL's status and market influence as the largest power generator in El Salvador. CEL's own former president referred to CEL as the "economic policy tool" of the GOES (*see* Ex. C-18), and has been publicly referred to as the "petty cash fund" of the GOES. (*See* Ex. C-53, "CEL en el Ojo de Huracán" (CEL in the Eye of the Hurricane), *El Diario de Hoy*, 15 October 2001.)

10. The GOES' use of CEL to achieve political goals is not something that the GOES or CEL proclaims for general public consumption. Admitting that role would create difficulties for the country in attracting new foreign investment, obtaining sovereign lending, and being awarded international aid. However CEL's domination of the Salvadoran power market is well documented and is viewed as one of the biggest impediments to attracting private investment into the Salvadoran market. (*See* Ex C-54).

308458693

4

11. That CEL is active in availing itself of its dominant market position to satisfy the political goals of the GOES is evidenced by its activities in March 2003, when CEL bid its power at greatly below market levels to reduce spot prices and thereby avoid having to impose an upward tariff adjustment. At the same time CEL strongly "encouraged" other generators, including NPC, to do the same. This manipulation occurred under the threat of executive action by the GOES if spot prices were not substantially lowered to avoid an increase in consumer tariffs. As a result, spot prices subsequently fell from $72.61 per megawatt hour (MWh) to about $4.46/MWh over the final three days of the month and then immediately returned to $73.26/MWh on the first day of the following month. (See Ex. C-55).

12. I also refer back to the events of May 2004, when CEL was purchasing energy at high prices in the regional market and then selling that same energy in the Salvadoran market at prices substantially below the purchase price. An example of this is May 11, 2004, at the 6 a.m. hour, when CEL purchased energy in the regional market at $68/MWh and then sold that energy in the Salvadoran market at $19/MWh. (See Ex. C-56). The Executive Director of CEL, José Oscar Medina, explained in his witness statement (Ex. R-4) that this was done to avoid rationing in the market, but the data show that the capacity available was 591 MW and the demand at that hour of the day was only 494 MW, and although demand quickly grew to 785 MW in the following hours CEL did not make similar non-commercial transactions to satisfy that increase in demand.

13. It is interesting that in the hour in question referenced above, one of CEL's own units bid 58.5 MW at $60 but the unit was not dispatched because the imported energy purchased by CEL at $68 was offered to the Salvadoran market at $19.08 and thereby displaced the $60 energy from CEL's own internal source. (See Ex. C-56). Furthermore, NPC bid that it had 5 MW available at $45.03 plus the next 5 MW at $52.18, then another 5 MW at $58.10, then another 5

5

308456893

MW at $58.11, and then another 30 MW at $63.78. (See same.) Obviously there was no threat of rationing and CEL's patently non-economic actions (buy high, sell very low) were driven by some unknown internal or government policy goals that override commercial logic.

14. In the first few days after NPC became a merchant operator upon the termination of the PPA in July 2002, NPC planned to commence repairs of ongoing tube oil leaks that had resulted from the 2001 earthquakes that had devastated the country. NPC therefore made high bids on blocks of energy that we thought would keep the Nejapa Plant out of the dispatch and free us to make repairs. (See Ex. C-57.) However, NPC was unaware that a CEL hydroelectric unit was in maintenance and another generator had a technical problem, and the combination of the two significantly reduced available supply to the market. NPC's power was therefore dispatched despite the high bid prices, causing market prices to rise for three days. The Superintendent of the SIGET was very unhappy with the price increase and demanded that NPC reduce its bids immediately and, if not, SIGET would impose severe sanctions. NPC complied with the demand from SIGET strictly because NPC realized that it had inadvertently been part of the reason that market prices rose. However, NPC was surprised by the threat from SIGET since NPC had not violated any laws or market regulations and had in fact warned the system operator, the Transactions Unit ("TU"), of its intent some days beforehand. Other private company participants in the market have been recipients of similar directives and threats from SIGET, while CEL is not subjected to similar threats and sanctions from the regulator.

15. For example, Section 2.4 of the Rationing Annex to the Regulations of the Operation of the Transmission System and the Wholesale Market ("REGUT") establishes the maximum price for rationing purposes at $228.57/MWh. (See Ex. C-58.) This effectively established the ceiling bids of energy under the most extreme situations of supply limitations in the market, and

consequently any bids above this level are required to be justified to the SIGET. CEL, however, has on regular occasion not fulfilled that requirement without suffering any comment or sanction from SIGET. (See Ex. C-59.) SIGET has allowed CEL to bid energy above the specified threshold but does not follow through to require CEL to justify the reason for the excessive bids. SIGET thus gives CEL, its fellow government entity, preferential treatment over private market participants, providing CEL even more dominance in the market than it already enjoys.

16. As a result of its market share, governmental power, and protection from regulatory sanctions, it is CEL that dominates NPC, and all other private generators operating in the Salvadoran power markets, not the reverse. CEL acts with impunity dominates the market with strategies based on noncommercial motives, and manipulates prices to achieve the political goals of the GOES. The result of this is extreme uncertainty for private investors and business leaders and leads to a lack of additional investment in generation in El Salvador (a complaint that CEL and the GOES periodically make in the media). It is for these reasons that the TCA was negotiated with the design to protect NPC's acceptance of deferred compensation for early the termination of the PPA while NPC was forced to transition into the market as a merchant operation naked of any commitments to purchase its energy and subject to CEL's well known market dominance and manipulation.

