# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COMISIÓN EJECUTIVA<br>HIDROELÉCTRICA DEL RÍO LEMPA,<br><br>Plaintiff,<br><br>v.<br><br>NEJAPA POWER COMPANY, L.L.C.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Action No. 1:08-MC-00135-GMS |

## NEJAPA POWER COMPANY, L.L.C.'S MEMORANDUM
## IN SUPPORT OF MOTION FOR RECONSIDERATION OF JULY 18, 2008 ORDER
## GRANTING ASSISTANCE TO LITIGANT PURSUANT TO 28 U.S.C. § 1782

Of Counsel.

C. Mark Baker
Texas Bar No. 01566010
Federal I.D. No. 993
Kevin O'Gorman
Texas Bar No. 00788139
Andrew P. Price
Texas Bar No. 24002791
Federal I.D. No. 22348
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

Dated: July 25, 2008

Kevin G. Abrams (#2375)
John M. Seaman (#3868)
ABRAMS & LASTER LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
abrams@abramslaster.com
seaman@abramslaster.com

*Attorneys for Defendant*
*Nejapa Power Company, L.L.C.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF THE NATURE AND THE STAGE OF PROCEEDINGS........................... 1

SUMMARY OF ARGUMENT ..................................................................................... 2

STATEMENT OF FACTS ........................................................................................... 3

    I.    CEL and NPC's Predecessor Enter Into a 20-Year Power Purchase Agreement.......................................................................................................... 4

    II.    The First Two Arbitrations:  NPC Prevails............................................................ 4

        A.    Arbitration Round One ............................................................................ 4

        B.    The TCA and its Arbitration Provisions ................................................... 4

        C.    Arbitration Round Two.............................................................................. 5

    III.    Arbitration Round Three – The Current Dispute .................................................. 6

    IV.    CEL Attempts to End-Run the Panel's Discovery Orders..................................... 8

ARGUMENT............................................................................................................ 10

    I.    CEL's Failure to Serve NPC Alone Justifies Reconsideration ............................ 10

    II.    Section 1782 Does Not Apply to Private Foreign or International Arbitrations .............................................................................................. 11

    III.    *Intel* Did Not Hold That a Private Foreign Arbitration Is a "Foreign or International Tribunal" for Purposes of Section 1782 ........................................ 13

    IV.    Even if *Intel* Applied, and it Does Not, CEL Failed to Meet its Discretionary Requirements.................................................................... 15

        A.    CEL Concealed From the Court its Attempt to Circumvent Foreign Proof-Gathering Limits........................................................... 16

        B.    The Panel Would Not Be "Receptive" to CEL's End-Run Around its Authority ....................................................................... 18

        C.    NPC Is a Party in a Foreign Arbitration and Thus CEL Can and Must Seek Discovery From the Panel..................................................... 18

        D.    CEL's Application Is "Burdensome" Satellite Litigation That Is Duplicative, Wasteful, and Contrary to the Arbitration Rules for Which CEL Bargained ........................................................................... 19

CONCLUSION......................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Advanced Micro Devices, Inc. v. Intel Corp.,*
No. C 01-7033, 2004 WL 2282320 (N.D. Cal. 2004) ..................................................... 20

*Allied-Bruce Terminix Cos. v. Dobson,*
513 U.S. 265 (1995).............................................................................................................. 5

*Braden v. Univ. of Pittsburgh,*
552 F.2d 948 (3d Cir. 1977) (en banc)........................................................................ 10, 11

*In re Al Fayed,*
36 F. Supp. 2d 694 (D. Md. 1999),
*aff'd,* 210 F.3d 421 (4th Cir. 2000) ............................................................................... 16

*In re Digitechnic,*
No. C07-414-JCC, 2007 WL 1367697 (W.D. Wash. May 8, 2007) ............................... 16

*In re Hallmark Capital Corp.,*
534 F. Supp. 2d 951 (D. Minn. 2007)...................................................................... 14, 15

*In re Letters Rogatory From Can.,*
No. 08-MC-50465-DT, 2008 WL 2760963 (E.D. Mich. July 15, 2008)......................... 10

*In re Merck & Co.,*
197 F.R.D. 267 (M.D.N.C. 2000) ...................................................................... 3, 10, 11

*In re Oxus Gold PLC,*
MISC 06-82 - GEB, 2007 WL 1037387 (D.N.J. Apr. 2, 2007)....................................... 15

*In re ROZ Trading Ltd.,*
No. 1:06-CV-02305-WSD, 2007 WL 120884 (N.D. Ga. Jan. 11, 2007)................... 14, 15

*Intel Corp. v. Advanced Micro Devices, Inc.,*
542 U.S. 241 (2004)................................................................................................*passim*

*Lopes v. Lopes,* 180 Fed. App'x 874 (11th Cir. 2006) (per curium)............................................. 19

*Max's Seafood Café by Lou-Ann, Inc. v. Quinteros,*
176 F.3d 669 (3d Cir. 1999)........................................................................................ 10

*National Broad. Co. v. Bear Stearns & Co.,*
165 F.3d 184 (2d Cir. 1999)........................................................... 3, 11, 12, 13, 15

*Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*,
    384 F. Supp. 2d 45 (D.D.C. 2005) ................................................................ 16

*Republic of Kaz. v. Biedermann Int'l*,
    168 F.3d 880 (5th Cir. 1999) ....................................................... 3, 13, 15, 16

*Schmitz v. Bernstein Liebhard & Lifshitz, L.L.P.*,
    376 F.3d 79 (2d Cir. 2004)........................................................................... 17

## STATUTES, RULES & CODES

9 U.S.C. § 7 ................................................................................................... 13

28 U.S.C. § 1782 ..................................................................................... *passim*

FED. R. CIV. P. 44.1 ........................................................................................ 5

FED. R. CIV. P. 59 ......................................................................................... 10

FED. R. CIV. P. 60 ......................................................................................... 10

## MISCELLANEOUS

David D. Caron, Lee M. Caplan, Matti Pellonpaa, *The UNCITRAL Arbitration Rules, A
    Commentary* 576 (2006) ............................................................................ 4, 5

W. Laurence Craig, William W. Park, Jan Paulsson, *International Chamber of Commerce
    Arbitration* 457 (3d ed. 2000) ...................................................................... 5

Bernard Hanotiau, *Document Production in International Arbitration: A Tentative Definition of
    'Best Practices,'* ICC Bulletin – 2006, Special Supplement on Document Production in
    International Arbitration 113 (2006)............................................................. 5

Hans Smit,
    *International Litigation Under the United States Code*,
    65 COLUM. L. REV. 1015 (1965) ........................................................... 14, 15

UNCITRAL Model Law on International Commercial Arbitration,
    http://www.unicitral.org/pdf/english/texts/arbitraiton/ml-arb/07-86998_Ebook.pdf ....... 17

## STATEMENT OF THE NATURE AND THE STAGE OF PROCEEDINGS

Plaintiff Comisión Ejecutiva Hidroeléctrica del Río Lempa ("CEL") is an entity controlled by the Government of El Salvador. CEL is a respondent in an ongoing private, foreign arbitration being conducted in Switzerland under the UNCITRAL Arbitration Rules, El Salvadoran substantive law, and Swiss procedural law, following a July 5, 2007 Notice of Arbitration served on CEL by Defendant Nejapa Power Company, L.L.C. ("NPC").

A duly appointed three-member arbitration panel (the "Panel") has held a preliminary hearing and issued two comprehensive procedural orders that: (i) limit discovery to the exchange of narrow requests seeking documents that are relevant and material to the dispute; and (ii) set forth the timing of such requests. The final hearing on the merits in the arbitration will begin in late April 2009.

As discussed below, CEL's representation to the Court that "there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL" is a blatant misrepresentation.

On July 3, 2008, CEL filed its Application for an Order Granting Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 ("Application"). D.I. 1. CEL therein invited this Court to interfere with the ongoing private foreign arbitration by exercising a judicial veto of the Panel's rulings on the breadth and timing of discovery.[1] CEL also failed to apprise the Court of two Circuit Court decisions that squarely hold that 28 U.S.C. § 1782 does *not* apply to private arbitration proceedings.

---

[1] On the same day, July 3, 2008, CEL filed a similar application in the Southern District of Texas seeking similar discovery against non-arbitration party El Paso Corporation, the former majority owner of NPC. *See* Declaration of Andrew P. Price at Tab 1 (hereafter "Decl. Tab ___"). Once again, CEL failed to provide notice to El Paso. CEL also represented to that court that the Panel would not be unreceptive to U.S.-style discovery. *Id.* at 7. The federal district court granted the *ex parte* application on July 8, 2008. Decl. Tab 2.

Told neither of the Panel's discovery rulings nor of the two Circuit Court decisions, on July 18, 2008, this Court entered an *ex parte* discovery order compelling NPC to respond to broad document production requests and to produce a witness for deposition following the issuance of subpoenas in the form attached to CEL's Application. D.I. 2. To date, NPC has not been served with the Application, the Order, or the discovery.

On July 17, 2008, after learning of CEL's Application by happenstance,[2] NPC directed a letter to the Panel advising it of CEL's Application to this Court (and the similar Application CEL filed in the Southern District of Texas) and asking that it order CEL to withdraw both Applications. Decl. Tab 3.

The Panel acted quickly. Within hours, the Panel requested CEL to respond and to do so by Tuesday, July 22, 2008. At CEL's request, the Panel extended CEL's response due date to Thursday, July 24, 2008. CEL filed its response. Decl. Tab 17. NPC followed with a brief reply. Decl. Tab 18. Early Friday morning, the Panel emailed the parties asking them to refrain from further filings and promising to advise them of its "decision as soon as possible." Decl. Tab 19.

## SUMMARY OF ARGUMENT

There is no diplomatic way to state it: CEL deceived the Court. And in a big way. CEL affirmatively represented to the Court that there is "no indication" that the Panel would be unreceptive to the discovery it seeks. Application at 8. As detailed below, the Panel has been consistently *un*receptive to CEL's broad discovery requests and has made it clear that it

---

[2] After learning that the Application had been filed, NPC's counsel contacted CEL's counsel on July 18 to propose a schedule for briefing on NPC's opposition to the Application. Having received no response from CEL, NPC's counsel prepared a motion to establish a deadline for its opposition to the Application. As NPC's counsel was about to file that motion, it found the July 18 Order on PACER, thus mooting any motion to establish a briefing schedule.

would not permit "U.S.-style discovery." CEL's Application to this Court was a deliberately misleading end-run around the Panel's authority. There are four independent reasons that the Court should reconsider and vacate its July 18, 2008 Order.

*First*, CEL clearly knew that NPC was represented by counsel and has been communicating with that counsel since the arbitration was filed on July 5, 2007. Nonetheless, CEL inexcusably failed to serve NPC with notice of its Application (or for that matter the July 18 Order). CEL has thus thumbed its nose at the arbitral process and at NPC's due process rights. *See In re Merck & Co.*, 197 F.R.D. 267, 271 (M.D.N.C. 2000).

*Second*, Section 1782 does not apply to *private* foreign or international arbitrations. CEL's application fails to mention dispositive precedent. Two Circuit Courts have specifically rejected use of Section 1782 in the private arbitration context. *See Republic of Kaz. v. Biedermann Int'l*, 168 F.3d 880, 883 (5th Cir. 1999); *National Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184, 191 (2d Cir. 1999). No Circuit Court has ever held to the contrary. (The Third Circuit has not addressed the issue.)

*Third*, CEL's primary authority, *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), is inapposite because it does not concern a private arbitration.

*Fourth*, even if Section 1782 does apply, CEL failed to satisfy *Intel*'s discretionary requirements. Only by failing to disclose material and compelling circumstances could CEL convince the Court that the factors were met. With the benefit of those circumstances, the Court should reconsider and deny the Application.

### STATEMENT OF FACTS

This is a commercial dispute stemming from a power plant project in El Salvador. It has spawned three arbitrations.

I.     **CEL and NPC's Predecessor Enter Into a 20-Year Power Purchase Agreement**

In 1994, El Salvador authorized the country's first private power generation project. CEL, the state-owned electric utility company, awarded the contract to the predecessor of NPC, a Delaware limited liability company. Thereafter, the parties entered into a 20-year Power Purchase Agreement. The Power Purchase Agreement provided for the construction of the plant and provided the terms and conditions under which CEL was obligated to purchase the power NPC generated.

CEL spent the next 14 years trying to renege on its contractual obligations.

II.    **The First Two Arbitrations:  NPC Prevails**

A.     **Arbitration Round One**

The power plant began generating power in 1995. Thereafter, CEL decided the deal was too pricey and sought to cancel the Power Purchase Agreement without payment to NPC. Pursuant to an arbitration provision in the Power Purchase Agreement, CEL and NPC arbitrated their resulting dispute. During the course of the arbitration, they reached a settlement, which was documented in a final arbitration award. That award gave CEL the option of terminating the Power Purchase Agreement if it paid NPC $90 million, and entered into a five-year Transmission Cost Agreement ("TCA") among other requirements. CEL exercised that option.

B.     **The TCA and its Arbitration Provisions**

The TCA's Section 7 contains an arbitration provision providing that disputes between the parties shall be resolved by arbitration before three arbitrators in accordance with the UNCITRAL Arbitration Rules. Decl. Tab 4. The UNCITRAL Arbitration Rules do not authorize U.S.-like discovery. *See* David D. Caron, Lee M. Caplan, Matti Pellonpaa, *The*

*UNCITRAL Arbitration Rules, A Commentary* 576 (2006). Decl. Tab. 20. Additionally, the UNCITRAL Rules do not provide for oral depositions, a creature of U.S. litigation practice.[3]

The parties also foreclosed resort to U.S. courts for discovery by agreeing that the seat of any arbitration would be Geneva, Switzerland. *See* TCA Section 7(b) ("[t]he seat of the arbitration shall be Geneva, Switzerland"). Decl. Tab 4. CEL concedes in its Application that Swiss procedural law governs (Application at 1), which provides: "[i]f the assistance of the judicial or administrative authorities of the State is needed to take evidence, the arbitral tribunal or, with the consent of the arbitral tribunal, a party may request the assistance of the judge at the seat of the arbitral tribunal who shall apply his own law." Decl. Tab 5.[4]

Thus, CEL and NPC bargained for limited discovery in any future arbitrated disputes. Furthermore, if judicial assistance was needed, they agreed that all requests would be filed in the courts of Switzerland.

### C. Arbitration Round Two

The second arbitration was triggered when CEL essentially sought to cancel the TCA without payment. NPC sought a declaratory judgment regarding the meaning and effect of the TCA. Once again, NPC was successful. Decl. Tab 6.

