**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COMISIÓN EJECUTIVA | § | |
| HIDROELÉCTRICA DEL RÍO LEMPA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Action No. 1:08-MC-00135-GMS |
| v. | § | |
| | § | |
| NEJAPA POWER COMPANY, L.L.C., | § | |
| | § | |
| Defendant. | § | |

**RESPONSE TO NEJAPA POWER COMPANY, LLC'S MOTION FOR
RECONSIDERATION OF JULY 18, 2008 ORDER GRANTING
ASSISTANCE TO LITIGANT PURSUANT TO 28 U.S.C. § 1782**

Nejapa Power Company ("NPC") has provided this Court with no basis to reconsider its

July 18th Order ("July 18th Order").[1] NPC's arguments are inaccurate and/or moot and the

authority cited is inapposite. The Court should, therefore, deny NPC's Motion for

Reconsideration ("Motion") for the following reasons:

- The Comisión Ejecutiva Hidroeléctrica del Río Lempa ("CEL") did not make any factual misrepresentations to this Court in its Section 1782 Application ("Application");

- CEL was not required to provide prior notice to NPC of the Application;

- The Supreme Court's decision in *Intel* is applicable to private arbitrations, and the cases cited by NPC are inapposite and have been largely overruled by *Intel* and its progeny;

- This Court properly weighed the *Intel* factors when it decided to grant CEL's Application;

---

[1]  *See* Motion for Reconsideration of July 18, 2008 Order Granting Assistance to Litigant Pursuant to 28 U.S.C. § 1782 (July 25, 2008).

- Neither the arbitration agreement nor the applicable arbitral rules prohibit CEL from seeking discovery through 28 U.S.C. § 1782;

- The Arbitral Tribunal ("Tribunal"), in its July 28th Procedural Order No. 3, refused NPC's request to order CEL to withdraw its document request petitions per 28 U.S.C. § 1782[2];

- The Tribunal has acknowledged this Court's jurisdiction to determine the narrow evidentiary issues before it, reasoning that that "it is certainly up to the courts in […] Delaware to decide whether Section 1782 applies to a foreign arbitration…and whether the measures sought…are admissible and should be granted."[3]

- The Tribunal rejected NPC's request for it to declare that "any documents or testimony that might be obtained by CEL through the Discovery Applications…may not be used in this arbitration[;]"[4] instead reserving judgment on the admissibility of any such evidence when, and if, that evidence is produced in the arbitration.[5]

- NPC's complaints about the breadth or scope of the document requests do not provide a basis to reconsider the July 18th Order.

For all of these reasons, this Court should deny both NPC's request to reconsider and to vacate its July 18th Order.[6]

---

[2]     Proc. Order No. 3 at ¶ 20, attached hereto as Exhibit A.  *See also* NPC's "urgent request" to the Tribunal, specifically asking the Tribunal to order CEL to "immediately withdraw" its Section 1782 application before this Court at p. 15, attached hereto as Exhibit B.

[3]     Exhibit A at ¶ 22.

[4]     Exhibit B at p. 16.

[5]     Exhibit A at ¶ 31 (emphasis added) (stating that "all documents, *including those that might be obtained through the [1782] process*…will have to be produced according to the procedural timetable provided for in Procedural Order No. 2."); *see also* Exhibit A at ¶ 37 (stating that "[t]he Arbitral Tribunal will also retain jurisdiction to admit or reject any documents which are irrelevant, unreasonably burdensome to the proceedings or in breach of the parties' rights.").

[6]     In light of the Tribunal's ruling in Procedural Order No. 3 prohibiting the deposition of potential witnesses, CEL does not currently intend to depose any potential witnesses, including Mr. Stephen Sutton, in compliance with this ruling.

1.     __CEL did not make any factual misrepresentations to this Court.__

CEL did not make any factual misrepresentations to the Court in its Application.  NPC's assertions to the contrary are misguided and have been mooted by the Tribunal's Procedural Order No. 3.

NPC claims in its Motion that CEL violated the Tribunal's orders by seeking discovery pursuant to Section 1782 and that CEL failed to disclose to the Court certain portions of the Tribunal's orders that conflicted with the discovery that CEL sought through its Application. Those assertions are incorrect.  The parties have never discussed, much less restricted, the formal or informal methods the parties might utilize to obtain evidence outside of the ambit of the arbitration.  The procedural orders issued before CEL filed its Application did not restrict, or even address, CEL's ability to collect evidence through means outside of the arbitral proceeding. Indeed, in Procedural Order No. 3, the Tribunal confirmed that no such restrictions had been agreed to by the parties and that "it is certainly up to the courts in…Delaware to decide whether Section 1782 applies to a foreign arbitration, whether their orders require leave or consent from the Arbitral Tribunal…."[7]  Accordingly, CEL's Application does not violate the Tribunal's orders, and CEL did not misrepresent any facts to this Court.  As confirmed by the Tribunal, the Application was, and continues to be, within the exclusive domain of this Court.

While Nejapa argues that the Tribunal would not have granted the discovery sought by CEL through its Application, that contention is irrelevant.  In *Intel*, the Supreme Court clarified that Section 1782 does not have a "foreign-discoverability requirement."[8]  The Supreme Court expressly recognized that Section 1782 aid is appropriate even in situations where a tribunal

---

[7]     Exhibit A at ¶ 22.

[8]     Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 253 (2004).

would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to Section 1782(a).[9]  The mere fact that the Tribunal in the Pending Arbitration limited discovery within the arbitration proceeding, does not invalidate CEL's assertion that "[t]here is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL…."[10]

  *Intel* does not require this Court to find that the Tribunal will "definitely welcome and accept discovery produced pursuant to § 1782."[11]  Post-*Intel* case law confirms that "a foreign court's procedural discovery limitations, as opposed to substantive limits on the admissibility of discovered evidence, should not prevent a district court from enabling a foreign litigant to obtain admissible evidence … pursuant to Section 1782."[12]  Here, the discovery limitations imposed by the Tribunal in its procedural orders do not address the admissibility of evidence obtained by the parties through means external to the arbitral proceeding.  Moreover, as explained in section 6, *infra*., the Tribunal has ordered CEL to produce any evidence obtained through Section 1782 in accordance with its procedural orders and it has reserved judgment on the admissibility of that evidence.

---

[9]   *See id.* at 262-63 (explaining that "[t]he foreign tribunal can place conditions on its acceptance of the information to maintain whatever measure of parity it concludes is appropriate.").

[10]  See NPC Memorandum in Support of Motion for Reconsideration of July 18, 2008 Order Granting Assistance to Litigant Pursuant to 28 U.S.C. § 1782, p. 18 (July 25, 2008) ("NPC Memorandum").

[11]  *In re Roz Trading Ltd. ("Roz Trading II")*, 2007 WL 120844, at *2 (N.D. Ga. 2007).

[12]  *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 275 (S.D.N.Y. 2004).

2.    **This Court correctly granted CEL's Application because CEL is not required to provide notice to NPC under Section 1782.**

Section 1782 does not require that notice be provided to the party from whom discovery is being sought at the time an application is filed.  The relevant section of the statute provides only that

> "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal" and that "[t]he order may be made ... upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court."[13]

Post-*Intel* case law confirms that Section 1782 does not require notice at the time an application is filed and that "failure to provide notice" is not a basis for dismissal of a Section 1782 application.[14]

In its Motion, NPC cannot cite to any post-*Intel* Section 1782 case law to substantiate its flawed assertion that the Order should be reconsidered because CEL did not provide notice to it at the time the Application was filed with the Court.  Instead, NPC cites to pre-*Intel* case law and to a recent case that does not deal with Section 1782.[15]  NPC fails to provide post-*Intel* case law to support its claim, because no such precedence exists.  The Court should not reconsider its

---

[13]    *See generally* 28 U.S.C. § 1782(a).

[14]    See In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries and other non-participants for use in Actions Pending in the Norway, 249 F.R.D. 96, 108 (S.D.N.Y. 2008) (stating that the "claim that a defect in service warrants dismissal of the application simply has no basis in law or fact.").

[15]    *See* NPC Memorandum at p. 10 (citing to pre-*Intel* cases and a 2007 case that deals with letters rogatory, not Section 1782).

Order when post-*Intel* case law and the plain language of the statute itself confirm that notice is not a requirement for court approval of a Section 1782 application.[16]

3.   **This Court's Order is valid because the Supreme Court's decision in *Intel* is applicable to this case and Section 1782 applies to private foreign arbitrations.**

NPC's assertion that *Intel* "is inapposite," is erroneous and undermines the very relevant findings of the U.S. Supreme Court with respect to Section 1782.  In *Intel*, the U.S. Supreme Court not only identified several discretionary factors for courts to consider when reviewing applications, but it also clarified that a "tribunal," for the purposes of Section 1782, is a "first-instance decisionmaker."[17]  The Pending Arbitration undeniably meets that definition, because the Tribunal is a first-instance decision-making body with respect to the dispute between CEL and NPC, thus qualifying as a "tribunal" for Section 1782 purposes.

NPC relies on outdated and overruled circuit court law to assert that Section 1782 does not apply to private arbitrations.  Both of the decisions NPC relies upon were made prior to the Supreme Court's examination and affirmation of Section 1782 in *Intel*.[18]  The Supreme Court's decision in *Intel* broadened the concept of "tribunal" from what some courts had previously interpreted, including those relied upon by NPC.

The Supreme Court's interpretation  of Section 1782 in *Intel* contradicts the interpretation and application asserted by NPC.  Post-*Intel* case law indicates that Section 1782 can be used to

---

[16]   As a practical matter, no discovery requests have been formally made to NPC in this case. As envisioned by Section 1782, CEL first applied to this Court for leave to seek such discovery.  Once granted, as here, the next step is for CEL to provide notice of the authorized discovery requests and order to NPC.  This process is currently being executed by the parties.

[17]   *Intel*, 542 U.S. at 258.

[18]   *See Nat'l Broad. Co., Inc. v. Bear Stearns & Co., Inc.*, 165 F. 3d 184 (2d. Cir. 1999); *Republic of Kazakhstan v. Biedermann*, 168 F. 3d 880 (5th Cir. 1999) (limiting the definition of "tribunal" in Section 1782 to exclude private arbitrations before the Supreme Court's decision in *Intel* in 2004).

aid a party in a private, foreign arbitration.[19]  The court in *Roz Trading I* found that the "reasoning" of "*Nat'l Broad. Co.,* [and *Republic of Kazakhstan* was] materially impacted by *Intel*" and that the "reasoning in *Intel* demonstrates the structural and analytical flaws in the Second and Fifth Circuits' interpretations of § 1782(a)."[20]  In *Hallmark*, the court denied a motion for reconsideration on the grounds of the inapplicability of Section 1782 to private arbitrations and also rejected the pre-*Intel* reasoning of the Second and Fifth Circuits, finding that the "[Supreme] Court's general approach to Section 1782, as well as that statute's legislative history, makes clear that the statute is best read not to impose any restrictive definitional exclusions that would necessarily preclude assistance to all private arbitral bodies."[21]

In light of the Supreme Court's decision in *Intel* and its progeny, this Court should disregard the pre-*Intel* Second and Fifth Circuit decisions regarding the applicability of Section 1782 to private arbitrations.  Moreover, regardless of the questionable value of these pre-*Intel* circuit court decisions in post-*Intel* jurisprudence, the Third Circuit has not addressed this issue, and this Court is not bound by non-Third Circuit decisions.[22]

**4.      This Court properly exercised its discretion in granting CEL's Application.**

This Court properly weighed the *Intel* factors in granting CEL's Application.  The Court concluded, as have other courts considering the issue, that the Application should be granted

---

[19]  *In re Roz Trading Ltd.*, 469 F. Supp. 2d 1221, 1226-27 (N.D. Ga. 2006) ("*Roz Trading I*"); *In re Application of Hallmark Capital Corp.*, 534 F. Supp. 2d 951, 954-55 (D. Minn. 2007).

[20]  *Roz Trading I*, 469 F. Supp. 2d at 1226.

[21]  *Hallmark*, 534 F. Supp. 2d at 954-55.

[22]  *See In re Oxus Gold PLC*, Misc. No. 06-82-GEB 2007 WL 1037387 at *5 n.3 (D. N.J. Apr. 2, 2007) (explaining that "[t]he Court is unaware of-and the parties have not offered-any decision in this Circuit fully addressing the issue.").

even though NPC is a party to the foreign proceeding.[23]  Because this Court properly weighed

the discretionary *Intel* factors in granting CEL's Application, its Order will be upheld if it

undergoes appellate review.[24]  Accordingly the Court should confirm its Order and deny NPC's

Motion.

**5.    Neither the arbitration agreement nor the applicable arbitral rules prohibit CEL from seeking discovery through Section 1782.**

        Contrary to NPC's allegations, CEL did not contract away its right to pursue discovery in

the United States through Section 1782.  Nothing in the arbitration agreement between CEL and

NPC precludes or prohibits either party from pursuing discovery through formal external means

such as Section 1782, and NPC does not cite to any agreement between the parties that evidences

such an understanding.  The only agreement the parties came to regarding future arbitral

proceedings was that they would be governed by the UNCITRAL Arbitration Rules and Swiss

procedural law. [25]

---

[23]    *See Infineon Tech. AG v. Green Power Tech, Ltd.*, 247 F.R.D. 1, 2005 WL 5887181 at *4 (D.D.C. 2005) (granting Section 1782 discovery because, despite the fact that the party from whom discovery was sought was a participant in the foreign proceeding, "the final three factors of the *Intel* test all counsel in favor of the discovery."); *see also In the Matter of the Application of the Proctor & Gamble Co.*, 334 F. Supp. 2d 1112, 1114-15 (E.D. Wis. 2004) (denying a request for a stay pending appeal of the district court's decision to grant a Section 1782 application even when the party from whom discovery was sought was also a party to the international proceeding).

