## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COMISIÓN EJECUTIVA<br>HIDROELÉCTRICA DEL RÍO LEMPA,<br><br>Plaintiff,<br><br>v.<br><br>NEJAPA POWER COMPANY, L.L.C.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Action No. 1:08-MC-00135-GMS |

### NEJAPA POWER COMPANY, L.L.C.'S REPLY TO RESPONSE TO MOTION FOR RECONSIDERATION OF JULY 18, 2008 ORDER GRANTING ASSISTANCE TO LITIGANT PURSUANT TO 28 U.S.C. § 1782

NPC files this Reply to CEL's Response to its Motion for Reconsideration ("Response")

(D.I. 9). CEL's arguments in support of the July 18, 2008 Order are insubstantial.[1]

### ARGUMENT

**I.      Even If *Intel* Applies, the Factors Weighed Against Granting the Application**

CEL pays short shrift to the *Intel* factors (Response at 7-8), and no wonder.

In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court

identified four factors that "bear consideration" in ruling on a § 1782 request.  First, applications

directed against non-participants in the foreign proceeding are favored over those directed

toward participants.  *Id.* at 264.  Second and third, if the foreign tribunal is not receptive to U.S.

---

[1] In an abundance of caution, NPC is filing a Notice of Appeal simultaneously with this Reply.  This Court continues to have jurisdiction to decide NPC's pending Motion for Reconsideration.  *See generally* Fed. R. App. P. 4(a)(4)(A); *MIF Realty L.P. v. Rochester Assocs.*, 92 F.3d 752, 755 (8th Cir. 1996) (premature notice of appeal does not divest the district court of jurisdiction to rule upon a timely-filed Rule 59(e) motion); *Gibbs v. Maxwell House, Div. of Gen. Foods Corp.*, 701 F.2d 145, 147 (11th Cir. 1983) (same).

federal-court judicial assistance or the application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States" then the application should not be favorably considered. *Id.* Fourth, "unduly intrusive or burdensome requests may be rejected or trimmed." *Id.*

The first three factors undoubtedly weigh against granting CEL's Application. First, NPC is a participant in the arbitration. Regarding the second and third factors, CEL represented to the Court that there "is *no* indication that the Tribunal in the Pending Arbitration would be unreceptive to the discovery being sought by CEL." Application at 8 (emphasis added).

NPC pointed out that CEL misrepresented the Panel's position and provided the Court with the Panel's first two procedural orders. Memorandum in Support of Motion to Reconsider ("Memorandum") at 6-8; Decl. Tabs 14, 16.

The Panel's July 28, 2008 Procedural Order No. 3 (issued in response to NPC's request for a procedural order on the heels of CEL's Application) could not be any clearer in exposing the misrepresentation CEL made to this Court:

> [T]he Arbitral Panel would *not* have authorised Respondent to proceed with its Texas and Delaware Applications had it been requested to do so.

Procedural Order No. 3, ¶ 30 (emphasis added); *see id.* ¶ 27(b) (labeling CEL's Application as "unwarranted").[2] The Panel further confirmed that it had rejected CEL's request for broad discovery and had rejected CEL's proposed discovery schedule. *Id.* ¶¶ 26, 28. The Panel went so far as to remark upon its displeasure with CEL by "recall[ing]" that "in allocating the costs of the arbitration, it retains discretion to take account of any unnecessary costs incurred in the arbitration as a consequence of the parties' behavior." *Id.* ¶ 32.

---

[2] NPC incorporates by reference its July 28, 2008 Letter to the Court summarizing the Panel's Procedural Order No. 3. Fed. R. Civ. P. 10(c). A courtesy copy of that Letter is attached hereto at Tab 1. Attached

CEL advances a new argument. According to CEL, whether the Panel would have granted the discovery sought by CEL through its Application is now "irrelevant" because *Intel* clarified that § 1782 does not have a "foreign discoverability requirement." Response at 3; *see also id.* at 11 ("The Tribunal's views on the scope of discovery are simply not relevant to this Court's determinations under Section 1782"). Thus, with a few strokes on its keyboard, CEL tries to excise two of the factors the Supreme Court instructed this Court to consider in deciding whether to grant a § 1782 application. Not so fast. Supreme Court opinions are not malleable, even when the teeth of a litigant's argument have come around to bite its tail.[3]

## II.    Section 1782 Is Not Applicable to Foreign Arbitrations

CEL argues that *National Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999) and *Republic of Kaz. v. Biedermann Int'l*, 168 F.3d 880 (5th Cir. 1999) were overruled in *Intel* and if not, neither is binding on this Court. Response at 6-7. As NPC pointed out in its Memorandum, two district courts wrongly relied on dicta in *Intel* to conclude that Section 1782 can be utilized in aid of a private arbitration. Memorandum at 13-15. It further pointed out that the Second Circuit refuted their analysis. *Id.* at 15, citing *NBC*, 165 F.3d at 191 n.9. NPC urges the Court to adopt the well-reasoned analysis set forth in the opinions issued by the Second and Fifth Circuits.[4]

---

at Tab 2 is the Panel's August 8, 2008 response to CEL's request for clarification of its Procedural Order No. 3 stating that its ruling on depositions applies to third parties.

[3] CEL relies on cases where three of the four *Intel* factors were met. Response at 8 n.23. Here, three of the four *Intel* factors are **not** met. Where three of the four *Intel* factors are not met, consideration of the fourth factor is "unnecessary and purely academic." *Advanced Micro Devices, Inc. v. Intel Corp.*, No. C 01-7033, 2004 WL 2282320, at *3 (N.D. Cal. 2004) (on remand) (Tab 3). In any event, for reasons stated in NPC's motion, CEL's application fails the fourth factor as well.

[4] A post-*Intel* case cited by CEL discusses the Second and Fifth Circuit decisions with no suggestion that either was overruled in *Intel*. Response at 9 n.27 (citing *In re Oxus Gold PLC*, MISC 06-82 – GEB, 2007 WL 1037387 (D. N.J. Apr. 2, 2007)) (Tab 4).

III.    **CEL's Argument That Agreeing to Arbitration Is Not An Agreement to Abide by the Arbitrator's Procedural Rulings or the Arbitration Rules Goes Too Far**

CEL next argues that, because the parties neither discussed nor agreed to forego discovery outside the arbitral process, CEL was at liberty to pursue U.S. styled discovery. Response at 3, 8. CEL's argument conflicts with the unambiguous UNCITRAL arbitration rules and applicable Swiss procedural law, which prohibit court intervention absent arbitral consent. *See* Memorandum at 17; *see also* Procedural Order No. 3 at ¶ 21.[5]

Also unavailing is CEL's related argument that it was at liberty to pursue U.S. style discovery because the Panel's previous orders did not address non-arbitral discovery. First, CEL is purporting to add a fifth factor to the *Intel* test. Second, if CEL were correct, then in the post-*Intel* world, all foreign tribunals – arbitral, judicial, administrative – would be forced to issue orders immediately stating that parties cannot seek the aid of U.S. courts to expand the discovery sought in aid of their proceedings. That is not, and should not be, the law. Foreign tribunals, private or public, should not be required to issues orders to forestall the exportation of U.S. discovery practices. If a party wants unfettered access to U.S. discovery procedures, it should negotiate for a forum selection clause requiring resolution of disputes in U.S. courts and not, as CEL did here, for one requiring arbitration.[6]

IV.    **CEL Offers No Excuse for Its Failure to Provide NPC With Notice**

*Intel* is not a notice case. NPC never argued that it was. Nor did NPC argue that the text of § 1782 requires notice. Instead, NPC cited district court decisions that required the

---

[5] CEL's reliance on a district court case in which a § 1782 application was granted when the UNCITRAL rules applied is misplaced because there is no indication that the respondent there made the argument that arbitrator consent was required. Response at 9 n.26.

[6] Of course, CEL also could have negotiated for certain U.S. style discovery in its arbitration agreement with NPC. It did not do that either.

respondent to be notified and afforded the opportunity to respond to a § 1782 application. *See* Memorandum at 10-11. In response, CEL cites a New York district court decision for the proposition that failure to provide notice is not a basis for dismissal of a § 1782 application. Response at 5 n.14 (citing *In re Application Pursuant to 28 U.S.C. § 1782 for an Order Permitting Christen Sveaas to Take Discovery From Dominique Levy, L&M Galleries*, 249 F.R.D. 96 (S.D.N.Y. 2008)). The New York district court's decision has no relevance here. First, NPC is not seeking dismissal because of lack of notice, but only reconsideration. (NPC seeks dismissal on the basis that § 1782 does not apply to private foreign arbitrations.) Second, the New York case concerned a service defect, not an *ex parte* order. Third, the respondent in that case had notice of the application and an opportunity to respond before the court granted the application. *Id.* at 108. NPC was afforded no such opportunity. Thus, CEL's lone authority fails to justify its purposeful decision not to notify NPC of its Application.

Equally important, CEL offers no explanation for not picking up the phone, sending an email, or utilizing other telecommunication devices to provide NPC with notice of its Application. What would have been the downside? If CEL is entitled to a Section 1782 order, its request could have withstood a response from NPC. Some questions answer themselves.[7]

---

[7] CEL admits that it was to provide NPC notice of the Court's Order and vaguely states that "[t]his process is currently being executed by the parties." Response at 6 n.16. CEL did not notify NPC of the July 18 Order. Memorandum at 2 n.2. Nor is NPC aware of any "process currently being executed by the parties."

## CONCLUSION

The Panel was careful to not overstep its authority and tell this Court what to do. But it made clear that, had it been asked, it would have said "No" to a request from CEL to proceed in this Court.

Some § 1782 applications are a close call. Now that the Court has the full story, this one was not. NPC asks that the Court reconsider its July 18, 2008 Order, vacate the Order, and dismiss this proceeding. NPC asks for any further relief to which it may be justly entitled.

Respectfully submitted,

Of Counsel.

C. Mark Baker
Texas Bar No. 01566010
Federal I.D. No. 993
Kevin O'Gorman
Texas Bar No. 00788139
Andrew P. Price
Texas Bar No. 24002791
Federal I.D. No. 22348
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

August 15, 2008

Kevin G. Abrams (#2375)
John M. Seaman (#3868)
ABRAMS & LASTER LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
abrams@abramslaster.com
seaman@abramslaster.com

*Attorneys for Defendant*
*Nejapa Power Company, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered participants.