17. CEL's status as a government entity which dominates the markets, and its low cost hydroelectric generation capacity, sets it apart from the other market participants. These distinctions allow, or require, CEL to adopt market strategies that are entirely unsuitable for any other generator, operationally or economically. For example, CEL oddly claims that it does not enter into bilateral sales contracts as a matter of its internal policy and therefore there is no real need for NPC to sell its own power under contract either. However CEL fails to mention that

7

309426893.3

CEL regularly maintained contracts with the distribution companies up through the end of 2002, until in 2003 it decided to dramatically alter its strategy. (See Ex. C-60.)

18. The contract pricing structure that NPC now employs is a direct result of CEL having established a pricing mechanism of "the spot price minus a percentage" under its contracts. In fact, CEL's contracts with the distribution companies were priced, depending on the block of energy, at spot minus 4%, 5½%, or 7%. (See Ex. C-60.) CEL's questioning of NPC's need to contract to sell its power is very curious because CEL fails to recognize the precedent that CEL itself established from the inception of the wholesale markets in 1998 through 2002, just as CEL fails to acknowledge the tremendous threat that it presents to any competitor or investor in the Salvadoran electricity market. As indicated previously, NPC and all other private generators must do all that they can to mitigate the onerous impacts of CEL's market dominance, price manipulations, and evasion of regulatory control to be able to realize an economic return on their sunk investments. One means by which NPC does this is through contracting to sell its power rather than depending entirely upon the volatile and CEL-manipulated spot market.

19. Finally, since receiving CEL's Statement of Defence which raised the issue, NPC has reviewed CEL's contention that CEL has reimbursed NPC for transmission costs and charges that are duplicative to some extent. NPC's review has revealed that information provided by the TU regarding ancillary charges includes an overlap on two specific types of charges: losses and deviations, and that CEL is due a credit for such duplicative amounts. NPC is continuing its analysis to determine the amount of overlap, and as soon as that amount is determined NPC will quickly credit such excess to outstanding amounts owed to NPC by CEL under the TCA.

20. This overlap occurred due to a mutual mistake by both NPC and CEL at the outset of the TCA. At a meeting between the parties on June 27, 2002, CEL and the parties tried to plan

3084369.3

how to handle certain matters in the performance of the TCA, such as the Spinning Reserve, and discussed what each party should tell the TU regarding their arrangement. (*See* Ex. C-61, memo regarding meeting.) It was CEL's intent at the time was to keep knowledge of the TCA between the parties to avoid political questioning of the agreement, since upon the settlement of the PPA Dispute CEL made only the payment of the Cash Award public. During that meeting the parties agreed upon what information the TU would be requested to provide in the summary invoice to allow NPC to make appropriate reimbursement requests under the TCA. The parties did not provide the TU with a full explanation of the reasoning for the information structure that the parties asked the TU to provide in the summary invoice, and consequently the summary invoice did not specify a "netting" of the items and resulted in the overlap, an error which was unintentional and of which NPC was unaware until it conducted its investigation following receipt of CEL's explanation of its claim in this regard.

Signed: December 17, 2004

Stephen M. Sutton

9

**EXHIBIT 5**

In the matter of an arbitration under
The Rules of Arbitration of
The United Nations Commission on International Trade Law
("UNCITRAL")

Mandarin Oriental Hotel du Rhône, Geneva
Quai Turrettini 1, 1201 Geneva, SWITZERLAND

14-17 March 2005

Before:

Dr. Robert BRINER
Mr. John BEECHEY
Mr. Bernardo M. CREMADES

BETWEEN:

NEJAPA POWER COMPANY, LLC ("NPC")

-v-

COMISIÓN EJECUTIVA HIDROELÉCTRICA DEL RIO LEMPA ("CEL")

Claimant

Respondent

_____

C. Mark BAKER and Jennifer PRICE of FULBRIGHT & JAWORSKI LLP
are appearing on behalf of the Claimant.

William L. CRAIG, Eduardo SILVA ROMERO, Virginie COLAIUTA
and Jaime GALLEGO of COUDERT FRERES are appearing on behalf
of the Respondent.

_____

Computerised transcript of

Reportage Intégral (Group WordWave)

**Page 133**

```
 1   MR BEECHEY:  Thank you.
 2   MS COLAIUTA:  In paragraph 19 of this first declaration, you
 3       state that you have reviewed CEL's claim – I am sorry,
 4       my mistake, I was referring to the second declaration,
 5       it is true. This is your second declaration (Handed),
 6       In paragraph 19 of your second declaration, you
 7       state that you have reviewed CEL's claim that NPC has
 8       double-billed to CEL for certain losses since the start
 9       of the TCA, and you also admit that these charges in
10       fact are duplicative and that CEL is due a credit, is
11       that correct?
12   A.  That is correct.
13   Q.  Are you responsible for signing, after verification,
14       NPC's invoices to CEL?
15   A.  Yes, I am responsible.
16   Q.  What types of checks were performed to ensure that the
17       invoices by NPC to CEL were prepared correctly, avoiding
18       any duplicative charge?
19   A.  You mean since this was discovered?
20   Q.  Even before. Since the TCA was in force, did you
21       perform any checks by yourself or by anybody in NPC's
22       staff?
23   A.  As Mr Gonzalez pointed out, there is a system of review
24       within our office. Obviously there was an oversight
25       that occurred, and it occurred based on a meeting
```