---

[3] Liberal U.S.-style discovery is anathema to international arbitration. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 280 (1995) (international arbitration procedure at odds with broad-ranging U.S. discovery); W. Laurence Craig, William W. Park, Jan Paulsson, *International Chamber of Commerce Arbitration* 457 (3d ed. 2000) ("[T]he authors are not aware of instances where ICC arbitrators have ordered depositions over the objection of a party."); Bernard Hanotiau, *Document Production in International Arbitration: A Tentative Definition of 'Best Practices,'* ICC Bulletin – 2006 Special Supplement on Document Production in International Arbitration 113 (2006). Decl. Tab 20. Of course, because private arbitration is a matter of contract, parties can agree to broad U.S.-style discovery should they want to do so. The arbitration agreement in the TCA contains no such provision.

[4] NPC hereby gives notice that it intends to raise an issue concerning the foreign law of a country. FED. R. CIV. P. 44.1; *see also* Decl. Tab 5.

**III.    Arbitration Round Three – The Current Dispute**

On July 5, 2007, NPC served CEL with a Notice of Arbitration commencing round three. Decl. Tab 4. As set forth in the notice, this latest dispute concerns CEL's refusal to perform certain obligations under the first arbitration award and the TCA, including CEL's promise to reimburse NPC for certain taxes and to maintain a standby letter of credit. *Id.*

With CEL's full participation in the process, the Panel was constituted in May 2008 and has since issued two procedural orders that comprehensively govern the arbitration and the timing and scope of permissible discovery. An overview of the process that produced these procedural orders reveals that CEL is seeking to obtain discovery from this Court that the Panel did not allow.

On June 4, 2008, the Chairman wrote to the parties seeking their comment on the draft first procedural order he provided, as well the parties' input on the sequence and timing of written submissions and document requests, among other items, in advance of a June 24, 2008 procedural hearing. Decl. Tab 7. Thereafter, on June 13, 2008, CEL proposed to NPC two rounds of document production – an "initial document production schedule" to take place before the parties' first round of submissions, and a "supplemental document production schedule" to take place later in the arbitration. Decl. Tab 8. NPC objected to the timing and number of document requests proposed by CEL. Decl. Tab 10. Specifically, NPC advocated for one round of document production that would take place only after the first round of submissions, in keeping with international arbitration practice. *See* n.3 *supra.* CEL and NPC also disagreed on the scope of document production: CEL asked for the first procedural order to allow a party to request production of "any identified document or class of documents which ***may be*** relevant ***or*** material to the outcome of the case." NPC countered that the order

should limit production to "documents that *are* relevant *and* material to the outcome of the case." Decl. Tab 10.

The Panel took up these and other issues at the June 24, 2008 procedural hearing. As reflected in the Panel's letter of June 27, 2008 (Decl. Tab 12), the Panel made two relevant decisions. First, it allowed for two rounds of document production, but the first was significantly narrower than CEL had requested. That first round would take place "in advance of the first round of written submissions," but would be restricted to a request for a "limited" number of documents that would be (i) relevant and material to the case, and (ii) "indispensable" for the preparation of the parties' first round of submissions. *Id.* CEL later referred to this as the Panel's "stringent essentiality standard." Decl. Tab 11.

Second, the Panel accepted NPC's position on relevance and materiality, allowing only narrowly tailored document requests. The Panel's revised draft first procedural order (circulated with its June 27, 2008 letter) provided at Section F.6:

> Any party may, within the time-limits provided in the procedural timetable or at any other time ordered by the [Panel,] request the other party to produce any identified document or narrowly circumscribed categories of documents which are not in its possession *and which are relevant and material to the outcome of the case.* In case of disagreement between the parties, the [Panel] shall have full discretion to take any appropriate decision, having regard to the requirements set out by the present paragraph, the legitimate interests of the other party and all the surrounding circumstances.

Decl. Tab 12 (emphasis added).

Similarly, the Panel's draft Procedural Timetable, at 8 provided: "Requests for production shall be made in a document (such as "Redfern Schedule" identifying each document or category of documents sought with precision, stating the reasons for the request, confirming that they are not in the possession, custody or control of the party requesting them, and establishing their relevance and materiality [including cross-reference to the sections of

the parties' submissions in which the relevant issues are discussed])." Decl. Tab. 12. Finally, the Panel would rule on objections to document requests (paragraph 9). *Id.*

At the close of the June 24 hearing, the Panel asked the parties to work together to propose actual dates for the procedural schedule in keeping with its rulings. Despite the Panel's clear decision that the first round of document requests for "indispensible" documents would take place before either party filed its first submission, CEL now wanted to see NPC's first memorial (due August 22, 2008) before submitting its limited document requests. NPC objected to CEL's gamesmanship. Decl. Tab 13.

On the morning of July 3, 2008, Dr. Mourre, on behalf of the Panel, wrote to the parties. He attached a signed Procedural Order No. 1, noting that its content had been agreed to by the parties. As set forth above, this Procedural Order contained the strict relevance and materiality requirements for document requests. The Panel also rejected CEL's arguments and reaffirmed its decision that requests for indispensible documents would take place *before* the parties' submissions. Decl. Tab 14 (concluding that CEL's proposal "would lead to an inequality between the parties" and "thus decid[ing] to stick to its initial proposal.").

In light of this ruling, the Panel asked CEL to indicate if it still wanted a round of requests for "indispensible" documents before the parties' first round of submissions. CEL replied that same day that it "agrees to dispense with this limited round of productions as currently framed in this proceeding." Decl. Tab 15. Thereafter, the Panel revised proposed Procedural Order No. 2 accordingly. After receiving additional comments as to specific dates, the Panel issued Procedural Order No. 2 on July 8, 2008. Decl. Tab 16.

## IV.    CEL Attempts to End-Run the Panel's Discovery Orders

On July 3, the same day that the Panel informed CEL that it would not reconsider its earlier decision, CEL surreptitiously filed an application with this Court asking for permission

to serve NPC with a broad document request (34 separate requests) and authority to serve a

deposition subpoena on the president of the manager of the entity that had formerly served as

NPC's manager, Stephen M. Sutton.    Not content with just 34 categories of requests, CEL

even sought open-ended and unsupervised discovery.    It asked the Court to enter an order

authorizing "subpoenas for the production of *additional* documents and the taking of

*additional* depositions *as CEL may reasonably deem appropriate* based upon review of

documents produced and depositions given by NPC."  Application at 11 (emphasis added).  As

noted above, on July 3, CEL also wrote a letter to the Panel stating that it had "agree[d] to

dispense with this limited round of productions as currently framed in this proceeding" but

CEL did not inform the Panel that it was seeking discovery at two U.S. courthouses.  Decl.

Tab 15.  With the benefit of hindsight, NPC now of course appreciates CEL's careful wording.

CEL had dispensed with seeking the documents through the arbitration procedures.  But it had

decided to avail itself of the more discovery-friendly U.S. court system.

      CEL's Application contains numerous material misrepresentations and omissions:

-     *Representation*: "[T]here is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL . . . It is therefore likely that the Tribunal. . . . would accept and consider such discovery."  Application at 8. *Truth*: The Panel has expressly limited document discovery and made no provision in its comprehensive procedural orders for U.S.-style oral depositions.  Absent agreement of the parties, arbitrators rarely, if ever, allow the taking of oral depositions over objection. *See* n.3 *supra*.

-     *Representation*: "Without the assistance of this Court ... important evidence may never be produced." Application at 5-6. *Truth*: Two procedural orders thus far issued by the Panel contain provisions, including a detailed schedule, that allow CEL to request and obtain documents from NPC.

-     *Representation*: "Given the relevance of this information [regarding intent] to the present dispute, an order requiring its production is vital."  Application at 5. *Truth*: The panel in the second arbitration rejected the relevance of the parties' purported intent and found that CEL had been unable to show that the parties' intent was in any

manner different from the contractual language in the TCA. Decl. Tab 6 (arbitration award ruling that CEL "ha[d] not been able to show" that the parties' intent was in any manner different from the clear language in the TCA).

CEL did not serve NPC with its Application.

Hearing only one side of the story (and an inaccurate one at that), the Court granted CEL's Application. As shown below, the other side of the story, and more importantly, applicable law, compels but one conclusion. CEL led this Court into error.

## ARGUMENT[5]

### I.    CEL's Failure to Serve NPC Alone Justifies Reconsideration

Courts are reticent to grant *ex parte* Section 1782 applications, recognizing that extreme discovery tactics frustrate rather than further justice. *E.g., In re Merck & Co.*, 197 F.R.D. 267, 270-71 (M.D.N.C. 2000). *Merck* stayed an application for a Section 1782 order pending the petitioner's notification of all interested parties. The court viewed the *ex parte* petition as a hurry-up offensive to get discovery that "invites upset, chaos, and ill-will" and unnecessary given the absence of exigent circumstances. *Id.* at 271; *see also In re Letters Rogatory From Can.*, No. 08-MC-50465-DT, 2008 WL 2760963, at *2 (E.D. Mich. July 15, 2008) ("Courts have identified dangers in granting ex parte discovery orders, especially in the context of international litigation and letters rogatory, and cautioned against the practice.") (Ex. A); *see generally Braden v. Univ. of Pittsburgh*, 552 F.2d 948, 951-55 (3d Cir. 1977) (en banc).

CEL's failure to notify NPC is particularly inexcusable. CEL had NPC's contact information at its fingertips. CEL and NPC have been in regular communication in connection

---

[5] As stated in the accompanying motion, NPC seeks relief under Fed. R. Civ. P. 59 and 60. *See generally Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). As NPC has not been served with CEL's discovery, it reserves the right to avail itself of the protections of Rule 45.

with the ongoing arbitration. Most recently, they participated in a June 24, 2008 procedural hearing and exchanged a raft of letters since that time. CEL found time to let the Panel know it was withdrawing part of its discovery request – which, unbeknownst to the Panel and NPC was one of its steps in its end-run around the Panel's orders – yet did not pick up the phone, send an email, or fax its filing to NPC. Moreover, as in *Merck*, there are no exigent circumstances. CEL's arbitration memorial is not due for months.

## II.    Section 1782 Does Not Apply to Private Foreign or International Arbitrations

Section 1782(a) provides in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a ***foreign or international tribunal***, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782 (emphasis added).

Two Circuit Courts have held that Section 1782 cannot be invoked in connection with private international arbitration proceedings. Their decisions are anchored in legislative history, statutory construction rules, and in the policies favoring arbitration. No Circuit Court has held that a ***private*** foreign or international arbitration is a proceeding "in a foreign or international tribunal" for purposes of Section 1782.

In *NBC*, a Mexican television broadcasting company filed for private commercial arbitration in a contractual dispute with NBC. *NBC*, 165 F.3d at 185-86. The contract provided for arbitration proceedings under the auspice of the International Chamber of Commerce ("ICC"). NBC applied, under Section 1782, for authorization to serve document subpoenas on six third-party financial institutions. After initially granting the application, the

district court later quashed the subpoenas, "concluding that the term 'foreign or international tribunal' in 28 U.S.C. § 1782 . . . does not encompass private international commercial arbitration." *Id.* at 186. The Second Circuit affirmed. *Id.* at 191.

The Second Circuit's comprehensive analysis includes a lengthy discussion of Section 1782's legislative history. *Id.* at 188-91. That history conclusively showed that private arbitration proceedings fall outside the statute's phrase "foreign or international tribunal." *Id.* at 190 ("[T]he legislative history reveals that when Congress in 1964 enacted the modern version of § 1782, it intended to cover governmental or intergovernmental arbitral tribunals.").

The Second Circuit further noted that applying Section 1782 to private foreign or international arbitration proceedings would conflict with Section 7 of the Federal Arbitration Act ("FAA"), an issue it avoided reaching. *Id.* at 191.[6] As the Second Circuit explained, Section 7 of the FAA explicitly confers authority upon arbitrators to obtain evidence; this is not a privilege of parties. *NBC*, 165 F.3d. at 187 ("§ 7 explicitly confers authority only upon ***arbitrators***; by necessary implication, the ***parties*** to an arbitration may not employ this provision to subpoena documents or witnesses.").[7]

---

[6] The Second Circuit elaborated as follows:

> The FAA applies to private commercial arbitration conducted in this country; and it applies also to arbitrations in certain foreign countries by virtue of legislation implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 7 I.L.M. 1046 (implemented at 9 U.S.C. §§ 201-08) (the "New York Convention"), and the Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, 14 I.L.M. 336 (implemented at 9 U.S.C. §§ 301-07) (the "IAC").

*NBC*, 165 F.3d at 187.

[7] Section 7 provides in pertinent part:

> ***The arbitrators . . . may summon in writing any person to attend before them or any of them as a witness . . . Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators. . . .***

The Second Circuit further reasoned that if the term "foreign or international tribunal" in Section 1782 were construed to include foreign or international private arbitration, foreign parties to private arbitrations could compel discovery in district court, though the same right is denied to parties in private arbitration subject to FAA jurisdiction in the U.S. Foreign parties would be entitled to the assistance of U.S. Courts, while domestic parties are not. And that would be the precise (and wrong) result. *Id.* at 187-88, 191 & n.9.

Finally, the Second Circuit determined that the principal benefits of arbitration, efficiency and cost-effectiveness, would be greatly compromised if Section 1782 were extended to private arbitrations. *NBC*, 165 F.3d at 188, 191 ("[P]olicy considerations of some magnitude reinforce our conclusion . . . that Congress did not intend for [Section 1782] to apply to an arbitral body established by private parties.").

The Fifth Circuit's analysis in *Biedermann*, 168 F.3d at 883, is similar. After considering the discrepancies between domestic and foreign arbitrations that would result if Section 1782 was construed to apply to private arbitrations, Section 1782's legislative history, the policy issues, and the Second Circuit's reasoning, the Fifth Circuit also held that the term "foreign and international tribunals" in Section 1782 does not include a private arbitration proceeding. *Id.*

CEL's Application mentions neither *NBC* nor *Biedermann*.

**III.    *Intel* Did Not Hold That a Private Foreign Arbitration Is a "Foreign or International Tribunal" for Purposes of Section 1782**

One could infer from CEL's extended discussion of *Intel* (Application at 7-10) that it involved an arbitration. One would be wrong.

---

9 U.S.C. § 7 (emphasis added).

At issue in *Intel*, *inter alia*, was whether the Directorate-General for Competition of the Commission of the European Communities ("Commission"), a public government agency organized under the authority of the European Union, was a "foreign or international tribunal" within the meaning of § 1782(a). *Id.* at 257-58.