[24]    *See In the Matter of the Application of the Proctor & Gamble Co.*, 334 F. Supp. 2d 1112, 1117 (E.D. Wis. 2004) (stating that, upon appeal, a district court "decision to grant [a Section 1782] application will be reviewed for an abuse of discretion.").

[25]    *See* Letter of M. Baker July 5, 2007, at P. 2 (attaching the relevant provisions of the TCA and stating "Section 7 of the TCA sets out the parties' agreement to resolve all Disputes between them arising out of or relating to the TCA by arbitration in accordance with the current UNCITRAL Arbitration Rules"), included with NPC Memorandum, Declaration of Andrew Price, Tab 4.

The rules applicable to the Arbitration Proceeding do not preclude discovery pursuant to Section 1782. Specifically, the UNCITRAL Arbitration Rules contain no such prohibition.[26] Similarly, Swiss procedural law contains no such restriction. While NPC asserts that Articles 184 and 185 of the 1991 Swiss *Loi Fédérale Sur Le Droit International Privé* ("SPIL") require the Tribunal's prior consent before a Section 1782 discovery application can be submitted to U.S. courts, that contention is erroneous. Article 184(1) SPIL provides that the arbitral tribunal has the authority to order production of documents from the parties and Article 185(2) SPIL explains that a party, with permission of the arbitral tribunal, or the tribunal itself, may seek legal assistance from state courts <u>in order to enforce the tribunal's document production orders</u>. These articles do not, as NPC contends, require tribunal authorization prior to proceeding with an application for discovery that is independent of and not stemming from an order of the arbitral tribunal. This principle has been confirmed by Dr. Gabrielle Nater-Bass, a well regarded expert within the Swiss arbitration community. Dr. Nater-Bass opined that "neither articles 184 and 185 SPIL, nor any other mandatory Swiss law provisions preclude U.S. pre-trial discoveries in aid of arbitration."[27] Simply put, neither the arbitration agreement nor the applicable arbitral or procedural rules prevent CEL from seeking discovery through Section 1782.

**6.     The Tribunal rejected NPC's request to prejudge the admissibility of any discovery acquired through Section 1782.**

The Tribunal has acknowledged this Court's jurisdiction to determine the issues before it and refused to prejudge any evidence potentially obtained via Section 1782. NPC specifically

---

[26]   *See In re Oxus Gold PLC*, 2007 WL 1037387 at *5 (D.N.J. 2007) (affirming the issuance of a Section 1782 order for a discovery request made with respect to an arbitration governed by the UNCITRAL Arbitration Rules).

[27]   *See* Statement of Gabrielle Nater-Bass, attached as Exhibit C (explaining the meaning of Articles 184 and 185 and asserting that no prior consent from the arbitral tribunal regarding Section 1782 applications is required under Swiss law).

asked both that CEL be required to "immediately withdraw" its Application before this Court and that the Tribunal refuse to admit any evidence obtained via Section 1782.[28]  Importantly, the Tribunal rejected these requests.  Instead, the Tribunal reiterated that "it is certainly up to the courts in […] Delaware to decide whether Section 1782 applies to a foreign arbitration….and whether the measures sought…are admissible and should be granted."[29]

The Tribunal also rejected NPC's request to declare that "any documents or testimony that might be obtained by CEL through the Discovery Applications…may not be used in this arbitration," refusing to prejudge any potential evidence before its production.[30]  Instead, the Tribunal held that "all documents, *including those that might be obtained through the [1782] process*…will have to be produced according to the procedural timetable provided for in Procedural Order No. 2."[31]  It further noted that it "will also retain jurisdiction to admit or reject any documents which are irrelevant, unreasonably burdensome to the proceedings or in breach of the parties' rights."[32]  Thus, NPC's arguments about the Tribunal's reluctance to admit evidence obtained through Section 1782 are misplaced.

7.    **This Court's Order is appropriate, because the discovery CEL seeks through its 1782 Application is relevant and sufficiently narrow.**

In reviewing CEL's Application, this Court evaluated the *Intel* Factors, which include the breadth and scope of the subject discovery.  In granting the Application, the Court determined that the requested discovery was not unduly burdensome.  NPC seeks to have this Court revisit its determination, citing the Tribunal's views on the scope of discovery within the arbitral

---

[28]    Exhibit B at p. 15; *see also* Exhibit A at ¶ 1.

[29]    Exhibit A at ¶ 22.

[30]    Exhibit B at p. 16.

[31]    Exhibit A at ¶ 31 (emphasis added).

[32]    Exhibit A at ¶ 37.

proceeding.  The Tribunal's views on the scope of discovery are simply not relevant to this

Court's determinations under Section 1782.  As noted previously, the Tribunal has itself

confirmed that it is up to this Court to decide the appropriateness of the discovery requests under

Section 1782.  CEL's discovery requests specifically target the information CEL needs to present

its defenses and counter-claims in the Pending Arbitration.  The Court should, therefore, reject

NPC's invitation to revisit its prior decision concerning the propriety of CEL's requests.

## **CONCLUSION**

This Court appropriately exercised its discretion in granting CEL's Application.  NPC

has provided the Court with no basis to reconsider or vacate that decision.  Therefore, this Court

should deny NPC's request to reconsider and vacate its July 18th Order.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


/s/ Donald E. Reid (#1058)

_____
Donald E. Reid (#1058)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
dreid@mnat.com
  *Attorneys for Plaintiff*

OF COUNSEL:

David M. Orta
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
(202) 942-5667
David.Orta@aporter.com

# EXHIBIT A

Procedural Order n°3

in the UNCITRAL Arbitration
between:

a) Claimant:

- Nejapa Power Company, L.L.C., Edificio Fusades, Blvd. Santa Elena, Antiguo
  Cuscatlan, La Libertad, El Salvador.

(hereinafter "Nejapa", or "the Claimant")

whose Counsel is:

Mr. Mark Baker (email: mbaker@fulbright.com), Mr. Kevin O'Gorman (email:
kogorman@fulbright.com),     and     Mr.     Anibal     Sabater     (email:
asabater@fulbright.com), Fulbright & Jaworski L.L.P., 1301 McKinney, Suite
5100, Houston, Texas 77010-3095, (U.S.A.), Telephone: +1 713 651 5151, Fax:
+1 713 651 5246.

b) Respondent:

- Comisión Ejecutiva Hidroeléctrica del Rio Lempa, Sección de Correspondencia
  (atención: Dirección Ejecutiva and Centro de Operaciones del Sistema), 9a Calle
  Poniente n°950, Centro de Gobierno, San Salvador, El Salvador.

(hereinafter "CEL", or "the Respondent")

whose Counsel is:

Mr. David Orta (email: david.orta@aporter.com), Mr. Forrest J. Deegan (email:
forrest.deegan@aporter.com),    and    Mr.    Daniel    Salinas-Serrano    (email:
daniel.salinas.serrano@aporter.com), Arnold & Porter LLP, 555 12th Street, N.W.,
Washington, D.C. 2004-1206.

## Procedural Order n°3

### A. The Request:

1. By letter dated 17 July 2008 ("the Request"), Claimant requested that the Arbitral Tribunal issue as a matter of urgency a procedural order:

(a) Confirming that CEL's Discovery Applications were filed without the prior authorization of the Arbitral Tribunal;

(b) Declaring that CEL's Discovery Applications are incompatible with the arbitration agreement, as embodied in TCA Section 7, as well as the arbitration rules and the Swiss legal provisions applicable to this arbitration;

(c) Declaring that CEL's Discovery Applications are incompatible with the two procedural orders issued to this date by the Arbitral Tribunal;

(d) Ordering CEL to immediately withdraw its Discovery Applications, along with any other application similar in nature, effects, or character to the Discovery Applications that may have been submitted by CEL;

(e) Ordering CEL to refrain from submitting any discovery applications outside this arbitration process and/or before any court of justice anywhere in the world, without the Arbitral Tribunal's express prior approval.

### B. Facts:

2. On July 3, 2008, Respondent filed in the U.S. District Court for the District of Delaware an *ex parte* Application for an order directed against Claimant "granting discovery for use in a foreign proceeding pursuant to 28 U.S.C. § 1782" ("the Delaware Application").

3. The Delaware Application requests that the court enter an order:

*"A. Granting CEL's application for discovery from NPC pursuant to 28 U.S.C. § 1782 (a);*

*B. Authorizing CEL to issue the following to NPC pursuant to Fed. R. Civ. P. 45:*

*(1) subpoenas for the production of documents compelling NPC to produce documents within 30 days following the service of each subpoena;*

*(2) subpoenas for the deposition of NPC personnel listed in Appendix C; and*

2

*(3) subpoenas for the production of additional documents and the taking of additional depositions as CEL may reasonably deem appropriate based upon review of documents produced and depositions given by NPC".*

4. On even date, Respondent filed in the U.S. District Court for the Southern District of Texas an *ex parte* Application for an order directed against El Paso Corporation, a non-party to the arbitration, "granting third-party discovery for use in a foreign proceeding pursuant to 28 U.S.C. § 1782" ("the Texas Application").

5. The Texas Application requests that the court enter an order:

*"A. Granting CEL's application for discovery from El Paso pursuant to 28 U.S.C. § 1782 (a);*

*B. Authorizing CEL to issue the following subpoenas to El Paso pursuant to Federal Rule of Civil Procedure 45:*

*(1) subpoenas for the production of documents compelling El Paso to produce documents within 20 days following the service of each subpoena;*

*(2) subpoenas for the deposition of El Paso personnel, including former Coastal personnel listed in Exhibit 4; and*

*(3) subpoenas for the production of additional documents and the taking of additional depositions as CEL may reasonably deem appropriate based upon review of documents produced and depositions given by El Paso".*

6. Both Applications include 34 identical requests for production of a broad list of categories of documents referring or relating to (i) the negotiation of the Final Award or the TCA, (ii) the negotiation of the TCA Amendment, (iii) the negotiation of the TCA Tax Provisions, (iv) the negotiation of the Standby Letter of Credit, (v) the potential economic value of the Final Award and/or the TCA to NPC or El Paso, (vi) the potential economic value of the TCA Amendment to NPC or El Paso, (vii) the potential economic value of the TCA Tax Provisions to NPC or El Paso, (viii) the potential economic value of the Standby Letter of Credit to NPC or El Paso, (ix) the actual economic value of the Final Award and/or the TCA to NPC or El Paso, (x) the actual economic value of the TCA Amendment to NPC or El Paso, (xi) the actual economic value of the TCA Tax Provisions to NPC or El Paso, (xii) the actual economic value of the Standby Letter of Credit to NPC or El Paso, (xiii) the reimbursement provisions of the TCA and/or Final Award that discuss the meaning, scope, intent or purpose of such provisions, (xiv) the potential value of the reimbursement provisions of the TCA and/or Final Award, (xv) the actual value of the reimbursement provisions of the TCA and/or Final Award, (xvi) the intent, purpose, scope or meaning of the TCA Amendment, (xvii) the intent, purpose, scope or

meaning of the TCA Tax Provisions, (xviii) the intent, purpose, scope or meaning of the Standby Letter of Credit, (xix) the commercial strategy employed by NPC relating to deviations as that term was used in the TCA and Final Award, (xx) the commercial strategy employed by NPC relating to deviations as that term is used in the TCA and Final Award, to, from or by Roberto Gonzalez, the Market Manager of NPC, (xxi) any comparisons between the economic value of the PPA to El Paso, Coastal Corporation or NPC and the economic value of the Final Award and/or TCA to El Paso, Coastal Corporation or NPC, (xxii) projections made by or on behalf of El Paso, Coastal Corporation or NPC of the actual transmission costs to be incurred by NPC or El Paso during the life of the TCA, (xxiii) the commercial strategy employed by NPC relating to deviations following expiration of the TCA, (xxiv) the liability, or the absence of liability, by NPC for the payment of taxes by NPC to any taxing authorities in El Salvador by reason of reimbursement payments received by NPC pursuant to the TCA, including, without limitation, any tax advice, legal, audit or accounting opinions received by NPC or El Paso relating to this subject, (xxv) the payment of taxes by NPC to any taxing authorities in El Salvador and due by reason of reimbursement payments received by NPC pursuant to the TCA, (xxvi) all tax advice, legal, audit or accounting opinions received by NPC referring or relating to the treatment of reimbursement payments received from CEL under the TCA in Nejapa Power Company LLC's tax returns filed in El Salvador for tax years 2002 through 2007, (xxvii) any estimates or projections of the deviations, as that term was used in the TCA ad Final Award, to be incurred by NPC during the life of the TCA, (xxviii) all communications relating to the 5 October 1998 letter from Robert Hart (President, Coastal Technology) to Guillermo Sol Bang (President, CEL), (xxix) all economic reports, analysis, forecasts or projections relating to said 5 October 1998 letter (xxx) all economic reports, analyses, forecasts or projections relating to the buy-out value of the PPA, (xxxi) all communications referring to the July 14, 2000 meeting between CEL and Coastal Corporation in Houston, (xxxii) all economic reports, analyses, forecasts or projections relating to said meeting, (xxxiii) all communications referring to the November 2001 meeting between CEL, NPC and El Paso in Miami, (xxxiv) all economic reports, analyses, forecasts or projections relating to said meeting.