I also certify that on August 15, 2008, I caused to be served true and correct copies of the foregoing on the following as indicated below:

**By Email and Hand Delivery**
Donald E. Reid
Jeremy D. Eichler
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

**By Email and U.S. Mail**
David M. Orta
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206

John M. Seaman (#3868)

# TAB 1

ABRAMS & LASTER LLP

JOHN M. SEAMAN

20 MONTCHANIN ROAD, SUITE 200
WILMINGTON, DE 19807
MAIN: 302-778-1000
FAX: 302-778-1001

DIRECT DIAL NUMBER
302-778-1152
SEAMAN@AbramsLaster.com

July 28, 2008

**BY CM/ECF AND HAND DELIVERY**

The Honorable Gregory M. Sleet
U.S. District Court
District of Delaware
844 N. King Street
Room 4324
Lockbox 19
Wilmington, DE 19801

Re:   *Comisión Ejecutiva Hidroeléctrica del Río Lempa v. Nejapa Power Company, L.L.C.*, D. Del., 08-MC-00135-GMS

Dear Judge Sleet:

We write on behalf of defendant Nejapa Power Company, L.L.C. ("NPC") pursuant to D. Del. LR 7.2.1(b), to inform the Court that the Arbitral Tribunal presiding in the foreign proceeding, *Nejapa Power Company, L.L.C. v. Comisión Ejecutiva Hidroeléctrica del Río Lempa* (UNCITRAL), today issued its Procedural Order No. 3, which is attached as Exhibit A. Procedural Order No. 3 directly relates to NPC's pending Motion for Reconsideration of July 18, 2008 Order Granting Assistance to Litigant Pursuant to 28 U.S.C. § 1782 (the "Motion for Reconsideration") (D.I. 3), filed on July 25, 2008. Among other things, Procedural Order No. 3:

(a)   is addressed to this court when it states that although "the Arbitral Tribunal has no power to assess the jurisdiction of a foreign court in respect of evidentiary requests in aid of the arbitration... since the orders are *ex parte* and still subject to review... it is appropriate for the Arbitral Tribunal to express its views as to whether the measures sought appear ... (iii) appropriate, so that the competent U.S. Courts may be able to take such views into account when reviewing their *ex parte* orders" (Order at ¶ 22);

(b)   confirms that plaintiff *Comisión Ejecutiva Hidroeléctrica del Río Lempa's* ("CEL") discovery application in this court was "filed without prior authorization of the Arbitral Tribunal" (Order at ¶ 37) and that the Arbitral Tribunal would not have authorized the discovery application had it been requested to do so. (Order at ¶ 30);

(c)   reiterates that the Arbitral Tribunal "has therefore clearly decided not to allow broadly framed requests for document production taking place prior to the first round of written submissions" (Order at ¶ 28);

The Honorable Gregory M. Sleet
July 28, 2008
Page 2

   (d)    declares that CEL's discovery application is "unwarranted in view of the parties'
          choice of international arbitration and the procedure established by the Arbitral
          Tribunal in the present proceedings" (Order at ¶ 37);

   (e)    declares that "all documents obtained through the Texas and Delaware Discovery
          process (if maintained) would have to be produced according to the procedural
          timetable, as provided by the Procedural Order n°2, and that the Arbitral Tribunal
          will in any event retain discretion to admit or reject any documents that are
          irrelevant, unreasonably burdensome to the proceedings, or in breach of the
          parties' rights" (*id.*);

   (f)    ordered CEL "to refrain from taking depositions of [NPC's] potential witnesses"
          (*id.*); and

   (g)    "[r]ecommend[ed] that the parties consult with the Arbitral Tribunal prior to
          resorting to any further court assistance in aid of the arbitration." *Id.*

     NPC therefore respectfully submits that Procedural Order No. 3 provides additional
support for the arguments set forth in its Motion for Reconsideration and asks that the Court
reconsider its *ex parte* July 18, 2008 Order, vacate it, and dismiss this proceeding and/or quash
the discovery sought by CEL.

     We are available at the Court's convenience if Your Honor has any questions.


                                        Respectfully submitted,


                                        *John M. Seaman*

                                        John M. Seaman (#3868)


JMS:smg
Enclosure
cc:    Clerk of the Court (by CM/ECF)
       Donald E. Reid, Esq. (by CM/ECF and email)
       David M. Orta, Esq. (by email)


{A&L-00069856-2}

# EXHIBIT A

C M
& P

CASTALDI MOURRE & PARTNERS

AVOCATS AU BARREAU DE PARIS

Mr. Mark Baker, Esq.
Mr. Kevin O'Gorman, Esq.
Mr. Aníbal Sabater, Esq.
Fulbright & Jaworski L.L.P.
Fulbright Towers
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
U.S.A.

Fax : 00.1.713.651.5246 /Mail
Email : mbaker@fulbright.com
       kogorman@fulbright.com
       asabater@fulbright.com

Mr. David M. Orta, Esq.
Mr. Forrest J. Deegan, Esq.
Mr. Daniel Salinas-Serrano, Esq.
Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004-1206
U.S.A.

Fax : 001.202.942.5999 / Mail
Email : david.orta@aporter.com
       forrest.deegan@aporter.com
       daniel.salinas.serrano@aporter.com

Paris, July 28, 2008

*Assistant Direct Line : 01 40 73 16 45*
*Email :  amourre@castaldimourre.com*

*Ref. : Nejapa Power Company, LLC  vs/ Comisión Ejecutiva Hidroeléctrica del Rio Lempa (Uncitral)*

Dear Sirs,

Please find attached the Arbitral Tribunal's Procedural Order n°3.

Best regards,

Alexis Mourre

73, BOULEVARD HAUSSMANN

75008 PARIS

TEL. +33.1.40.73.16.40    MILANO    WWW.CASTALDIMOURRE.COM    PARIS

FAX. +33.1.40.73.16.44    Castaldi Mourre & Partners est une association d'avocats (Toque: R.2371 au Barreau de Paris

ISO9001
WCS    UKAS
Certificate No. 3154

Procedural Order n°3

in the UNCITRAL Arbitration
between:

a) Claimant:

- Nejapa Power Company, L.L.C., Edificio Fusades, Blvd. Santa Elena, Antiguo
  Cuscatlan, La Libertad, El Salvador.

(hereinafter "Nejapa", or "the Claimant")

whose Counsel is:

Mr. Mark Baker (email: mbaker@fulbright.com), Mr. Kevin O'Gorman (email:
kogorman@fulbright.com), and Mr. Aníbal Sabater (email:
asabater@fulbright.com), Fulbright & Jaworski L.L.P., 1301 McKinney, Suite
5100, Houston, Texas 77010-3095, (U.S.A.), Telephone: +1 713 651 5151, Fax:
+1 713 651 5246.

b) Respondent:

- Comisión Ejecutiva Hidroeléctrica del Rio Lempa, Sección de Correspondencia
  (atención: Dirección Ejecutiva and Centro de Operaciones del Sistema), 9a Calle
  Poniente n°950, Centro de Gobierno, San Salvador, El Salvador.

(hereinafter "CEL", or "the Respondent")

whose Counsel is:

Mr. David Orta (email: david.orta@aporter.com), Mr. Forrest J. Deegan (email:
forrest.deegan@aporter.com), and Mr. Daniel Salinas-Serrano (email:
daniel.salinas.serrano@aporter.com), Arnold & Porter LLP, 555 12th Street, N.W.,
Washington, D.C. 2004-1206.

1

<u>**Procedural Order n°3**</u>

**A. The Request:**

1. By letter dated 17 July 2008 ("the Request"), Claimant requested that the Arbitral Tribunal issue as a matter of urgency a procedural order:

> (a) Confirming that CEL's Discovery Applications were filed without the prior authorization of the Arbitral Tribunal;
>
> (b) Declaring that CEL's Discovery Applications are incompatible with the arbitration agreement, as embodied in TCA Section 7, as well as the arbitration rules and the Swiss legal provisions applicable to this arbitration;
>
> (c) Declaring that CEL's Discovery Applications are incompatible with the two procedural orders issued to this date by the Arbitral Tribunal;
>
> (d) Ordering CEL to immediately withdraw its Discovery Applications, along with any other application similar in nature, effects, or character to the Discovery Applications that may have been submitted by CEL;
>
> (e) Ordering CEL to refrain from submitting any discovery applications outside this arbitration process and/or before any court of justice anywhere in the world, without the Arbitral Tribunal's express prior approval.

**B. Facts:**

2. On July 3, 2008, Respondent filed in the U.S. District Court for the District of Delaware an *ex parte* Application for an order directed against Claimant "granting discovery for use in a foreign proceeding pursuant to 28 U.S.C. § 1782" ("the Delaware Application").

3. The Delaware Application requests that the court enter an order:

> "*A. Granting CEL's application for discovery from NPC pursuant to 28 U.S.C. § 1782 (a);*
> *B. Authorizing CEL to issue the following to NPC pursuant to Fed. R. Civ. P. 45:*
> *(1) subpoenas for the production of documents compelling NPC to produce documents within 30 days following the service of each subpoena;*
> *(2) subpoenas for the deposition of NPC personnel listed in Appendix C; and*

2

> *(3) subpoenas for the production of additional documents and the taking of additional depositions as CEL may reasonably deem appropriate based upon review of documents produced and depositions given by NPC".*

4. On even date, Respondent filed in the U.S. District Court for the Southern District of Texas an *ex parte* Application for an order directed against El Paso Corporation, a non-party to the arbitration, "granting third-party discovery for use in a foreign proceeding pursuant to 28 U.S.C. § 1782" ("the Texas Application").