**Page 134**

```
 1       between the parties on June 27th 2002 when they agreed
 2       how to handle the TCA once we would be entering it.
 3   Q.  Okay. Were you aware that – do you not agree with me
 4       you have employees in your accounting department who
 5       check and review and prepare the various invoices. Do
 6       they check whether there is any duplication of costs?
 7   A.  Well, there certainly are checks and reviews of the
 8       statements that came to us. Obviously this one did not
 9       get caught.
10   Q.  Okay. So the TCA could have detected earlier the double-billing
11       of these charges –
12   A.  But inside, from NPC's internal point of view, I guess
13       MR BEECHEY: CEL, you say?
14       MS COLAIUTA: CEL, I said CEL.
15   Q.  Do you not agree with me that CEL could have
16       detected earlier the double-billing of these charges if
17       it was disclosed by NPC, a copy of the DTEs?
18   A.  Possibly. They possibly could. I do not know.
19   Q.  Okay. Why did you not disclose a copy of the DTEs to
20       CEL?
21   A.  Because it contains a lot of confidential information in
22       it about our operation, which is why we had the meeting
23       on June 27th to agree with CEL on how these costs would
24       be reported to them and what would be acceptable, and
```

**Page 135**

```
 1       that is how we got the summary that was prepared by the
 2       UT.
 3   Q.  What part of the DTE would you consider confidential;
 4       every single page of it or there is some part of it –
 5   A.  Parts of it, definitely.
 6   Q.  Parts of it?
 7   A.  Yes.
 8   Q.  Would it be, for example, the monthly summary that –
 9       the table that is contained inside the DTE would be
10       considered confidential?
11   A.  Yes.
12   Q.  Why?
13   A.  Well, there is some information in there that would lead
14       to identification of contracts, pricing possibly.
15   Q.  Which information particularly?
16   A.  I am not the right person to ask that, but there is
17       confidential information in there.
18   Q.  When you speak about confidentiality, you speak about
19       commercially prejudicial information?
20   A.  I do not know about the characterisation of prejudicial,
21       but there is proprietary information in there,
22       definitely.
23   Q.  So who should I ask instead of you to know whether this
24       information is commercially proprietary?
25   A.  The gentleman before me. I thought you did ask him.
```

**Page 136**

```
 1   Q.  Okay. But you are his supervisor?
 2   A.  Correct.
 3   Q.  Okay, I would like you now to switch to another
 4       argument. In your statement, you affirmed that the TCA
 5       required CEL to pay NPC's transmission cost in the same
 6       way as it did when the PFA was in force. Do you confirm
 7       this statement?
 8   A.  Yes.
 9   Q.  This was clearly agreed between you and CEL's
10       representatives, in particular Mr Novellino, when
11       negotiations took place; right?
12   A.  That is correct.
13   Q.  Did Mr Novellino, any time when discussing with you
14       about how the payment has to occur, mention how much CEL
15       was paying under the PFA for transmission costs?
16   A.  I certainly do not recall.
17   Q.  Is it possible that he mentioned to you this number,
18       more or less $6 million?
19   A.  It is possible.
20       MR BAKER:  Objection; calls for speculation.
21   A.  But if I can add, I would not necessarily agree to it.
22       We certainly were aware what the charges were under the
23       PFA and one of the things we noticed in the almost three
24       years that these charges existed was that not all of the
25       charges were occurring. For one, there is AGC; there
```

14/03/2005

Nejapa Power - Geneva

## 137

```
1  was a number of charges that just were not occurring at
2  the time we were negotiating this. And the trend was
3  a rising trend on TCA charges.
4  Q.  So you made this verification before signing the TCA?
5  A.  We did not go into it blindly, no.
6  Q.  Okay. Did you record this verification? Who did this
7      verification?
8  A.  It would have been me.
9  Q.  You personally?
10 A.  Yes.
11 Q.  Without anybody else within NPC?
12 A.  The commercial group.
13 Q.  Did you have to communicate this information to El Paso?
14 A.  Yes.
15 Q.  Was this communication to be made in writing or orally?
16 A.  I really do not recall, but basically at the time we
17     were just looking at a continuation of the provision of
18     the change in law provision of the PPA. It is just the
19     way it was so stated there.
20 Q.  Usually, before signing a contract, are you required,
21     when you have to communicate your decision of
22     stipulating a particular contract, and you are required
23     to transmit this information to El Paso, how do you
24     transmit the information? By writing or orally?
25 A.  Both.
```

## 138

```
1  Q.  Both. So you have a written document that indicates
2      what were your expectations under the TCA, which was
3      communicated to El Paso?
4  A.  I do not believe so. I am not sure. To be quite
5      honest, I do not really recall any specific approval for
6      this particular TCA. One of the reasons was it was part
7      of an arbitration and there was another group deeply
8      involved, based in Houston.
9  MR BAKER: Objection: mischaracterises the answer.
10 A.  I cannot answer one way or the other. I do not know or
11     recall the document in question that you are searching
12     for. I know I had a lot of communications with Houston,
13     obviously.
14 Q.  These communications were in writing sometimes?
15 A.  Sometimes, I am sure they were, sure.
16 Q.  Did you prepare any internal memoranda on the basis
17     of --
18 Q.  Okay. But you recall having written communications on
19     this subject with El Paso to decide whether or not to --
20     you said yes?
21 A.  Yes.
22 Q.  But you recall you had written communications with
23     El Paso before deciding whether or not to sign this
24     agreement, the TCA?
25 MR BAKER: I am going to object. This is the third time you
```