The Court traced Section 1782's history, beginning with its original language, which authorized assistance of discovery for use in a "foreign court," though its total revision in 1964, when the statute was enacted in its present form and the relevant language changed to "in a proceeding in a foreign or international tribunal." *Id.* at 247-49 (quoting the Senate Report, which explained that "Congress introduced the word 'tribunal' to ensure that 'assistance is not confined to proceedings before conventional courts,' but extends also to 'administrative and quasi-judicial proceedings'").

To resolve the question before it – whether the Commission was a "tribunal" – the Court looked to the Commission's integral role as decision-maker within the context of a state-sponsored judicial system and its authority to enforce European competition laws. *Id.* at 250, 254-55. Only then did it hold that the Commission qualified as a "tribunal." *Id.* at 257. *Intel* neither expressly or impliedly overruled the Fifth or Second Circuit; the Supreme Court did not cite, much less discuss, their opinions.

Extending *Intel*'s holding to non-administrative and non-quasi-governmental ***private foreign or international arbitration*** is quite a leap. Unfortunately, two district courts have taken that leap. *See In re Hallmark Capital Corp.*, 534 F. Supp. 2d 951 (D. Minn. 2007); *In re ROZ Trading Ltd.*, No. 1:06-CV-02305-WSD, 2007 WL 120884 (N.D. Ga. Jan. 11, 2007) (Ex. B). These courts seized upon dictum in the Supreme Court's decision to conclude that Section 1782 now applies to private international arbitrations, like this one. The *Intel* majority quoted

from the work of Professor Hans Smit in its analysis of the 1964 congressional expansion of Section 1782.  *See Intel*, 542 U.S. at 258 (quoting Smit, *International Litigation under the United States Code*, 65 COLUM. L. REV. 1015, 1026 & n.71 (1965)) ("'[t]he term 'tribunal' ... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts'"). Because Smit had concluded that Section 1782's ambiguous term "tribunal" should include "arbitral tribunals," these courts concluded that the U.S. Supreme Court has signaled its agreement with the conclusion that private arbitration was intended.  That quote from *Intel* is far too tenuous to support such weight.  The Second Circuit actually contemplated articles written by Professor Smit and came to a contrary conclusion as to private arbitrations because the legislative history was so compelling.  *NBC*, 165 F.3d at 191 n.9.

 *Hallmark* and *Roz* are the only two post-*Intel* orders granting Section 1782 relief in private international arbitrations,[8] and they are simply wrongly decided.  Both deferred to the dictum in *Intel* rather than analyzing the legislative history and important policy implications considered by the Second and Fifth Circuits.  Therefore, the Court should not be swayed by these clearly nonbinding district court orders.

**IV. Even if *Intel* Applied, and it Does Not, CEL Failed to Meet its Discretionary Requirements**

 Even if CEL could succeed in convincing the Court that a private foreign or international arbitration panel is a "foreign or international tribunal" for purposes of Section 1782(a), CEL's bid for discovery would still flounder because such a finding is only the first step of the analysis:  "[A] district court is ***not required*** to grant a § 1782(a) discovery

---

[8] *In re Oxus Gold PLC*, MISC 06-82 – GEB, 2007 WL 1037387 (D.N.J. Apr. 2, 2007), involved proceedings that were "intergovernmental" in character and very much unlike the purely private dispute at issue in *NBC* and *Biedermann* (and here). (Ex. C).

application simply because it has the authority to do so." *Intel*, 542 U.S. at 264 (emphasis added).

In *Intel*, the Court set out several considerations "[t]o guide the District Court on remand" in determining whether discovery should be ordered in a particular case. *Id.* at 247. None of the *Intel* factors supports CEL's request to compel discovery.

### A.    CEL Concealed From the Court its Attempt to Circumvent Foreign Proof-Gathering Limits

One of the Supreme Court's key considerations in determining whether to order discovery under Section 1782 is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Id.* at 264-65. Translated to this case, the Court should consider whether CEL's Section 1782 request is an attempt to circumvent the discovery decisions of the foreign Panel.

Courts take a decidedly dim view of applicants who invoke the provisions of Section 1782 in an "attempt to manipulate United States court processes for tactical advantage." *Biedermann*, 168 F.3d at 883; *see also In re Al Fayed*, 36 F. Supp. 2d 694 (D. Md. 1999), *aff'd*, 210 F.3d 421 (4th Cir. 2000) (rejecting attempted end-run around failed FOIA request through a Section 1782 application).[9]

CEL's Application is a similar end run around the Panel's authority. Through its written rulings, the Panel has made clear that there would be no U.S.-style discovery in this

---

[9] The order allowing discovery can be set aside on the basis of CEL's misleading representation alone. *See Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*, 384 F. Supp. 2d 45, 54 (D.D.C. 2005) (rejecting Section 1782 petition because no direct information regarding the receptivity of the foreign tribunal to discovery under Section 1782 was presented); *see also In re Digitechnic*, No. C07-414-JCC, 2007 WL 1367697, at *4 (W.D. Wash. May 8, 2007) ("Digitechnic fails to provide any actual evidence of [its] assertion" that the Paris Court of Appeals would be receptive to the discovery sought in U.S. court.) (Ex. D). Moreover, given that CEL has violated the rules of arbitration it agreed to follow, the imagined receptivity of the arbitration panel is baseless.

arbitration. The discovery process is instead set out by the Panel's Procedural Orders (1 and 2), which do not contemplate broad document requests or depositions; nor do they permit the parties to ignore the Orders in favor of their own discovery timetable and methods in U.S. courts.[10] As explained, the Panel's decision gave proper respect to the parties' arbitration agreement. CEL's Application seeks to usurp the Panel's determination. *See Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 84 (2d Cir. 2004) (upholding denial of relief under §1782 where German government was "obviously unreceptive to the judicial assistance of an American federal court").

CEL's Application is also a transparent bypass of the limitations of Swiss law, in contravention of the parties' agreement. Its Application reveals that CEL only told this Court half the legal story. CEL correctly stated to the Court that procedural questions not addressed by UNCITRAL Arbitration Rules are governed by Swiss law because the agreed-to seat of arbitration is in Geneva, Switzerland. *See* TCA Section 7(b) (providing that "[t]he seat of arbitration shall be Geneva, Switzerland"). What CEL failed to disclose was that UNCITRAL Arbitration Rules and Swiss law positively preclude an *ex parte* Application. Specifically, under Swiss law, the Panel must authorize any request submitted by a party to the courts of justice seeking to take evidence. Moreover, under Swiss law, all requests for assistance to take evidence must be filed in the courts of the seat of arbitration. Decl. Tab 4. These conditions have not been met. Nor has CEL's Application been otherwise approved by the Panel. CEL's

---

[10] The Panel's determination is consistent with Section 7 of the TCA, which provides in relevant part, that the dispute between the parties "shall be finally resolved by arbitration in accordance with [the UNCITRAL Arbitration Rules]." TCA Section 7(a). UNCITRAL Model Law on International Commercial Arbitration is explicit that "no Court shall intervene except where provided in this law." http://www.uncitral.org/pdf/english/texts/arbitration/ml-arb/07-86998_Ebook.pdf. And Article 24(3) establishes that "[a]t any time ... the arbitral

failure to avail itself of these procedures, and its misrepresentation of the applicable proof-gathering restrictions to this Court, demonstrate why CEL is not entitled to the relief it obtained on false pretenses.

### B.     The Panel Would Not Be "Receptive" to CEL's End-Run Around its Authority

The Court is also directed to "take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.

As explained above, the arbitration proceedings between these parties have been ongoing for some time, and CEL has already sought and been denied liberal discovery at this stage in the arbitration from the Panel. Contrary to CEL's representation that "there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL," Application at 8, as discussed above, the Panel has already addressed these discovery issues and made its decision. CEL has thus mischaracterized the Panel's position on these requests. CEL's Application thus fails on this *Intel* factor as well.[11]

### C.     NPC Is a Party in a Foreign Arbitration and Thus CEL Can and Must Seek Discovery From the Panel

The Supreme Court also directed federal courts to evaluate the status of the party from whom discovery is sought in the foreign proceeding. *Intel*, 524 U.S. at 264. Participants in the foreign proceeding are subject to the jurisdiction of the foreign tribunal, which "can itself order them to produce evidence." *Id.* ("[W]hen the person from whom discovery is sought is a

---

tribunal may require the parties to produce documents, exhibits or other evidence within such a period of time as the tribunal shall determine."

[11] In its July 24 letter response to the Panel (Decl. Tab 17), CEL argued that its U.S. court proceedings were "completely independent" of the arbitration proceeding, a statement which is at odds with CEL's Application.

participant in the foreign proceeding, . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."). The rationale for favoring Applications regarding "nonparticipants" is based on the sound premise that a "foreign tribunal has jurisdiction over those appearing before it, and can itself order them [the parties] to produce evidence." *Id.* The "'person from whom discovery is sought' must therefore be a person or entity outside of the jurisdiction of the foreign tribunal . . . ." *Lopes v. Lopes*, 180 Fed. App'x 874, 877 (11th Cir. 2006) (per curiam) (quoting *Intel*). CEL, by contrast, is a participant with the full benefit of a discovery procedure set forth by the Panel, and NPC is a party within the jurisdiction of the Panel.

### D.    CEL's Application Is "Burdensome" Satellite Litigation That Is Duplicative, Wasteful, and Contrary to the Arbitration Rules for Which CEL Bargained

Finally, the Supreme Court indicated that "unduly intrusive or burdensome requests may be rejected or trimmed" in granting relief in a Section 1782 proceeding. *Id.* at 265. Due to the *ex parte* nature of the proceedings so far, the Court has not had the chance to consider the burdensome nature of CEL's requests in proper context. Doing so reveals that the requests are patently improper.

CEL not only seeks an Order to compel depositions – in the face of contrary international arbitration practice – but also seeks the "rights and protections" of U.S. courts to adjudicate and pass judgment on subsequent discovery motions related to the Application, including both depositions and document production. CEL's Application seeks to undo its own agreement to arbitrate; in the process, CEL attempts to burden this Court with duplicative litigation at the public's expense. The Panel recognized the burden of CEL's proposed serial discovery requests on the arbitration proceedings:   "The Arbitral Tribunal of course appreciates that it would be conceivable to have three stages of document production

requests....Yet the Arbitral Tribunal believes that such a procedure would be overly burdensome and is not justified in the case at hand." Decl. Tab 14 (Dr. Mourre letter of July 3, 2008).

Additionally, CEL's Application is a (renewed) attempt by CEL to obtain evidence on (i) the issue of the parties' intent at the time they executed the TCA and (ii) the related issue of the deviations that had to be reimbursed by CEL pursuant to the TCA. The issue of the deviations does not belong to this arbitration: it was decided in a prior UNCITRAL Arbitration, in which NPC obtained a favorable award. CEL is simply seeking to re-open and re-litigate the settled issue of the deviations.

The undue burden imposed by the Application is clear for all of the above reasons. The fourth factor of the *Intel* test, like those before it, fails to support CEL's Application to compel discovery under Section 1782. In any event, in the circumstances extant here, the Court would be well within its discretion to deny an application under Section 1782. *Intel*, 542 U.S. at 264; *Advanced Micro Devices, Inc. v. Intel Corp.*, No. C 01-7033, 2004 WL 2282320, at *2 (N.D. Cal. 2004) (denying application for discovery in full on remand) (Ex. E).

## CONCLUSION

After not getting its way in a private foreign arbitration proceeding it bargained for, CEL sought a judicial veto of the Panel's comprehensive discovery rulings. Employing Section 1782 to allow *ad hoc* interference with arbitration proceedings is an assault on private foreign arbitrations. It should not be countenanced. That CEL did so by means of a stealth attack merely underscores the weakness of its position.

Defendant here, and claimant in the ongoing arbitration in Geneva, Nejapa Power Company, L.L.C. asks that the Court reconsider its July 18, 2008 Order, vacate the Order and dismiss this proceeding. NPC asks for any further relief to which it may be justly entitled.

Respectfully submitted,

Of Counsel.

C. Mark Baker
Texas Bar No. 01566010
Federal I.D. No. 993
Kevin O'Gorman
Texas Bar No. 00788139
Andrew P. Price
Texas Bar No. 24002791
Federal I.D. No. 22348
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

Dated: July 25, 2008

_____
Kevin G. Abrams (#2375)
John M. Seaman (#3868)
ABRAMS & LASTER LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
abrams@abramslaster.com
seaman@abramslaster.com

*Attorneys for Defendant*
*Nejapa Power Company, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered participants.

I also certify that on July 25, 2008, I caused to be served true and correct copies of the foregoing on the following as indicated below:

**By Email and Hand Delivery**
Donald E. Reid
Jeremy D. Eichler
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

**By Email and U.S. Mail**
David M. Orta
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206


_____
John M. Seaman (#3868)

# EXHIBIT A

Westlaw.

Slip Copy                                                            Page 1
Slip Copy, 2008 WL 2760963 (E.D.Mich.)
**2008 WL 2760963 (E.D.Mich.)**

In re Letters Rogatory From Canada
E.D.Mich.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D.
Michigan,Southern Division.
In re LETTERS ROGATORY FROM CANADA.
In re Considar Metal Marketing, Inc.
**No. 08-MC-50465-DT.**

July 15, 2008.

Jayson M. Macyda, Dold, Spath, Troy, MI, for
Considar Metal Marketing, Inc.

*OPINION AND ORDER DENYING EX PARTE
PETITION*

MONA K. MAJZOUB, United States Magistrate
Judge.
*1 This matter comes before the Court on the Ex
Parte Petition Requesting Entry of Letters Rogatory
by the United States District Court for the Eastern
District of Michigan filed by Considar Metal Mar-
keting, Inc. on May 19, 2008. (Docket no. 1). This
matter was referred to the undersigned for decision
pursuant to 28 U.S.C. § 636(b)(1)(A). (Docket no.
3). The Court dispenses with oral argument pursu-
ant to E.D. Mich. LR 7.1(e). This matter is now
ready for ruling.

Petitioner Considar requests that three letters rogat-
ory be issued by this Court to the Canadian courts
in connection with Petitioner's attempt to obtain de-
position testimony and document production from
three Canadian companies: Fischercast Corp.; Teck
Cominco, Metals Ltd.; and Xtrata, Zinc, Inc.
(Docket no. 1). Petitioner seeks this discovery in
connection with an action in this court in which it is
the Defendant. *Metropolitan Alloys Corp. v. Con-
sidar Metal Mktg., Inc., Inc.,* No. 06-12667 (E.D.Mich.).
In *Metropolitan,* Plaintiff Metropolitan Alloys
Corp. (MAC) claims that Petitioner failed to honor
a contract to sell to Plaintiff special high grade zinc
at a certain price in 2005 and 2006. (Docket no. 1).