7. Both Applications specify that the evidence sought is for use in the present arbitration.

8. The Texas Application was granted *ex parte* on 8 July 2008. The Delaware Application was also approved *ex parte* (Respondent letter in reply to the Request of 24 July 2008, page 6). Both Applications are subject to review by the District Courts.

#### C. The reasons for the Request:

9. Claimant submits that "*CEL's Discovery Applications constitute a breach of (i) the arbitration agreement between the parties, (ii) the UNCITRAL Arbitration Rules, (iii) the procedural law applicable to this arbitration, and (iv) the procedural orders issued by the Arbitral Tribunal in this arbitration. CEL's Discovery Applications also constitute an impermissible attempt to "re-trade" issues which were addressed and resolved not just by this tribunal, but also in the previous UNCITRAL arbitration between the parties* [...]" (Request, page 2).

10. In respect of the request for depositions, Claimant submits that "*Astonishingly, in its Delaware Discovery Application, CEL seeks the oral deposition of Mr. Sutton, despite: (i) having extensive testimony from Mr. Sutton (including testimony on deviations and the "parties' intent") available on the record from the two previous arbitrations between the parties; and (ii) knowing that Mr. Sutton is likely to be a key Nejapa witness in this arbitration and that, consequently, CEL would have ample chance to examine him at the evidentiary hearing*" (Request, page 4).

11. Claimant further submits, in respect of the Discovery Applications, that "*nowhere in its Delaware Discovery Application does CEL discuss (i) the current status of this arbitration, (ii) the existence of a procedural schedule that allows for the production of documents and the examination of witnesses in this arbitration, (iii) the inconsistencies between the tribunal procedural orders and the discovery CEL seeks in the court, or (iv) whether the Arbitral Tribunal has authorized, or was even informed of, CEL's Delaware Discovery Application. In fact, failing to discharge its duty of transparency and candor, CEL has not disclosed to the federal court in Delaware the fact that (i) CEL's Delaware Discovery Application has never been approved by the Arbitral Tribunal and (ii) the tribunal has not allowed oral depositions or the type of broad document requests CEL is seeking from the courts*", that "*CEL's Delaware Discovery Application is accompanied by several exhibits, including transcripts from the hearing in the Previous UNCITRAL Arbitration, which have not been submitted under seal, and which are now publicly available as a matter of course to the general public*", and that "*in keeping with its strategy to hide and mislead, CEL chose not to serve or notify this tribunal or Nejapa of its Delaware Discovery Application, although CEL knows that Nejapa is represented in this arbitration by the undersigned*" (Request, page 5).

12. Claimant thus argues that: "*First,* [...] *Discovery in U.S. courts is not what the parties bargained for and, accordingly, constitutes a breach of the arbitration agreement. Second, CEL's Discovery Applications contravene the rulings and orders*

5

*issued by the Arbitral Tribunal in this arbitration. Third, as a general matter U.S.-style discovery is not allowed in international arbitration. Fourth, court discovery serves no meaningful purpose in this arbitration. Fifth, CEL's Discovery Applications are an impermissible attempt to re-open matters that were already decided in the Previous UNCITRAL Arbitration. Sixth, CEL's Discovery Application breaches the "equality of arms" principle that, as CEL has acknowledged, applies in every international arbitration case, including this one"* (Request, page 7).

## D. Respondent's Reply:

13. Respondent objected to the Request on 24 July 2008 ("the Reply"), by contending that *"the proceedings in the United States are completely independent from this arbitration proceeding, and there is nothing in the UNCITRAL Arbitration Rules or in this Tribunal's orders that preclude CEL from utilizing the means available to it to obtain evidence"* (Reply, pages 1 and 2). Respondent also purports that the Request is *"wholly without merit and premature in any event"*, as the Arbitral Tribunal *"should not prejudge the admissibility of evidence that it has not yet had an opportunity to review"*, and because *"an order by this Tribunal preventing CEL from obtaining the evidence it needs to prove its case, or prejudging whether it can utilize any evidence obtained, would severely prejudice CEL's ability to be heard and present its defence in the pending arbitration"* (Request, page 2).

14. Respondent submits that, by *"collecting and preparing the evidence for its defence and any counterclaims so that it can be in a position to submit its evidence when it files its first memorial"*, it is *"availing itself of a right that it has under the federal laws of the United States to obtain evidence that it may use to aid its defence in this proceeding"* (Reply, page 2). Respondent also submits that, by doing so, it *"has not violated any orders of the Tribunal or the UNCITRAL Arbitration Rules that govern this arbitration, nor has it violated the arbitration agreement between the parties. The parties never discussed with this Tribunal what formal or informal methods the parties would utilize to obtain their evidence. The Tribunal's orders and the arbitration agreement do not speak to this issue"* (Reply, page 2).

15. Respondent further submits that *"the dispute between the parties is being resolved by the Tribunal under the UNCITRAL Arbitration Rules, which do not prohibit the use of Section 1782 to obtain evidence in aid of an UNCITRAL ad hoc arbitration"*, that the measures sought in the United States will not undermine the Arbitral Tribunal's authority, as *"the U.S. courts that review Section 1782 Applications do not in any way decide any of the issues pending between the parties in the arbitration"*, and as *"this Tribunal will retain the discretion to allow or disallow the use of any evidence*

*obtained*" (Reply, pages 3 and 4). Respondent further posits that "*NPC's assertion that Articles 184 and 185 of the 1991 Swiss Loi Fédérale Sur Le Droit International Privé ("SPIL") require the Tribunal's prior consent before a Section 1782 Discovery Application can be submitted to U.S. courts is erroneous*" (Reply, page 4), that "*the Tribunal does not have the authority to preclude CEL from utilizing Section 1782 to gather evidence, nor is it within the Tribunal's process to limit the evidence that CEL can seek pursuant to Section 1782. Neither the parties' arbitration agreement nor the UNCITRAL Arbitration Rules grant such authority to the Tribunal. It is the U.S. court judge who determines whether or not a 1782 Application is granted and whether a discovery request is sufficiently narrow*" (Reply, page 5).

16. Respondent also submits that the IBA Rules on the Taking of Evidence in International Arbitration ("the IBA Rules") "*encourage parties to obtain discovery outside of the arbitral process, and to only turn to the tribunal when absolutely necessary*" (Reply, page 5), that "*this Arbitration is not governed by the ICDR Guidelines, and CEL has never agreed that these guidelines should govern any aspect of this arbitration*" (Reply, page 6), and that "*the evidence CEL seeks through its Section 1782 Applications is relevant and material to the current proceeding. CEL will demonstrate as much, when and if, it offers any evidence it obtains through these proceedings as evidence in this arbitration*" (Reply, page 6).

17. Respondent finally submits that "*not only is the discovery CEL is seeking through its Section 1782 Applications appropriate, it is particularly necessary, because El Paso, one party from who CEL is seeking discovery, is not a party to this arbitration [...]. The Tribunal does not have jurisdiction or authority over a third party who may have relevant information to this arbitration*" (Reply, page 7).

18. In respect of the argument that the Applications would amount to an attempt to re-open issues already decided in previous arbitrations, Respondent submits that "*there is no mention of "deviations" in any of CEL's requests; rather they focus primarily on the intent of the parties in executing the documents at issue, an issue that, as CEL will demonstrate, is central to this arbitration*" (Reply, page 7). In respect of the argument that the Applications would place the parties on an unequal footing, Respondent objects that "*Salvadoran court-ordered discovery for use in international arbitration is possible*" (Reply, page 8).

### E. Tribunal's decision:

19. In addressing the issues so raised by the parties, the Arbitral Tribunal will have regard to certain principles relevant to international arbitrations such as this one.

20. First, it is generally admitted that the parties may seek court-assistance to obtain evidence, either at the place of the arbitration or at the place where an evidentiary measure is to be enforced. There is nothing in the UNCITRAL Arbitration Rules or in the IBA Rules preventing the parties from doing so.

21. However, it is also generally recognized that, once the Arbitral Tribunal is constituted, such court applications require the consent of the Arbitral Tribunal, which needs to be able to assess whether they are appropriate, notably with regard to the relevance and materiality of the evidence requested. Article 3 (8) of the IBA Rules clearly subjects court applications directed to non-parties to the Arbitral Tribunal's authorization, and the same condition logically applies to any court application directed against a party. Swiss procedural law is also to that effect, as Article 184 SPIL provides that the assistance of Swiss courts may be sought by the Arbitral Tribunal or with the consent of the Arbitral Tribunal. The Swiss authorities' quoted by Respondent also confirm that "*the entitlement to request judicial assistance lies with the Arbitral Tribunal or a party, with the Arbitral Tribunal's consent*" (M. Schneider, comment to Art. 184 SPIL, in *International Arbitration in Switzerland*, Helbing & Lichtenhahn, 58). It is certainly true that the Swiss SPIL does not deal with the conditions under which court assistance may be sought in countries other than Switzerland as the seat of the arbitration. Nevertheless, it seems reasonable to consider that, by submitting to arbitration, the parties have agreed to an alternative to litigation and, thereby, to subject evidentiary applications to the courts to the tribunal's consent, once the latter has been constituted.

22. Second, the Arbitral Tribunal has no power to assess the jurisdiction of a foreign court in respect of evidentiary requests in aid of the arbitration. In the case at hand, it is certainly up to the courts in Texas and Delaware to decide whether Section 1782 applies to a foreign arbitration, whether their orders require leave or consent from the Arbitral Tribunal, and whether the measures sought, as broad as they are, are admissible and should be granted. Nevertheless, since the orders have been granted *ex parte* and are still subject to review ("... *it is the U.S. courts that should decide such issues, not the Tribunal. NPC can bring any such complaints to the U.S. courts, and those complaints will be decided there*", Reply, page 6), it is appropriate for the Arbitral Tribunal to express its views as to whether the measures sought appear (i) compatible with the parties' agreement to arbitrate, (ii) consistent with the procedural rules applicable to the arbitration, and (iii) appropriate, so that the competent U.S. courts may be able to take such views into account when reviewing their *ex parte* orders.

23. Third, the Arbitral Tribunal has the duty to protect the integrity of the arbitration by ensuring that any unauthorized court application will not unduly affect or impede the organization of the arbitration or prevent the correct application of the Arbitral Tribunal's orders. The Arbitral Tribunal also has the duty to ensure that each party be granted equal treatment in the arbitration proceedings.

24. In light of the foregoing, the Arbitral Tribunal will now address the issues in dispute.

### a) Document Discovery:

25. The discovery orders sought by Respondent in Texas and Delaware have not been authorised by the Arbitral Tribunal, and the Arbitral Tribunal has not been previously informed of Respondent's Applications.

26. However, whether broad discovery should be allowed in this arbitration is an issue that has already been addressed by the Arbitral Tribunal during the 24 June 2008 procedural hearing (by teleconference) and in the Arbitral Tribunal's letter of 3 July 2008 to the parties. During the 24 June 2008 hearing, the Arbitral Tribunal decided that requests for the production of documents should refer specifically to identified documents or narrowly circumscribed categories of documents. The Arbitral Tribunal also decided that such requests should be concentrated in one round of requests to take place after the submission of the first round of pleadings and evidence. The Arbitral Tribunal nevertheless decided, at Respondent's request, to allow limited production requests in advance of the first round of written submissions, provided that the request bore on limited number of documents that would be (i) relevant and material to the case, and (ii) indispensable for the preparation of Claimant's Statement of Claim and/or Respondent's Defence or Counterclaim. Said decisions were confirmed in the Arbitral Tribunal's letter of 3 July 2008 to the parties, in which the Tribunal stated the following:

> "*the Arbitral Tribunal already made it clear during the 24 June conference call that it wished the document production requests to be concentrated in one round of requests and objections between the two rounds of written submissions, in line with normal arbitration practice.*
>
> *While the Arbitral Tribunal understands that, under specific circumstances, it may be appropriate to allow some degree of discovery prior to filing of the parties' first written submissions, in the case at hand there does not appear to be any such particular reason to depart from the generally accepted principle that each party may request access to identified documents or class of documents after filing of the first written submissions.*

*Yet, at Respondent's request, the Arbitral Tribunal has accepted that each party may request the production of a limited number of documents prior to the first round of submissions. This may allow Claimant to use such documents for the preparation of its Statement of Claim, and Respondent for the preparation of its Counterclaim, if any.*

*The Arbitral Tribunal believes that authorising requests for document production after the filing of the Statement of Claim (as requested by Respondent) would lead to an inequality between the parties, as Respondent would be able to prepare its Defence and Counterclaim on the basis of documents obtained from Claimant, while Claimant would not have had the same opportunity for the Statement of Claim.*

*The Arbitral Tribunal of course appreciates that it would be conceivable to have three stages of document production requests (one before the Statement of Claim, one before the Statement of Defence and Counterclaim, and one before the second round of submissions). Yet the Arbitral Tribunal believes that such a procedure would be overly burdensome and is not justified in the case at hand.*

*Finally, the Arbitral Tribunal does not believe the proposed document production schedule would be prejudicial to Respondent, as Respondent will be able to rely on the preliminary round of document production (mainly, we assume, for the preparation of its Counterclaim), and will subsequently be able to request the production of additional documentation in advance of the filing of its second written submission".*

27. By letter of even date, Respondent communicated to the Arbitral Tribunal that it *"agrees to dispense with this limited round of production* [taking place in advance of the first submissions]", and the Arbitral Tribunal consequently issued, on 8 July 2008, its Procedural Order n°2, providing in Section B that all requests for document production should (i) be made after the first round of submissions, and (ii) refer to specific documents or narrowly circumscribed categories of documents.