5. The Texas Application requests that the court enter an order:

> *"A. Granting CEL's application for discovery from El Paso pursuant to 28 U.S.C. § 1782 (a);*
> *B. Authorizing CEL to issue the following subpoenas to El Paso pursuant to Federal Rule of Civil Procedure 45:*
> *(1) subpoenas for the production of documents compelling El Paso to produce documents within 20 days following the service of each subpoena;*
> *(2) subpoenas for the deposition of El Paso personnel, including former Coastal personnel listed in Exhibit 4; and*
> *(3) subpoenas for the production of additional documents and the taking of additional depositions as CEL may reasonably deem appropriate based upon review of documents produced and depositions given by El Paso".*

6. Both Applications include 34 identical requests for production of a broad list of categories of documents referring or relating to (i) the negotiation of the Final Award or the TCA, (ii) the negotiation of the TCA Amendment, (iii) the negotiation of the TCA Tax Provisions, (iv) the negotiation of the Standby Letter of Credit, (v) the potential economic value of the Final Award and/or the TCA to NPC or El Paso, (vi) the potential economic value of the TCA Amendment to NPC or El Paso, (vii) the potential economic value of the TCA Tax Provisions to NPC or El Paso, (viii) the potential economic value of the Standby Letter of Credit to NPC or El Paso, (ix) the actual economic value of the Final Award and/or the TCA to NPC or El Paso, (x) the actual economic value of the TCA Amendment to NPC or El Paso, (xi) the actual economic value of the TCA Tax Provisions to NPC or El Paso, (xii) the actual economic value of the Standby Letter of Credit to NPC or El Paso, (xiii) the reimbursement provisions of the TCA and/or Final Award that discuss the meaning, scope, intent or purpose of such provisions, (xiv) the potential value of the reimbursement provisions of the TCA and/or Final Award, (xv) the actual value of the reimbursement provisions of the TCA and/or Final Award, (xvi) the intent, purpose, scope or meaning of the TCA Amendment, (xvii) the intent, purpose, scope or

meaning of the TCA Tax Provisions, (xviii) the intent, purpose, scope or meaning of the Standby Letter of Credit, (xix) the commercial strategy employed by NPC relating to deviations as that term was used in the TCA and Final Award, (xx) the commercial strategy employed by NPC relating to deviations as that term is used in the TCA and Final Award, to, from or by Roberto Gonzalez, the Market Manager of NPC, (xxi) any comparisons between the economic value of the PPA to El Paso, Coastal Corporation or NPC and the economic value of the Final Award and/or TCA to El Paso, Coastal Corporation or NPC, (xxii) projections made by or on behalf of El Paso, Coastal Corporation or NPC of the actual transmission costs to be incurred by NPC or El Paso during the life of the TCA, (xxiii) the commercial strategy employed by NPC relating to deviations following expiration of the TCA, (xxiv) the liability, or the absence of liability, by NPC for the payment of taxes by NPC to any taxing authorities in El Salvador by reason of reimbursement payments received by NPC pursuant to the TCA, including, without limitation, any tax advice, legal, audit or accounting opinions received by NPC or El Paso relating to this subject, (xxv) the payment of taxes by NPC to any taxing authorities in El Salvador and due by reason of reimbursement payments received by NPC pursuant to the TCA, (xxvi) all tax advice, legal, audit or accounting opinions received by NPC referring or relating to the treatment of reimbursement payments received from CEL under the TCA in Nejapa Power Company LLC's tax returns filed in El Salvador for tax years 2002 through 2007, (xxvii) any estimates or projections of the deviations, as that term was used in the TCA ad Final Award, to be incurred by NPC during the life of the TCA, (xxviii) all communications relating to the 5 October 1998 letter from Robert Hart (President, Coastal Technology) to Guillermo Sol Bang (President, CEL), (xxix) all economic reports, analysis, forecasts or projections relating to said 5 October 1998 letter (xxx) all economic reports, analyses, forecasts or projections relating to the buy-out value of the PPA, (xxxi) all communications referring to the July 14, 2000 meeting between CEL and Coastal Corporation in Houston, (xxxii) all economic reports, analyses, forecasts or projections relating to said meeting, (xxxiii) all communications referring to the November 2001 meeting between CEL, NPC and El Paso in Miami, (xxxiv) all economic reports, analyses, forecasts or projections relating to said meeting.

7. Both Applications specify that the evidence sought is for use in the present arbitration.

8. The Texas Application was granted *ex parte* on 8 July 2008. The Delaware Application was also approved *ex parte* (Respondent letter in reply to the Request of 24 July 2008, page 6). Both Applications are subject to review by the District Courts.

4

### C. The reasons for the Request:

9. Claimant submits that *"CEL's Discovery Applications constitute a breach of (i) the arbitration agreement between the parties, (ii) the UNCITRAL Arbitration Rules, (iii) the procedural law applicable to this arbitration, and (iv) the procedural orders issued by the Arbitral Tribunal in this arbitration. CEL's Discovery Applications also constitute an impermissible attempt to "re-trade" issues which were addressed and resolved not just by this tribunal, but also in the previous UNCITRAL arbitration between the parties [...]"* (Request, page 2).

10. In respect of the request for depositions, Claimant submits that *"Astonishingly, in its Delaware Discovery Application, CEL seeks the oral deposition of Mr. Sutton, despite: (i) having extensive testimony from Mr. Sutton (including testimony on deviations and the "parties' intent") available on the record from the two previous arbitrations between the parties; and (ii) knowing that Mr. Sutton is likely to be a key Nejapa witness in this arbitration and that, consequently, CEL would have ample chance to examine him at the evidentiary hearing"* (Request, page 4).

11. Claimant further submits, in respect of the Discovery Applications, that *"nowhere in its Delaware Discovery Application does CEL discuss (i) the current status of this arbitration, (ii) the existence of a procedural schedule that allows for the production of documents and the examination of witnesses in this arbitration, (iii) the inconsistencies between the tribunal procedural orders and the discovery CEL seeks in the court, or (iv) whether the Arbitral Tribunal has authorized, or was even informed of, CEL's Delaware Discovery Application. In fact, failing to discharge its duty of transparency and candor, CEL has not disclosed to the federal court in Delaware the fact that (i) CEL's Delaware Discovery Application has never been approved by the Arbitral Tribunal and (ii) the tribunal has not allowed oral depositions or the type of broad document requests CEL is seeking from the courts"*, that *"CEL's Delaware Discovery Application is accompanied by several exhibits, including transcripts from the hearing in the Previous UNCITRAL Arbitration, which have not been submitted under seal, and which are now publicly available as a matter of course to the general public"*, and that *"in keeping with its strategy to hide and mislead, CEL chose not to serve or notify this tribunal or Nejapa of its Delaware Discovery Application, although CEL knows that Nejapa is represented in this arbitration by the undersigned"* (Request, page 5).

12. Claimant thus argues that: *"First, [...] Discovery in U.S. courts is not what the parties bargained for and, accordingly, constitutes a breach of the arbitration agreement. Second, CEL's Discovery Applications contravene the rulings and orders*

5

*issued by the Arbitral Tribunal in this arbitration. Third, as a general matter U.S.-style discovery is not allowed in international arbitration. Fourth, court discovery serves no meaningful purpose in this arbitration. Fifth, CEL's Discovery Applications are an impermissible attempt to re-open matters that were already decided in the Previous UNCITRAL Arbitration. Sixth, CEL's Discovery Application breaches the "equality of arms" principle that, as CEL has acknowledged, applies in every international arbitration case, including this one"* (Request, page 7).

### D. Respondent's Reply:

13. Respondent objected to the Request on 24 July 2008 ("the Reply"), by contending that *"the proceedings in the United States are completely independent from this arbitration proceeding, and there is nothing in the UNCITRAL Arbitration Rules or in this Tribunal's orders that preclude CEL from utilizing the means available to it to obtain evidence"* (Reply, pages 1 and 2). Respondent also purports that the Request is *"wholly without merit and premature in any event"*, as the Arbitral Tribunal *"should not prejudge the admissibility of evidence that it has not yet had an opportunity to review"*, and because *"an order by this Tribunal preventing CEL from obtaining the evidence it needs to prove its case, or prejudging whether it can utilize any evidence obtained, would severely prejudice CEL's ability to be heard and present its defence in the pending arbitration"* (Request, page 2).

14. Respondent submits that, by *"collecting and preparing the evidence for its defence and any counterclaims so that it can be in a position to submit its evidence when it files its first memorial"*, it is *"availing itself of a right that it has under the federal laws of the United States to obtain evidence that it may use to aid its defence in this proceeding"* (Reply, page 2). Respondent also submits that, by doing so, it *"has not violated any orders of the Tribunal or the UNCITRAL Arbitration Rules that govern this arbitration, nor has it violated the arbitration agreement between the parties. The parties never discussed with this Tribunal what formal or informal methods the parties would utilize to obtain their evidence. The Tribunal's orders and the arbitration agreement do not speak to this issue"* (Reply, page 2).

15. Respondent further submits that *"the dispute between the parties is being resolved by the Tribunal under the UNCITRAL Arbitration Rules, which do not prohibit the use of Section 1782 to obtain evidence in aid of an UNCITRAL ad hoc arbitration"*, that the measures sought in the United States will not undermine the Arbitral Tribunal's authority, as *"the U.S. courts that review Section 1782 Applications do not in any way decide any of the issues pending between the parties in the arbitration"*, and as *"this Tribunal will retain the discretion to allow or disallow the use of any evidence*

*obtained*" (Reply, pages 3 and 4). Respondent further posits that "*NPC's assertion that Articles 184 and 185 of the 1991 Swiss Loi Fédérale Sur Le Droit International Privé ("SPIL") require the Tribunal's prior consent before a Section 1782 Discovery Application can be submitted to U.S. courts is erroneous*" (Reply, page 4), that "*the Tribunal does not have the authority to preclude CEL from utilizing Section 1782 to gather evidence, nor is it within the Tribunal's process to limit the evidence that CEL can seek pursuant to Section 1782. Neither the parties' arbitration agreement nor the UNCITRAL Arbitration Rules grant such authority to the Tribunal. It is the U.S. court judge who determines whether or not a 1782 Application is granted and whether a discovery request is sufficiently narrow*" (Reply, page 5).

16. Respondent also submits that the IBA Rules on the Taking of Evidence in International Arbitration ("the IBA Rules") "*encourage parties to obtain discovery outside of the arbitral process, and to only turn to the tribunal when absolutely necessary*" (Reply, page 5), that "*this Arbitration is not governed by the ICDR Guidelines, and CEL has never agreed that these guidelines should govern any aspect of this arbitration*" (Reply, page 6), and that "*the evidence CEL seeks through its Section 1782 Applications is relevant and material to the current proceeding. CEL will demonstrate as much, when and if, it offers any evidence it obtains through these proceedings as evidence in this arbitration*" (Reply, page 6).

17. Respondent finally submits that "*not only is the discovery CEL is seeking through its Section 1782 Applications appropriate, it is particularly necessary, because El Paso, one party from who CEL is seeking discovery, is not a party to this arbitration [...]. The Tribunal does not have jurisdiction or authority over a third party who may have relevant information to this arbitration*" (Reply, page 7).