## 139

```
1  have mischaracterised the prior testimony in a question.
2  He has answered it three times and she keeps coming back
3  and saying you recall documents when he says he does not
4  recall documents.
5  MS COLAIUTA: I was referring to written communications to
6  El Paso from him, and I did not mention documents in my
7  last --
8  MR BAKER: No, you said memoranda one time, you said
9  documents another time.
10 MS COLAIUTA: In my previous question --
11 THE CHAIRMAN: Okay, now let us go on with the questioning
12 and I would suggest that on redirect, you can clarify
13 what you feel are problems which have occurred on
14 cross-examination. So please, Ms Colaiuta, go on.
15 MS COLAIUTA: In your statement, when you refer to the fact
16 that transmission costs under the PPA were the ones that
17 had to be paid, or reimbursed by CEL under the TCA, you
18 state that these costs were to be repaid without
19 limitation; is that correct?
20 A.  Yes.
21 Q.  To what do you refer when you use that phrase; do you
22     refer to the kind of cost or to the amount to be
23     reimbursed?
24 A.  I think in that particular phrase I would like to see
25     the TCA again.
```

## 140

```
1  A.  Yes.
2  Q.  But I believe it refers to the group of costs.
3  Q.  To the group of costs?
4  A.  Correct.
5  Q.  So that means to the kind of costs?
6  A.  Correct.
7  Q.  Not to the amount?
8  A.  Correct.
9  Q.  Would you like to have a copy of the TCA?
10 A.  Sure, I will.
11 Q.  Just to make sure I understand, the phrase in question
12     is in section D of the background statement. In the
13     middle of section D?
14 A.  Correct.
15 Q.  Can you read this paragraph? Would you mind?
16 A.  The paragraph, okay:
17     "Unidad de Transacciones, together with its
18     successors, assigns brands to you, being the entity
19     responsible for managing the wholesale electricity
20     markets and electricity distribution in El Salvador,
21     also charges NPC for certain costs, which include,
22     without limitation, automatic generation control, zero
23     voltage, forced generation, reactive power for capacity
24     banks, losses, grid congestion, deviations, spinning
25     reserve calculation and non-delivered energy
```

EXHIBIT 6

Summary of CEL-NPC Negotiations,
Miami, November 8-9

Meeting at the J.W. Mariott Hotel in Miami was attended by:

For CEL: Jorge José Shann (member of the CEL Board of Directors), Salvador Novellino (Chief Financial Officer, CEL), Jorge Kuri (lawyer), W. L. Craig (lawyer, Coudert Freres).

For NPC: Nadeem Babar (Senior Managing Director, Structured Markets, El Paso), Mark Croak (Managing Director, Structured Markets, El Paso), Steve Sutton (Manager, NPC), Basil Nichols (lawyer, in-house counsel, El Paso).

## CEL's Principal Position

CEL's position was based on Boston Pacific's original June 29, 2000 report as updated on November 2, 2001 which justified a buy-out payment to NPC of between $36 to $42 million (with the added proviso that these amounts were based on a lump sum payment taxable at 25%, and should be reduced further if it could be demonstrated that the payment was in fact non-taxable).

## NPC's Principal Position

NPC took the position that it was not bound by the $135 million "offer" contained in Robert Hart's October 5, 1998 letter (or any prior position taken by NPC in the arbitration or elsewhere) and that if it insisted on being completely "made whole" by a current buy-out (presumably using its preferred method of comparing as of the date of termination the discounted cash value of revenue for the remaining years of the PPA with the discounted cash value of revenue from sales as a merchant plant) it would require a lump sum payment of over $200 million, but it "was not asking for this".

It based its current position on El Paso's general corporate policy that all assets on its balance sheet represented a capital cost, or cost of financing, of 12% p.a., which it considered its minimum return on capital (whether the capital was raised by equity or loans). It then based its estimate of the required buy-out sum on the amount which positive cash flow arising from the PPA had exceeded the 12% capital cost set out above. According to NPC its net annual positive cash flow from the NPC amounted to $21.5 million (depreciation $18.6 million, profits $2.9 million). NPC likewise took the position that it had always insisted that the payment must be tax-free, that it continued to do so, and that no reduction in the lump sum should be given to CEL simply because the condition of non-taxability was attained (it will be recalled, nevertheless, that the Hart letter said that the $135.5 million buy-out price would be "used to pay NPC obligations with third parties and to pay the taxes arising from this transaction" (emphasis supplied).)

According to its way of thinking, NPC's original settlement offer would be a cash payment approaching the value of its investment plus a one-year extension of the PPA.