As a result, Plaintiff claims that it was forced to ob-
tain zinc from other companies and in the process it
suffered damages. (*Id.*). The discovery period ends
in *Metropolitan* on August 29, 2008. (*Id.;* docket no.
28).

Petitioner alleges in its Ex Parte Petition that
through discovery it has learned that the three cor-
porations listed above and located in Ontario,
Canada, have information pertaining to the allega-
tions made by Plaintiff in *Metropolitan.* Fischercast
Corporation is located in Peterborough, Ontario,
and Petitioner states that "MAC alleges it has a
contract with Fischercast and that MAC suffered
economic damage when it purchased SHG Zinc
from other suppliers given Considar did not provide
SHG Zinc pursuant to the alleged oral agree-
ment."(Docket no. 1 at 3). Petitioner also alleges
that the "other two [Canadian companies] are zinc
suppliers that did or may have supplied zinc."(*Id.*).
These two companies are located in Toronto,
Canada. (*Id.*).

Petitioner further alleges that it has "been unable to
secure information from these corporations" which
makes letters rogatory essential to ensure that the
litigants have access to all relevant information per-
taining to the case.(*Id.*). The three proposed letters
rogatory to these companies are attached to Peti-
tioner's petition. The documents sought by Petition-
er are generally all order, confirmations, contracts,
and communications between Plaintiff MAC and
the Canadian companies relating to the sale of high
grade zinc. (Docket no. 1).

A court has inherent authority to issue letters rogat-
ory. *See United States v. Staples,* 256 F.2d 290, 292
(9th Cir.1958). In addition, 28 U.S.C. § 1781(a)(2)
implicitly provides federal courts with authority to
issue letters rogatory when it allows the United
States Department of State to receive a letter rogat-
ory issued by a tribunal in the United States for the
purpose of transmitting it to the foreign tribunal.
Whether to issue such a letter is a matter of discre-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2760963 (E.D.Mich.)
**2008 WL 2760963 (E.D.Mich.)**

Page 2

tion for the court. *See United States v. Mason,* 1990 WL 185894, slip copy at *2 (4th Cir. Nov. 29, 1990); *Asis Internet Servs. v. Optin Global, Inc.,* 2007 WL 1880369, slip copy at *3 (N.D. Cal. June 29, 2007). Conducting a deposition in a foreign country under the authority of a letter rogatory is provided for in Fed.R.Civ.P. 28(b)(1). Factors relevant to the court's exercise of its discretion include those listed in Fed.R.Civ.P. 26(b) and (c).*Asis Internet Servs.,* 2007 WL 1880369, slip copy at *3. The Supreme Court has cautioned that American courts "should exercise special vigilance to protect foreign litigants" from unwarranted discovery when deciding whether to authorize the taking of evidence abroad. *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. of Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *Kia Motors America, Inc. v. Autoworks Distrib.,* 2007 WL 4372949, slip copy at *5 (D.Minn. Sept. 27, 2007).

*2 In considering the relevant factors, the Court finds good reason to deny Petitioner's request for letters rogatory. Petitioner's showing in its Ex Parte Petition that the requested discovery is reasonably calculated to lead to the discovery of admissible evidence is weak. Fed.R.Civ.P. 26(b)(1). Petitioner merely claims that Teck Cominco Metals Limited and Xstrata Zinc "did or may have" supplied zinc to Plaintiff. There is no support given for the conclusion that these companies "may have" supplied zinc to Plaintiff. With respect to Fishercast Corp., Petitioner claims that Plaintiff MAC alleges that it has a contract with Fishercast. The nature of this contract is not stated. Also, there is no support given for the statement even if the Court assumes that the contract was related to Plaintiff supplying Fishercast with zinc alloy. Such a weak initial showing of the likelihood of discovering relevant information is cause in and of itself to deny Petitioner's request. *See Asis Internet Servs.,* 2007 WL 1880369, slip copy at *3.

Another reason for denying Petitioner's request is that it has failed to explain the efforts it has made to

obtain the requested discovery from Plaintiff MAC. Although exhaustion of other available remedies is not a prerequisite to issuing a letter rogatory under Rule 28(b)(2), whether the discovery can be obtained from another source that is more convenient, less burdensome, or less expensive under Rule 26(b)(2) remains a relevant consideration. *Tulip Computers Int'l B.V. v. Dell Computer Corp.,* 254 F.Supp.2d 469, 474 (D.Del.2003); *Madanes v. Madanes,* 199 F.R.D. 135, 141 (S.D.N.Y.2001). The types of documents requested in the proposed letters rogatory are the type that presumably Plaintiff MAC would possess or control here in Michigan. Obtaining such documents from Plaintiff MAC would be a much easier and efficient process for obtaining the documents.[FN1]The only information supplied by Petitioner on this issue is its conclusory assertion in its Petition that it "has been unable to secure information from these corporations."(Docket no. 1 at 3). The possibility that an easier and more efficient method exists to obtain the requested discovery weighs in favor of denying Petitioner's request for letters rogatory.

> FN1. A related consideration is that the recently extended close of discovery in the underlying action is August 29, 2008. The process of obtaining discovery through letters rogatory will surely be more time-consuming than obtaining the documents from MAC.

Finally, Petitioner's filing of its Ex Parte Petition is not the best method for bringing this issue before the Court for decision. The action in which Petitioner plans to use any relevant information obtained by the letters rogatory is pending before this Court. By filing this ex parte petition, rather than filing a motion in that pending case, Petitioner has deprived Plaintiff MAC of the opportunity to respond and make any arguments it may have concerning Petitioner's request. Courts have identified dangers in granting ex parte discovery orders, especially in the context of international litigation and letters rogatory, and cautioned against the practice.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2760963 (E.D.Mich.)
**2008 WL 2760963 (E.D.Mich.)**

Page 3

*See In re Merck & Co.,* 197 F.R.D. 267, 270-71 (M.D.N.C.2000). Petitioner offers no reason why it chose not to file a motion in the underlying action, and nothing in the record shows that Plaintiff MAC is aware of this separate action regarding letters rogatory.

**\*3 IT IS THEREFORE ORDERED** that Petitioner's Ex Parte Petition (docket no. 1) is **DENIED.**

### NOTICE TO THE PARTIES

Pursuant to Fed.R.Civ.P. 72(a), the parties have a period of ten days from the date of this Order within which to file any written appeal to the District Judge as may be permissible under 28 U.S.C. 636(b)(1).

E.D.Mich.,2008.
In re Letters Rogatory From Canada
Slip Copy, 2008 WL 2760963 (E.D.Mich.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Slip Copy                                                                          Page 1
Slip Copy, 2007 WL 120844 (N.D.Ga.)
**2007 WL 120844 (N.D.Ga.)**

**H**
In re Roz Trading Ltd.
N.D.Ga.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Georgia,Atlanta
Division.
In re Application of **ROZ TRADING** LTD., Eliza-
beth Square, P.O. Box 847, Grand Cayman, Grand
Cayman Islands, British West Indies, Applicant.
No. 1:06-CV-02305-WSD.

Jan. 11, 2007.

Frank Andrews Lightmas, Jr., Lightmas & Delk,
Atlanta, GA, Stuart H. Newberger, Crowell & Mor-
ing, Washington, DC, for Petitioner.
L. Joseph Loveland, Jr., Brian Avery White, Cath-
erine M. O'Neil, King & Spalding, Atlanta, GA, for
Respondent.

*OPINION AND ORDER*

WILLIAM S. DUFFEY, United States District Judge.
**\*1** This matter is before the Court on The Coca-
Cola Company's Emergency Motion for Stay
Pending Appeal [12], Roz Trading Ltd.'s Opposi-
tion to CocaCola's Emergency to Stay Pending Ap-
peal [14], and Respondent The Coca-Cola Com-
pany's Reply in Further Support of Its Emergency
Motion for a Stay Pending Appeal [15].

**I. BACKGROUND**

On December 19, 2006, this Court issued an Order
(the "Order") granting Petitioner Roz Trading,
Ltd.'s ("Petitioner") Application for an Order Dir-
ecting The Coca-Cola Company to Produce Docu-
ments Pursuant to 28 U.S.C. § 1782 For Use in a
Proceeding Before a Foreign Tribunal. The Order
compelled The Coca-Cola Company
("Respondent") to produce certain specified docu-
ments or document categories to Petitioner by Janu-
ary 20, 2007, for use in an arbitration hearing be-

fore an arbitral panel convened by the International
Arbitral Centre of the Austrian Federal Economic
Chamber in Vienna (the "Centre"), between Peti-
tioner, Respondent's subsidiary the Coca-Cola Ex-
port Company ("CCEC"), and others. The arbitra-
tion concerns an alleged breach of contract between
Petitioner and CCEC, and Respondent is factually
implicated in the circumstances surrounding the
breach. The facts leading up to the arbitration are
set forth more fully in the Court's Order.

In the Order, this Court held: (i) that the term
"tribunal" in § 1782(a) encompassed private arbit-
ral tribunals such as an arbitral panel of the Centre;
and (ii) that the factors of *Intel Corp. v. Advanced
Micro Devices, Inc.,* 542 U.S. 241, 124 S.Ct. 2466,
159 L.Ed.2d 355 (2004) counseled granting Peti-
tioner the discovery it sought.

Respondent has appealed the Order. Respondent
contends that it is likely to prevail upon appeal, and
that its likelihood of prevailing on appeal and the
equities demand a stay pending appeal in the in-
terests of justice. For the reasons below, Respond-
ent's request is denied.

**II. DISCUSSION**

The grant of an emergency motion to stay a trial
court's mandate is an "exceptional response
..." *Garcia-Mir v. Meese,* 781 F.2d 1450, 1453
(11th Cir.1986). A grant of stay depends upon four
factors: "(1) whether the stay applicant has made a
strong showing that [it] is likely to succeed on the
merits; (2) whether the applicant will be irreparably
injured absent a stay; (3) whether the issuance of a
stay will substantially injure the other parties inter-
ested in the proceeding; and (4) where the public
interest lies ." *Venus Lines Agency v. CVG Industria
Venezolana De Aluminio, C.A.,* 210 F.3d 1309,
1313-1314 (11th Cir.2000)*citing Hilton v. Braun-
skill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95
L.Ed.2d 724 (1987). The first factor is ordinarily

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 120844 (N.D.Ga.)
**2007 WL 120844 (N.D.Ga.)**

the most important. *See Garcia-Mir*, 781 F.2d at 1453. Respondent "may also have his motion granted upon a lesser showing of a 'substantial case on the merits' when 'the balance of equities ... weighs heavily in favor of granting the stay.' " *Id.*

A. *Success Upon the Merits*

Respondent first argues that it has a probable likelihood of success on the merits. In support of its contention, Respondent rehashes its arguments based on the pre-*Intel* decisions *Nat'l Broad Co. v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir.1999) and *Republic of Kazahkstan v. Biedermann Int'l*, 168 F.3d 880 (5th Cir.1999). As the Court explained in its Order, those opinions are inconsistent with the Supreme Court's guidance in *Intel*, impose impermissible judicial limitations into the unambiguous text of § 1782(a), and conduct legislative history analyses that are both unnecessary and unpersuasive, particularly in light of *Intel*. Respondent does not show a likelihood of success on this issue by simply repeating its earlier arguments, which the Court previously considered.[FN1]

> FN1. Respondent raises one new authority in support of its argument that *Nat'l Broad Co.* is correct: *In re Oxus Gold, PLC*, No. 06-82, 2006 WL 2927615 (D.N.J. Oct.10, 2006).*Oxus Gold* is an unpublished New Jersey District Court case that cites both *Intel* and *Nat'l Broad Co.* approvingly. *Oxus Gold* dealt with whether an arbitral panel of the United Nations Commission on International Law was a "tribunal" under § 1782(a).*Oxus Gold* did not address the issue before this Court-whether a private arbitral body can constitute a "tribunal" under § 1782(a). Although *Oxus Gold* cited *Nat'l Broad Co.* for the proposition that private arbitral bodies are not § 1782(a) "tribunals," the statement was not necessary to the holding that an arbitral tribunal under the auspices of the United Nations is a § 1782(a) tribunal, and is thus

dicta.

> *Intel* directs the Court to interpret § 1782 by its terms. The text of § 1782(a) provides no basis for distinguishing between "public" and "private" arbitral tribunals. Section 1782 authorizes courts to aid party seeking discovery for proceedings in foreign or international tribunals of "criminal, civil, administrative, or other nature."*Intel*, 542 U.S. at 259.

**\*2** Respondent next argues that the Eleventh Circuit "may well find" that the Court abused its discretion in applying the Intel factors: (i) whether the Respondent is a participant in the foreign proceeding; (ii) the nature of the foreign tribunal and the character of the proceedings underway abroad, and (iii) the receptivity of the foreign tribunal to U.S. federal-court judicial assistance.

Respondent argues that discovery is more readily available from participants in the arbitration, and that the Centre is not guaranteed to be receptive to the aid of this Court.

Respondent is not likely to prevail on its first argument. Respondent does not offer any support for its claim that the discovery sought is available from participants in the arbitration. Respondent also does not suggest how this claim, if true, would be relevant to the *Intel* analysis. Petitioner and the Court have suggested that Respondent seems likely to have exclusive possession, custody, or control of responsive documents. Respondent does not deny the suggestion, and states only that it "is presently unaware of any pertinent documents that are in its exclusive possession, custody, or control."(Emergency Mot. for Stay at 9.)

Respondent is not a party to the arbitration, and on this ground alone the first *Intel* factor is satisfied. Either Respondent has responsive documents, in which case they may not be discoverable through any other means and should be produced; or Re-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

spondent does not have responsive documents, in which case the Order imposes the single obligation of so advising the Petitioner and the Court.

Respondent also is not likely to prevail on its argument regarding the second and third *Intel* factors. Respondent argues that the arbitral panel may choose not to accept materials compelled to be produced under § 1782. Respondent claims that because there is no way to predict whether the arbitral panel will accept § 1782 discovery, the Court should not find the panel "receptive" to such discovery.