28. The Arbitral Tribunal has therefore clearly decided not to allow broadly framed requests for document production taking place prior to the first round of written submissions. That decision is consistent with general practices applied in international arbitration, as reflected by the IBA Rules. This was done (i) to ensure that the document production would be focused and relevant in light of the facts of the case and the parties' arguments, as submitted in their first written submissions, and (ii) to enable the Arbitral Tribunal to decide on possible disagreements on the requests for document production in light of the parties' statements of fact and law. The Arbitral Tribunal believes that the arbitral proceedings, as currently framed, are appropriate, that they ensure that the case will be resolved in a reasonable period of time and at a reasonable cost to the parties. The Arbitral Tribunal also believes that the procedural rules, as framed in its procedural orders n°1 and n°2, ensure that the parties will be treated equally and will have a fair opportunity to state their case.

29. The Arbitral Tribunal also believes that there is nothing to indicate that this procedure will not be adequate or that it will not yield the same documents that might be available through the courts provided these are relevant and material to the disputes in this case. As far as El Paso is concerned, it is true that said company is a non-party. Yet, the requests for document discovery presented against El Paso are identical to those presented against Nejapa, and there is nothing to indicate that Respondent would not be able to obtain from Nejapa the documents sought from El Paso, so that any order directed against the latter would only become necessary once the Arbitral Tribunal had ruled on possible objections by the Claimant in respect of requests to produce pursuant to Procedural Orders n°1 and n°2.

30. In light of the foregoing, and based on the information provided so far by the parties, the Arbitral Tribunal would not have authorised Respondent to proceed with its Texas and Delaware Applications had it been requested to do so.

31. In any event, the Arbitral Tribunal confirms that all documents, including those that might be obtained through the Texas and Delaware Discovery process (if maintained), will have to be produced according to the procedural timetable provided for in Procedural Order n°2. The Arbitral Tribunal will also retain jurisdiction to admit or reject any documents which are irrelevant, unreasonably burdensome to the proceedings or in breach of the parties' rights.

32. Finally, the Arbitral Tribunal recalls that, in allocating the costs of the arbitration, it retains discretion to take account of any unnecessary costs incurred in the arbitration as a consequence of the parties' behavior.

### b) Depositions:

33. The Texas and Delaware Applications include subpoenas for the deposition of NPC and El Paso personnel, and Claimant has objected that the individuals in question (notably Mr. Sutton) are likely to be called as witnesses in the arbitration by Nejapa.

34. The Arbitral Tribunal believes that Respondent should not be allowed to take the depositions of potential Nejapa witnesses before the evidentiary hearing scheduled from 27 April to 1 May 2009.

35. As currently framed, the procedural rules established by the Arbitral Tribunal provide that each party will submit written witness statements with its first written submission, and that each party will submit the list of the witnesses it wishes to

present or cross-examine by 10 April 2009. This means that the parties will have to decide which of the other party's witnesses they wish to cross-examine on the basis of such witnesses' written statements. In the Arbitral Tribunal's view, Respondent would be placed in an advantageous position if it had the ability to undertake an examination under oath of Claimant's witnesses before the evidentiary hearing. Such a situation would affect the equality of the parties as the witnesses presented by Claimant would be bound by their depositions, while Respondent would be able to prepare its own witnesses testimony free from any such procedure, according to normal international arbitration practice.

36. Consequently, the Arbitral Tribunal believes that depositions would entail a breach of party equality in this case. The Arbitral Tribunal agrees, in this respect, with the view expressed in the ICDR Guidelines for Arbitrators Concerning Exchanges of Information that depositions are not an appropriate procedure in international arbitration.

### Decision

37. As a consequence of the foregoing, the Arbitral Tribunal:

a) Confirms that Respondent's Discovery Applications were filed without the prior authorization of the Arbitral Tribunal;

b) Declares that said Applications are unwarranted in view of the parties' choice of international arbitration and the procedure established by the Arbitral Tribunal in the present proceedings;

c) Declares that all documents obtained through the Texas and Delaware Discovery process (if maintained) would have to be produced according to the procedural timetable, as provided by the Procedural Order n°2, and that the Arbitral Tribunal will in any event retain discretion to admit or reject any documents that are irrelevant, unreasonably burdensome to the proceedings, or in breach of the parties' rights;

d) Orders Respondent to refrain from taking depositions of Claimant's potential witnesses;

e) Recommends that the parties consult with the Arbitral Tribunal prior to resorting to any further court assistance in aid of the arbitration;

f) Rejects all other requests.

This Procedural Order is signed in five [5] original copies by the Chairman on behalf of the Arbitral Tribunal.

Date: 28 July 2008

# EXHIBIT B

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
FULBRIGHT TOWER
1301 MCKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

C. MARK BAKER
PARTNER
MBAKER@FULBRIGHT.COM

DIRECT DIAL: (713) 651-7708
TELEPHONE:    (713) 651-5151
FACSIMILE:    (713) 651-5246

July 17, 2008

**BY EMAIL AND COURIER**

Dr. Alexis Mourre - amourre@cmdslaw.com
Castaldi Mourre & Partners
73, Boulevard Haussmann
75008 Paris
France

Mr. Henri C. Alvarez – halvarez@fasken.com
Fasken Martineau
2900 – 550 Burrard Street
Vancouver, British Columbia V6C 0A3
Canada

Dr. Juan Fernández-Armesto – jfa@jfarmesto.com
Armesto & Asociados
General Pardiñas, 102
28006 Madrid
Spain

Re:     Nejapa Power Company, L.L.C. ("Nejapa") v. Comisión Ejecutiva Hidroeléctrica
del Rio Lempa ("CEL"), an Arbitration pursuant to the UNCITRAL Arbitration
Rules and a Transmission Costs Agreement of June 30, 2002 ("TCA")

Dear Members of the Arbitral Tribunal:

I write in connection with a very urgent matter that has just been discovered by Nejapa
and threatens the integrity of this arbitration.

On July 3, 2008, CEL filed in two U.S. federal courts *ex parte* applications for broad,
U.S.-style discovery and oral depositions allegedly "in aid" of this arbitration. The tribunal will
recall July 3 was the same day that CEL suddenly abandoned its request for two rounds of
document production and criticized the tribunal for its alleged procedural unfairness. CEL's
applications were orchestrated secretly, without notice to Nejapa, this tribunal, or any other
parties, on the eve of a long holiday weekend in the United States. CEL's applications are

July 17, 2008
Page 2

attached as Exhibits A and B, and will be collectively referred to as "CEL's Discovery Applications."

The first discovery application is addressed against Nejapa, the Claimant in this very arbitration, and was filed by CEL in the U.S. District Court for the District of Delaware ("CEL's Delaware Discovery Application"). Nejapa has not been officially notified of or served with this application. In fact, Nejapa knows of this Application only because it located it on the U.S. federal courts' database known as Pacer in the last few days. Accordingly, Nejapa has not had an opportunity to contest those proceedings and, to the best of Nejapa's knowledge, the court has not issued an order in them as of this date.

The second application is addressed against El Paso Corporation ("El Paso"), Nejapa's former majority owner, and was filed by CEL in the U.S. District Court, Southern District of Texas, Houston Division ("CEL's Houston Discovery Application"). The court granted the application on July 8, 2008, without giving prior notice to El Paso or to any other party. *See* court order attached as Exhibit C.

For the reasons explained below, CEL's Discovery Applications constitute a breach of (i) the arbitration agreement between the parties, (ii) the UNCITRAL Arbitration Rules, (iii) the procedural law applicable to this arbitration, and (iv) the procedural orders issued by the arbitral tribunal in this arbitration. CEL's Discovery Applications also constitute an impermissible attempt to "re-trade" issues which were addressed and resolved not just by this tribunal, but also in the previous UNCITRAL arbitration between the parties ("Previous UNCITRAL Arbitration").

Moreover, CEL's Discovery Applications contain serious misrepresentations. Specifically:

(i) At the procedural hearing held on June 24, 2008, the arbitral tribunal expressly ruled that there would be no U.S.-style "discovery" in this arbitration. However, CEL's Discovery Applications state that "[h]ere, **there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL ... It is therefore likely that the Tribunal ... would accept and consider such discovery**." (emphasis added.) *See* CEL's Delaware Discovery Application, page 8, and CEL's Houston Discovery Application, paragraphs 17-18.

(ii) The two procedural orders thus far issued by the arbitral tribunal in this arbitration contain provisions, including a detailed schedule, that allow CEL to request and obtain documents from Nejapa. Hiding this important fact from the U.S. federal courts in Delaware and Houston, CEL's Discovery Applications state that: "Without the assistance of this Court ... important evidence may never be produced." *See* CEL's Delaware Discovery Application, pages 5-6, and CEL's Houston Discovery Application, paragraph 10.

July 17, 2008
Page 3

     The following sections discuss CEL's Discovery Applications and Nejapa's petitions to the arbitral tribunal in this connection. Specifically, **Sections A, B, and C** of this letter discuss the background, content, and effects of CEL's Discovery Applications; **Section D** explains why the arbitral tribunal should order the immediate withdrawal of CEL's Discovery Applications; and **Section E** contains Nejapa's specific prayer for relief in this connection.

### A.    Background of CEL's Discovery Applications

     CEL's Discovery Applications are based on 28 U.S.C. § 1782(a), which reads as follows:

> "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court."

     28 U.S.C. § 1782(a) is a rarely applied provision that has been at the center of some recent case-law and an intense legal debate. For the reasons explained below, Nejapa considers that CEL is misusing 28 U.S.C. § 1782(a) in an attempt to circumvent the current arbitration between the parties and the procedural orders issued in it by the arbitral tribunal.

### B.    CEL's Delaware Discovery Application Against Nejapa

     On July 3, 2008, the Arbitral Tribunal issued Procedural Order No. 1 setting forth, among other things, the procedures for the production of documents and the interrogation of witnesses *in the arbitration*. *See* Procedural Order No. 1 at Sections F(6) and H. On that same date, however, CEL chose to ignore those procedures and submitted its *ex parte* Delaware Discovery Application asking *a federal court in Delaware* to order that (i) Nejapa produce 34 broad categories of documents and (ii) make Stephen M. Sutton, Nejapa's former manager, available for deposition. Mr. David Orta, counsel for CEL in this arbitration, is also listed as counsel for CEL in CEL's Delaware Discovery Application.

     CEL's Delaware Discovery Application reads as follows in relevant part:

> "At issue in the Pending Arbitration is the meaning and scope of certain reimbursement obligations under the TCA and CEL's obligation to maintain a Standby Letter of Credit. Pursuant to Article 1431 of the Salvadoran Civil Code, the intent of the parties is paramount in interpreting the meaning and scope of TCA provisions at issue in the Pending Arbitration ...

> Here, discovery is sought from [Nejapa] which was involved in the negotiation of the very documents at issue in the Pending Arbitration ...

> NPC likely possesses documents that are relevant to the negotiation and signing of the TCA and the settlement of the 1999 Arbitration ...

July 17, 2008
Page 4

> Without the assistance of this Court, this important evidence may never be produced ...
>
> Here, **there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL.** In fact, the evidence sought by CEL through its § 1782 petition would assist the Tribunal in its analysis of the case, and the Tribunal will retain the choice whether or not to accept the evidence and, if accepted, what weight it is to be given. Moreover, **the UNCITRAL Arbitration Rules do not prohibit admission of discovery obtained pursuant to § 1782.**
>
> **It is therefore likely that the Tribunal in the Pending Arbitration would accept and consider such discovery ...**"
>
> CEL's Delaware Discovery Application, pages 2-8. (footnote omitted.)

Astonishingly, in its Delaware Discovery Application, CEL seeks the oral deposition of Mr. Sutton, despite:

(i)   Having extensive testimony from Mr. Sutton (including testimony on deviations and the "parties' intent") available on the record from the two previous arbitrations between the parties; and

(iii)   Knowing that Mr. Sutton is likely to be a key Nejapa witness in this arbitration and that, consequently, CEL would have ample chance to examine him at the evidentiary hearing.