18. In respect of the argument that the Applications would amount to an attempt to re-open issues already decided in previous arbitrations, Respondent submits that "*there is no mention of "deviations" in any of CEL's requests; rather they focus primarily on the intent of the parties in executing the documents at issue, an issue that, as CEL will demonstrate, is central to this arbitration*" (Reply, page 7). In respect of the argument that the Applications would place the parties on an unequal footing, Respondent objects that "*Salvadoran court-ordered discovery for use in international arbitration is possible*" (Reply, page 8).

**E. Tribunal's decision:**

19. In addressing the issues so raised by the parties, the Arbitral Tribunal will have regard to certain principles relevant to international arbitrations such as this one.

7

20. First, it is generally admitted that the parties may seek court-assistance to obtain evidence, either at the place of the arbitration or at the place where an evidentiary measure is to be enforced. There is nothing in the UNCITRAL Arbitration Rules or in the IBA Rules preventing the parties from doing so.

21. However, it is also generally recognized that, once the Arbitral Tribunal is constituted, such court applications require the consent of the Arbitral Tribunal, which needs to be able to assess whether they are appropriate, notably with regard to the relevance and materiality of the evidence requested. Article 3 (8) of the IBA Rules clearly subjects court applications directed to non-parties to the Arbitral Tribunal's authorization, and the same condition logically applies to any court application directed against a party. Swiss procedural law is also to that effect, as Article 184 SPIL provides that the assistance of Swiss courts may be sought by the Arbitral Tribunal or with the consent of the Arbitral Tribunal. The Swiss authorities' quoted by Respondent also confirm that "*the entitlement to request judicial assistance lies with the Arbitral Tribunal or a party, with the Arbitral Tribunal's consent*" (M. Schneider, comment to Art. 184 SPIL, in *International Arbitration in Switzerland*, Helbing & Lichtenhahn, 58). It is certainly true that the Swiss SPIL does not deal with the conditions under which court assistance may be sought in countries other than Switzerland as the seat of the arbitration. Nevertheless, it seems reasonable to consider that, by submitting to arbitration, the parties have agreed to an alternative to litigation and, thereby, to subject evidentiary applications to the courts to the tribunal's consent, once the latter has been constituted.

22. Second, the Arbitral Tribunal has no power to assess the jurisdiction of a foreign court in respect of evidentiary requests in aid of the arbitration. In the case at hand, it is certainly up to the courts in Texas and Delaware to decide whether Section 1782 applies to a foreign arbitration, whether their orders require leave or consent from the Arbitral Tribunal, and whether the measures sought, as broad as they are, are admissible and should be granted. Nevertheless, since the orders have been granted *ex parte* and are still subject to review ("*... it is the U.S. courts that should decide such issues, not the Tribunal. NPC can bring any such complaints to the U.S. courts, and those complaints will be decided there*", Reply, page 6), it is appropriate for the Arbitral Tribunal to express its views as to whether the measures sought appear (i) compatible with the parties' agreement to arbitrate, (ii) consistent with the procedural rules applicable to the arbitration, and (iii) appropriate, so that the competent U.S. courts may be able to take such views into account when reviewing their *ex parte* orders.

8

23. Third, the Arbitral Tribunal has the duty to protect the integrity of the arbitration by ensuring that any unauthorized court application will not unduly affect or impede the organization of the arbitration or prevent the correct application of the Arbitral Tribunal's orders. The Arbitral Tribunal also has the duty to ensure that each party be granted equal treatment in the arbitration proceedings.

24. In light of the foregoing, the Arbitral Tribunal will now address the issues in dispute.

### a) Document Discovery:

25. The discovery orders sought by Respondent in Texas and Delaware have not been authorised by the Arbitral Tribunal, and the Arbitral Tribunal has not been previously informed of Respondent's Applications.

26. However, whether broad discovery should be allowed in this arbitration is an issue that has already been addressed by the Arbitral Tribunal during the 24 June 2008 procedural hearing (by teleconference) and in the Arbitral Tribunal's letter of 3 July 2008 to the parties. During the 24 June 2008 hearing, the Arbitral Tribunal decided that requests for the production of documents should refer specifically to identified documents or narrowly circumscribed categories of documents. The Arbitral Tribunal also decided that such requests should be concentrated in one round of requests to take place after the submission of the first round of pleadings and evidence. The Arbitral Tribunal nevertheless decided, at Respondent's request, to allow limited production requests in advance of the first round of written submissions, provided that the request bore on limited number of documents that would be (i) relevant and material to the case, and (ii) indispensable for the preparation of Claimant's Statement of Claim and/or Respondent's Defence or Counterclaim. Said decisions were confirmed in the Arbitral Tribunal's letter of 3 July 2008 to the parties, in which the Tribunal stated the following:

> "the Arbitral Tribunal already made it clear during the 24 June conference call that it wished the document production requests to be concentrated in one round of requests and objections between the two rounds of written submissions, in line with normal arbitration practice.
>
> While the Arbitral Tribunal understands that, under specific circumstances, it may be appropriate to allow some degree of discovery prior to filing of the parties' first written submissions, in the case at hand there does not appear to be any such particular reason to depart from the generally accepted principle that each party may request access to identified documents or class of documents after filing of the first written submissions.

*Yet, at Respondent's request, the Arbitral Tribunal has accepted that each party may request the production of a limited number of documents prior to the first round of submissions. This may allow Claimant to use such documents for the preparation of its Statement of Claim, and Respondent for the preparation of its Counterclaim, if any.*

*The Arbitral Tribunal believes that authorising requests for document production after the filing of the Statement of Claim (as requested by Respondent) would lead to an inequality between the parties, as Respondent would be able to prepare its Defence and Counterclaim on the basis of documents obtained from Claimant, while Claimant would not have had the same opportunity for the Statement of Claim.*

*The Arbitral Tribunal of course appreciates that it would be conceivable to have three stages of document production requests (one before the Statement of Claim, one before the Statement of Defence and Counterclaim, and one before the second round of submissions). Yet the Arbitral Tribunal believes that such a procedure would be overly burdensome and is not justified in the case at hand.*

*Finally, the Arbitral Tribunal does not believe the proposed document production schedule would be prejudicial to Respondent, as Respondent will be able to rely on the preliminary round of document production (mainly, we assume, for the preparation of its Counterclaim), and will subsequently be able to request the production of additional documentation in advance of the filing of its second written submission".*

27. By letter of even date, Respondent communicated to the Arbitral Tribunal that it *"agrees to dispense with this limited round of production* [taking place in advance of the first submissions]", and the Arbitral Tribunal consequently issued, on 8 July 2008, its Procedural Order n°2, providing in Section B that all requests for document production should (i) be made after the first round of submissions, and (ii) refer to specific documents or narrowly circumscribed categories of documents.

28. The Arbitral Tribunal has therefore clearly decided not to allow broadly framed requests for document production taking place prior to the first round of written submissions. That decision is consistent with general practices applied in international arbitration, as reflected by the IBA Rules. This was done (i) to ensure that the document production would be focused and relevant in light of the facts of the case and the parties' arguments, as submitted in their first written submissions, and (ii) to enable the Arbitral Tribunal to decide on possible disagreements on the requests for document production in light of the parties' statements of fact and law. The Arbitral Tribunal believes that the arbitral proceedings, as currently framed, are appropriate, that they ensure that the case will be resolved in a reasonable period of time and at a reasonable cost to the parties. The Arbitral Tribunal also believes that the procedural rules, as framed in its procedural orders n°1 and n°2, ensure that the parties will be treated equally and will have a fair opportunity to state their case.

29. The Arbitral Tribunal also believes that there is nothing to indicate that this procedure will not be adequate or that it will not yield the same documents that might be available through the courts provided these are relevant and material to the disputes in this case. As far as El Paso is concerned, it is true that said company is a non-party. Yet, the requests for document discovery presented against El Paso are identical to those presented against Nejapa, and there is nothing to indicate that Respondent would not be able to obtain from Nejapa the documents sought from El Paso, so that any order directed against the latter would only become necessary once the Arbitral Tribunal had ruled on possible objections by the Claimant in respect of requests to produce pursuant to Procedural Orders n°1 and n°2.

30. In light of the foregoing, and based on the information provided so far by the parties, the Arbitral Tribunal would not have authorised Respondent to proceed with its Texas and Delaware Applications had it been requested to do so.

31. In any event, the Arbitral Tribunal confirms that all documents, including those that might be obtained through the Texas and Delaware Discovery process (if maintained), will have to be produced according to the procedural timetable provided for in Procedural Order n°2. The Arbitral Tribunal will also retain jurisdiction to admit or reject any documents which are irrelevant, unreasonably burdensome to the proceedings or in breach of the parties' rights.

32. Finally, the Arbitral Tribunal recalls that, in allocating the costs of the arbitration, it retains discretion to take account of any unnecessary costs incurred in the arbitration as a consequence of the parties' behavior.

b) Depositions:

33. The Texas and Delaware Applications include subpoenas for the deposition of NPC and El Paso personnel, and Claimant has objected that the individuals in question (notably Mr. Sutton) are likely to be called as witnesses in the arbitration by Nejapa.

34. The Arbitral Tribunal believes that Respondent should not be allowed to take the depositions of potential Nejapa witnesses before the evidentiary hearing scheduled from 27 April to 1 May 2009.

35. As currently framed, the procedural rules established by the Arbitral Tribunal provide that each party will submit written witness statements with its first written submission, and that each party will submit the list of the witnesses it wishes to

present or cross-examine by 10 April 2009. This means that the parties will have to decide which of the other party's witnesses they wish to cross-examine on the basis of such witnesses' written statements. In the Arbitral Tribunal's view, Respondent would be placed in an advantageous position if it had the ability to undertake an examination under oath of Claimant's witnesses before the evidentiary hearing. Such a situation would affect the equality of the parties as the witnesses presented by Claimant would be bound by their depositions, while Respondent would be able to prepare its own witnesses testimony free from any such procedure, according to normal international arbitration practice.

36. Consequently, the Arbitral Tribunal believes that depositions would entail a breach of party equality in this case. The Arbitral Tribunal agrees, in this respect, with the view expressed in the ICDR Guidelines for Arbitrators Concerning Exchanges of Information that depositions are not an appropriate procedure in international arbitration.