- 2 -

Positions taken by the Parties, November 9

Each party summarized its position on Friday morning after having taken into account the position and explanations of the other party:

**CEL**

| | |
|---|---|
| $42.0 million | (based on Boston Pacific) |
| 21.5 | (additional cash offer in lieu of one year extension of PPA, refused by CEL, representing foregone benefit of extension to NPC) |
| $63.5 million | |

**NPC**

| | |
|---|---|
| $155 million | (original NPC investment) |
| (-) 33 | (contribution of PPA to NPC through 12/31/01 in excess of 12% p.a. capital cost recouped through CEL's payment) |
| 122 | |
| (-) 21.5 | (value of one year PPA extension to NPC) |
| 100.5 million | |

**NPC's Revised Position**

Based on the large differences between the position of the parties, and NPC's perception that CEL could not make a sufficiently high cash offer, NPC further conferred and made a further offer, which it stated to be valid through 26 November, as follows:

i)    Cash: $75 million.

ii)   New 5 year PPA, with terms similar or identical to present PPA, except that the price would be fixed at 8 cents per Kwh

iii)  CEL to be responsible for all transmission costs

iv)   Present PPA to be terminated as of the date of the payment of $75 million and execution of the new PPA.

Mr. Babar took the position that El Paso was not convinced that Nejapa could make a profit as a merchant plant and was not convinced that the market prices estimated by Mr. Novellino would be realized. Accordingly, El Paso alleged that after termination of the PPA the Nejapa plant would have no net asset value on the balance sheet. Mr. Babar's insistence on a new 5 year PPA at a reduced price was designed to create asset value so that he could take the position with his board that the plant with a contract (which would develop profits for NPC of $3.5 million annually) had some residual value. According to Babar, this residual value was only $11 million, hence the value of El Paso's offer was $86 million ($75 million + $11 million) which was $36 million less than El Paso's original $122 million offer. According to Salvador Novellino, the El Paso proposal of $75 million with a contract does not represent any real concession by El Paso, but really reflects that they estimate the residual value of the plant at the end of five years to be $36 million.

-3-

NPC.

WLC expressed disappointment that NPC's revised counter offer did very little to bridge the gap between the parties' positions and did not represent a substantial effort by

Mr. Siman advised that the negotiators did not have authority to agree on a new or extended PPA, only to make a cash payment, and the issues presented by NPC would be taken up expeditiously with CEL's board.

William Laurence Craig

## APPENDIX B

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# United States District Court

### DISTRICT OF DELAWARE

COMISIÓN EJECUTIVA HIDROELÉCTRICA          **SUBPOENA IN A CIVIL CASE**
DEL RIO LEMPA, et al.

**V.**

CASE NUMBER:[1] Civil Action No.

NEJAPA POWER COMPANY, L.L.C., et al.

To:   NEJAPA POWER COMPANY, L.L.C.
      c/o The Corporation Trust Company
      1309 Orange Street
      Wilmington, DE  19801

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  See Attachment 1.

| PLACE Morris, Nichols, Arsht & Tunnell LLP 1201 North Market Street, 18th Floor Wilmington, DE  19801 | DATE AND TIME July 25, 2008, 10:00 a.m. |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and

may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
|  |  |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
David Orta, Esq. (202) 942-5667
Arnold & Porter, 555 12th Street, N.W., Washington, D.C.

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

1  If action is pending in district other than district of issuance, state district under case name

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | . |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

Date

Signature of Server

Address of Server

RULE 45, Federal Rules of Civil Procedure, Part C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS:

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney In breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)    (A)    A person commanded to produce and permit Inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying, may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying or any or all of the designated materials or of the premises, if objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued, if objection has been made, the party Serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who Is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A)    On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance;

(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person presides, Is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may In order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(vi)    subjects a person to undue burden.

(B)    If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial Information, or

(ii)    requires disclosure of an un-retained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)    requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that Cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories In the demand.

(2)    when information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**Attachment 1**

**DEFINITIONS**

Unless the context indicates otherwise, the following words and phrases are defined and used herein as follows:

1.    The term "CEL" means and refers to Comisión Ejecutiva Hidroeléctrica del Río Lempa.

2.    The term "NPC," "you" or "your" means and refers to Nejapa Power Company, L.L.C. also know as Nejapa Power Co., and Nejapa Co., their predecessors and successors, each of their subsidiaries of subsidiaries, divisions, affiliates in which it owns a majority or a controlling interest, and other organizational or operating units, and all of their predecessors or successors and each of their directors, officers, employees, agents or representatives, attorneys, consultants, contractors, and subcontractors, and all persons acting or purporting to act on their behalf for any purpose whatsoever.

3.    The term "EL PASO," means El Paso Corporation, also know as El Paso CGP Co., El Paso Technology Inc., and El Paso Energy Corporation.

4.    The term COASTAL CORPORATION refers to that energy company that previously owned NPC and that was acquired by EL PASO.

5.    The term "PPA" means and refers to the Power Purchase Agreement dated May 18, 1994, by and between CEL and NPC, as ultimate successor-in-interest to Trigen Energy Corporation, as amended, also known as Contract CEL-2401.

6.    "NEJAPA PLANT" refers to the thermal power plant constructed by NPC in the Nejapa region of El Salvador as provided for in the PPA.

7.     The term "1999 ARBITRATION" refers to the arbitration initiated by CEL on May 13, 1999, to terminate the PPA.

8.     The term "FINAL AWARD" means and refers to the Final Award issued on March 21, 2002, for the 1999 Arbitration.

9.     The term "TCA" means and refers to the Transmission Costs Agreement between NPC and CEL executed on June 30, 2002, as part of the Final Award for the 1999 Arbitration.