In *Intel*, the Supreme Court rejected the "foreign discoverability" rule, 542 U.S. at 254, and expressly recognized that § 1782 aid was appropriate even in situations where the tribunal would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to § 1782(a).*Id.* at 262-63."[T]he foreign tribunal can place conditions on its acceptance of the information to maintain whatever measure of parity it concludes is appropriate."*Id.* at 262.

A similar situation exists here. The parties do not contend that the Centre has a policy against accepting the aid of U.S. courts. It is thus proper for this Court to grant a § 1782 request, even if the specific panel deciding the underlying dispute would not order similar discovery or ultimately decides not to accept the specific discovery ordered by this Court.

Respondent further misconstrues the second and third *Intel* factors. These factors do not require the Court to find that the tribunal will definitely welcome and accept discovery produced pursuant to § 1782. The Court is required only to evaluate the nature and character of the proceedings and the overall receptivity of the tribunal to its assistance. The proceedings before the Centre appear to anticipate that the parties will produce information relevant to the dispute. Although the Centre's arbitral panels are not compelled to accept information produced through discovery, if they choose to request such information, it may only be obtainable through

mechanisms such as § 1782(a). Respondent's claim that the arbitral panel might not be receptive to the aid of this Court is purely speculative. Thus, it appears the Centre is fundamentally "receptive" to such aid for the purposes of this Intel criteria.

B. *Irreparable Injury to Respondent*

*3 Respondent claims that it will be irreparably injured if the Court does not grant its Emergency Motion to Stay, because Petitioner intends to send the materials to Austria, where the Court may lack the authority to retrieve them.FN2 Respondent does not claim that any of the requested documents are privileged or constitute work-product under United States law.FN3Respondent does not present the Court with any authority or other grounds to support a conclusion that being compelled to produce unprivileged documents will irreparably harm it. The potential "injury" claimed by Respondent is thus minimal. Respondent must only search for and produce materials responsive to Petitioner's requests.FN4

> FN2.Section 1782(a) allows the Court to impose conditions on the aid it grants under the statute. Respondent could, for example, move the Court to impose protective conditions on the use of the materials ordered to be produced, such as limiting Petitioner's ability to use such documents in any subsequent U.S. proceedings or requiring precautions to be taken to preserve confidentiality where appropriate. Protective measures such as these would likely minimize or eliminate the risk of harm about which Respondent speculates. Respondent has not made any such request.

> FN3. Respondent reserves the possibility that some documents might enjoy undefined privileges under Uzbek or Austrian law. Respondent does not identify any such privileges, or claim that they apply to any of the materials required to be pro-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 120844 (N.D.Ga.)
**2007 WL 120844 (N.D.Ga.)**

duced by the Order.

FN4. Respondent also argues that a failure to grant a stay will necessarily result in the documents passing beyond the control of this Court or the Eleventh Circuit, thus mooting its appeal. Respondent's argument appears to rely on the principle that "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever ... the appeal must be dismissed."*Church of Scientology of California v. U.S.,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). This is not the case here. The Eleventh Circuit could grant "some meaningful relief" if Respondent prevailed. For example, the "partial remedy" of ordering Petitioner to destroy or return its copies of the materials, or limiting their use in any subsequent proceedings in this country, is sufficient to prevent the case from being moot. *See id.* at 13.

Even if Respondent's appeal were otherwise moot, the Eleventh Circuit could still find this issue to be capable of repetition yet evading review. *See, e.g., Bourgeois v. Peters,* 387 F.3d 1303, 1308 (11th Cir.2004) (entertaining an otherwise moot appeal where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.").

### C. *The Issuance of a Stay Will Likely Substantially Injure Petitioner*

Petitioner would face substantial potential injury if a stay were ordered. If this Court grants the requested stay, Petitioner runs the significant risk that the arbitration will proceed regardless of the stay,[FN5] and that Petitioner will be unable to obtain relevant

documents before the arbitral panel reaches a decision. As Respondent has noted, neither this Court nor the Eleventh Circuit may compel a tribunal located in Austria to stay resolution of an arbitration during the pendency of Respondent's appeal. If this Court grants a stay, Petitioner suffers the significant risk of prejudice by a final arbitral decision being reached without consideration of relevant evidence in Respondent's possession.

FN5. Petitioner represents that the process of convening the arbitral panel will conclude this month with the appointment of the panel's Chair.

On balance, Petitioner would bear the risk of more serious harm than Respondent if a stay were issued. Respondent would risk the possibility of a minor harm: that it produce documents for which it has not claimed privilege or immunity, and be unable to retrieve them. Petitioner would risk the possibility of a more serious injury: that it suffer significant prejudice in the arbitration due to a lack of relevant evidence in Respondent's possession.

### D. *The Public Interest*

The public interest does not support granting a stay in this case. Granting a stay would encourage parties to foreign arbitrations to pursue protracted discovery disputes to delay the production of evidence in the hope that a final arbitral decision on the underlying merits might be reached before the discovery dispute is resolved. "The laudatory goals of [arbitration] will be achieved only to the extent that courts ensure arbitration is an alternative to litigation, not an additional layer in a protracted contest."*B.L. Harbert Intern., LLC v. Hercules Steel Co.,* 441 F.3d 905, 907 (11th Cir.2006). This is particularly true where, as here, a delay in the discovery would create the possibility for an interested non-party to the underlying arbitration to deny the arbitral tribunal information that may be relevant to its decision.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 120844 (N.D.Ga.)
**2007 WL 120844 (N.D.Ga.)**

Page 5

E. *Respondent's Substantial Showing on the Merits*

Respondent last argues that it has a "substantial case on the merits," because the issue of applying § 1782(a) to a private arbitral panel is one of first impression in this circuit, and two pre-*Intel* circuit courts have ruled that private arbitral bodies are not § 1782(a) tribunals. The Court acknowledges that this is an issue of first impression, about which the parties did not provide and the Court could not find specific post-*Intel* guidance. The lesser "substantial showing" standard only applies, however, when "the balance of equities ... weighs heavily in favor of granting the stay."*Garcia-Mir*, 781 F.2d at 1453 (quotations omitted). As shown above, the equities do not weigh heavily in favor of granting a stay-if anything, they weigh against it.

## III. CONCLUSION

*4 The parties to the arbitration before the Centre ultimately seek a fair and just resolution to their dispute. In *Intel,* the Supreme Court counseled United States District Courts, upon request, to provide discovery in aid of tribunals of "criminal, civil, administrative, or other nature."542 U.S. at 259. The Order seeks to provide such aid, thus ensuring that the arbitral panel has access to relevant information upon which it can reach a fair and just resolution.

The factors discussed above, and particularly the likelihood of success on the merits factor, counsel this Court to deny Respondent's request for stay.

Accordingly,

**IT IS HEREBY ORDERED** that The Coca-Cola Company's Emergency Motion for Stay Pending Appeal [ 12] is **DENIED.**

**IT IS FURTHER ORDERED** that in view of time required to brief and consider Respondent's Motion for Stay Pending Appeal, the Court extends to January 31, 2007, the date by which Respondent is required to produce the materials required by the

Court's December 19, 2006 order.

**SO ORDERED,** this 11th day of January, 2007.

N.D.Ga.,2007.
In re Roz Trading Ltd.
Slip Copy, 2007 WL 120844 (N.D.Ga.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 1037387 (D.N.J.)
**2007 WL 1037387 (D.N.J.)**

**H**
In re Oxus Gold PLC
D.N.J.,2007.
Only the Westlaw citation is currently available.NOT FOR PUBLICATION
United States District Court,D. New Jersey.
In the Matter of the Application of OXUS GOLD
PLC for Assistance before a Foreign Tribunal.
MISC No. 06-82-GEB.

April 2, 2007.

MEMORANDUM OPINION

BROWN, Chief Judge.
*1 This matter comes before the Court upon Respondent Jack A. Barbanel's ("Barbanel" or "Respondent") Appeal of Magistrate Judge Hughes' Denial of Respondent's Motion to Vacate the Court's Order of August 11, 2006, and Petitioner Oxus Gold Plc.'s ("Oxus" or "Petitioner") Cross-Appeal of Judge Hughes' Grant of Respondent's Motion to Vacate the Court's Order of August 17, 2006.[FN1] The Court has fully reviewed all documents filed and submitted. For the reasons set forth below, the Court will deny Respondent's Appeal, and will deny Petitioner's Cross-Appeal.

> FN1. The parties refer to the respective orders by their filing date. For the sake of clarity, this Court will refer to their signature date instead.

**I. BACKGROUND**

Oxus is an international mining group based in the United Kingdom. (Pet. Opp'n at 5.) Mr. Barbanel is the managing director of SIG Overseas Ltd. ("SIG"), a corporate finance and private equity consulting company. (Resp. Br. at 4.) Mr. Barbanel's primary residence is in Moscow, Russia, but he spends about two months every year in New Jersey. (Resp. Br. at 17; Pet. Opp'n at 12.)

In September 1998, Norox Mining Company Ltd. ("Norox"), an Oxus subsidiary, entered into a joint venture agreement with Kyrgyzaltyn Open Joint Stock Company ("Kyrgyzaltyn"), a company owned by the Kyrgyz government. (Resp. Br. at 3; Pet. Opp'n at 5.) The joint venture company, Talas Gold Mining Company ("TGMC") was created for the purpose of developing and exploiting the Jerooy gold deposit in the Kyrgyz Republic. (Resp. Br. at 3; Pet. Opp'n at 5.) TGMC was majority controlled by Oxus. (Resp. Br. at 3; Pet. Opp'n at 5.)

TGMC was granted a license (the "License") to exploit the gold deposit in early 2000. (Resp. Br. at 3; Pet. Opp'n at 5.) In August 2004, however, the Kyrgyz government canceled TGMC's License, and withdrew Oxus' rights to develop the mine. (Resp. Br. at 3; Pet. Opp'n at 6.) In November 2005, Mr. Barbanel contacted the Kyrgyz government regarding the Jerooy Mine. (Resp. Br. at 4; Pet. Opp'n at 6.) Mr. Barbanel claims to have initiated said contact on behalf of a client, Global G.o.l.d. Holdings Gmbh ("Global Gold") interested in competing for the License to develop the mine. (Resp. Br. at 4.) Oxus contends that SIG was the management firm of Global Gold, and that Mr. Barbanel had power of attorney for Global Gold. (Resp. Br. at 5; Pet. Opp'n at 7.) Oxus contends that the actions of Global Gold and the Kyrgyz government were unlawful and resulted in discrimination against Oxus. (Pet. Opp'n at 7.) After unsuccessful attempts to have the License reinstated, Oxus halted development of the Jerooy Mine in February 2006. (Resp. Br. at 5; Pet. Opp'n at 7.)

Beginning in March 2006, TGMC initiated three actions in Bishkek Inter-Regional Court, Kyrgyzstan (the "Kyrgyz Court proceedings") challenging the actions of the Kyrgyz Government with respect to the License. (Resp. Br. at 5; Pet. Opp'n at 8.) In June 2006, Oxus also filed a Notice of Claim and Request for Arbitration (the "Arbitration claim") against the Kyrgyz Republic under the United Kingdom-Kyrgyz Bilateral Investment Treaty (the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 1037387 (D.N.J.)
**2007 WL 1037387 (D.N.J.)**

"BIT"), claiming that the Kyrgyz government's actions with respect to the Jerooy Mine violated the BIT. (Resp. Br. at 5-6; Pet. Opp'n at 9.) Finally, in May 2006, the Kyrgyz government indicated that it intended to file a Claim for Compensation against TGMC (the "Compensation Claim") for allegedly failing to develop the Jerooy Mine. (Resp. Br. at 6; Pet. Opp'n at 9.)

\*2 On August 11, 2006 Oxus filed an *ex parte* application with this Court pursuant to 28 U.S.C. § 1782 to obtain discovery from Barbanel and SIG for use in a foreign or international tribunal. (Resp. Br. at 7; Pet. Opp'n at 9.) The undersigned granted the request by order dated August 11, 2006 (the "Section 1782 Order"). Oxus subsequently filed another *ex parte* application, pursuant to 28 U.S.C. § 1783, to allow service *abroad* of the subpoena authorized under the Section 1782 Order. (Resp. Br. at 10-11; Pet. Opp'n at 10.) Magistrate Judge Hughes granted that request by order dated August 17, 2006 (the "Section 1783 Order"). On September 5, 2006, Mr. Barbanel filed a motion to vacate the Section 1782 Order and the Section 1783 Order. By order dated October 10, 2006 (the "Hughes Order"), Judge Hughes denied the request to vacate the Section 1782 Order and granted the request to vacate the Section 1783 Order.

Mr. Barbanel appeals Judge Hughes' denial of Mr. Barbanel's motion to vacate the Section 1782 Order. Oxus, for its part, cross-appeals Judge Hughes' grant of Mr. Barbanel's motion to vacate the Section 1783 Order. Each party's appeal will be addressed in turn.

## II. DISCUSSION

### A. STANDARD

Local Civil Rule 72. 1(c)(1)(A) and Federal Rule of Civil Procedure 72(a) provide that a Magistrate Judge's ruling on a non-dispositive matter will be set aside only if the order is "clearly erroneous or contrary to law." *See* L. CIV. R. 72. 1(c)(1)(A);

FED. R. CIV. P. 72(a). Such rulings are "entitled to great deference and [are] reversible only for abuse of discretion." *Kresefky v. Panasonic Commc'ns & Sys. Co.,* 169 F.R.D. 54, 64 (D .N.J.1996).[FN2]

> FN2. It is uncontested that Respondent's motion to vacate was a non-dispositive motion.

### B. APPLICATION

#### A. Respondent's Appeal-28 U.S.C. § 1782

In denying Respondent's Motion to Vacate the Section 1782 Order, Judge Hughes found that Oxus was entitled, under 28 U.S.C. § 1782, to serve a subpoena on SIG and Mr. Barbanel in connection with foreign litigation. The Court will affirm Judge Hughes' decision to uphold the Section 1782 Order.

Under 28 U.S.C. § 1782(a),

[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal.... To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a). In essence, the Court may order a person to offer testimony or produce documents if three requirements are satisfied: "(1) the person must reside (or be found) in the district in which the application is made; (2) the discovery must be "for use" in a proceeding before a foreign tribunal; and (3) the application may be made by a foreign or international tribunal or 'any interested person.' " *In re Imanagement Servs.,* No. 05-2311, 2006 U.S. Dist. LEXIS 8876, at \*5 (D.N.J. Feb. 28, 2006), *citing, inter alia, In re Bayer A. G.,* 146 F.3d 188, 193 (3d Cir .1998).