Additionally, CEL also wants documents responsive to 34 document production requests. *See* Appendix B-Attachment 1 to CEL's Delaware Discovery Application. Their breadth is uniquely American. Additionally, the requests frequently seek the production of documents that have no connection with the issues raised in this arbitration nor with the so-called (by CEL) "intent of the parties" when the TCA was signed. (As discussed above, CEL's Delaware Discovery Application, as framed by CEL, is allegedly aimed at helping CEL obtain documents related only to the "intent of the parties" at the time the TCA was signed). The following examples (which are representative of the other 30 requests) will give the arbitral tribunal an idea not just of the remarkably broad scope of the requests, but also of the type of documents that CEL is seeking in its Delaware Discovery Application:

> "DOCUMENT REQUEST NO. 1:
> All correspondence, reports, analysis, forecasts, or projections, to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, [Nejapa]), Basil Nichols (In-house counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, [Nejapa]), that REFER OR RELATE to the negotiation of the FINAL AWARD and/or the TCA ...
>
> DOCUMENT REQUEST NO. 5:
> All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton

75324153.6

July 17, 2008
Page 5

(Manager, NPC), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, [Nejapa]), Roberto Gonzalez (Market Manager, [Nejapa]), that REFER OR RELATE to the potential economic value of the FINAL AWARD and/or the TCA to [Nejapa] or EL PASO ...

DOCUMENT REQUEST NO. 11:
All correspondence, reports, analyses, forecasts, or projections to, from, by, and/or between Nadeem Babar (Senior Managing Director, Structured Markets, EL PASO), Mark Croak (Managing Director, Structured Markets, EL PASO), Steve Sutton (Manager, [Nejapa]), Basil Nichols (In-House Counsel, EL PASO), Robert Hart (President, Coastal Technology), Ernesto Cordova (General Manager, [Nejapa]), Roberto Gonzalez (Market Manager, [Nejapa]), that REFER OR RELATE to the actual economic value of the TCA TAX PROVISIONS to [Nejapa] or EL PASO ...

DOCUMENT REQUEST NO 23:
All DOCUMENTS REFERRING OR RELATING to the commercial strategy employed by [Nejapa] relating to deviations following expiration of the TCA ...."

CEL's Delaware Discovery Application, Exhibit 4, pages 6-13.

There are several additional aspects of CEL's Delaware Discovery Application which are noteworthy. First, nowhere in its Delaware Discovery Application does CEL discuss (i) the current status of this arbitration, (ii) the existence of a procedural schedule that allows for the production of documents and the examination of witnesses in this arbitration, (iii) the inconsistencies between the tribunal procedural orders and the discovery CEL seeks in the court, or (iv) whether the arbitral tribunal has authorized, or was even informed of, CEL's Delaware Discovery Application. In fact, failing to discharge its duty of transparency and candor, CEL has not disclosed to the federal court in Delaware the fact that (i) CEL's Delaware Discovery Application has never been approved by the arbitral tribunal and (ii) the tribunal has not allowed oral depositions or the type of broad document requests CEL is seeking from the courts. As discussed above, all CEL has told the federal court in Delaware in this connection is that *"there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL."*

Second, CEL's Delaware Discovery Application is accompanied by several exhibits, including transcripts from the hearing in the Previous UNCITRAL Arbitration, which have not been submitted under seal, and which are now publicly available as a matter of course to the general public.

Third, in keeping with its strategy to hide and mislead, CEL chose not to serve or notify this tribunal or Nejapa of its Delaware Discovery Application, although CEL knows that Nejapa is represented in this arbitration by the undersigned.[1]

---

[1]    By contrast, and consistent with its belief that one party should not unfairly surprise the other, Nejapa has copied Mr. Orta in its communications with the members of the arbitral tribunal in the past UNCITRAL arbitration, even though Mr. Orta was not counsel of record in that arbitration.

July 17, 2008
Page 6

### C.    CEL's Houston Discovery Application against El Paso

On the same day, July 3, 2008, CEL also submitted its Houston Discovery Application. CEL's counsel in the Houston Application includes Messrs. David Orta and Forrest Deegan, both of whom also represent CEL in the current arbitration.

Using language that traces closely to that in CEL's Delaware Discovery Application, the Houston Discovery Application filed by CEL against El Paso reads as follows in relevant part:

> "[A]t issue in the Pending Arbitration, is the meaning and scope of certain reimbursement obligations under the TCA and CEL's obligation to maintain a Standby Letter of Credit. Pursuant to Article 1431 of the Salvadoran Civil Code, the intent of the parties is paramount in interpreting the meaning and scope of TCA provisions at issue in the Pending Arbitration ...
>
> El Paso is believed to be in possession of evidence relevant to the Pending Arbitration ...
>
> Without the assistance of this Court, this important evidence may never be produced ...
>
> Here, **there is no indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL.** In fact, the evidence sought by CEL through its § 1782 petition would assist the Tribunal in its analysis of the case, and the Tribunal will retain the choice whether or not to accept that evidence and, if accepted, what weight it is to be given. **Moreover, the UNCITRAL Arbitration Rules do not prohibit admission of discovery obtained pursuant to § 1782.**
>
> **It is therefore likely that the Tribunal in the Pending Arbitration would accept and consider such discovery ...**"
>
> CEL's Houston Discovery Application, §§ 2-18. (footnote omitted and emphasis added.)

In its Houston Discovery Application, CEL seeks that an order be entered by the federal court subpoenaing El Paso to produce 34 broad categories of documents, which are virtually identical to those being sought in CEL's Delaware Discovery Application and equally unrelated to this dispute. In its Houston Discovery Application, CEL also seeks three oral depositions from Messrs. Nadeem Babar, Mark Croak, and Robert Hart, most of whom are former El Paso employees.

As discussed above, on July 8, 2008, the federal court in Houston issued an *ex parte* order granting CEL's Houston Discovery Application. It is still possible, however, for a party to move to quash that order.

As in the case of CEL's Delaware Discovery Application, the Houston Discovery Application submitted by CEL is accompanied by sensitive exhibits (including transcripts from the Previous UNCITRAL Arbitration), which have not been submitted under seal. Also, in its Houston Discovery Application, CEL omitted from discussing (i) the current status of this arbitration, (ii) the existence of a procedural schedule that allows for the production of documents and the examination of witnesses in this arbitration, (iii) the inconsistencies between

July 17, 2008
Page 7

the tribunal procedural orders and the discovery CEL seeks in the court, and (iv) whether the
arbitral tribunal has authorized CEL's Houston Discovery Application.

### D.     CEL's Discovery Applications Are Impermissible and CEL Should Be Ordered to Withdraw Them Immediately

The arbitral tribunal should order CEL to immediately withdraw its Discovery
Applications and cease and desist from any efforts to have evidence related to the dispute taken
outside this arbitration.

First, in this particular case, discovery in U.S. courts is not what the parties bargained for
and, accordingly, constitutes a breach of the arbitration agreement.

Second, CEL's Discovery Applications contravene the rulings and orders issued by the
arbitral tribunal in this arbitration.

Third, as a general matter U.S.-style discovery is not allowed in international arbitration.

Fourth, court discovery serves no meaningful purpose in this arbitration.

Fifth, CEL's Discovery Applications are an impermissible attempt to re-open matters that
were already decided in the Previous UNCITRAL Arbitration.

Sixth, CEL's Discovery Application breaches the "equality of arms" principle that, as
CEL has acknowledged, applies in every international arbitration case, including this one.

The following paragraphs discuss each of those matters separately.

### 1.     Discovery in U.S. courts is not what the parties bargained for and, accordingly, breaches the arbitration agreement

In this particular case the parties have crafted a dispute resolution mechanism that
positively excludes U.S.-style discovery and/or discovery in U.S. courts. In fact, the parties have
positively excluded that type of discovery not once, but twice.

### (i)     The UNCITRAL Arbitration Rules do not allow for CEL's Discovery Applications

First, the parties agreed to exclude resort to all courts of justice for discovery applications
when they chose to have this arbitration dealt with and resolved under the UNCITRAL
Arbitration Rules. (As explained by the parties in previous submissions, this arbitration has been
brought pursuant to TCA Section 7, which provides in relevant part, that the dispute between the
parties "shall be finally resolved by arbitration in accordance with [the UNCITRAL Arbitration
Rules]." *See* TCA Section 7(a).)

The UNCITRAL Arbitration Rules contain clear rules on the taking of evidence in
general and on the production of documents in particular, and none of those rules allow for
unfettered discovery, much less for oral depositions. As for the production of documents, Article

July 17, 2008
Page 8

24(3) of the UNCITRAL Arbitration Rules establishes that "at any time … the arbitral tribunal may require the parties to produce documents, exhibits or other evidence within such a period of time as the tribunal shall determine."

The language in Article 24(3) of the UNCITRAL Arbitration Rules is clear and does not authorize a court to order (nor a party to resort to a court so that the court orders) the production of documents. Further, under Article 24(3) of the UNCITRAL Arbitration Rules, a party can be required to produce specific documents, exhibits, or other evidence, but not broad or barely specific categories of documents, such as those sought in CEL's Discovery Applications. The leading commentators to the UNCITRAL Arbitration Rules agree:

> "Although Article 24(3) grants the arbitral tribunal wide discretion, the tribunal should not accept non-specific requests or permit so-called 'fishing expeditions' for discovery of, say, 'all possibly relevant material.'"

> David Caron, Lee M. Caplan, Matti Pellonpaa, THE UNCITRAL ARBITRATION RULES: A COMMENTARY 576 (2006).

*(ii)    CEL's Discovery Applications are unlawful under applicable Swiss procedural law*

Second, and equally important, the parties excluded resort to the U.S. courts for discovery when they agreed that the seat of this arbitration would be Geneva, Switzerland. *See* TCA Section 7(b) (providing that "The seat of the arbitration shall be Geneva, Switzerland").

By agreeing that Geneva would be the seat of arbitration, the parties were also agreeing to the application of Swiss procedural law to this arbitration. CEL has recently re-ratified that agreement. Specifically, CEL stated the following in a submission to the ICDR on December 26, 2007, concerning the profile of the chairman of the arbitral tribunal (attached as Exhibit D):

> "… the candidates should have an understanding of Swiss procedural law applicable in international arbitrations, because Respondent anticipates that there will be certain procedural questions raised during **this arbitration** that **will be governed by Swiss law, given that the seat of arbitration is in Geneva, Switzerland**." (emphasis added.)

> CEL's Letter to the ICDR of December 26, 2007, page 2, paragraph (iv).

Some of the Swiss procedural legal provisions applicable in this arbitration are embodied in the 1991 Swiss *Loi Fédérale Sur Le Droit International Privé* or 1991 Swiss Federal Private International Law ("SPIL"). This is what the SPIL provides in connection with court-ordered discovery:

> "Article 184

> (2)  Si l'aide des autorités judiciaires de l'Etat est nécessaire à l'administration de la preuve, le tribunal arbitral, ou les parties d'entente avec lui, peuvent requérir le concours du juge du siège du tribunal arbitral; ce juge applique son propre droit.

July 17, 2008
Page 9

> Article 185
>
> …
>
> Si l'aide de l'autorité judiciaire est nécessaire dans d'autres cas, on requerra le concours du juge du siège du tribunal arbitral."

Unofficial English translation:

> "Article 184
>
> …
>
> (2) If the assistance of the judicial or administrative authorities of the State is needed to take evidence, the arbitral tribunal or, with the consent of the arbitral tribunal, a party may request the assistance of the judge at the seat of the arbitral tribunal who shall apply his own law.

> Article 185:
>
> If further assistance of the judicial or administrative authorities is required, the judge at the seat of the arbitral tribunal shall have jurisdiction."[2]

Based on SPIL Articles 184 and 185, it is clear that the arbitral tribunal must authorize previously any request submitted by one party to the courts of justice seeking aid to take evidence. Moreover, SPIL Articles 184 and 185 also make it clear that, as a rule, all requests for assistance to take evidence must be filed in the courts of the seat of arbitration.

> 2.    *CEL's Discovery Applications contravene the very specific instructions issued by the arbitral tribunal in this arbitration*

CEL's Discovery Applications are in breach of the rulings and instructions given by the arbitral tribunal in this arbitration. For instance:

---

[2]     SPIL Articles 184 and 185 are consistent with the following provisions in the UNCITRAL Model Law on International Commercial Arbitration:

> "Article 5:      In matters governed by this Law, no Court shall intervene except where so provided in this Law.
>
> …
>
> Article 27:      The arbitral tribunal or a party with the approval of the arbitral tribunal may request from a competent court of this State assistance in taking evidence. The court may execute the request within its competence and according to its rules on taking evidence."

July 17, 2008
Page 10

(i)    During the procedural call held on June 24, 2008, and conducted under the UNCITRAL Arbitration Rules, the arbitral tribunal informed the parties that the document disclosures would be done in keeping with international arbitration practice. The unmistakable import was that broad, U.S.-style discovery would not be allowed.

(ii)   During that same procedural call, the arbitral tribunal indicated that, although the parties had not formally agreed to the application of the IBA Rules on the Taking of Evidence in International Commercial Arbitration ("IBA Rules"),[3] the arbitral tribunal would nonetheless draw "inspiration" from those Rules.

Under Article 3(3)(a) of the IBA Rules a party is only entitled to seek production of "narrow and specific categories" of documents.

Also, under Article 3(3)(b) of the IBA Rules a party is only entitled to seek production of documents that are "relevant and material to the outcome of the case."