### Decision

37. As a consequence of the foregoing, the Arbitral Tribunal:

a) Confirms that Respondent's Discovery Applications were filed without the prior authorization of the Arbitral Tribunal;

b) Declares that said Applications are unwarranted in view of the parties' choice of international arbitration and the procedure established by the Arbitral Tribunal in the present proceedings;

c) Declares that all documents obtained through the Texas and Delaware Discovery process (if maintained) would have to be produced according to the procedural timetable, as provided by the Procedural Order n°2, and that the Arbitral Tribunal will in any event retain discretion to admit or reject any documents that are irrelevant, unreasonably burdensome to the proceedings, or in breach of the parties' rights;

d) Orders Respondent to refrain from taking depositions of Claimant's potential witnesses;

e) Recommends that the parties consult with the Arbitral Tribunal prior to resorting to any further court assistance in aid of the arbitration;

f) Rejects all other requests.

This Procedural Order is signed in five [5] original copies by the Chairman on behalf of the Arbitral Tribunal.

Date: 28 July 2008

# TAB 2

C M
& P

# CASTALDI MOURRE & PARTNERS

### AVOCATS AU BARREAU DE PARIS

Mr. Mark Baker, Esq.
Mr. Kevin O'Gorman, Esq.
Mr. Aníbal Sabater, Esq.
Fulbright & Jaworski L.L.P.
Fulbright Towers
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
U.S.A.

**Fax : 00.1.713.651.5246**
**Email : mbaker@fulbright.com**
    **kogorman@fulbright.com**
    **asabater@fulbright.com**

Mr. David M. Orta, Esq.
Mr. Forrest J. Deegan, Esq.
Mr. Daniel Salinas-Serrano, Esq.
Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004-1206
U.S.A.

**Fax : 001.202.942.5999**
**Email : david.orta@aporter.com**
    **forrest.deegan@aporter.com**
    **daniel.salinas.serrano@aporter.com**

Paris, August 8, 2008

*Assistant Direct Line : 01 40 73 16 45*
*Email :   amourre@castaldimourre.com*

*Ref. : Nejapa Power Company, LLC  vs/  Comisión Ejecutiva Hidroeléctrica del Rio Lempa*
    *(Uncitral)*

Dear Sirs,

The Arbitral Tribunal acknowledges receipt, with thanks, of Respondent's letter of 30 July 2008 and of Claimant's 5 August 2008 letter, which content is duly noted.

In its letter of 30 July 2008, Respondent asks the Arbitral Tribunal to "*confirm that its ruling in Procedural Oder n°3 ordering Respondent "to refrain from taking depositions*

73, BOULEVARD HAUSSMANN
75008, PARIS                    MILANO          WWW.CASTALDIMOURRE.COM                PARIS
TEL. +33 · 1 · 40 73 16 40
FAX. +33 · 1 · 40 73 16 44       Castaldi Mourre & Partners est une association d'avocats (Toque: R.237) au Barreau de Paris



ISO9001
WCS
UKAS
QUALITY
MANAGEMENT

Certificate No 3154/3

*of Claimant's potential witnesses" does not extend to persons and entities that are not parties to this arbitration and are wholly unrelated to NPC".* In its letter of 5 August 2008, Claimant requests that *"the Arbitral Tribunal confirm that CEL may not take oral depositions or pursue documents requests except as specifically authorized by the Arbitral Tribunal in Procedural Order n°2".*

As far as document production requests are concerned, the Arbitral Tribunal believes that the wording of Procedural Order n°3 is clear and does not deserve further explanation.

CASTALDI
MOURRE
& PARTNERS

As to Respondent's concern that the Arbitral Tribunal does not have jurisdiction *"to restrict Respondent's ability to take evidence from individuals and entities wholly unrelated to this arbitration or any party to it and over which the Tribunal has no jurisdiction or authority"*, it has been addressed in Sections 22 and 23 of Procedural Order n°3.

Regarding the meaning of the words *"Claimant's potential witnesses"* in Section 37 (d) of Procedural Order n°3, the Arbitral Tribunal refers to Section H.1 of Procedural Order n°1, confirming that any person may be presented by a party as a witness. Claimant may therefore call as witnesses not only members of its personnel, but also officers or employees of entities that are not party to the arbitration, such as El Paso, its parent company. As a consequence, the Arbitral Tribunal is of the view that, in compliance with Procedural Order n°3, Respondent should not proceed with depositions until the list of Claimant's witnesses is known, as provided by Section D.11 of Procedural order n°2.

Respondent may then seek the Arbitral Tribunal's leave to conduct depositions, and the Arbitral Tribunal will consider the application in light of Procedural Order n°3, of the parties' pleadings and evidence produced, and other surrounding circumstances.

Best regards,

Alexis Mourre

cc : Dr. Henri Alvarez
Prof. Juan Fernandez-Armesto

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569

▷
Advanced Micro Devices v. Intel Corp.
N.D.Cal.,2004.

United States District Court,N.D. California.
ADVANCED MICRO DEVICES, INC., Plaintiff,
v.
INTEL CORPORATION, Defendant.
**No. C 01-7033.**

Oct. 4, 2004.

Patrick Lynch, David I. Hurwitz, O'Melveny & My-
ers LLP, Los Angeles, CA, for Plaintiff.
Joseph Kattan, Gibson Dunn & Crutcher, Washing-
ton, DC, Robert E. Cooper, Samuel G. Liversidge,
Gibson Dunn & Crutcher LLP, Los Angeles, CA,
James A. Murray, Santa Clara, CA, for Defendant.

ORDER DENYING IN FULL AMD'S AMENDED
APPLICATION PURSUANT TO 28 U.S.C. §
1782(a)

WARE, J.

### I. INTRODUCTION

**\*1** Advanced Micro Devices, Inc. ("AMD") initi-
ated this miscellaneous action to obtain discovery
from Intel Corporation ("Intel") pursuant to 28
U.S.C. § 1782(a). The Court referred the action to
Magistrate Judge Lloyd, who issued an "Order
Granting in Part AMD's Amended Application For
Order Directing Intel To Produce Documents Pur-
suant To 28 U.S.C. § 1782 And Denying Intel's
Cross-Application."On September 27, 2004, the
Court heard argument on Intel's Motion for *denovo*
Determination of AMD's Amended Application and
Intel's Cross-Application Pursuant to 28 U.S.C. §
1782; Objections To Magistrate Judge's Recom-
mended Decision. Having conducted a *denovo* re-
view, and based upon all papers filed to date and
the comments of counsel, the Court denies in full
AMD's amended application for discovery.

### II. BACKGROUND

In October of 2000, AMD filed a complaint with he
European Commission ("EC") against Intel for en-
gaging in alleged anti-competitive behavior in viol-
ation of European laws. AMD describes the com-
plaint as including the following three major charges:

(1) that Intel uses "Intel Inside" and other "market
development fund" programs as loyalty rebates to
secure the agreement of PC manufacturers and re-
tailers to deal exclusively in Intel-based PCs,

(2) that Intel withholds product allocations,
roadmap information, or technology to coerce PC
manufacturers and retailers to deal exclusively with
Intel, and

(3) that Intel forms private, standard-setting cartels
that establish interfaces between microprocessors
and other components of the PC system, and by ex-
cluding AMD and other disfavored firms from ac-
cess to this critical information Intel promotes its
monopoly on microprocessors.

In pursuit of that complaint, AMD filed an applica-
tion in this Court for an order directing Intel to pro-
duce documents pursuant to 28 U.S.C. § 1782.Sec-
tion 1782(a) provides that a federal district court
"may order" a person "resid[ing]" or "found" in the
district to give testimony or produce documents
"for use in a proceeding in a foreign or internation-
al tribunal ... upon application of any interested per-
son."In its present form, AMD's application con-
sists of seventy (70) document requests, sixty-seven
(67) of which essentially seek Intel documents pro-
duced to Intergraph Corporation in an action
between the parties in the Northern District of
Alabama, *Intergraph Corporation v. Intel Corpora-
tion,* CV 97-N-3023-NE (the "Intergraph case"). In-
tel produced approximately 500,00 pages of confid-
ential business information in the course of the In-
tergraph case.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569

The Intergraph case included allegations of patent infringement, state law violations, and antitrust claims. Intergraph's antitrust claims were reportedly based upon assertions that Intel's decision not to supply Intergraph with the patented Intel sample and pre-release microprocessors constituted monopolization of the microprocessor market; that Intel violated Section 2 of the Sherman Act by using its monopoly microprocessors to leverage a competitive advantage in the downstream markets of workstations, graphics accelerators and chipsets; and that Intel conspired with Intergraph workstation competitors to hinder Intergraph's sale of workstations to selected digital animation customers. Intergraph's antitrust claims were rejected on summary judgment.*Intergraph Corp. v. Intel Corp.,* 88 F.Supp.2d 1288 (N.D.Ala.2000), *aff'd*253 F.3d 695 (Fed.Cir.2001).

### III. DISCUSSION

**\*2** This Court has the benefit of the Supreme Court's determination that Section 1782(a) authorizes, but does not require a federal district court to authorize the discovery sought in this case. *Intel Corp. v. Advanced Micro Devices, Inc.,* --- U.S. ----, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004).[FN1] To guide this Court on remand, the Supreme Court delineated four main factors that "bear consideration" in ruling on a § 1782 request. First, the Supreme Court found that "when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."*Id.* at 2483. The Supreme Court reasoned as follows:

> FN1. In reaching this conclusion, the Supreme Court resolved three key issues. First, it held that Section 1782 does not contain a "foreign-discoverability" requirement. *Id.* at 2476. Thus, AMD is not required in this case to make a threshold showing that the discovery it seeks would

have been discoverable in the European Commission investigation had those documents been located within the Union. Second, the Supreme Court held that Section 1782(a) makes discovery available to complainants, such as AMD, who do not have the status of private "litigants" and are not sovereign agents. *Id.* Third, the Supreme Court held that a "proceeding" before a foreign "tribunal" need not be "pending" nor "imminent" for an applicant to invoke § 1782(a).*Id.* Instead, " § 1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation."*Id.* at 2480.

A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence.... In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.

*Id.* Second, the Supreme Court found that the district court faced with a § 1782(a) request "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."*Id.* Third, the Supreme Court also stated that "a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."*Id.* Fourth, the Supreme Court instructed that "unduly intrusive or burdensome requests may be rejected or trimmed."*Id.*

Having considered the factors set forth by the Supreme Court, this Court, in its discretion, holds that AMD's application for discovery should be denied in full. First, the Supreme Court has already determined that Intel is a participant in the EC proceedings, and that participant-status is significant

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569

because the EC has jurisdiction over Intel, and therefore could simply ask Intel to produce any or all of the discovery AMD now seeks. The EC, however, has not sought the documents AMD now seeks. Therefore, the first factor weighs against granting AMD's application.