10.     The term "TCA AMENDMENT" means and refers to the document titled "Amendment #1 Transmission Costs Agreement Between CEL and Nejapa Power Company, L.L.C." dated July 1, 2002, amending the Transmission Cost Agreement as described therein.

11.     The term "TCA TAX PROVISIONS" refers to Section 3 of the TCA, both in its original form and as amended by Section 3 of the TCA Amendment.

12.     The term "2003 ARBITRATION" refers to the arbitration initiated by NPC on September 5, 2003, focusing on the nature and scope of certain of CEL's reimbursement obligations to NPC under the TCA.

13.     The term "PENDING ARBITRATION" refers to the pending arbitration which NPC notified CEL it was filing on July 5, 2007.

14.     The term "STANDBY LETTER OF CREDIT" refers to that letter of credit dated June 30, 2002 and referred to in section 4 of the TCA and section 15 of the FINAL AWARD.

15.     The term "UT" and/or "TU" refers to the Unidad de Transacciones, the wholesale electricity market operator within El Salvador.

16.     The term "DOCUMENT" shall have the same meaning as the definitions of writings, recordings, and photographs in Rule 1001 of the Federal Rules of Evidence and the description "documents" in Rule 34(a)(1) of the Federal Rules of Civil Procedure and includes,

without limitation, the original or copy of handwriting, typewriting, printing, photostatting, and every means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, symbols, and includes all electronically stored material, whether stored or transmitted by e-mail, floppy disk, hard drive, CD-ROM, or any other electronic means.

17.    The term "COMMUNICATION" means and refers to any transmission, transfer, conveyance or exchange of meaning or information, opinions, questions, or comments of any kind, in any manner, at any time or place and under any circumstances, whether by spoken or written language or other means of transmission or conveyance, including but not limited to, telephone conversations, discussions, letters, and e-mail messages.

18.    The phrase "REFERRING OR RELATING TO" means and includes constituting, concerning, alluding to, responding to, connected with, commenting on, referencing, regarding, discussing, involving, showing, describing, reflecting, analyzing, evidencing or comprising.

19.    The term "any" means "any and all." The term "all" has the same meaning. The terms "and" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these requests any information which might otherwise be construed outside their scope.

20.    The term "related" or "relating to" means comprising, constituting, reflecting, respecting, concerning, referring to, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussion or evaluating.

21.    The term "date" means the exact day, month and year, if ascertainable, or if not, the best approximation thereof.

22.    The terms "and" and "or" are to be interpreted both conjunctively and disjunctively.

3

## INSTRUCTIONS

1.    You are requested to produce all DOCUMENTS responsive to these DOCUMENT REQUESTS that are in your possession, custody or control pursuant to Federal Rule of Civil Procedure 34, including DOCUMENTS currently in the custody of your agents and attorneys.

2.    If any DOCUMENT called for by these DOCUMENT REQUESTS was at one time within your possession, custody or control, but is no longer within you possession, custody or control, then as to each such DOCUMENT:

    a.    Identify each DOCUMENT by stating the type of DOCUMENT, its date, author, recipient, recipients of copies, and subject matter;

    b.    State the last time, place, and date that you saw the DOCUMENT, as well as the identity of the person in possession of the DOCUMENT; and

    c.    State why the DOCUMENT left your possession and any knowledge or information you have regarding the current location of the DOCUMENT or any copies of the DOCUMENT.

3.    If there is any DOCUMENT responsive to these DOCUMENT REQUESTS that the responding party contends is privileged or confidential and which is for any other reason withheld, you are hereby requested to provide the following information:

    a.    the name of the sender and author of the DOCUMENT;

    b.    the name of the person to whom the DOCUMENT or copies of the DOCUMENT were sent;

    c.    the date on which such DOCUMENT was prepared or written and the date on which it was transmitted;

d.    a description of the subject matter of the DOCUMENT; and

e.    the statute, rule or decision which is claimed to give rise to the privilege or other reason for withholding the DOCUMENT.

4.    If you object to all or any portion of any category of DOCUMENTS called for by these DOCUMENT REQUESTS, please produce all DOCUMENTS within each category to which your objections do not apply and please state whether any DOCUMENTS are being produced that are subject to the objection.

5.    You are requested to produce all DOCUMENTS as they are kept in the usual course of business.

6.    The singular of any term shall include the plural, and the plural of any term shall include the singular.

7.    When the DOCUMENT REQUESTS do not specifically ask for a particular DOCUMENT but the DOCUMENT would help to make the production complete, comprehensible or not misleading, please produce the DOCUMENT. Only non-identical copies of a DOCUMENT are to be considered separate DOCUMENTS.

8.    Each itemized request that follows is to be construed independently and not limited by reference to any other itemized request.

9.    Except when stated otherwise expressly, each itemized request calls for all DOCUMENTS described, regardless of the time or date prepared.

10.    Except as otherwise set forth in specific DOCUMENT REQUESTS, the relevant time period for the DOCUMENT REQUESTS shall be from January 1, 1999 to the present.

## DOCUMENT REQUESTS

### DOCUMENT REQUEST NO. 1:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER OR RELATE to the negotiation of the FINAL AWARD and/or the TCA.