\*3 Even if the statutory requirements are met, however, the Court may, in its discretion, deny a re-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1037387 (D.N.J.)
**2007 WL 1037387 (D.N.J.)**

Page 3

quest for discovery under 28 U.S.C. § 1782(a).*In re Imanagement,* at \*9, *citing Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264 (2004). Among the four factors to be taken into consideration in the court's exercise of discretion are the following:

(1) whether the person from whom the discovery is sought is a participant in the foreign proceeding;

(2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court assistance;

(3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or policies; and

(4) whether the request is unduly intrusive or burdensome.

*In re Imanagement,* at \* 10, citing Intel, at 264.

In ruling upon Barbanel's motion to vacate, Judge Hughes found that each of the three requirements set out in *In re Imanagement* had been met, and that the Court had properly exercised its discretionary power to grant Oxus' request for discovery pursuant to 28 U.S.C. § 1782. Mag. J. Op. at 7. Respondents, however, contend that the Magistrate Judge erred in his application of Section 1782, and that his opinion should therefore be reversed.

1. Whether Mr. Barbanel resides or can be found in the district

Respondent argues that the Magistrate Judge erred in concluding that he "resides" or "is found" in the District of New Jersey. Resp. Br. at 17. Mr. Barbanel concedes that he maintains some contacts with the district, but insists that such contacts are not sufficient to satisfy the requirements of 28 U.S.C. § 1782. *Id.* at 17-18.Respondent alleges in particular (1) that he resides in Moscow, Russia, (2) that he and his Russian wife maintain their primary

residence in Moscow, (3) that he is employed in Moscow, and (4) that he regularly conducts business there. *Id.*

Oxus responds that the evidence in fact conclusively establishes that Mr. Barbanel resides in the district of New Jersey, and that the portion of Judge Hughes' Order relating to the Section 1782 Order should therefore be affirmed. Pet. Opp'n at 12. Indeed, Oxus claims that Mr. Barbanel (1) "leases a residential apartment in New Jersey in which he resides at least two months each year," (2) "has owned for more than 23 years a separate residential property in New Jersey," (3) is registered to vote in the district of New Jersey, (4) is a member of the New Jersey State Bar, (4) uses a business card that identifies Princeton, New Jersey as one of the office locations of his company, SIG, (5) receives personal and business telephone calls in Princeton, and (6) "maintains regular appointments with his physician who is located in New Jersey."*Id.* at 12-13.In the alternative, Oxus contends that the evidence establishes at the very least that Mr. Barbanel can be "found," for the purposes of 28 U.S.C. § 1782, in the district of New Jersey. *Id.* at 14.

\*4 Faced with the evidence of Mr. Barbanel's frequent and sustained contacts with the district, Judge Hughes declined to hold that Mr. Barbanel was a resident of New Jersey, but found that the requirements of the statute were nonetheless met as Mr. Barbanel was "admittedly present and [could] be found in New Jersey on a consistent basis every year."Mag. J. Op. at 8. Given the wealth of evidence establishing Mr. Barbanel's strong ties to the district of New Jersey, this Court concludes that Magistrate Judge Hughes' finding that Mr. Barbanel "resides or can be found" in New Jersey was not clearly erroneous.*See Edelman v. Taittinger,* 295 F.3d 171, 178-79 (2d Cir.2002) (advocating flexible interpretation of the phrase "resides or is found," and criticizing suggested interpretation of Section 1782 requiring potential deponent to be in the district *at the time the discovery order is issued.*).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**2. Whether the requested discovery is "for use" in a proceeding before a foreign tribunal**

Respondent also contends that the discovery sought by Oxus is not "for use" in a "proceeding in a foreign or international tribunal," and that Judge Hughes therefore erred in upholding the Section 1782 Order. Resp. Br. at 20. The Court disagrees.

**a. Foreign Tribunal**

Respondent argues that "Section 1782 does not apply to *private* international arbitration," and that the Arbitration-the only proceeding, it claims, identified by Judge Hughes as satisfying the requirements of Section 1782-cannot provide a basis for the Magistrate Judge's opinion. *Id.* at 20 (emphasis added). Indeed, Respondent contests Judge's Hughes' findings that the Arbitration has "been authorized by the sovereign states of the United Kingdom and Kyrgyzstan" and that it is being "conducted by the United Nations Commission on International Law."*Id.* at 20 (quotations omitted), *quoting* Mag. J. Op. at 10.

Respondent insists, instead, that the arbitration panel consists of three private individuals chosen by the parties, is "neither a governmental nor intergovernmental arbitral tribunal," is not "being conducted by any United Nations committee," and does not involve claims "between sovereign nations or their instrumentalities."Resp. Br. at 21-23. Respondent concludes that the discovery sought by Oxus cannot be deemed "for use" in a "foreign tribunal" under 28 U.S.C. § 1782, and that Judge Hughes' decision to uphold the Section 1782 Order should therefore be reversed.

Petitioner responds that the arbitral body conducting the Arbitration "was expressly authorized by the United Kingdom and Kyrgyzstan as an important component of their Bilateral Investment Treaty," and that the Arbitration is therefore conducted "pursuant to adjudicatory authority vested by an international agreement among sovereign en-

tities."Pet. Opp'n at 17. Petitioner concludes that "Judge Hughes correctly found that this arbitration is not the result of a contract or agreement between the *private* parties, but instead is a proceeding authorized by [national government entities] for the purpose of adjudicating disputes under the Bilateral Investment Treaty."*Id.* at 19 (quotations omitted).

**\*5** Both the Second and Fifth Circuits have held that private international arbitrations do not constitute "foreign and international tribunals" under 28 U.S.C. § 1782. *See Application of the Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 883 (5th Cir.1999) ("the term 'foreign and international tribunals' in § 1782 was not intended to authorize resort to United States federal courts to assist discovery in private international arbitrations."); *N.B. C., Inc. v. Bear Stearns & Co., Inc.*, 165 F.3d 184, 191 (2d Cir.1999) ("policy considerations of some magnitude reinforce our conclusion, based upon an analysis of the text and legislative history of § 1782, that Congress did not intend for that statute to apply to an arbitral body established by private parties."). The *N.B. C.* court noted in particular that "the legislative history reveals that when Congress in 1964 enacted the modern version of § 1782, it intended to cover governmental or intergovernmental arbitral tribunals and conventional courts and other state-sponsored adjudicatory bodies."*N.B.C.*, 165 F.3d at 190.[FN3]

> FN3. The Court is unaware of-and the parties have not offered-any decision in this Circuit fully addressing the issue.

In the case at bar, however, Article 8 of the BIT Agreement between the United Kingdom and Kazakhstan specifically mandates that disputes between nationals of the two countries would be resolved by arbitration governed by international law.[FN4]The Arbitration at issue in this case, between two admittedly private litigants, is thus being conducted within a framework defined by two nations and is governed by the Arbitration Rules of the United Nations Commission on International Trade Law (the "UNCITRAL rules"). In light of these facts, this

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 5
Slip Copy, 2007 WL 1037387 (D.N.J.)
**2007 WL 1037387 (D.N.J.)**

Court concludes that the Magistrate Judge's holding that the arbitration panel in the case at bar constituted a "foreign tribunal" for purposes of a 28 U.S.C. § 1782 analysis was not clearly erroneous or contrary to law.

> FN4. Indeed, Article 8 of the BIT Agreement provides, in relevant part: Settlement of Disputes between an Investor and a Host State
>
> (1) Disputes between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of the latter under this Agreement in relation to an investment of the former which have not been amicably settled shall, after a period of three months from written notification of a claim, be submitted to *international arbitration* if the national or company concerned so wishes.
>
> Where the dispute is referred to international arbitration, the national or company and the Contracting Party concerned in the dispute may agree to refer the dispute either to:
>
> (a) the International Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention on the Settlement of Investment Disputes between States and Nationals of other States ... ); or
>
> (b) the Court of Arbitration of the International Chamber of Commerce; or
>
> (c) an international arbitrator or ad hoc arbitration tribunal to be appointed by a special agreement or established under the Arbitration Rules of the United Nations Commission on International Trade Law.

> If after a period of three months from written notification of the claim there is no agreement to one of the above alternative procedures, the dispute shall at the request in writing of the national or company concerned be submitted to arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law as then in force. The parties to the dispute may agree in writing to modify these Rules.
>
> United Kingdom-Kyrgyz Republic Bilateral Investment Treaty, Declaration of Audley William Sheppard ("Sheppard Decl.") Ex. A, Art. 8 (emphasis added).

b. For Use

Respondent also argues that Judge Hughes should have vacated the Section 1782 Order on the ground that the discovery sought by Oxus was not *for use* in connection with any proceeding cited by Oxus other than the Arbitration. Resp. Br. at 29. Mr. Barbanel contends first that the proceedings in the Kyrgyz courts concern events that bear little or no connection to him, and that information gleaned from him through the discovery requests at issue here would not be relevant to those proceedings. *Id.* at 29-30.

In addition, Mr. Barbanel claims that any such information would be inadmissible before the Kyrgyz courts, because the Kyrgyz court proceedings are currently before the Kyrgyz Supreme Court (which, allegedly, does not consider evidence that was not presented to the court of first instance) and because the Compensation Claim remains a potential claim—i.e. one that has yet to give rise to formal legal proceedings. *Id.* Respondent concludes that since the information sought would be neither relevant to, nor admissible in, said legal proceedings, such information could not be deemed "for use" before a foreign tribunal.

*6 Petitioner responds that Mr. Barbanel "was, and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1037387 (D.N.J.)
**2007 WL 1037387 (D.N.J.)**

is, [in fact,] directly involved with many of the events at issue in the foreign proceedings," and that it "strains credulity for Barbanel to now contend that he has no relevant information with respect to such matters."Pet. Opp'n at 24. As for Mr. Barbanel's admissibility argument, Oxus claims that controlling authority in this Circuit establishes that the Court need not assess the admissibility in foreign proceedings of the evidence sought from Mr. Barbanel. Oxus adds, in the alternative, that the Section 1782 Order should stand even if the Court had to make such a determination, as the information sought pursuant to the statute is likely to soon become admissible. Indeed, it claims that "a remand of the Kyrgyz Court Claims would necessarily entail the submission of evidence not considered by the trial court," and that "the Kyrgyz Government has made plain its intention to pursue litigation against Oxus and TGMC" in connection with the Compensation Claims. *Id.* at 20-21.

Addressing first the issue of the relevance of the information sought by Oxus, the Court's review of the record suggests that there exists significant evidence tying Mr. Barbanel to the events giving rise to those proceedings. Judge Hughes was thus not clearly in error in finding that the information sought might prove of some relevance to the foreign proceedings.

Turning next to the issue of admissibility, the Court notes that this Circuit has consistently held that a party seeking a discovery order under 28 U.S.C. 1782 need not demonstrate that the information sought would be admissible in the foreign proceedings. *In re Bayer*, 146 F.3d at 193;*see also John Deere, Ltd. v. Sperry Corp* ., 754 F.2d 132, 133 (3d Cir.1985) (holding that 28 U.S.C. 1782(a) does not require district court to consider the ultimate admissibility of evidence in the foreign jurisdiction.). The argument that the Section 1782 Order should be vacated on the ground that the evidence sought would be not be neither discoverable nor admissible in the foreign proceedings is therefore unavailing.

Finally, the Supreme Court in *Intel* held that "Sec-

tion 1782(a) does not limit the provision of judicial assistance to 'pending' [or imminent] adjudicative proceedings."*Intel*, 542 U.S. at 258. The Court held instead that Section 1782(a) should be read only to require that it be "within reasonable contemplation" that the evidence sought would be used in a dispositive proceeding. *Id.* at 259,*citing In re Crown Prosecution Serv.*, 870 F.2d 686, 691 (D.C.Cir.1989). In the case at bar, it is within reasonable contemplation (1) that the matters before the Kyrgyz Court proceedings would be remanded back to the trial court (rendering the discovery at issue here "of use" in those proceedings) and (2) that the Compensation Claim would be litigated in the near future. The fact that any information elicited pursuant to the Section 1782 Order may not be immediately presented to the foreign courts does not compel Judge Hughes to vacate the Section 1782 Order.

*7 For the foregoing reasons, Judge Hughes' finding that the evidence sought by Respondent would be "for use" in the foreign proceedings was not clearly erroneous.

3. Whether the application for discovery was made by a foreign or international tribunal or any interested person

While Respondent does not contest the claim that Oxus is an "interested party" with respect to the Arbitration, he contends that Judge Hughes' ruling that Oxus was such an "interested party" in the Kyrgyz court proceedings was "clearly erroneous and contrary to law."Resp. Br. at 32. Indeed, Respondent insists that "it is clear that Oxus is not a party to any of the proceedings of the Kyrgyz courts," and that it "has no participation rights" in those proceedings. *Id.* at 32-33.Oxus responds that Magistrate Judge Hughes in fact correctly held that it "satisfied the interested party requirement with respect to those proceedings because Oxus is the majority parent of TGMC ... a named party in the foreign Kyrgyz proceedings...." Pet. Opp'n at 15.

The Supreme Court in *Intel* held that "[t]he text of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

§ 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant.' " *Intel,* at 256.Given the close connection between Oxus, TGMC and the events having given rise to the Kyrgyz Court proceedings and the Compensation Claims, Judge Hughes's finding that Oxus was an "interested party" with respect to those proceedings was not clearly erroneous.

4. Whether the Magistrate Judge abused his discretion in refusing to vacate the Section 1782 Order

Respondent contends that "Magistrate Judge Hughes not only committed clear error in concluding that Oxus'[ ] application satisfied the threshold requirements of Section 1782; he also abused his discretion in determining that relevant factors favored requiring production of testimony and documents by Mr. Barbanel." Resp. Br. at 34.

First, respondent claims that "the information sought by the subpoena is neither admissible nor relevant in the foreign proceedings."*Id.* at 35.Mr. Barbanel contends that this should have lead Judge Hughes to vacate the 1782 Order. *Id.* Moreover, Respondent submits that Oxus' alleged failure to request any documents from Respondent when the Kyrgyz court proceedings were at the trial level "severely undermin[es] any claim that Mr. Barbanel, who had no involvement in the events at issue in those litigation [sic], has information of any relevance to provide," and that any information sought by Oxus would not "be admissible in the Kyrgyz Supreme Court...."*Id.* at 35-36.Finally, Respondent argues that the Section 1782 Order should have been vacated on the grounds that "the requests for information from Mr. Barbanel [issued in connection with that Order] are unduly intrusive and burdensome".*Id.* at 36.