None of those requirements have been satisfied by CEL's Discovery Applications, both of which are classic "fishing expeditions" and seek production of broad and unspecific categories of documents, many of which are unrelated to this dispute.

Finally, under Article 3(3) of the IBA Rules a party is only entitled to seek production of documents from the other party. The fact that CEL's Houston Discovery Application is addressed against El Paso (not a party in this arbitration) constitutes an additional reason why that application is inconsistent with the IBA Rules.

(iii)  The arbitral tribunal crafted a comprehensive procedural order that governs the timing and scope of disclosures in the arbitration. The Procedural Order No. 2 issued by the arbitral tribunal provides (at paragraph 4) that:

"Each Party may request the other party, after the first round of written submissions, to produce specific documents or narrowly circumscribed categories of documents in the conditions provided by Section F. 6 of the Arbitral Tribunal's Procedural Order no. 1."

For its part, Section F.6 of Procedural Order No. 1 provides that:

"Any party may, within the time-limits provided in the procedural timetable or at any other time ordered by the Arbitral Tribunal, request the other party to

---

[3]    In discussions between the parties, CEL originally agreed to the application of the IBA Rules to this arbitration, but then changed its mind. In hindsight, it is particularly interesting that CEL originally agreed that the IBA Rules would govern this arbitration, but then decided that it would be better off withdrawing its agreement to them.

July 17, 2008
Page 11

> produce any identified document or narrowly circumscribed categories of documents which are not in its possession and which are relevant and material to the outcome of the case. In case of disagreement between the parties, the Arbitral Tribunal shall have full discretion to take any appropriate decision, having regard to the requirements set out by the present paragraph, the legitimate interests of the other party and all the surrounding circumstances."

CEL's Discovery Applications violate the arbitral tribunal's procedural orders, insofar as:

- CEL has requested the production of documents through the U.S. court system rather than in the arbitration pursuant to the orders of the arbitral tribunal;

- The document production requests contained in CEL's Discovery Applications are broader than, and inconsistent with, the document production requests allowed by the arbitral tribunal;

- CEL's Discovery Applications are untimely because they have been submitted before the parties' first round of submissions on the merits;

- CEL has requested documents which are neither relevant nor material for the outcome of the dispute; and

- CEL has requested that depositions be taken, something that was specifically rejected by the tribunal and omitted from the arbitral tribunal's procedural orders, and has no place in the dispute resolution system contractually agreed to by the parties, international arbitration.

In further disregard of the rulings of the arbitral tribunal, CEL surreptitiously submitted its Discovery Applications at the same time that the arbitral tribunal was finalizing its Procedural Order no. 2, and when CEL was aware that that Procedural Order would regulate document requests.

**By submitting its Discovery Applications, in effect CEL seeks to overrule or "second guess" the tribunal's decisions on how to administer the case.**

Also, given the incomplete and inexact information provided by CEL to the U.S. courts, those courts (i) will likely be ruling on objections to the document requests with limited knowledge of the issues actually in the dispute, and (ii) will apply a lower, U.S.-style discovery threshold, which would fail to take into account the circumstances of this case and the orders of the arbitral tribunal.

3.    *There is no room for U.S.-style discovery in international arbitration*

In the often quoted words of Alan Redfern and Martin Hunter, there is no room for U.S.-style discovery in international arbitration because "[w]holesale disclosure of documents is an

July 17, 2008
Page 12

expensive and time-consuming process for all concerned and rarely reveals the 'smoking-gun' that is being sought." *See* Martin Hunter and Alan Redfern with Nigel Blackaby and Constantine Partasides, LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION 300 (2004).

In order to address the specific issue of U.S.-style discovery in arbitration, the American Arbitration Association and the International Centre for Dispute Resolution ("ICDR") issued the ICDR Guidelines for Arbitrators Concerning Exchanges of Information ("ICDR Guidelines," attached as Exhibit E) in 2008. The ICDR Guidelines constitute a useful source of guidance in non-ICDR cases. Here is what the ICDR Guidelines say about the issue of discovery and depositions in international arbitration:

> "Introduction: ... One of the factors contributing to complexity, expense and delay in recent years has been the migration from court systems into arbitration of procedural devices that allow one party to a court proceeding access to information in the possession of the other, without full consideration of the differences between arbitration and litigation ...

> 1(a) The tribunal shall manage the exchange of information among the parties in advance of the hearings with a view to maintaining efficiency and economy. The tribunal and the parties should endeavor to avoid unnecessary delay and expense while at the same time balancing the goals of avoiding surprise, promoting equality of treatment, and safeguarding each party's opportunity to present its claims and defenses fairly ...

> **6(b) Depositions, interrogatories, and requests to admit, as developed in American court procedures, are generally not appropriate procedures for obtaining information in international arbitration.**" (emphasis added.)

Notably, Section 1(a) of the ICDR Guidelines (quoted above) requires the arbitral tribunal to actively intervene to ensure that only appropriate mechanisms for the exchange of information are adopted and implemented by the parties; and, as explained in section 6(b) of the Guidelines (also quoted above), depositions are not an appropriate mechanism for the exchange of information by the parties to an arbitration.

### 4. Court-discovery serves no meaningful purpose in this arbitration

At the June 24, 2008, procedural hearing, the arbitral tribunal gave the parties the opportunity to submit two rounds of document production requests in this arbitration. This was at CEL's urging. However, on July 3, 2008, the same day on which it submitted its Discovery Applications in the U.S., CEL wrote to the arbitral tribunal saying that it "agree[d] to dispense" with one of the two rounds of document production requests. Unbeknownst to the arbitral tribunal and Nejapa, CEL, at that very moment, was secretly requesting in two U.S.-courts some of the documents that it was agreeing not to request (at least for the time being) in the arbitration, and depositions, which CEL knew had no place in international arbitration.

CEL's procedural misconduct goes several steps further. As explained previously, the two procedural orders already issued by the tribunal in this arbitration allow CEL to seek and

July 17, 2008
Page 13

obtain the production of the documents that it needs for its defense (and potential counter-claims) in this arbitration. There is no need for document requests outside this arbitration.

CEL may try to argue that the Houston Discovery Application is necessary because it allows CEL to obtain documents and oral depositions from El Paso, which is not a party to this arbitration. This argument is wrong for two reasons.

First, the categories of documents requested from El Paso in the Houston Discovery Application are identical to the categories of documents requested from Nejapa in the Delaware Discovery Application, and there is no indication that El Paso will have any responsive documents that Nejapa does not have. Second, and in any event, we understand that Nejapa has the right to obtain documents from El Paso.

5. *CEL's Discovery Applications are an unlawful attempt to re-trade issues already addressed in the Previous UNCITRAL Arbitration*

As explained at Sections B and C above, CEL's Discovery Applications are a (renewed) attempt by CEL to obtain evidence on (i) the issue of the parties' intent at the time they executed the TCA and (ii) the related issue of the deviations that had to be reimbursed by CEL pursuant to the TCA.

The issue of the deviations does not belong to this arbitration: already at the center of the Previous UNCITRAL Arbitration, this is an issue on which Nejapa obtained a completely favorable award. However, given the way in which CEL has framed its Discovery Applications, there is every indication that CEL is attempting to re-open the issue of the deviations and of whether the tribunal should look at the parties' intent.

In this context, it is not surprising that CEL objected so vigorously to the service of Mr. John Beechey, whom Nejapa appointed as co-arbitrator in the current dispute on September 4, 2007. Along with Messrs. Robert Briner (chairman) and Bernardo Cremados, Mr. Beechey had already served as an arbitrator in the Previous UNCITRAL Arbitration and was very familiar with (i) the deviations that had to be paid by CEL pursuant to the TCA, and (ii) CEL's failed attempts to avoid paying for them, on the alleged basis that such payment would be inconsistent with the "parties' intent" at the time they entered into the TCA.

This arbitral tribunal should not allow CEL to seek and/or submit in this arbitration evidence related to the deviations and/or the parties' intent at the time the TCA was executed. Evidence on those matters was repeatedly rejected by the arbitral tribunal (and objected to by the parties) in the Previous UNCITRAL Arbitration. By way of example:

(i)     After receiving various requests from CEL that evidence on the issue of the "parties' intent" be taken in the Previous UNCITRAL Arbitration, the tribunal in that arbitration ruled that: "The Tribunal will presently order no further discovery or disclosure." *See* Para. 6 of Procedural Order No. 4 of December 7, 2004, issued by the arbitral tribunal in the Previous UNCITRAL Arbitration, attached as Exhibit F.

July 17, 2008
Page 14

(ii)    During the evidentiary hearing, both parties repeatedly objected to questions made to witnesses and experts concerning the issue of the parties' intent. *See, e.g.*, excerpt from the transcript attached as Exhibit G.

(iii)    On April 11, 2005, CEL tried to submit in the Previous UNCITRAL Arbitration a "memorandum" from a witness purportedly establishing that, according to the parties' intent, the "value of the TCA … was surely expected by both parties to be no more than $32 million dollars." *See* CEL's letter of April 11, 2005, to the arbitral tribunal in the Previous UNCITRAL Arbitration, page 2. The letter is attached as Exhibit H. On April 13, 2005, Dr. Robert Briner, chairman of the arbitral tribunal in the Previous UNCITRAL Arbitration, rejected the submission of that memorandum because the evidentiary record was already closed. *See* letter from Dr. Briner attached as Exhibit I. The arbitral tribunal ratified that decision in another letter from Dr. Briner dated May 3, 2005, attached as Exhibit J.

(iv)    On July 4, 2005, the arbitral tribunal issued its final award in the Previous UNCITRAL Arbitration, attached as Exhibit K. That award emphasized that the language in the TCA was very clear and, accordingly, there was no reason for the arbitral tribunal to consider any evidence on the parties' intent. *See* award of July 4, 2005, pages 23-24. The award also indicated that CEL "ha[d] not been able to show" that the parties' intent was in any manner different from the clear language in the TCA. *See* award of July 4, 2005, page 23. CEL has never challenged this award and, instead, is trying to enforce it, although not on its own original terms, in the courts of El Salvador. However, CEL's efforts to distort the award in the eyes of the judges of El Salvador on the issue of interest do not infect or extend to the clear statements from the arbitral tribunal to the effect that evidence on the parties' intent was irrelevant and immaterial.

This arbitration should not be used by CEL to revisit past unfavorable decisions and re-open a final award issued by pre-eminent arbitrators. Accordingly, this arbitral tribunal should order CEL to withdraw its Discovery Applications.

6.    *CEL's Discovery Applications are in breach of the principle of "equality of arms"*

CEL's Discovery Applications have been surreptitiously submitted without notice to counsel for Nejapa, on the eve of a holiday weekend, precisely to gain an unfair advantage over Nejapa. Additionally, the tribunal has issued a comprehensive ruling that governs the timing and scope of disclosures in the case. But even if it had not, and even if the arbitration agreement allowed CEL's Discovery Applications (which it does not), CEL knows that it would be difficult for Nejapa to obtain discovery against CEL in Salvadoran courts. Among other reasons, Salvadoran courts do not appear to have issued in the past any order providing for discovery in support of an international arbitration, nor does this appear to be a possibility contemplated in Salvadoran legislation.

July 17, 2008
Page 15

CEL has acknowledged the importance of equality, at least when it benefited from such an argument. On July 2, 2008, CEL submitted a letter in this arbitration providing comments to the latest draft of Procedural Order No. 2 circulated by the arbitral tribunal and strongly emphasizing that "equality" of procedural opportunities is an essential element in any international arbitration. *See* CEL's letter of July 2, 2008, page 6. It is ironic that CEL, so inclined to see and vigorously argue against non-existent violations of the principle of "equality," should have decided to use procedural mechanisms, such as U.S.-style discovery, which, for reasons beyond Nejapa's control, are not available to both parties in this arbitration.

### 7.    *Conclusion*

CEL's Discovery Applications are (i) inconsistent with the arbitral tribunal's rulings (*see* section D.2), (ii) contrary to the agreed dispute resolution provisions (*see* section D.1), (iii) impermissible pursuant to the applicable arbitration rules and Swiss legislation (*see* section D.1), (iv) devoid of any meaningful purpose in this arbitration (*see* section D.4), and (v) aimed at re-opening issues which were already resolved in the final and binding award issued in the past UNCITRAL arbitration between the parties (*see* section D.5).

Additionally, as also shown above, CEL's resort to the U.S. courts, as embodied in its Discovery Applications, constitutes action incompatible with and in breach of the arbitration agreement contained in TCA Section 7 (*see* Section D.1).

### E.    Nejapa's Requested Relief

In view of the foregoing, Nejapa respectfully requests that the arbitral tribunal issue *as a matter of urgency* a procedural order:

(i)     Confirming that CEL's Discovery Applications were filed without the prior authorization of the arbitral tribunal;

(ii)    Declaring that CEL's Discovery Applications are incompatible with the arbitration agreement, as embodied in TCA Section 7, as well as the arbitration rules and the Swiss legal provisions applicable to this arbitration;

(iii)   Declaring that CEL's Discovery Applications are incompatible with the two procedural orders issued to this date by the arbitral tribunal;

(iv)    Ordering CEL to immediately withdraw its Discovery Applications, along with any other application similar in nature, effects, or character to the Discovery Applications that may have been submitted by CEL;

(v)     Ordering CEL to refrain from submitting any discovery applications outside this arbitration process and/or before any court of justice anywhere in the world, without the arbitral tribunal's express prior approval;

July 17, 2008
Page 16

   (vi)   Providing that any documents or testimony that might be obtained by CEL
through the Discovery Applications or through any other similar procedural
device or mechanism may not be used in this arbitration.