Second, the EC is not receptive to judicial assistance in this case. On this issue, it is significant to this Court that the Supreme Court cited to the EC's two *amicuscuriae* briefs to support the finding that the EC "does not need or want" this Court's assistance in obtaining the documents AMD seeks. *See* European Commission *Amicus Curiae* 11-16; Brief for European Commission as *Amicus Curiae* in Support of Pet. for Cert. 4-8. The EC also stated that it "does not consider it necessary to request or even subsequently to review the documents sought" by AMD in this case. Brief for European Commission as *Amicus Curiae* in Support of Pet. for Cert. 4. Moreover, the EC has stated that granting AMD's § 1782(a) request would jeopardize "vital Commission interests." *See* European Commission *Amicus Curiae* 15.

*3 Third, AMD's § 1782(a) application appears to be an attempt to circumvent the EC decision not to pursue such discovery. *See* European Commission *Amicus Curiae* 6.

Because three out of the four factors discussed above clearly weigh against granting AMD's application, the Court finds it largely unnecessary and purely academic to address the final factor, namely whether the requests are unduly intrusive or burdensome. Nevertheless, for the sake of completeness, the Court finds that the documents sought in AMD's application are unduly intrusive and burdensome. AMD has made no attempt to tailor its application to the subject matter of the EC complaint. For example, AMD's document requests do not contain the words "Europe" or "European," the name of any European country, or the name or description of any European OEM or retailer. Instead, it appears that AMD intentionally kept the requests broad, essentially lifting 67 out of its 70 document

requests verbatim from requests served on Intel by Intergraph. The breadth of AMD's application, when considered in light of the EC's determination that the requested documents are unwanted and unlikely to be reviewed, weighs against granting any portion of AMD's application.

## IV. CONCLUSION

For the reasons set forth above, AMD's amended application for discovery is denied in full. Intel's cross-application is denied as moot.

N.D.Cal.,2004.
Advanced Micro Devices v. Intel Corp.
Not Reported in F.Supp.2d, 2004 WL 2282320 (N.D.Cal.), 2004-2 Trade Cases P 74,569

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 4

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 1037387 (D.N.J.)

**H**
In re Oxus Gold PLC
D.N.J.,2007.
Only the Westlaw citation is currently available.NOT FOR PUBLICATION
United States District Court,D. New Jersey.
In the Matter of the Application of OXUS GOLD PLC for Assistance before a Foreign Tribunal.
**MISC No. 06-82-GEB.**

April 2, 2007.

MEMORANDUM OPINION

BROWN, Chief Judge.
**\*1** This matter comes before the Court upon Respondent Jack A. Barbanel's ("Barbanel" or "Respondent") Appeal of Magistrate Judge Hughes' Denial of Respondent's Motion to Vacate the Court's Order of August 11, 2006, and Petitioner Oxus Gold Plc.'s ("Oxus" or "Petitioner") Cross-Appeal of Judge Hughes' Grant of Respondent's Motion to Vacate the Court's Order of August 17, 2006.[FN1]The Court has fully reviewed all documents filed and submitted. For the reasons set forth below, the Court will deny Respondent's Appeal, and will deny Petitioner's Cross-Appeal.

> FN1. The parties refer to the respective orders by their filing date. For the sake of clarity, this Court will refer to their signature date instead.

**I. BACKGROUND**

Oxus is an international mining group based in the United Kingdom. (Pet. Opp'n at 5.) Mr. Barbanel is the managing director of SIG Overseas Ltd. ("SIG"), a corporate finance and private equity consulting company. (Resp. Br. at 4.) Mr. Barbanel's primary residence is in Moscow, Russia, but he spends about two months every year in New Jersey. (Resp. Br. at 17; Pet. Opp'n at 12.)

In September 1998, Norox Mining Company Ltd. ("Norox"), an Oxus subsidiary, entered into a joint venture agreement with Kyrgyzaltyn Open Joint Stock Company ("Kyrgyzaltyn"), a company owned by the Kyrgyz government. (Resp. Br. at 3; Pet. Opp'n at 5.) The joint venture company, Talas Gold Mining Company ("TGMC") was created for the purpose of developing and exploiting the Jerooy gold deposit in the Kyrgyz Republic. (Resp. Br. at 3; Pet. Opp'n at 5.) TGMC was majority controlled by Oxus. (Resp. Br. at 3; Pet. Opp'n at 5.)

TGMC was granted a license (the "License") to exploit the gold deposit in early 2000. (Resp. Br. at 3; Pet. Opp'n at 5.) In August 2004, however, the Kyrgyz government canceled TGMC's License, and withdrew Oxus' rights to develop the mine. (Resp. Br. at 3; Pet. Opp'n at 6.) In November 2005, Mr. Barbanel contacted the Kyrgyz government regarding the Jerooy Mine. (Resp. Br. at 4; Pet. Opp'n at 6.) Mr. Barbanel claims to have initiated said contact on behalf of a client, Global G.o.l.d. Holdings Gmbh ("Global Gold") interested in competing for the License to develop the mine. (Resp. Br. at 4.) Oxus contends that SIG was the management firm of Global Gold, and that Mr. Barbanel had power of attorney for Global Gold. (Resp. Br. at 5; Pet. Opp'n at 7.) Oxus contends that the actions of Global Gold and the Kyrgyz government were unlawful and resulted in discrimination against Oxus. (Pet. Opp'n at 7.) After unsuccessful attempts to have the License reinstated, Oxus halted development of the Jerooy Mine in February 2006. (Resp. Br. at 5; Pet. Opp'n at 7.)

Beginning in March 2006, TGMC initiated three actions in Bishkek Inter-Regional Court, Kyrgyzstan (the "Kyrgyz Court proceedings") challenging the actions of the Kyrgyz Government with respect to the License. (Resp. Br. at 5; Pet. Opp'n at 8.) In June 2006, Oxus also filed a Notice of Claim and Request for Arbitration (the "Arbitration claim") against the Kyrgyz Republic under the United Kingdom-Kyrgyz Bilateral Investment Treaty (the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"BIT"), claiming that the Kyrgyz government's actions with respect to the Jerooy Mine violated the BIT. (Resp. Br. at 5-6; Pet. Opp'n at 9.) Finally, in May 2006, the Kyrgyz government indicated that it intended to file a Claim for Compensation against TGMC (the "Compensation Claim") for allegedly failing to develop the Jerooy Mine. (Resp. Br. at 6; Pet. Opp'n at 9.)

**\*2** On August 11, 2006 Oxus filed an *ex parte* application with this Court pursuant to 28 U.S.C. § 1782 to obtain discovery from Barbanel and SIG for use in a foreign or international tribunal. (Resp. Br. at 7; Pet. Opp'n at 9.) The undersigned granted the request by order dated August 11, 2006 (the "Section 1782 Order"). Oxus subsequently filed another *ex parte* application, pursuant to 28 U.S.C. § 1783, to allow service *abroad* of the subpoena authorized under the Section 1782 Order. (Resp. Br. at 10-11; Pet. Opp'n at 10.) Magistrate Judge Hughes granted that request by order dated August 17, 2006 (the "Section 1783 Order"). On September 5, 2006, Mr. Barbanel filed a motion to vacate the Section 1782 Order and the Section 1783 Order. By order dated October 10, 2006 (the "Hughes Order"), Judge Hughes denied the request to vacate the Section 1782 Order and granted the request to vacate the Section 1783 Order.

Mr. Barbanel appeals Judge Hughes' denial of Mr. Barbanel's motion to vacate the Section 1782 Order. Oxus, for its part, cross-appeals Judge Hughes' grant of Mr. Barbanel's motion to vacate the Section 1783 Order. Each party's appeal will be addressed in turn.

## II. DISCUSSION

### A. STANDARD

Local Civil Rule 72. 1(c)(1)(A) and Federal Rule of Civil Procedure 72(a) provide that a Magistrate Judge's ruling on a non-dispositive matter will be set aside only if the order is "clearly erroneous or contrary to law."*See* L. CIV. R. 72. 1(c)(1)(A);

FED. R. CIV. P. 72(a). Such rulings are "entitled to great deference and [are] reversible only for abuse of discretion."*Kresefky v. Panasonic Commc'ns & Sys. Co.,* 169 F.R.D. 54, 64 (D .N.J.1996).[FN2]

> FN2. It is uncontested that Respondent's motion to vacate was a non-dispositive motion.

## B. APPLICATION

### A. Respondent's Appeal-28 U.S.C. § 1782

In denying Respondent's Motion to Vacate the Section 1782 Order, Judge Hughes found that Oxus was entitled, under 28 U.S.C. § 1782, to serve a subpoena on SIG and Mr. Barbanel in connection with foreign litigation. The Court will affirm Judge Hughes' decision to uphold the Section 1782 Order.

Under 28 U.S.C. § 1782(a),

[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal.... To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a). In essence, the Court may order a person to offer testimony or produce documents if three requirements are satisfied: "(1) the person must reside (or be found) in the district in which the application is made; (2) the discovery must be "for use" in a proceeding before a foreign tribunal; and (3) the application may be made by a foreign or international tribunal or 'any interested person.' " *In re Imanagement Servs.,* No. 05-2311, 2006 U.S. Dist. LEXIS 8876, at \*5 (D.N.J. Feb. 28, 2006), *citing, inter alia, In re Bayer A. G.,* 146 F.3d 188, 193 (3d Cir .1998).

**\*3** Even if the statutory requirements are met, however, the Court may, in its discretion, deny a re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2007 WL 1037387 (D.N.J.)

quest for discovery under 28 U.S.C. § 1782(a).*In re Imamagement*, at \*9, *citing Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). Among the four factors to be taken into consideration in the court's exercise of discretion are the following:

(1) whether the person from whom the discovery is sought is a participant in the foreign proceeding;

(2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court assistance;

(3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or policies; and

(4) whether the request is unduly intrusive or burdensome.

*In re Imamagement*, at \* 10, citing Intel, at 264.

In ruling upon Barbanel's motion to vacate, Judge Hughes found that each of the three requirements set out in *In re Imamagement* had been met, and that the Court had properly exercised its discretionary power to grant Oxus' request for discovery pursuant to 28 U.S.C. § 1782. Mag. J. Op. at 7. Respondents, however, contend that the Magistrate Judge erred in his application of Section 1782, and that his opinion should therefore be reversed.