### DOCUMENT REQUEST NO. 2:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC) that REFER OR RELATE to the negotiation of the TCA AMENDMENT.

### DOCUMENT REQUEST NO. 3:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER OR RELATE to the negotiation of the TCA TAX PROVISIONS.

**DOCUMENT REQUEST NO. 4:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER OR RELATE to the negotiation of the STANDBY LETTER OF CREDIT.

**DOCUMENT REQUEST NO. 5:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the potential economic value of the FINAL AWARD and/or the TCA to NPC or EL PASO.

**DOCUMENT REQUEST NO. 6:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the potential economic value of the TCA AMENDMENT to NPC or EL PASO.

**DOCUMENT REQUEST NO. 7:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the potential economic value of the TCA TAX PROVISIONS to NPC or EL PASO.

**DOCUMENT REQUEST NO. 8:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the potential economic value of the STANDBY LETTER OF CREDIT to NPC or EL PASO.

**DOCUMENT REQUEST NO. 9:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR

RELATE to the actual economic value of the FINAL AWARD and/or the TCA to NPC or EL PASO.

**DOCUMENT REQUEST NO. 10:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the actual economic value of the TCA AMENDMENT to NPC or EL PASO.

**DOCUMENT REQUEST NO. 11:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the actual economic value of the TCA TAX PROVISIONS to NPC or EL PASO.

**DOCUMENT REQUEST NO. 12:**

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR

RELATE to the actual economic value of the STANDBY LETTER OF CREDIT to NPC or EL PASO.

### DOCUMENT REQUEST NO. 13:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the reimbursement provisions of the TCA and/or FINAL AWARD that discuss the meaning, scope, intent or purpose of such provisions.

### DOCUMENT REQUEST NO. 14:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the potential value of the reimbursement provisions of the TCA and/or FINAL AWARD.

### DOCUMENT REQUEST NO. 15:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto

Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the actual value of the reimbursement provisions of the TCA and/or FINAL AWARD.

### DOCUMENT REQUEST NO. 16:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the intent, purpose, scope or meaning of the TCA AMENDMENT.

### DOCUMENT REQUEST NO. 17:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the intent, purpose, scope, or meaning of the TCA TAX PROVISIONS.

### DOCUMENT REQUEST NO. 18:

All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto

Cordova (General Manager, NPC), Roberto Gonzalez (Market Manager, NPC), that REFER OR RELATE to the intent, purpose, scope, or meaning of the STANDBY LETTER OF CREDIT.

**DOCUMENT REQUEST NO. 19:**

All DOCUMENTS during the period 2002 through 2007 REFERRING OR RELATING to the commercial strategy employed by NPC relating to deviations as that term was used in the TCA and FINAL AWARD.

**DOCUMENT REQUEST NO. 20:**

All DOCUMENTS during the period 2002 through 2007 REFERRING OR RELATING to the commercial strategy employed by NPC regarding deviations, as that term is used in the TCA and FINAL AWARD, to, from or by Roberto Gonzalez, the Market Manager of NPC.

**DOCUMENT REQUEST NO. 21:**

All DOCUMENTS REFERRING OR RELATING to any comparisons between the economic value of the PPA to EL PASO, COASTAL CORPORATION or NPC and the economic value of the FINAL AWARD and/or TCA to EL PASO, COASTAL CORPORATION or NPC.

**DOCUMENT REQUEST NO. 22:**

All DOCUMENTS REFERRING OR RELATING to projections made by or on behalf of EL PASO, COASTAL CORPORATION or NPC of the actual transmission costs to be incurred by NPC or EL PASO during the life of the TCA.

**DOCUMENT REQUEST NO. 23:**

All DOCUMENTS REFERRING OR RELATING to the commercial strategy employed by NPC relating to deviations following expiration of the TCA.

**DOCUMENT REQUEST NO. 24:**

All DOCUMENTS REFERRING OR RELATING to the liability, or the absence of liability, by NPC for the payment of taxes by NPC to any taxing authorities in El Salvador by reason of reimbursement payments received by NPC pursuant to the TCA, including, without limitation, any tax advice, legal, audit or accounting opinions received by NPC or EL PASO relating to this subject.

**DOCUMENT REQUEST NO. 25:**

All DOCUMENTS REFERRING OR RELATING to the payment of taxes by NPC to any taxing authorities in El Salvador and due by reason of reimbursement payments received by NPC pursuant to the TCA.

**DOCUMENT REQUEST NO. 26:**

All tax advice, legal, audit or accounting opinions received by NPC REFERRING OR RELATING to the treatment of reimbursement payments received from CEL under the TCA in Nejapa Power Company LLC's tax returns filed in El Salvador for tax years 2002 through 2007.

**DOCUMENT REQUEST NO. 27:**

All DOCUMENTS created prior to the effective date of the TCA REFERRING OR RELATING to any estimates or projections of the deviations, as that term was used in the TCA and FINAL AWARD, to be incurred by NPC during the life of the TCA.

**DOCUMENT REQUEST NO. 28:**

All communications, to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert

13

Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER

OR RELATE to the October 5, 1998 Letter from Robert Hart (President, Coastal Technology) to

Guillermo Sol Bang (President, CEL).