Oxus, for its part, takes exception to Mr. Barbanel's claims that he has no involvement in the proceedings at issue and that it would be unduly burdensome to comply with the subpoenas. Indeed, Oxus

responds that "Barbanel was, and is, directly involved with many of the events at issue in the foreign proceedings," and notes that Barbanel does not "proffer any basis on which to conclude that Oxus is seeking anything but properly tailored discovery...."*Id.* at 24.Oxus adds that Barbanel cannot "explain how a single deposition limited to inquiries regarding Oxus, the Jerooy Mine, and Barbanel's efforts to secure conflicting rights in that mine could be construed as overly broad."*Id.*

**\*8** As noted above, and as explained by Judge Hughes, this Circuit has held that Section 1782 does not include a foreign admissibility requirement. Accordingly, Mr. Barbanel's argument that the information sought by Oxus was not admissible in the foreign proceedings is unavailing. *See In re Bayer,* 146 F.3d at 193. In addition, this Court has established above that it was not clearly erroneous for Judge Hughes to find that Mr. Barbanel might have information relevant to the Kyrgyz Court proceedings, the Arbitration and the Compensation Claim. Finally, the wealth of evidence establishing that Mr. Barbanel enjoys regular and extensive stays in the district of New Jersey suggests that compelling him to submit to a deposition in the District would not prove unduly burdensome. For the foregoing reasons, Magistrate Judge Hughes' discretionary decision to uphold the Section 1782 Order was not clearly erroneous.

This Court will therefore affirm Judge Hughes' denial of Respondent's Motion to Vacate the Section 1782 Order.

**B. Petitioner's Cross-Appeal-28 U.S.C. § 1783**

In his October 10, 2006 Order granting Respondent's Motion to Vacate the Section 1783 Order, Judge Hughes held that "in the Court's discretion and because Petitioner ha[d] failed to satisfy the requirements of Section 1783, [the Section 1783] Order [was to be] vacated."Mag. J. Op. at 16. Judge Hughes thus denied Oxus the right to serve, outside the United States, the discovery requests authorized

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1037387 (D.N.J.)
**2007 WL 1037387 (D.N.J.)**

under the Section 1782 Order. This Court will affirm Judge Hughes' decision.[FN5]

> FN5. Barbanel argues that Oxus' cross-appeal is untimely, on the grounds that "[u]nder the Local Civil Rules of this Court, Mr. Barbanel's appeal from Magistrate Judge Hughes' rulings on Section 1782 and on the scope of the subpoena does not give Oxus a right to cross-appeal an *independent order* concerning service under Section 1783."Resp. Reply at 2 (emphasis added).

> Local Civil Rule 72. 1(c)(1)(A) provides, in relevant part, that:

> Any party may appeal from a Magistrate Judge's determination of a nondispositive matter within 10 days after the party has been served with a copy of the Magistrate Judge's order ... Any party opposing the appeal shall file a responsive brief at least 14 days prior to the date originally noticed for argument. A cross-appeal *related to the subject matter of the original determination* may be filed by the responding party together with that party's opposition and may be noticed for a hearing on the same date as the original appeal....

> L. CIV. R. 72. 1(c)(1)(A) (emphasis added). The Court finds that Petitioner's cross-appeal is undeniably "related to the subject matter" of the determination appealed by Mr. Barbanel. Accordingly, Petitioner's cross-appeal is timely under the Rules.

Under 28 U.S.C. § 1783:

(a) A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United

States who is in a foreign country, or requiring the production of a specified document or other thing by him, if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and, in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

28 U.S.C. § 1783(a). As interpreted by Judge Hughes, the statute requires Petitioner to show that "(1) there is a pending proceeding in the United States, (2) the information cannot be obtained through any other source, and (3) the information is necessary in the interest of justice."Mag. J. Op. at 13, *citing*28 U.S.C. § 1783(a). Petitioner contends that Judge Hughes misinterpreted the first requirement of 28 U.S.C. § 1783, and that his decision to vacate the Section 1783 Order should therefore be reversed.

Indeed, Oxus argues that Judge Hughes erred as a matter of law in vacating the Section 1783 Order "when he ruled that § 1783 cannot authorize service of a subpoena for discovery to be used in proceedings pending *outside the United States.*" Resp. Opp'n at 25 (emphasis added), *citing* Mag. J. Op. at 10. Oxus contends in the first instance that Section 1783 should not be read to require the existence of pending proceedings in the United States. Resp. Opp'n at 27. In the alternative, Oxus submits that the legal maneuvering before this Court aimed at securing the right to issue a subpoena under Section 1782 should be deemed to constitute such a "pending domestic proceeding."*Id.*

*9 In response, Barbanel contends that the plain language of 28 U.S.C. § 1783 suggests that it may be applied only in connection with proceedings pending in the United States, and notes that Oxus "has failed to identify a single case in which Section 1783 has been invoked in connection with anything other than a domestic proceeding."Resp. Reply at 6-7.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

"When interpreting statutes ..., the first step is to determine whether the language at issue has a plain and unambiguous meaning."*Dobrek v. Phelan,* 419 F.3d 259, 263 (3d Cir.2005), *citing Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450 (2002)."The inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent."*Dobrek,* at 263.The language of 28 U.S.C. § 1783 offers no indication that Congress intended for the provision to apply in connection with foreign proceedings. On the contrary, its wording suggests that it was unambiguously intended to apply to domestic proceedings only. Tellingly, and as noted by Judge Hughes, the parties have been unable to cite any case in which Section 1783 was applied in connection with foreign proceedings. *See* Mag. J. Op. at 14.

The Court also finds unavailing Petitioner's claim that the "proceedings" initiated before this Court to obtain discovery from Mr. Barbanel under Section 1782 should be deemed to satisfy the "domestic proceeding" requirement of 28 U.S.C. § 1783. Such an interpretation would allow movants to circumvent the legislature's intent to restrict the scope of Section 1783 to domestic proceedings. The Court hereby rejects it.

Accordingly, the Court concludes that Judge Hughes did not err in holding that 28 U.S.C. § 1783 was not applicable in the case at bar.

### III. CONCLUSION

For the foregoing reasons, the Court denies both Respondent's Appeal and Petitioner's Cross-Appeal. An appropriate form of Order accompanies this Opinion.

D.N.J.,2007.
In re Oxus Gold PLC
Slip Copy, 2007 WL 1037387 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy                                                                          Page 1
Slip Copy, 2007 WL 1367697 (W.D.Wash.)
**2007 WL 1367697 (W.D.Wash.)**

**C**
In re Degitechnic
W.D.Wash.,2007.
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.
In re Application of DIGITECHNIC.
**No. C07-414-JCC.**

May 8, 2007.

Jonathan I. Blackman, Joseph B. Landau, Cleary
Gottlieb Steen & Hamilton, New York, NY, Peter
Scott Ehrlichman, Dorsey & Whitney, Seattle, WA,
for Digitechnic.

ORDER

JOHN C. COUGHENOUR, United States District
Judge.
*1 This matter comes before the Court on the Mo-
tion to Quash Subpoena filed by Respondent Mi-
crosoft Corporation ("Microsoft") (Dkt. No. 7), Ap-
plicant Digitechnic's Opposition (Dkt. No. 20), and
Microsoft's Reply (Dkt. No. 22). The Court, having
carefully considered all of the papers submitted and
determined that oral argument is not necessary,
hereby finds and rules as follows.

**I. FACTS**

The parties to this dispute have been litigating
against each other since 1995 over alleged disparity
in licencing practices employed by Microsoft. Digi-
technic (a French computer manufacturer) unsuc-
cessfully sought to secure certain licencing agree-
ments with Microsoft in the mid-1990s for its soft-
ware applications, which Digitechnic wished to pre-
install on its computers for sale on the French mar-
ket, while Microsoft allegedly entered into coveted
and more favorable agreements with United States
computer manufacturers. All of the relevant and
protracted legal proceedings have taken place in
France.

In May of 1995, Digitechnic filed suit against Mi-
crosoft's French subsidiary (Microsoft France) in
the Commercial Court of Evry alleging unfair com-
petition. That complaint was dismissed in Septem-
ber of 1997. The decision was appealed to the Paris
Court of Appeals, which upheld the dismissal in
March of 2000. Digitechnic again appealed to the
*Cour de cassation,* and that appeal too was dis-
missed in June of 2002.

A second related lawsuit began in May of 2005,
wherein Digitechnic sued Microsoft Corporation in
the Commercial Court of Bobigny, alleging dispar-
ity between licencing agreements that Microsoft
had with Digitechnic and other computer manufac-
turers. In May of 2006, the Commercial Court of
Bobigny awarded Digitechnic i 12,690,444, which
Microsoft appealed to the Paris Court of Appeals in
June of 2006. The Paris Court of Appeals proceed-
ings are the equivalent of a trial *de novo,* and may
include discovery and presentation of new evid-
ence. Microsoft's appeal brief was due by October
13, 2006. Digitechnic's responsive brief was due
February 26, 2007.

However, on February 21, 2007, Digitechnic filed
the instant action-an *ex parte* Application for dis-
covery proceedings pursuant to 28 U.S.C. § 1782.
That same day, United States District Judge Mar-
tinez signed Digitechnic's proposed Order, granting
Digitechnic's unilateral request to seek discovery in
this Court. (Order (Dkt. No. 3).) This initial Order
gave Digitechnic permission to serve a subpoena on
Microsoft and gave Microsoft time to assert objec-
tions to that subpoena, about which the parties then
would have time to confer. The Order also set forth
a schedule for filing motions to compel and mo-
tions for relief from the subpoena. On March 20,
2007, after Microsoft had been appraised of the in-
stant proceedings and moved to quash the sub-
poena, the case was reassigned to the undersigned
and this Court granted Microsoft's motion for relief
from the deadlines set forth in the original Order
pending the outcome of the instant motion to quash.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(Order (Dkt. No. 17).)

*2 Based on this Court's *pro forma* granting of Digitechnic's *ex parte* Application to commence discovery proceedings in this Court on February 21, 2007 and prior to Microsoft's participation in the instant proceedings, Digitechnic petitioned the Paris Court of Appeals on February 23, 2007 for an extension of its February 26, 2007 brief deadline, stating that Digitechnic's "attorneys just got the Washington State Court to order Microsoft to disclose ... pertinent documents for an examination of the petitions and arguments of both parties in connection with the proceedings before the [French] court."(Opp'n, Garaud Decl. Ex. 3.) Microsoft opposed this request in the French proceedings, pointing out the extremely late hour of the extension request as well as the fact that additional discovery was likely not needed because Digitechnic had prevailed below on the evidence already in the French record. (*Id.* Ex. 4.) On March 1, 2007, Paris Court of Appeals Judge le Bail granted Digitechnic's request and extended its brief due date to May 31, 2007.(*Id.* Ex. 5.) Digitechnic seeks to use the discovery sought in the instant proceedings in its French appeal brief now due on May 31, 2007.<sup>FN1</sup>

> FN1. Alongside the Paris Court of Appeals proceedings already described are two additional French proceedings involving Digitechnic wherein Microsoft is not a party. First, in May of 1998, Digitechnic initiated a complaint against Microsoft in the French Competition Court, which investigates via a *Rapporteur,* who may request documents or information from anyone. Microsoft answered questions in this proceeding. In December of 2004, Digitechnic's complaint was dismissed. Digitechnic appealed that decision to the Paris Court of Appeals as well, which reversed the dismissal in May of 2005 and remanded for further proceedings. This action remains pending. Second, Digitechnic filed for judicial reorganization in the Commercial

Court of Bobigny. This too remains unresolved. These additional proceedings are only tangentially relevant to the instant discovery action.

The subpoena Microsoft seeks to quash here requests production of the following documents: (1) "[a]ll documents that contain, constitute, reflect, evidence, or refer to the terms and conditions under which" Microsoft "made Pack Office Pro available to Dell France, Gateway France, or other OEMs in France between 1994 and 2000 ...."; (2) "[a]ll documents relating to the qualifications and conditions ... relating to financial standing, technical qualifications, service, customer feedback, and protection of IP rights" that Microsoft "required from Dell France, Gateway France, or other OEMs in France between 1994 and 2000 in order to (a) accept to make available Pack Office Pro, and (b) make available Pack Office Pro at the OEM level"; (3) "[a]ll documents relating to competition" in various sub-market descriptions; (4) "[a]ll documents relating to the interoperability between MS Windows operating system and third-party PPA suites and individual PPAs (word-processing, spreadsheets, graphics presentations, email, database), for the period between 1994 and 2000 ...."; and (5) "[a]ll documents relating to the interoperability between each Office Application and competing third-party PPAs for the period between 1994 and 2000...." (Application (Dkt. No. 1) 16-18 (subpoena text).) Microsoft anticipates that searching for, retrieving, reviewing, and producing this vast swath of documents spanning a seven-year period that ended seven years ago would involve hundreds of thousands, "if not millions," of pages, would take at least three months to complete, and would cost hundreds of thousands of dollars. (Mot., Dawson Decl. ¶¶ 3-4.)

The question before the Court is whether Digitechnic should be permitted to pursue the foregoing discovery under the Federal Rules of Civil Procedure for use in the French appeal now pending before the Paris Court of Appeals. Microsoft seeks to have this Court quash the subpoena and deny Digitechnic this

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 3
Slip Copy, 2007 WL 1367697 (W.D.Wash.)
**2007 WL 1367697 (W.D.Wash.)**

discovery path altogether.

## II. ANALYSIS

**\*3** The federal statute Digitechnic invokes to obtain discovery from Microsoft in this jurisdiction for use before the Paris Court of Appeals is 28 U.S.C. § 1782, which provides in relevant part that a district court "*may* order" a person or entity to give testimony or statements or to produce documents or things "for use in a proceeding in a foreign or international tribunal."28 U.S.C. § 1782(a) (emphasis added).

The Federal Rules of Civil Procedure generally govern discovery obtained under this statute. *Id.* The parties agree that the statute's basic requirements are met and that the United States Supreme Court's opinion in *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004), provides the proper analytical framework for determining whether § 1782(a)*should* be applied to allow the discovery sought here. They disagree, however, about the result of that analysis.

In *Intel,* the Supreme Court specifically held that the assistance to foreign proceedings allowed by § 1782 is discretionary, not mandatory. 542 U.S. at 255, 260-61. The Court reiterated this finding throughout the opinion: "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so."*Id.* at 264.The Court then went on to discuss the factors that a district court should consider when ruling on a § 1782(a) request, as follows:

First, when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.... In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.