I thank you for your very prompt attention to this matter.

Very truly yours,

E. Mark Baker / CH

C. Mark Baker
Counsel for Nejapa Power Company, L.L.C.

Enclosures:   As discussed above

cc:       Ms. Janice Feigher
          Mr. David Orta
          Mr. Forrest Deegan
          Mr. Daniel Salinas-Serrano
          Mr. Kevin O'Gorman (Firm)
          Mr. Aníbal Sabater (Firm)

75324153.6

# EXHIBIT C

HOMBURGER

**By Courier**

Mr. David M. Orta
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
USA

July 23, 2008 NAG | MEJ

312014 | NAG | 000004.docx

lic. iur. Gabrielle Nater-Bass
Rechtsanwältin

Homburger AG
Weinbergstrasse 56 | 58
CH-8006 Zürich
Postfach 194 | CH-8042 Zürich

Telefon +41 43 222 10 00
Fax +41 43 222 15 00
gabrielle.nater@homburger.ch

**Nejapa Power Company, LLC ("Nejapa") v. Comisión Ejecutiva Hidroeléctrica del Rio Lempa ("CEL"), an Arbitration Conducted under the UNCITRAL Arbitration Rules and the Transmission Costs Agreement of March 21, 2002**

Dear Mr. Orta:

I write in response to your inquiry regarding the relevance of the provisions of the Swiss Federal Private International Law ("SPIL") to applications filed in U.S. federal courts for pre-trial discovery in aid of the ongoing arbitration based on 28 U.S.C. § 1782 ("1782 applications"). I understand that the ongoing arbitration proceedings are governed by the UNCITRAL Arbitration Rules and that the arbitral tribunal has its seat in Geneva, Switzerland.

Upon review of NPC's July 17, 2008 letter to the Tribunal, I understand that NPC opposes CEL's applications filed pursuant to 28 U.S.C. § 1782 in U.S. federal courts. In support of this opposition, NPC has argued that "[b]ased on SPIL Articles 184 and 185, it is clear the arbitral tribunal must authorize any request submitted by one party to the courts of justice seeking aid to take evidence." (*see* NPC's July 17, 2008 letter, at page 9). Based on my understanding of applicable Swiss Law and 28 U.S.C. § 1782, I disagree with NPC's conclusion. In particular, Articles 184 and 185 of the SPIL do not require that the arbitral tribunal must provide preliminary approval of 1782 applications.

Article 184(1) SPIL provides that the taking of evidence, which includes the production of documents in possession of the opposing party, falls within the competence of the arbitral tribunal. In the case of non-compliance with procedural orders issued by the arbitral tribunal for the taking of evidence by a party or a wit-

ness, Article 184(2) SPIL provides that the arbitral tribunal or, with the consent of the arbitral tribunal, a party may seek legal assistance from state courts in order to enforce such procedural orders. Further, Article 185 SPIL generally provides that the arbitral tribunal may seek the legal assistance of the local state courts. As such, Articles 184(2) and 185 SPIL do not relate to the issue of whether a party may seek aid from a foreign state court, but only to ways for the arbitral tribunal, which has no coercive powers, to proceed in case a party or a witness does not comply with its procedural orders.[1]

To the best of my knowledge, there exists no precedent on the issue how an arbitral tribunal seated in Switzerland shall deal with a parallel pre-trial discovery application in U.S. courts. Some Swiss arbitration practitioners have voiced the opinion that pre-trial discovery proceedings, according to 28 U.S.C. § 1782, are admissible means in aid of international arbitration in order to obtain documents or information to be used as evidence in arbitration proceedings. In fact, I am aware of a forthcoming publication on this issue and have discussed the issue with its author. As such, neither Articles 184 and 185 SPIL nor any other mandatory Swiss law provision precludes U.S. pre-trial discoveries in aid of the arbitration. Consequently, no prior consent from the arbitral tribunal is required.

As a matter of fact, the pre-trial discovery proceedings on the one hand and the arbitration proceedings on the other hand, are completely independent proceedings. As such, the arbitral tribunal, based on the provisions of the SPIL, has no authority whatsoever to interfere in the U.S. pre-trial discovery proceedings. Rather, these proceedings are solely governed by 28 U.S.C. § 1782 and it is up to the U.S. federal courts to decide whether the applications for pre-trial discovery shall be approved or not.

While it may be within the tribunal's discretion to disallow any evidence obtained by CEL, including evidence obtained through the utilization of 1782 applications, doing so may violate the parties' right to be heard, which is of utmost importance in arbitration proceedings. In fact, an award rendered on such basis bears the risk of being challenged pursuant to Article 190(2)(d) SPIL for violation of the parties' right to be heard.

---

[1] *See* Poudret|Besson, Comparative Law of International Arbitration, 2nd Ed., Zurich 2007, N 669 et seq., attached as Exhibit 1; Schneider, in re: Berti, International Arbitration in Switzerland - An Introduction and a Commentary on Articles 176 - 194 of the Swiss Private International Law Statute, Basle|Geneva|Munich 2000, in particular N 21, 55 and 57 ad Art. 184, attached as Exhibit 2.

I hope that the foregoing answers your question for the time being. Please do not hesitate to contact me if you have any further questions regarding this matter.


Best regards,

Gabrielle Nater-Bass


Enclosures

**Exhibit** 1
Homburger AG
P. O. Box 194
8042 Zürich

# Comparative Law of International Arbitration

### SECOND EDITION
### UPDATED AND REVIEWED
### By

JEAN-FRANÇOIS POUDRET
Doctor in Law, Dr. h.c. mult.,
Attorney at Law and
Honorary Professor of
the University of Lausanne

SÉBASTIEN BESSON
Doctor in Law, L.L.M.
(Columbia),
Attorney at Law, Partner,
Python & Peter, Geneva

Translated by

STEPHEN V. BERTI
Ordinary Professor at the
University of
Lucerne, Titular Professor
at the University
of Fribourg

ANNETTE PONTI
Attorney at Law,
Python & Peter, Geneva



**THOMSON**



SWEET & MAXWELL

Schulthess §

*The Arbitral Procedure*

in practice and do not raise any questions of comparative law, so we shall not dwell on them further.[604]

## 6.4.4 Court support in evidentiary matters

669    Since they lack *imperium*, arbitrators do not have the power to force a party to submit to evidentiary orders. Neither can they address orders binding on third parties, notably a witness or a person in possession of documents important for the outcome of the case. Only court intervention can assure the efficiency of an evidentiary order made by an arbitral tribunal if the addressee does not voluntarily comply.[605]

670    Most arbitration laws considered here provide for a mechanism of court support in evidentiary matters.[606]

In France, the statutory text does not contain an express provision regarding court support for evidentiary measures made by an arbitral tribunal.[607] While the courts have widely taken jurisdiction to preserve evidence, their jurisdiction to enforce evidentiary measures taken by the arbitrators is uncertain.[608] Measures to preserve evidence can be based on NCPC, Art.145 and on the general provisions concerning jurisdiction to order provisional measures.[609] NCPC, Art.145 provides that "if there is a legitimate motive before proceedings are pending to preserve evidence or to establish facts upon which the outcome of dispute could depend, all legally permissible evidentiary measures can be ordered at the request of any interested party". Recourse to the courts under this provision is only possible until the arbitrators have been seised, but does not require urgency.[610] Even if the conditions of NCPC, Art.145 are not fulfilled, the parties can apply to the courts under the provisions governing provisional measures to preserve evidence.[611] The court's intervention does not then depend on whether the arbitrators have been seised, but the applicant must show that there is urgency.[612] The state of French law is more uncertain when the court's intervention aims at enforcing an evidentiary measure ordered by the arbitral tribunal. Although legal scholars recognise that a court can order a third party to produce documents, they do not appear to accept that courts have jurisdiction in general to support the taking of evidence in arbitral proceedings, and in particular to force a party to appear before the arbitrators or to order the production of documents in the possession of a party.[613] To remedy this drawback of French law, certain authors

---

[604] See in addition Berger, p.443; Huys and Keutgen, pp.284–285, paras 424–425; Redfern and Hunter, pp.314–315, paras 6–101 to 102.
[605-606] Footnotes omitted from this edition.
[607] Fouchard, Gaillard and Goldman, para.1338.
[608] Fouchard, Gaillard and Goldman, paras 1331–1333 and 1338.
[609] Fouchard, Gaillard and Goldman, paras 1332–1333.
[610] Cas., Rev. arb. 1986, p.233; Rev. arb. 1996, p.228; Besson, pp.197–198, para.317; Fouchard, Gaillard and Goldman, para.1332; Hory, *op. cit.*, p.202.
[611] Fouchard, Gaillard and Goldman, para.1333; Hory, *op. cit.*, pp.193–194.
[612] Fouchard, Gaillard and Goldman, para.1333.
[613] Fouchard, Gaillard and Goldman, para.1338.

*Evidence*

submit that the arbitral tribunal should be able to issue an interim and enforceable award ordering the evidentiary measure,[614] which is not compatible with the definition of "arbitral award" given by the French courts[615] and which indeed seems to have been excluded by the *Cour de cassation* in a December 2001 decision already cited in connection with provisional measures.[616] In certain cases, the initiation of an interlocutory expertise may help in gathering missing means of evidence, since experts have wide powers of investigation under French law.[617]

In the other countries, the arbitration laws provide for court assistance, but its scope and conditions are not uniform. In Italy, the assistance appears to be limited to compelling a witness to appear before the arbitrators (ICCP 2006, Art.816ter(3)). German law (ZPO, § 1050) and Swiss law (Concordat, Art.27(2) and PILS, 184(2)) recognise a general jurisdiction allowing the courts to take all necessary supporting measures aimed at assisting the arbitral tribunal in taking evidence. In Switzerland it is hence possible to have a witness summoned to appear before the arbitral tribunal or to obtain a court order to produce documents against a party or a third party.[618] The efficiency of such court orders can be reinforced by the threat of penal sanctions in the event of non-compliance. In Germany, despite the broad wording of ZPO, § 1050, it is unclear whether the courts can order a person not party to the arbitral proceedings to produce documents.[618a] Furthermore, the enforcement by the court of an order for production of documents against a party is apparently not available because the only remedy under German law is to draw adverse inferences from the party's failure to produce the documents.[618b]

The restrictions mentioned above illustrate the fact that, in Switzerland as in Germany, the court "applies its own law" (PILS, Art.184(2), second sentence) and must therefore not depart from the evidentiary measures provided for by its own code of civil procedure, unless authorised by private international law to observe "foreign forms of procedure", as do PILS, Art.11(2) and (3).[619] If the request for assistance relates to unknown or inadmissible evidentiary measures, the court can in our opinion order similar measures which are compatible with its own law. The arbitral tribunal may not refuse to apply to the court for support

**671**

[614] de Boisséson, p.743, para.751; Fouchard, Gaillard and Goldman, para.1338; Moreau, Rev. arb. 1978, p.333.

[615] Ch.8.1.2, para.729; see also para.632.

[616] Ch.6.3.4.2, para.632, fn.474.

[617] See Craig, Park and Paulsson, p.478 § 27.02, referring to Cas., Rev. arb. 1996, pp.228, 230 (second issue, pp.50, 52).

[618] Lalive, Poudret and Reymond, p.149, para.2 *ad* Concordat, Art.27 Concordat and p.374, para.6 *ad* PILS, Art.184; Walter, Bosch and Brönnimann, pp.163–164.

[618a] Bredow and Mulder, *op. cit.*, pp.147–148; Harbst, Arbitrating in Germany, Arbitration, vol.70/2 (2004), pp.92 and 94, stating that a state court can order the production of documents by third parties.

[618b] Bredow and Mulder, *op. cit.*, p.152; Harbst, Arbitrating in Germany, Arbitration, vol.70/2 (2004), p.92.

[619] Bucher, pp.77–78, para.218; KSP-Schneider, p.1561, para.61 *ad* Art.184; Lalive, Poudret and Reymond, p.374, para.7 *ad* PILS, Art.184; Walter, Bosch and Brönnimann, p.167; Schwab and Walter, p.154 and 157 Ch.17, paras 2 and 15.

# International Arbitration in Switzerland

Exhibit 2
Homburger AG
P. O. Box 194
8042 Zürich

An Introduction to and a Commentary on Articles 176–194 of the
Swiss Private International Law Statute

**by**

Stephen V. Berti, Marc Blessing, Robert Briner, Felix R. Ehrat,
Caroline Freymond, Cesare Jermini, Pierre A. Karrer, Thomas Legler,
Paolo Michele Patocchi, Wolfgang Peter, Michael E. Schneider,
Anton K. Schnyder, Nedim Peter Vogt, Werner Wenger, Markus Wirth

**Edited by**

Stephen V. Berti

**General Editors**

Heinrich Honsell        Nedim Peter Vogt

Anton K. Schnyder

Helbing & Lichtenhahn
Basel – Geneva – Munich



KLUWER LAW
INTERNATIONAL
THE HAGUE · LONDON · BOSTON

para. 4). In PILS arbitrations the issue must be settled pursuant to the applicable procedural rules. It should in any event be clarified in due time and the parties must be protected from surprises (THORENS, 697).