1. Whether Mr. Barbanel resides or can be found in the district

Respondent argues that the Magistrate Judge erred in concluding that he "resides" or "is found" in the District of New Jersey. Resp. Br. at 17. Mr. Barbanel concedes that he maintains some contacts with the district, but insists that such contacts are not sufficient to satisfy the requirements of 28 U.S.C. § 1782. *Id.* at 17-18.Respondent alleges in particular (1) that he resides in Moscow, Russia, (2) that he and his Russian wife maintain their primary

residence in Moscow, (3) that he is employed in Moscow, and (4) that he regularly conducts business there. *Id.*

Oxus responds that the evidence in fact conclusively establishes that Mr. Barbanel resides in the district of New Jersey, and that the portion of Judge Hughes' Order relating to the Section 1782 Order should therefore be affirmed. Pet. Opp'n at 12. Indeed, Oxus claims that Mr. Barbanel (1) "leases a residential apartment in New Jersey in which he resides at least two months each year," (2) "has owned for more than 23 years a separate residential property in New Jersey," (3) is registered to vote in the district of New Jersey, (4) is a member of the New Jersey State Bar, (4) uses a business card that identifies Princeton, New Jersey as one of the office locations of his company, SIG, (5) receives personal and business telephone calls in Princeton, and (6) "maintains regular appointments with his physician who is located in New Jersey."*Id.* at 12-13.In the alternative, Oxus contends that the evidence establishes at the very least that Mr. Barbanel can be "found," for the purposes of 28 U.S.C. § 1782, in the district of New Jersey. *Id.* at 14.

\*4 Faced with the evidence of Mr. Barbanel's frequent and sustained contacts with the district, Judge Hughes declined to hold that Mr. Barbanel was a resident of New Jersey, but found that the requirements of the statute were nonetheless met as Mr. Barbanel was "admittedly present and [could] be found in New Jersey on a consistent basis every year."Mag. J. Op. at 8. Given the wealth of evidence establishing Mr. Barbanel's strong ties to the district of New Jersey, this Court concludes that Magistrate Judge Hughes' finding that Mr. Barbanel "resides or can be found" in New Jersey was not clearly erroneous.*See Edelman v. Taittinger*, 295 F.3d 171, 178-79 (2d Cir.2002) (advocating flexible interpretation of the phrase "resides or is found," and criticizing suggested interpretation of Section 1782 requiring potential deponent to be in the district *at the time the discovery order is issued.*).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1037387 (D.N.J.)

2. Whether the requested discovery is "for use" in a proceeding before a foreign tribunal

Respondent also contends that the discovery sought by Oxus is not "for use" in a "proceeding in a foreign or international tribunal," and that Judge Hughes therefore erred in upholding the Section 1782 Order. Resp. Br. at 20. The Court disagrees.

a. Foreign Tribunal

Respondent argues that "Section 1782 does not apply to *private* international arbitration," and that the Arbitration-the only proceeding, it claims, identified by Judge Hughes as satisfying the requirements of Section 1782-cannot provide a basis for the Magistrate Judge's opinion. *Id.* at 20 (emphasis added). Indeed, Respondent contests Judge's Hughes' findings that the Arbitration has "been authorized by the sovereign states of the United Kingdom and Kyrgyzstan" and that it is being "conducted by the United Nations Commission on International Law."*Id.* at 20 (quotations omitted), *quoting* Mag. J. Op. at 10.

Respondent insists, instead, that the arbitration panel consists of three private individuals chosen by the parties, is "neither a governmental nor intergovernmental arbitral tribunal," is not "being conducted by any United Nations committee," and does not involve claims "between sovereign nations or their instrumentalities."Resp. Br. at 21-23. Respondent concludes that the discovery sought by Oxus cannot be deemed "for use" in a "foreign tribunal" under 28 U.S.C. § 1782, and that Judge Hughes' decision to uphold the Section 1782 Order should therefore be reversed.

Petitioner responds that the arbitral body conducting the Arbitration "was expressly authorized by the United Kingdom and Kyrgyzstan as an important component of their Bilateral Investment Treaty," and that the Arbitration is therefore conducted "pursuant to adjudicatory authority vested by an international agreement among sovereign en-

tities."Pet. Opp'n at 17. Petitioner concludes that "Judge Hughes correctly found that this arbitration is not the result of a contract or agreement between the *private* parties, but instead is a proceeding authorized by [national government entities] for the purpose of adjudicating disputes under the Bilateral Investment Treaty."*Id.* at 19 (quotations omitted).

*5 Both the Second and Fifth Circuits have held that private international arbitrations do not constitute "foreign and international tribunals" under 28 U.S.C. § 1782. *See Application of the Republic of Kazakhstan v. Biedermann Int'l,* 168 F.3d 880, 883 (5th Cir.1999) ("the term 'foreign and international tribunals' in § 1782 was not intended to authorize resort to United States federal courts to assist discovery in *private* international arbitrations."); *N.B. C., Inc. v. Bear Stearns & Co., Inc.,* 165 F.3d 184, 191 (2d Cir.1999) ("policy considerations of some magnitude reinforce our conclusion, based upon an analysis of the text and legislative history of § 1782, that Congress did not intend for that statute to apply to an arbitral body established by private parties."). The *N.B. C.* court noted in particular that "the legislative history reveals that when Congress in 1964 enacted the modern version of § 1782, it intended to cover governmental or intergovernmental arbitral tribunals and conventional courts and other state-sponsored adjudicatory bodies."*N.B.C.,* 165 F.3d at 190.[FN3]

> FN3. The Court is unaware of-and the parties have not offered-any decision in this Circuit fully addressing the issue.

In the case at bar, however, Article 8 of the BIT Agreement between the United Kingdom and Kazakhstan specifically mandates that disputes between nationals of the two countries would be resolved by arbitration governed by international law.[FN4]The Arbitration at issue in this case, between two admittedly private litigants, is thus being conducted within a framework defined by two nations and is governed by the Arbitration Rules of the United Nations Commission on International Trade Law (the "UNCITRAL rules"). In light of these facts, this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                           Page 5
Slip Copy, 2007 WL 1037387 (D.N.J.)

Court concludes that the Magistrate Judge's holding that the arbitration panel in the case at bar constituted a "foreign tribunal" for purposes of a 28 U.S.C. § 1782 analysis was not clearly erroneous or contrary to law.

> FN4. Indeed, Article 8 of the BIT Agreement provides, in relevant part: Settlement of Disputes between an Investor and a Host State
>
> (1) Disputes between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of the latter under this Agreement in relation to an investment of the former which have not been amicably settled shall, after a period of three months from written notification of a claim, be submitted to *international arbitration* if the national or company concerned so wishes.
>
> Where the dispute is referred to international arbitration, the national or company and the Contracting Party concerned in the dispute may agree to refer the dispute either to:
>
> (a) the International Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention on the Settlement of Investment Disputes between States and Nationals of other States ... ); or
>
> (b) the Court of Arbitration of the International Chamber of Commerce; or
>
> (c) an international arbitrator or ad hoc arbitration tribunal to be appointed by a special agreement or established under the Arbitration Rules of the United Nations Commission on International Trade Law.

> If after a period of three months from written notification of the claim there is no agreement to one of the above alternative procedures, the dispute shall at the request in writing of the national or company concerned be submitted to arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law as then in force. The parties to the dispute may agree in writing to modify these Rules.
>
> United Kingdom-Kyrgyz Republic Bilateral Investment Treaty, Declaration of Audley William Sheppard ("Sheppard Decl.") Ex. A, Art. 8 (emphasis added).

b. For Use

Respondent also argues that Judge Hughes should have vacated the Section 1782 Order on the ground that the discovery sought by Oxus was not *for use* in connection with any proceeding cited by Oxus other than the Arbitration. Resp. Br. at 29. Mr. Barbanel contends first that the proceedings in the Kyrgyz courts concern events that bear little or no connection to him, and that information gleaned from him through the discovery requests at issue here would not be relevant to those proceedings. *Id.* at 29-30.

In addition, Mr. Barbanel claims that any such information would be inadmissible before the Kyrgyz courts, because the Kyrgyz court proceedings are currently before the Kyrgyz Supreme Court (which, allegedly, does not consider evidence that was not presented to the court of first instance) and because the Compensation Claim remains a potential claim-i.e. one that has yet to give rise to formal legal proceedings. *Id.* Respondent concludes that since the information sought would be neither relevant to, nor admissible in, said legal proceedings, such information could not be deemed "for use" before a foreign tribunal.

**\*6** Petitioner responds that Mr. Barbanel "was, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                   Page 6
Slip Copy, 2007 WL 1037387 (D.N.J.)

is, [in fact,] directly involved with many of the events at issue in the foreign proceedings," and that it "strains credulity for Barbanel to now contend that he has no relevant information with respect to such matters."Pet. Opp'n at 24. As for Mr. Barbanel's admissibility argument, Oxus claims that controlling authority in this Circuit establishes that the Court need not assess the admissibility in foreign proceedings of the evidence sought from Mr. Barbanel. Oxus adds, in the alternative, that the Section 1782 Order should stand even if the Court had to make such a determination, as the information sought pursuant to the statute is likely to soon become admissible. Indeed, it claims that "a remand of the Kyrgyz Court Claims would necessarily entail the submission of evidence not considered by the trial court," and that "the Kyrgyz Government has made plain its intention to pursue litigation against Oxus and TGMC" in connection with the Compensation Claims. *Id.* at 20-21.

Addressing first the issue of the relevance of the information sought by Oxus, the Court's review of the record suggests that there exists significant evidence tying Mr. Barbanel to the events giving rise to those proceedings. Judge Hughes was thus not clearly in error in finding that the information sought might prove of some relevance to the foreign proceedings.

Turning next to the issue of admissibility, the Court notes that this Circuit has consistently held that a party seeking a discovery order under 28 U.S.C. 1782 need not demonstrate that the information sought would be admissible in the foreign proceedings. *In re Bayer,* 146 F.3d at 193;*see also John Deere, Ltd. v. Sperry Corp .,* 754 F.2d 132, 133 (3d Cir.1985) (holding that 28 U.S.C. 1782(a) does not require district court to consider the ultimate admissibility of evidence in the foreign jurisdiction.). The argument that the Section 1782 Order should be vacated on the ground that the evidence sought would be not be neither discoverable nor admissible in the foreign proceedings is therefore unavailing.