## DOCUMENT REQUEST NO. 29:

All economic reports, analyses, forecasts, or projections to, from, by, and/or between

Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak

(Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil

Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto

Cordova (General Manager, NPC), that REFER OR RELATE to the October 5, 1998 Letter from

Robert Hart (President, Coastal Technology) to Guillermo Sol Bang (President, CEL).

## DOCUMENT REQUEST NO. 30:

All economic reports, analyses, forecasts, or projections that were requested, reviewed,

performed or provided to, from, by, and/or between Nadeem Babar (Senior Managing Director,

Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL

PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert

Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), and any

outside consultants that REFER OR RELATE to the buy-out value of the PPA.

## DOCUMENT REQUEST NO. 31:

All communications, to, from, by, and/or between Nadeem Babar (Senior Managing

Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets,

EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert

Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER

OR RELATE to the July 14, 2000 meeting between CEL and COASTAL CORPORATION in Houston, TX.

### DOCUMENT REQUEST NO. 32:

All economic reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER OR RELATE to the July 14, 2000 meeting between CEL and COASTAL CORPORATION in Houston, TX.

### DOCUMENT REQUEST NO. 33:

All communications, to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER OR RELATE to the November 2001 meeting between CEL, NPC and EL PASO in Miami, FL.

### DOCUMENT REQUEST NO. 34:

All economic reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, NPC), that REFER OR RELATE to the November 2001 meeting between CEL, NPC and EL PASO in Miami, FL.

## APPENDIX C

AO 88 (Rev. 1/94) Subpoena in a Civil Case

### Issued by the
# United States District Court
## DISTRICT OF DELAWARE

COMISIÓN EJECUTIVA HIDROELÉCTRICA
DEL RIO LEMPA, et al.

**SUBPOENA IN A CIVIL CASE**

### V.

CASE NUMBER:[1] Civil Action No.

NEJAPA POWER COMPANY, L.L.C., et al.

To:  Stephen M. Sutton
     Nejapa Power Company, L.L.C.
     c/o The Corporation Trust Company
     1309 Orange Street
     Wilmington, DE 19801

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street, 18th Floor<br>Wilmington, DE 19801 | DATE AND TIME<br>August 4, 2008; 10:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and

may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
David Orta, Esq. (202) 942-5667
Arnold & Porter, 555 12th Street, N.W., Washington, D.C.

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

1  If action is pending in district other than district of issuance, state district under case name

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | . |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____         _____
                         Date                                      Signature of Server

                                                              _____
                                                              Address of Server

                                                              _____

RULE 45, Federal Rules of Civil Procedure, Part C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS:

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney In breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)    (A)    A person commanded to produce and permit Inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying, may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying or any or all of the designated materials or of the premises, if objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued, if objection has been made, the party Serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who Is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A)    On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance;

(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person presides, Is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may In order to attend trial be commanded to travel from any such place within the state in which the trial Is held, or

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(vi)    subjects a person to undue burden.

(B)    If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial Information, or

(ii)    requires disclosure of an un-retained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)    requires a person who is not a party of an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that Cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories In the demand.

(2)    when information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

✎JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
La Comision Ejecutiva Hidroelectrica Del Rio
Lempa

**DEFENDANTS**
Nejapa Power Company, L.L.C.

(b)  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)
Donald E. Reid, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
1201 North Market Street, P.O. Box 1347,
Wilmington, DE 19899-1347, (302) 658-9200

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. 1782
Brief description of cause: Issuance of subpoenas for assistance to a foreign tribunal

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
7/3/08

SIGNATURE OF ATTORNEY OF RECORD
*Donald E. Reid*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**V. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**APPENDIX A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COMISIÓN EJECUTIVA                          )
HIDROELÉCTRICA DEL RÍO LEMPA,               )
                                            )
                 Plaintiff,                 )
                                            )
       v.                                   )        Misc. Action No. _____
                                            )
NEJAPA POWER COMPANY, L.L.C.,               )
                                            )
                 Defendant.                 )

**[PROPOSED] ORDER**

Upon consideration of La Comisión Ejecutiva Hidroeléctrica del Río Lempa's

("CEL's") Application for an Order Granting Assistance to Litigant Before Foreign Tribunal

pursuant to 28 U.S.C. § 1782 and the declarations submitted therewith and it appearing that the

requirements of 28 U.S.C. § 1782 have been satisfied, it is therefore;

ORDERED, that the application is granted; and it is

FURTHER ORDERED, that CEL is authorized pursuant to 28 U.S.C. § 1782 to

take discovery relating to the issues identified in CEL's application from Respondent Nejapa

Power Company, L.L.C., also know as Nejapa Power Co., Nejapa Co., and NPC ("NPC")

including issuing a subpoena to NPC in the form attached as Appendix B, and it is

FURTHER ORDERED, that CEL is authorized pursuant to 28 U.S.C. § 1782 to

take the depositions of the NPC representatives identified in Appendix C and CEL is authorized

to issue a subpoena for the deposition of these representatives in the form attached as Appendix

C, and it is

FURTHER ORDERED, that NPC is directed to comply with such subpoenas in accordance with, and subject to its rights under, the Federal Rules of Civil Procedure and the Rules of this Court.

IT IS SO ORDERED, this _____ day of _____, 2008.


_____
Judge, United States District Court

2380517