Second, as the 1964 Senate Report suggests, a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance.... Specifically, a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.... Also, unduly intrusive or burdensome requests may be rejected or trimmed.

*Id.* at 264-65.Thus, four general factors govern this analysis: (1) whether Microsoft is a participant in the foreign proceedings, (2) the nature of the Paris Court of Appeals and its receptivity to this Court's assistance in discovery, (3) whether Digitechnic's request is an attempt to circumvent French discovery restrictions or policies, and (4) whether the discovery sought from Microsoft is unduly intrusive or burdensome. Moreover, "district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."*Schmitz v. Bernstein Liebhard & Lifshitz, LLP,* 376 F.3d 79, 84 (2d Cir.2004) (internal quotations and citations omitted).

**\*4** The first *Intel* factor suggests that because Microsoft is a participant in the French litigation, French discovery devices can adequately provide what Digitechnic seeks. Digitechnic argues that French discovery is far less comprehensive than United States discovery and asserts that the French discovery rules go so far as to require identification of documents "by date, author, recipient and/or content."(Opp'n, Garaud Decl. ¶ 3.) However, Digitechnic has not pointed to any such particular restrictions anywhere in the French New Code of Civil Procedure. (*See id.* & Ex. 2.) Moreover, Mi-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 4
Slip Copy, 2007 WL 1367697 (W.D.Wash.)
**2007 WL 1367697 (W.D.Wash.)**

crosoft provides evidence of a quite general discovery order it obtained in another litigation under these same French discovery rules. (Reply, Razavi Decl. & Ex. 1.) Accordingly, the Court is unconvinced that Digitechnic cannot obtain any of the discovery it seeks here via French discovery procedures. More importantly, Digitechnic has not even *tried* to obtain any of the discovery sought here by way of French discovery tools. On this point, Digitechnic emphasizes that there is no "exhaustion" requirement in § 1782. While this is correct, there is nevertheless no reason that this Court should overlook Digitechnic's failure to attempt any discovery measures in France in making the discretionary decision now before it. Further, even if French discovery is not as broad as discovery in the United States as a general matter, Digitechnic's assertion that it has not attempted to use any French procedures due to perceived futility is unavailing in light of its overstatement of French restrictions. Nor does Digitechnic attempt to explain why it waited until almost a year after Microsoft filed the relevant appeal and a mere five days before its French appeal brief was *due* to commence the instant discovery request. Accordingly, the Court finds that this factor favors quashing the subpoena.

The second *Intel* factor considers the nature of the foreign tribunal and any attitude it has toward the help sought in this Court. Digitechnic repeatedly states that the Paris Court of Appeals judge "expressed great interest" in the possibility of Digitechnic being able to obtain discovery in the United States for use in the French proceedings. (Opp'n 1, 3, 8, 11.) However, Digitechnic fails to provide any actual evidence of this assertion, and Microsoft asserts to the contrary that no opinion on usefulness was expressed even though the judge extended Digitechnic's brief deadline. Moreover, when this Court examines just how Digitechnic framed the status of its § 1782 action in this Court to the French judge, Digitechnic's position is even less convincing. Specifically, as noted *supra*, on February 23, 2007, just two days after obtaining an *ex*

*parte* Order allowing it to *serve a subpoena* and one day after that subpoena was served, Digitechnic represented to the Paris Court of Appeals that its "attorneys just got the Washington State Court to order Microsoft to disclose ... pertinent documents for an examination of the petitions and arguments of both parties in connection with the proceedings before the [French] court."(Opp'n, Garaud Decl. Ex. 3.) Given that Microsoft had not yet had a chance to object to the subpoena or actually participate in an adversarial determination of the *merits* of Digitechnic's subpoena and overall § 1782 application, as it does here for the first time, the foregoing characterization of the instant proceedings by Digitechnic can be described most charitably as creative, but more accurately as misleading. Finally, the mere fact that the French brief deadline was extended does not convince this Court that the French judge is particularly interested or disinterested in the discovery Digitechnic seeks here. This factor presents a toss-up at best, and likely tends in Microsoft's favor.

*5 The third *Intel* factor requires assessment of whether Digitechnic's instant discovery application simply seeks to circumvent French discovery rules. The Court has already noted that Digitechnic has not used any French discovery rules since it began litigating there in 1995. The current eleventh-hour discovery application seeking discovery never sought in France certainly appears to be a circumvention attempt on Digitechnic's part. Digitechnic claims that because French discovery rules do not allow what it seeks here (though it has not tried to obtain such discovery in France) this Court should allow discovery under the Federal Rules of Civil Procedure. Simultaneously, Digitechnic asserts that it is not trying to circumvent French discovery restrictions. The obvious contradiction herein suggests either that the discovery Digitechnic seeks here could have and should have been obtained much earlier in France (verifying that the first *Intel* factor swings in Microsoft's favor) or that the discovery sought here truly cannot be obtained in France and therefore that this Court should hesitate

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1367697 (W.D.Wash.)
**2007 WL 1367697 (W.D.Wash.)**

to order discovery at a late stage of French litiga-
tion when such discovery was not sought or is not
available in that forum.

The fourth and final *Intel* factor relates to the bur-
den imposed by the discovery request. Microsoft's
contention that the extremely broadly-worded and
sweeping requests quoted *supra* will unduly burden
Microsoft in terms of time, effort, and expense at
this late stage of the French appeal process is far
more convincing than Digitechnic's assertion that
its requests are specific enough to merit compulsion
by this Court. The plain language of the requests re-
veal that they seek broad categories of documents
for the period from 1994 to 2000-a time period that
overlapped with the first five years of the litigation
for which these documents are sought but now is
seven years in the past. While Microsoft's cost and
time estimates may not be perfect predictions, they
are quite plausible given the wording of the sub-
poena. Moreover, as already noted *supra*, not a
single discovery request was made until five days
before Digitechnic's brief was due (and over four
months after Microsoft's own brief due date) in lit-
igation spanning over twelve years. Given Digit-
echnic's complete failure to justify the timing of
this request, the Court finds little difficulty with the
idea that the instant discovery proceedings will un-
duly burden Microsoft.

**III. CONCLUSION**

For the foregoing reasons, Microsoft's motion to
quash Digitechnic's subpoena is GRANTED and
the subpoena is QUASHED in its entirety. Digit-
echnic's Application to seek discovery in this Court
pursuant to § 1782(a) is DENIED. The Clerk is dir-
ected to CLOSE this case.

W.D.Wash.,2007.
In re Degitechnic
Slip Copy, 2007 WL 1367697 (W.D.Wash.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569
**2004 WL 2282320 (N.D.Cal.)**

▷
Advanced Micro Devices v. Intel Corp.
N.D.Cal.,2004.

United States District Court,N.D. California.
ADVANCED MICRO DEVICES, INC., Plaintiff,
v.
INTEL CORPORATION, Defendant.
**No. C 01-7033.**

Oct. 4, 2004.

Patrick Lynch, David I. Hurwitz, O'Melveny & My-
ers LLP, Los Angeles, CA, for Plaintiff.
Joseph Kattan, Gibson Dunn & Crutcher, Washing-
ton, DC, Robert E. Cooper, Samuel G. Liversidge,
Gibson Dunn & Crutcher LLP, Los Angeles, CA,
James A. Murray, Santa Clara, CA, for Defendant.

ORDER DENYING IN FULL AMD'S AMENDED
APPLICATION PURSUANT TO 28 U.S.C. §
1782(a)

WARE, J.

I. INTRODUCTION

*1 Advanced Micro Devices, Inc. ("AMD") initi-
ated this miscellaneous action to obtain discovery
from Intel Corporation ("Intel") pursuant to 28
U.S.C. § 1782(a). The Court referred the action to
Magistrate Judge Lloyd, who issued an "Order
Granting in Part AMD's Amended Application For
Order Directing Intel To Produce Documents Pur-
suant To 28 U.S.C. § 1782 And Denying Intel's
Cross-Application."On September 27, 2004, the
Court heard argument on Intel's Motion for *denovo*
Determination of AMD's Amended Application and
Intel's Cross-Application Pursuant to 28 U.S.C. §
1782; Objections To Magistrate Judge's Recom-
mended Decision. Having conducted a *denovo* re-
view, and based upon all papers filed to date and
the comments of counsel, the Court denies in full
AMD's amended application for discovery.

II. BACKGROUND

In October of 2000, AMD filed a complaint with he
European Commission ("EC") against Intel for en-
gaging in alleged anti-competitive behavior in viol-
ation of European laws. AMD describes the com-
plaint as including the following three major charges:

(1) that Intel uses "Intel Inside" and other "market
development fund" programs as loyalty rebates to
secure the agreement of PC manufacturers and re-
tailers to deal exclusively in Intel-based PCs,

(2) that Intel withholds product allocations,
roadmap -information, or technology to coerce PC
manufacturers and retailers to deal exclusively with
Intel, and

(3) that Intel forms private, standard-setting cartels
that establish interfaces between microprocessors
and other components of the PC system, and by ex-
cluding AMD and other disfavored firms from ac-
cess to this critical information Intel promotes its
monopoly on microprocessors.

In pursuit of that complaint, AMD filed an applica-
tion in this Court for an order directing Intel to pro-
duce documents pursuant to 28 U.S.C. § 1782.Sec-
tion 1782(a) provides that a federal district court
"may order" a person "resid[ing]" or "found" in the
district to give testimony or produce documents
"for use in a proceeding in a foreign or internation-
al tribunal ... upon application of any interested per-
son."In its present form, AMD's application con-
sists of seventy (70) document requests, sixty-seven
(67) of which essentially seek Intel documents pro-
duced to Intergraph Corporation in an action
between the parties in the Northern District of
Alabama, *Intergraph Corporation v. Intel Corpora-
tion,* CV 97-N-3023-NE (the "Intergraph case"). In-
tel produced approximately 500,00 pages of confid-
ential business information in the course of the In-
tergraph case.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569
**2004 WL 2282320 (N.D.Cal.)**

The Intergraph case included allegations of patent infringement, state law violations, and antitrust claims. Intergraph's antitrust claims were reportedly based upon assertions that Intel's decision not to supply Intergraph with the patented Intel sample and pre-release microprocessors constituted monopolization of the microprocessor market; that Intel violated Section 2 of the Sherman Act by using its monopoly microprocessors to leverage a competitive advantage in the downstream markets of workstations, graphics accelerators and chipsets; and that Intel conspired with Intergraph workstation competitors to hinder Intergraph's sale of workstations to selected digital animation customers. Intergraph's antitrust claims were rejected on summary judgment.*Intergraph Corp. v. Intel Corp.,* 88 F.Supp.2d 1288 (N.D.Ala.2000), *aff'd*253 F.3d 695 (Fed.Cir.2001).

### III. DISCUSSION

*2 This Court has the benefit of the Supreme Court's determination that Section 1782(a) authorizes, but does not require a federal district court to authorize the discovery sought in this case. *Intel Corp. v. Advanced Micro Devices, Inc.,* --- U.S. ----, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004).FNI To guide this Court on remand, the Supreme Court delineated four main factors that "bear consideration" in ruling on a § 1782 request. First, the Supreme Court found that "when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."*Id.* at 2483. The Supreme Court reasoned as follows:

> FNI. In reaching this conclusion, the Supreme Court resolved three key issues. First, it held that Section 1782 does not contain a "foreign-discoverability" requirement. *Id.* at 2476. Thus, AMD is not required in this case to make a threshold showing that the discovery it seeks would

have been discoverable in the European Commission investigation had those documents been located within the Union. Second, the Supreme Court held that Section 1782(a) makes discovery available to complainants, such as AMD, who do not have the status of private "litigants" and are not sovereign agents. *Id.* Third, the Supreme Court held that a "proceeding" before a foreign "tribunal" need not be "pending" nor "imminent" for an applicant to invoke § 1782(a).*Id.* Instead, " § 1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation."*Id.* at 2480.

A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence.... In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.
*Id.* Second, the Supreme Court found that the district court faced with a § 1782(a) request "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."*Id.* Third, the Supreme Court also stated that "a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."*Id.* Fourth, the Supreme Court instructed that "unduly intrusive or burdensome requests may be rejected or trimmed."*Id.*

Having considered the factors set forth by the Supreme Court, this Court, in its discretion, holds that AMD's application for discovery should be denied in full. First, the Supreme Court has already determined that Intel is a participant in the EC proceedings, and that participant-status is significant

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569
**2004 WL 2282320 (N.D.Cal.)**

because the EC has jurisdiction over Intel, and therefore could simply ask Intel to produce any or all of the discovery AMD now seeks. The EC, however, has not sought the documents AMD now seeks. Therefore, the first factor weighs against granting AMD's application.

Second, the EC is not receptive to judicial assistance in this case. On this issue, it is significant to this Court that the Supreme Court cited to the EC's two *amicuscuriae* briefs to support the finding that the EC "does not need or want" this Court's assistance in obtaining the documents AMD seeks. *See* European Commission *Amicus Curiae* 11-16; Brief for European Commission as *Amicus Curiae* in Support of Pet. for Cert. 4-8. The EC also stated that it "does not consider it necessary to request or even subsequently to review the documents sought" by AMD in this case. Brief for European Commission as *Amicus Curiae* in Support of Pet. for Cert. 4. Moreover, the EC has stated that granting AMD's § 1782(a) request would jeopardize "vital Commission interests." *See* European Commission *Amicus Curiae* 15.

**\*3** Third, AMD's § 1782(a) application appears to be an attempt to circumvent the EC decision not to pursue such discovery. *See* European Commission *Amicus Curiae* 6.

Because three out of the four factors discussed above clearly weigh against granting AMD's application, the Court finds it largely unnecessary and purely academic to address the final factor, namely whether the requests are unduly intrusive or burdensome. Nevertheless, for the sake of completeness, the Court finds that the documents sought in AMD's application are unduly intrusive and burdensome. AMD has made no attempt to tailor its application to the subject matter of the EC complaint. For example, AMD's document requests do not contain the words "Europe" or "European," the name of any European country, or the name or description of any European OEM or retailer. Instead, it appears that AMD intentionally kept the requests broad, essentially lifting 67 out of its 70 document

requests verbatim from requests served on Intel by Intergraph. The breadth of AMD's application, when considered in light of the EC's determination that the requested documents are unwanted and unlikely to be reviewed, weighs against granting any portion of AMD's application.

### IV. CONCLUSION

For the reasons set forth above, AMD's amended application for discovery is denied in full. Intel's cross-application is denied as moot.

N.D.Cal.,2004.
Advanced Micro Devices v. Intel Corp.
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.