20    With respect to the **procedure to be observed for production**, a party will usually first request the opposing party to produce the desired documents. In the event of non-compliance the party can appeal to the arbitral tribunal. Many laws and arbitration rules expressly authorize the arbitral tribunal to order the production of certain documents. Occasionally, such authority is dependant on a party's motion, but more often it is granted generally (Art. 1460 para. 3 French NCPC; Art. 48 lit. b WIPO Rules; Art. 25.3 Geneva Chamber of Commerce Rules; Art. 13.1 lit. g and i LCIA Rules; Art. 28 para. 2 NAI Rules). Many rules of procedure expressly empower the arbitral tribunal to order production of documents of its own initiative (Art. 42 para. 2 Zurich Chamber of Commerce Rules; Art. 4 para. 5 IBA Evidence Rules; for the corresponding practice of the Iran-U.S. Claims Tribunal, see HOLTZMANN, ArbInt 1995, 44). Even if the rules of procedure do not expressly so provide, the arbitral tribunal has such authority as a result of its mandate to define the form of the proceedings (see RÜEDE/HADENFELDT, 263; for ICC Arbitration Proceedings, see CRAIG/PARK/PAULSSON, 410, with reference to the American case Mobile Oil vs. Asamera).

21    **If the requested party refuses to produce the document**, the arbitrator can draw conclusions with respect to its contents (Art. 4 para. 6 IBA Evidence Rules; CRAIG/PARK/PAULSSON, 410; BERGER, 298, FN 256 with further references). It will be helpful to provide that such prejudicial conclusions may be drawn only if the arbitral tribunal itself has ordered production and indicated the consequences of non-compliance. It is said that an arbitral tribunal has no further means of coercion (CRAIG/PARK/PAULSSON, 410), but in Switzerland it can solicit the assistance of a court (see N 55 et seq.). DE BOISSESON even allows a decision on the merits ordering production of the documents (Droit français, N 751), but this depends on the basis of the right to production.

c)   Testimony

22    With respect to **witness testimony**, substantial differences traditionally exist between common law countries and countries on the European Continent (DE BOISSESON, Introduction comparative, 93 et seq.). In the English and American tradition thoroughly prepared witness testimony usually serves not only as important evidence but also as a graphical presentation of the facts before the court (for details, see MADDEN). In Continental Europe, documentary evidence takes precedence and witness evidence is frequently resorted to only as an alternative (PERROT, 165, "if conclusive documents are lacking, the arbitrators can hear witness evidence...").

23    In *international arbitrations* witnesses are regularly examined even if extensive written documentation has been filed (for an exception, see the *Dalmia* award and its evaluation before the English courts; REDFERN/HUNTER, 335). However, in such cases the examination of witnesses frequently serves more as supplementary clarification and less as conclusive evidence (SCHNEIDER, Witnesses, 302 et seq.).

required (DFT 116 II 639, 644). In practice, an announcement will include the witnesses to be heard, frequently also the points put to evidence, and occasionally a programme. The programme can be determined unilaterally by the arbitral tribunal, be agreed upon by the parties themselves or jointly between the parties and the arbitral tribunal (SCHNEIDER, Witnesses, 308; ibid., Témoins, 569 et seq., with example).

52    With respect to **the evidentiary procedure itself**, it must be taken into consideration that the parties' conceptions thereof will frequently differ. Thus, the procedure must be clarified as early as possible (LALIVE/POUDRET/REYMOND, 371; IPRG-Kommentar-VOLKEN, Art. 184 N 7), the respective decisions being taken by the arbitral tribunal unless the parties have determined the question themselves (Art. 182 N 33 et seq.). The arbitral tribunal is free to use or admit techniques unknown under Swiss Law, but should nevertheless be familiar with their application so as to ensure that the rules are observed (particularly, for example, when monitoring examination of witnesses pursuant to Anglo-American practice, LALIVE/POUDRET/REYMOND, 372).

53    It should be underlined that under the Swiss conception the right to a fair trial (Art. 282 N 49 et seq.) includes the **parties' right to state their position**, that is the right either to contribute to the administering of important evidence or at least to make an opinion on the result of the evidence if such result is likely to influence the decision (DFT 115 Iᵃ 8, 11 with further references). The same applies to international arbitrations (DFT 116 II 639, 643; decision of 23.10.1989, reported in Bull ASA 1989, 51 et seq.; RÜEDE/HADENFELDT, 208, 264; LALIVE/POUDRET/ REYMOND, 354; SCHLOSSER, N 832). The parties' right to state their position furthermore requires that the tribunal to disclose the results of its investigations as far as these will be relevant to its decision (RÜEDE/HADENFELDT, 210, 212; SCHLOSSER, N 832). The same applies to *private knowledge of the arbitral tribunal*, particularly technical knowledge, if it is relevant for the decision and cannot be assumed to be generally known (SCHLOSSER, N 644; RÜEDE/HADENFELDT, 210 et seq.).

54    The parties have an **obligation to cooperate** which derives from the principle of good faith in arbitration proceedings (see ICC Arbitration Award No. 1434, reported in Clunet 1976, 978, 982). However, legitimate party interests in *confidentiality* and *protection of secrets* must be taken into due account. Special measures might be required to meet such requirements in contentious proceedings (HAUTOT, 24 et seq.; SCHLOSSER, N 641; Art. 52 WIPO Rules contain a special regulation which provides, among other things, that a *confidentiality advisor* be used; see SCHNEIDER in WIPO/ASA, Conference on Rules for Institutional Arbitration and Mediation, 1995, 81).

### III.    State Judicial Assistance (para. 2)

55    The arbitral tribunal has no coercive powers. Thus, many arbitration laws provide that the state courts shall provide judicial assistance in one form or another (for details, see SCHLOSSER, N 588). Article 27 para. 2 Concordat makes similar

provision, but restricts the right to approach the state courts to the arbitral tribunal and to cases where the administering of evidence is reserved to state jurisdiction. Article 184 para. 2 is rather more generous, since it applies whenever judicial assistance is *required* (see also LALIVE/POUDRET/REYMOND, 373; contra: RÜEDE/HADENFELDT who can detect no difference) and opens the possibility for a party to resort to the courts with arbitral tribunal's consent.

The **practical implication** of this provision is frequently estimated to be small (BERGER, 320; BLESSING, Schiedsgerichtsrecht, 58, writes that the Zurich Court of Appeal has not yet had a case of judicial assistance pursuant to Art. 27 Concordat). A few cases concerning international arbitrations in Geneva have been reported (REVACLIER, Bull ASA 1994, 306), but even there such cases appear to be the exception.    56

The statutory **condition precedent** for state judicial assistance is that this be required for the proper carrying out of evidentiary proceedings. WALTER/BOSCH/BRÖNNIMANN (161) submit that the state court can be approached only if the arbitral tribunal itself is not legally entitled to carry out the action. This may be correct for Article 27 para. 2 Concordat (although LALIVE/POUDRET/REYMOND seem to take a less narrow view, 149). Article 184 para. 2, however, provides no reason for such a restriction. Practical difficulties, such as great distance between the place of arbitration and the residence of a witness, or the witness's expected refusal to testify, are quite sufficient to justify a request to a state court (see also RÜEDE/ HADENFELDT, 265). However, for practical reasons the arbitral tribunal will request judicial assistance in the taking of evidence only if absolutely necessary. If a party refuses to produce documents or to be examined, its conduct can be assessed according to the principles of evidence obstruction without judicial assistance being required (RÜEDE/HADENFELDT, 265; see also N 18 et seq.).    57

**The entitlement to request judicial assistance** lies with the arbitral tribunal or a party, with the arbitral tribunal's consent. The French text provides that *les parties* are entitled to file the request. A joint application by the parties would probably be rare, so the French version of the provision would deprive it of its practical significance. Thus, the German and Italian versions, which coincide, are to be preferred (see LALIVE/POUDRET/REYMOND, 374; agreeing, WALTER/BOSCH/BRÖNNIMANN, 164). If the arbitral tribunal refuses consent without good reason, the state court can nevertheless grant the request for judicial assistence, its jurisdiction resulting in such cases directly from Article 184 or Article 185. However, since the state court is not required to verify the justification from the arbitral tribunal's stance (A. BUCHER, Schiedsgerichtsbarkeit, N 217), cases where the refusal is ignored will be rare.    58

**Addressee of the request** is the competent state court at the seat of the arbitral tribunal as designated by Cantonal law (A. BUCHER, Schiedsgerichtsbarkeit, N 217). Unless the Cantons provide differently, the competent court is identical with the judicial authority in the sense of Article 3 Concordat (RÜEDE/HADENFELDT, 266; for Geneva, see REVACLIER, Bull ASA, 1994, 303). The only addressees mentioned in Article 184 para. 2 are state courts and not some other authorities (LALIVE/POUDRET/REYMOND, 373, submit that the provision refers to state judicial    59

Re:    <u>Nejapa Power Company, LLC ("Nejapa") v. Comisión Ejecutiva Hidroeléctrica del Rio Lempa ("CEL"), an Arbitration Conducted under the UNCITRAL Arbitration Rules and the Transmission Costs Agreement of March 21, 2002</u>

Dear Mr. Orta:

    I write in response to your inquiry regarding the relevance of the provisions of the Swiss Federal Private International Law ("SPIL") to applications filed in U.S. federal courts for pre-trial discovery in aid of the ongoing arbitration based on 28 U.S.C. § 1782 ("1782 applications"). I understand that the ongoing arbitration proceedings are governed by the UNCITRAL Arbitration Rules and that the arbitral tribunal has its seat in Geneva, Switzerland.

    Upon review of NPC's July 17, 2008 letter to the Tribunal, I understand that NPC opposes CEL's applications filed pursuant to 28 U.S.C. § 1782 in U.S. federal courts. In support of this opposition, NPC has argued that "[b]ased on SPIL Articles 184 and 185, it is clear the arbitral tribunal must authorize any request submitted by one party to the courts of justice seeking aid to take evidence." NPC's July 17, 2008 letter, at page. 9. Based on my understanding of applicable Swiss Law and 28 U.S.C. § 1782, I disagree with NPC's conclusion. In particular, Articles 184 and 185 of the SPIL do not require that the arbitral tribunal must provide preliminary approval of 1782 applications.

    Article 184(1) SPIL provides that the taking of evidence, which includes the production of documents in possession of the opposing party, falls within the competence of the arbitral tribunal. In the case of non-compliance with procedural orders issued by the arbitral tribunal for the taking of evidence by a party or a witness, Article 184(2) SPIL provides that the arbitral tribunal or, with the consent of the arbitral tribunal, a party may seek legal assistance from state courts in order to enforce such procedural orders. Further, Article 185 SPIL generally provides that the arbitral tribunal may seek the legal assistance of the local state courts. As such, Articles 184(2) and 185 SPIL do not relate to the issue of whether a party may seek aid from a foreign state court, but only to ways for the arbitral tribunal, which has no coercive powers, to proceed in case a party or a witness does not comply with its procedural orders.[1]

    To the best of my knowledge, there exists no precedent on the issue how an arbitral tribunal seated in Switzerland shall deal with a parallel pre-trial discovery application in U.S. courts. Some Swiss arbitration practitioners have voiced the opinion that pre-trial discovery proceedings, according to 28 U.S.C. § 1782, are admissible means in aid of international arbitration in order to obtain documents or information to be used as evidence in arbitration proceedings. In fact, I am aware of a forthcoming publication on this issue and have discussed the issue with its author. As such, neither Articles 184 and 185 SPIL nor any other mandatory

---

[1] *See* Schneider, in re: Berti, International Arbitration in Switzerland - An Introduction and a Commentary on Articles 176 - 194 of the Swiss Private International Law Statute, Basle|Geneva|Munich 2000, in particular N 21, 55 and 57 ad Art. 184, attached as Exhibit 1.

Swiss law provision precludes U.S. pre-trial discoveries in aid of the arbitration. Consequently, no prior consent from the arbitral tribunal is required.

As a matter of fact, the pre-trial discovery proceedings on the one hand and the arbitration proceedings on the other hand, are completely independent proceedings. As such, the arbitral tribunal, based on the provisions of the SPIL, has no authority whatsoever to interfere in the U.S. pre-trial discovery proceedings. Rather, these proceedings are solely governed by 28 U.S.C. § 1782 and it is up to the U.S. federal courts to decide whether the applications for pre-trial discovery shall be approved or not.

While it may within the tribunal's discretion to disallow any evidence obtained by CEL, including evidence obtained through the utilization of 1782 applications, doing so may violate the parties' right to be heard, which is of utmost importance in arbitration proceedings. In fact, an award rendered on such basis bears the risk of being challenged pursuant to Article 190(2)(d) SPIL for violation of the parties' right to be heard.

I hope that the foregoing answers your question for the time being. Please do not hesitate to contact me if you have any further questions regarding this matter.

Best regards,

Gabrielle Nater-Bass

HOMBURGER AG
Gabrielle Nater-Bass, LL.M.
Weinbergstrasse 56|58 CH-8035 Zürich