Finally, the Supreme Court in *Intel* held that "Sec-

tion 1782(a) does not limit the provision of judicial assistance to 'pending' [or imminent] adjudicative proceedings."*Intel,* 542 U.S. at 258. The Court held instead that Section 1782(a) should be read only to require that it be "within reasonable contemplation" that the evidence sought would be used in a dispositive proceeding. *Id.* at 259,*citing In re Crown Prosecution Serv.,* 870 F.2d 686, 691 (D.C.Cir.1989). In the case at bar, it is within reasonable contemplation (1) that the matters before the Kyrgyz Court proceedings would be remanded back to the trial court (rendering the discovery at issue here "of use" in those proceedings) and (2) that the Compensation Claim would be litigated in the near future. The fact that any information elicited pursuant to the Section 1782 Order may not be immediately presented to the foreign courts does not compel Judge Hughes to vacate the Section 1782 Order.

\*7 For the foregoing reasons, Judge Hughes' finding that the evidence sought by Respondent would be "for use" in the foreign proceedings was not clearly erroneous.

3. Whether the application for discovery was made by a foreign or international tribunal or any interested person

While Respondent does not contest the claim that Oxus is an "interested party" with respect to the Arbitration, he contends that Judge Hughes' ruling that Oxus was such an "interested party" in the Kyrgyz court proceedings was "clearly erroneous and contrary to law."Resp. Br. at 32. Indeed, Respondent insists that "it is clear that Oxus is not a party to any of the proceedings of the Kyrgyz courts," and that it "has no participation rights" in those proceedings. *Id.* at 32-33.Oxus responds that Magistrate Judge Hughes in fact correctly held that it "satisfied the interested party requirement with respect to those proceedings because Oxus is the majority parent of TGMC ... a named party in the foreign Kyrgyz proceedings...." Pet. Opp'n at 15.

The Supreme Court in *Intel* held that "[t]he text of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

§ 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant.' " *Intel,* at 256.Given the close connection between Oxus, TGMC and the events having given rise to the Kyrgyz Court proceedings and the Compensation Claims, Judge Hughes's finding that Oxus was an "interested party" with respect to those proceedings was not clearly erroneous.

4. Whether the Magistrate Judge abused his discretion in refusing to vacate the Section 1782 Order

Respondent contends that "Magistrate Judge Hughes not only committed clear error in concluding that Oxus'[ ] application satisfied the threshold requirements of Section 1782; he also abused his discretion in determining that relevant factors favored requiring production of testimony and documents by Mr. Barbanel." Resp. Br. at 34.

First, respondent claims that "the information sought by the subpoena is neither admissible nor relevant in the foreign proceedings."*Id.* at 35.Mr. Barbanel contends that this should have lead Judge Hughes to vacate the 1782 Order. *Id.* Moreover, Respondent submits that Oxus' alleged failure to request any documents from Respondent when the Kyrgyz court proceedings were at the trial level "severely undermin[es] any claim that Mr. Barbanel, who had no involvement in the events at issue in those litigation [sic], has information of any relevance to provide," and that any information sought by Oxus would not "be admissible in the Kyrgyz Supreme Court...."*Id.* at 35-36.Finally, Respondent argues that the Section 1782 Order should have been vacated on the grounds that "the requests for information from Mr. Barbanel [issued in connection with that Order] are unduly intrusive and burdensome".*Id.* at 36.

Oxus, for its part, takes exception to Mr. Barbanel's claims that he has no involvement in the proceedings at issue and that it would be unduly burdensome to comply with the subpoenas. Indeed, Oxus

responds that "Barbanel was, and is, directly involved with many of the events at issue in the foreign proceedings," and notes that Barbanel does not "proffer any basis on which to conclude that Oxus is seeking anything but properly tailored discovery...."*Id.* at 24.Oxus adds that Barbanel cannot "explain how a single deposition limited to inquiries regarding Oxus, the Jerooy Mine, and Barbanel's efforts to secure conflicting rights in that mine could be construed as overly broad."*Id.*

**\*8** As noted above, and as explained by Judge Hughes, this Circuit has held that Section 1782 does not include a foreign admissibility requirement. Accordingly, Mr. Barbanel's argument that the information sought by Oxus was not admissible in the foreign proceedings is unavailing. *See In re Bayer,* 146 F.3d at 193. In addition, this Court has established above that it was not clearly erroneous for Judge Hughes to find that Mr. Barbanel might have information relevant to the Kyrgyz Court proceedings, the Arbitration and the Compensation Claim. Finally, the wealth of evidence establishing that Mr. Barbanel enjoys regular and extensive stays in the district of New Jersey suggests that compelling him to submit to a deposition in the District would not prove unduly burdensome. For the foregoing reasons, Magistrate Judge Hughes' discretionary decision to uphold the Section 1782 Order was not clearly erroneous.

This Court will therefore affirm Judge Hughes' denial of Respondent's Motion to Vacate the Section 1782 Order.

**B. Petitioner's Cross-Appeal-28 U.S.C. § 1783**

In his October 10, 2006 Order granting Respondent's Motion to Vacate the Section 1783 Order, Judge Hughes held that "in the Court's discretion and because Petitioner ha[d] failed to satisfy the requirements of Section 1783, [the Section 1783] Order [was to be] vacated."Mag. J. Op. at 16. Judge Hughes thus denied Oxus the right to serve, outside the United States, the discovery requests authorized

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2007 WL 1037387 (D.N.J.)

under the Section 1782 Order. This Court will af-
firm Judge Hughes' decision.[FN5]

> FN5. Barbanel argues that Oxus' cross-
> appeal is untimely, on the grounds that
> "[u]nder the Local Civil Rules of this
> Court, Mr. Barbanel's appeal from Magis-
> trate Judge Hughes' rulings on Section
> 1782 and on the scope of the subpoena
> does not give Oxus a right to cross-appeal
> an *independent order* concerning service
> under Section 1783."Resp. Reply at 2
> (emphasis added).
>
> Local Civil Rule 72. 1(c)(1)(A)
> provides, in relevant part, that:
>
> Any party may appeal from a Magistrate
> Judge's determination of a nondisposit-
> ive matter within 10 days after the party
> has been served with a copy of the Ma-
> gistrate Judge's order ... Any party op-
> posing the appeal shall file a responsive
> brief at least 14 days prior to the date
> originally noticed for argument. A cross-
> appeal *related to the subject matter of
> the original determination* may be filed
> by the responding party together with
> that party's opposition and may be no-
> ticed for a hearing on the same date as
> the original appeal....
>
> L. CIV. R. 72. 1(c)(1)(A) (emphasis ad-
> ded). The Court finds that Petitioner's
> cross-appeal is undeniably "related to
> the subject matter" of the determination
> appealed by Mr. Barbanel. Accordingly,
> Petitioner's cross-appeal is timely under
> the Rules.

Under 28 U.S.C. § 1783:

(a) A court of the United States may order the issu-
ance of a subpoena requiring the appearance as a
witness before it, or before a person or body design-
ated by it, of a national or resident of the United

States who is in a foreign country, or requiring the
production of a specified document or other thing
by him, if the court finds that particular testimony
or the production of the document or other thing by
him is necessary in the interest of justice, and, in
other than a criminal action or proceeding, if the
court finds, in addition, that it is not possible to ob-
tain his testimony in admissible form without his
personal appearance or to obtain the production of
the document or other thing in any other manner.

28 U.S.C. § 1783(a). As interpreted by Judge
Hughes, the statute requires Petitioner to show that
"(1) there is a pending proceeding in the United
States, (2) the information cannot be obtained
through any other source, and (3) the information is
necessary in the interest of justice."Mag. J. Op. at
13, *citing*28 U.S.C. § 1783(a). Petitioner contends
that Judge Hughes misinterpreted the first require-
ment of 28 U.S.C. § 1783, and that his decision to
vacate the Section 1783 Order should therefore be
reversed.

Indeed, Oxus argues that Judge Hughes erred as a
matter of law in vacating the Section 1783 Order
"when he ruled that § 1783 cannot authorize service
of a subpoena for discovery to be used in proceed-
ings pending *outside the United States.*" Resp.
Opp'n at 25 (emphasis added), *citing* Mag. J. Op. at
10. Oxus contends in the first instance that Section
1783 should not be read to require the existence of
pending proceedings in the United States. Resp.
Opp'n at 27. In the alternative, Oxus submits that
the legal maneuvering before this Court aimed at
securing the right to issue a subpoena under Section
1782 should be deemed to constitute such a
"pending domestic proceeding."*Id.*

*9 In response, Barbanel contends that the plain
language of 28 U.S.C. § 1783 suggests that it may
be applied only in connection with proceedings
pending in the United States, and notes that Oxus
"has failed to identify a single case in which Sec-
tion 1783 has been invoked in connection with any-
thing other than a domestic proceeding."Resp.
Reply at 6-7.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"When interpreting statutes ..., the first step is to determine whether the language at issue has a plain and unambiguous meaning."*Dobrek v. Phelan,* 419 F.3d 259, 263 (3d Cir.2005), *citing Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450 (2002)."The inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent."*Dobrek,* at 263.The language of 28 U.S.C. § 1783 offers no indication that Congress intended for the provision to apply in connection with foreign proceedings. On the contrary, its wording suggests that it was unambiguously intended to apply to domestic proceedings only. Tellingly, and as noted by Judge Hughes, the parties have been unable to cite any case in which Section 1783 was applied in connection with foreign proceedings. *See* Mag. J. Op. at 14.

The Court also finds unavailing Petitioner's claim that the "proceedings" initiated before this Court to obtain discovery from Mr. Barbanel under Section 1782 should be deemed to satisfy the "domestic proceeding" requirement of 28 U.S.C. § 1783. Such an interpretation would allow movants to circumvent the legislature's intent to restrict the scope of Section 1783 to domestic proceedings. The Court hereby rejects it.

Accordingly, the Court concludes that Judge Hughes did not err in holding that 28 U.S.C. § 1783 was not applicable in the case at bar.

## III. CONCLUSION

For the foregoing reasons, the Court denies both Respondent's Appeal and Petitioner's Cross-Appeal. An appropriate form of Order accompanies this Opinion.

D.N.J.,2007.
In re Oxus Gold PLC
Slip Copy, 2007 WL 1037387 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.